UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NORMAN WANG,<br><br>Plaintiff,<br><br>-against-<br><br>UNIVERSITY OF PITTSBURGH, UNIVERSITY OF PITTSBURGH MEDICAL CENTER, UNIVERSITY OF PITTSBURGH PHYSICIANS, AMERICAN HEART ASSOCIATION, INC., WILEY PERIODICALS, INC., SAMIR SABA, MARK GLADWIN, KATHRYN BERLACHER, MARC SIMON, and JOHN DOES 1-10,<br><br>Defendants. | No. 2:20-cv-01952-JFC |

**COMPLAINT**

This is an action for retaliation in violation of the First Amendment and in violation of federal law, as well as state law claims.

JURISDICTION AND VENUE

1. This is an action arising under the Constitution and laws of the United States. Jurisdiction is vested in this Court pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)-(4).

2. Plaintiffs seek relief under 42 U.S.C. §§ 1981, 1983, 1988, and 2000d et seq.

3. Jurisdiction over the state law claims at Count III through Count VII is invoked pursuant to the doctrine of supplemental jurisdiction at 28 U.S.C. § 1367. The state law claims (Count III through Count VII) form part of the same case or controversy as Counts I and II.

4. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claim occurred in this district.

PARTIES

5 . Plaintiff Norman Wang is a cardiologist, a member of the faculty of the University of Pittsburgh School of Medicine ("UPSOM"), and a doctor employed by University of Pittsburgh Physicians ("UPP"). He resides and works in this district. Until recently, he directed the fellowship program in clinical cardiac electrophysiology at the University of Pittsburgh Medical Center ("UPMC"). Wang is an American citizen who is ethnically Chinese by birth.

6. Defendant University of Pittsburgh ("Pitt") is an educational institution in, and supported by, the Commonwealth of Pennsylvania. It is part of the Commonwealth System of Higher Education in Pennsylvania and is a state-related institution. The individual employees and agents acting on its behalf act under color of state authority. UPSOM is a part of Pitt. Pitt receives federal funds that, among other things, assist it in providing a medical education for students at UPSOM.

7. Defendant UPMC is a Pennsylvania corporation doing business in Pennsylvania. It operates hospitals and medical centers in Pennsylvania and is affiliated with Pitt. As part of its operations, it employs residents and operates fellowship programs for physicians who have completed their residencies. The fellowship program for which Plaintiff was the director was one such fellowship program. The fellowship programs are part of a Graduate Medical Education ("GME") program at UPMC.

8. Defendant UPMC receives federal funds. It specifically receives federal funds to employ residents and fellows in its residency, GME, and fellowship programs.

9. Defendant UPP is a group medical practice that employs faculty physicians and is affiliated with, and wholly-owned by, UPMC. It supplies physician services to UPMC facilities and its employees also serve as faculty at UPSOM.

10. Defendant American Heart Association, Inc. is a New York not-for-profit corporation whose headquarters is in Dallas, Texas. It publishes the Journal of the American Heart Association ("JAHA"), which is published online and throughout the world, including in this district.

11. Wiley Periodicals, Inc. ("Wiley") is a Delaware corporation that publishes and distributes online journals, including JAHA.

12. Defendant Samir Saba is the Chief of the Cardiology Division in the Department of Medicine at UPSOM. The actions taken by Defendant Saba described below were taken in his role as Chief of the Cardiology Division at UPSOM and were thus taken under color of state authority.

13. Defendant Mark Gladwin is the Chairman of the Department of Medicine at UPSOM. The actions he took described herein were taken in that role, on behalf of UPSOM, and under color of state authority.

14. Defendant Kathryn Berlacher is a Professor in the Cardiology Division in the Department of Medicine at UPSOM. The actions taken by her were taken under color of state authority.

15. Defendant Marc Simon is a Professor in the Cardiology Division in the Department of Medicine at UPSOM. The actions taken by him were taken under color of state authority.

16. John Does 1-10, whose identities are currently unknown to Plaintiff, are other agents of UPSOM, UPP, and UPMC, and who acted on their behalf.

## FACTUAL BACKGROUND

17. Plaintiff's employment contract with UPP requires him to provide both academic services to UPSOM and physician services to UPMC. In the contract, UPP delegates supervision of all of Plaintiff's activities required by the contract – both his academic activities and his physician services – to a department head at UPSOM. Thus, a state actor supervises and controls all of Plaintiff's employment activities. During the events described below, that state actor was Saba.

18. Similarly, UPMC delegates much of the supervision of the physicians who work in its facilities to UPP and, accordingly, with respect to Plaintiff, to the same state actor identified in Plaintiff's employment contract with UPP.

19. Plaintiff's contract with UPP provides that Plaintiff is eligible for additional compensation above his base salary under an incentive salary plan in which compensation is based in part on "academic productivity."

20. In 2019 and 2020, Plaintiff wrote an article on diversity and the cardiology workforce, tracing the history of the use of race and ethnicity as factors in determining admission into medical schools, residency programs, and fellowships. The article asserted that the medical profession had not been successful in reaching its goals of increasing the percentages of underrepresented races and ethnicities in the medical profession generally, and cardiology in particular. It also noted that programs to achieve those goals applied different standards to applications by members of underrepresented races and ethnicities and raised questions about the legality, effectiveness, and wisdom of doing so.

21. Plaintiff submitted his article to JAHA. After it went through JAHA's normal review and vetting process, Defendants AHA and Wiley offered to publish Plaintiff's article in

JAHA. The contract between AHA and Wiley, on the one hand, and Plaintiff, on the other hand, called for Plaintiff to pay $1600 to AHA and Wiley to publish the article with open access to the public in JAHA. JAHA published the article on its website in March 2020.

22. Four months later, in late July 2020, various individuals on social media attacked the conclusions that Plaintiff drew in his article or simply made ad hominem attacks on Plaintiff. Defendants Saba, Gladwin, Berlacher, and others – currently unknown to Plaintiff but referred to as John Does 1-5 in this complaint – also acting on behalf of Defendants Pitt, UPP, and UPMC also criticized Plaintiff's conclusions and resolved and agreed to impose adverse employment consequences at UPP upon Plaintiff.

23. On July 31, 2020, Defendants Saba and Berlacher met with Plaintiff. During the course of the conversation, Plaintiff told Saba and Berlacher that the selection processes for the medical education program at UPSOM and the GME program at UPMC were violating federal law because of the racial and ethnic preferences the two institutions employed in selecting and favoring some applicants for admission over others on the basis of the applicant's race and ethnicity.

24. Shortly after Plaintiff told Saba and Berlacher of the illegal nature of the programs at UPSOM and UPMC, and because of those statements, Saba removed Plaintiff from his role as the director of the fellowship program in clinical cardiac electrophysiology; as Chief of the Cardiology Division in the Department of Medicine at UPSOM, Saba possessed the authority to undertake this official action on behalf of both UPSOM and UPMC.

25. In removing Plaintiff as a director of the fellowship program, Saba had the agreement and approval of Gladwin, Berlacher, and others acting on behalf of Defendants Pitt, UPP, and UPMC.

26. In doing so, Saba, and those acting jointly with him, retaliated against Plaintiff because he expressed the view that UPMC and UPSOM, as well as other medical schools and institutions, were following policies and practices that violated federal law by discriminating on the basis of race and ethnicity.

27. Shortly after Plaintiff told Saba and Berlacher of the illegal nature of the programs at UPMC and UPSOM, as well as other medical schools and institutions, and because of those statements, Saba and Berlacher, with the approval of Gladwin and John Does 1-5, forbade Plaintiff from having contact with individuals in any fellowship programs at UPMC, with residents, or with medical students at UPSOM.

28. Plaintiff's contact with medical students was part of his job as a member of the faculty of UPSOM.

29. Either Saba and Gladwin possessed the final decision-making authority (1) to remove Plaintiff as the director of the fellowship program at UPSOM and UPMC, and (2) to restrict Plaintiff's ability to interact with residents, medical students and members of the fellowship programs; or they otherwise received authorization for these adverse actions by a decision-maker who possessed final decision-making authority to establish policy for UPSOM and UPMC with respect to the subject matter.

30. The decisions (1) to remove the director of the fellowship program, and (2) to order a faculty member to restrict his interactions with students represent the official policy of UPSOM and UPMC.

31. Shortly after Plaintiff's meeting with Saba and Berlacher, Gladwin wrote an email letter addressed to his colleagues in the UPSOM community. Gladwin sent this letter in his role as the Chair of the Department of Medicine at UPSOM. Among other things,

Gladwin's letter discussed Plaintiff's scholarly article published by JAHA. Gladwin wrote that many in the UPSOM community had heard about a "perspective" published by "a faculty member" at UPSOM that "was antithetical to our values and deeply hurtful to many of our URM faculty." It further stated: "We have taken immediate action and removed the person from their [sic] leadership position . . ."

32. Gladwin's letter constitutes an official proclamation or policy statement by the Chair of the Department of Medicine at UPSOM, which directly describes to UPSOM's "values," policies and decisions announced by Gladwin as a decision-maker of UPSOM; Gladwin's letter indicates that he possesses the authority to speak on behalf of UPSOM on issues of policy, and in particular on policy issues involving faculty and employment decisions.

33. Although Gladwin did not mention Plaintiff by name, he was referring to Plaintiff and the article that JAHA published. Everyone in the UPSOM community well understood that Gladwin's letter referred to Plaintiff and his scholarly article.

34. Defendant Gladwin used his final decision-making authority as the Chair of the Department of Medicine at UPSOM to effect the adverse actions undertaken against Plaintiff; as a result, the adverse actions taken against Plaintiff establish the official policy of the UPSOM.

35. The adverse employment actions taken by Defendants have had a negative financial impact on Plaintiff. Plaintiff was paid sums in addition to his base salary to be the director of the fellowship in clinical cardiac electrophysiology. Because he was removed from that position, Plaintiff is no longer paid those additional sums.

36. Plaintiff was also paid sums in addition to his base salary for consulting with groups needing his expertise in clinical cardiac electrophysiology at UPMC. Because the

groups with which he consults frequently include medical students, residents, or fellows, and because he was prohibited from contact with those individuals, Plaintiff was no longer able to consult as frequently as he did previously and lost income as a consequence.

37. On or around October 27, 2020, Anantha Shekhar, a Vice Provost for Health Sciences at Pitt and the Dean of UPSOM, rescinded Saba's order precluding Plaintiff from having any contact with medical students. Shekhar did not rescind any other part of Saba's order, and, accordingly, Plaintiff is still losing income as a consequence of that order.

38. At around the same time as these adverse employment actions were taken against Plaintiff, a number of employees of UPSOM, UPP, and UPMC – currently unknown to Plaintiff and identified here as John Does 6-10 – acting on behalf of UPSOM, UPP, and UPMC, began a systematic attack campaign against Plaintiff's article. Among other things, these agents of UPSOM, UPP, and UPMC specified that the article contained many miscitations and misquotations. They made these statements to AHA and Wiley and called for AHA and Wiley to retract the article.

39. Despite the fact that the article was vetted pursuant to the usual procedures for review of all articles in JAHA, AHA and Wiley retracted the article without first providing Plaintiff with any evidence of wrongdoing or errors in the article and without providing Plaintiff any opportunity to rebut any such charges of wrongdoing or errors. In a statement announcing the retraction on August 5, 2020, Wiley and AHA explained the need to remove Plaintiff's article from the publication:

> The author's institution, the University of Pittsburgh Medical Center (UPMC), has notified the Editor-in-Chief that the article contains many misconceptions and misquotes and that together those inaccuracies, misstatements, and selective misreading of source materials strip the paper of its scientific validity.

In a further statement published on its website and updated on August 6, 2020, AHA claimed that the views expressed in Plaintiff's article "are a misrepresentation of the facts and are contrary to our organization's core values and historic commitment to promoting diversity and inclusion in medicine and science." At around the same time, JAHA also published an article entitled "A Path Forward," in which it stated that Plaintiff's institution had requested the article be retracted "based on specific scientific errors as well as misleading and incomplete quotations."

39. The AHA specifically claimed that Plaintiff's article was factually inaccurate, affirming it "take[s] [its] responsibility to ensure factual accuracy seriously [in the publication of the JAHA]. AHA assured the public and the medical community that "[t]he Journal can and will do better[,"] in the future, to prevent the publication of other articles like Plaintiff's article, which "contain[ed] deliberate misinformation" and "misrepresentation[.]" *See* AHA Statement, Aug. 5, 2020, updated Aug. 6, 2020 (URL: https://newsroom.heart.org/news/wang-paper-is-wrong-diversity-equity-and-inclusiveness-in-medicine-and-cardiology-are-important-and-necessary).

40. The statements of John Does 6-10, Wiley, and AHA were false statements of fact, which they published with malice and reckless disregard of their truth. These statements damaged Plaintiff's reputation in both the medical profession and the academic world.

41. AHA and Wiley did not return the $1600 fee that Plaintiff paid pursuant to the contract between him, on the other hand, and AHA and Wiley, on the other.

42. Plaintiff asked AHA and Wiley to identify the flaws in the article, including the misquotations that they claim he included in it. Neither AHA nor Wiley responded to Plaintiff's request.

43. On or around August 2, 2020, Saba re-tweeted a Twitter post that stated that the article used misquotes, false representations, and racist thinking:

> This article [of Plaintiff's] uses misquotes, false interpretations, and racist thinking to defend a single person's conclusions. We are outraged that @JAHA_AHA published this shameful and infuriating piece

In an email sent to the UPMC community at UPMC, on August 6, 2020, Saba asserted that the Dean of UPSOM, Dean Anantha Shekhar, sought the retraction of Plaintiff's article.

44. On or around August 2, 2020, Berlacher tweeted a Twitter post in which she stated that the article "misinterprets data and misquotes people" and is "scientifically invalid and racist."

45. Sometime in August 2020, Defendant Marc Simon (along with others) published an article in JAHA entitled "Equity, Diversity, and Inclusiveness in Cardiovascular Healthcare and Medicine." The article asserted that Plaintiff's article "misrepresented facts in its efforts to argue against affirmative action in the field of cardiology." It also stated that the article included a "misrepresentation of evidence."

46. The statements made by AHA, Wiley, Saba, Berlacher, Simon, and John Does 6-10 were defamatory – false statements of fact, which cast Plaintiff's professional abilities in a negative light, accused him of engaging in academic malpractice by frequently misquoting sources, that necessitated the intervention of his school's dean to ensure the retraction of the article.

47. To date, Plaintiff remains barred by UPSOM, UPMC, and UPP from contacting any residents or fellows. His removal from the position of director of the fellowship program in clinical cardiac electrophysiology remains in effect. These adverse actions constituted substantial changes in Plaintiff's employment responsibilities. As a result of Defendants'

actions, a cloud also continues to hang over Plaintiff's reputation and, accordingly, his ability to obtain other employment is constrained. In the absence of injunctive relief from this Court, these adverse actions against Plaintiff, and their consequences, will continue.

FIRST CLAIM FOR RELIEF (FOR VIOLATIONS OF THE FIRST AMENDMENT AND SECTION 1983) AGAINST PITT, UPMC, UPP, GLADWIN, SABA, BERLACHER, AND JOHN DOES 1-5

48. Plaintiff hereby incorporates all of the previous allegations of this complaint.

49. Plaintiff's article on the history of race-conscious selection procedures in the field of medicine and cardiology was on a topic of public concern. His speech was not made on behalf of UPSOM, UPP, or UPMC.

50. Plaintiff's discussion in his conversation with Saba and Berlacher, that UPMC's and UPSOM's programs violated federal law, was on a topic of public concern. His views were not expressed on behalf of UPSOM, UPP, or UPMC; and they were not based on his own personal concern because he is not currently subject to any of the selection processes he identified.

51. Defendants Pitt, UPMC, UPP, Gladwin, Saba, Berlacher, and John Does 1-5 retaliated against Plaintiff for exercising his protected First Amendment rights when he published his article on the history of race-conscious selection procedures and when he reported the violations of federal law by UPMC and UPSOM during his conversation with Saba and Berlacher.

52. As a result of Plaintiff exercising his protected First Amendment rights, Defendants Pitt, UPMC, UPP, Gladwin, Saba, Berlacher, and John Does 1-5 acted under color

of state authority in removing Plaintiff from his position as the director of the fellowship program in clinical cardiac electrophysiology, and in precluding him from having contact with medical students, residents, and fellows.

53. Either Saba and Gladwin possessed the decision-making authority to undertake these adverse actions against Plaintiff, thus establishing the official policy of UPSOM, UPMC and UPP; or they otherwise received approval from the necessary decision-maker.

54. Gladwin's letter circulated to the UPSOM community represents a proclamation or official policy statement of UPSOM, announced by a decision-maker who spoke directly on behalf of UPSOM.

55. Defendants did not and do not have an adequate justification for imposing adverse consequences on Plaintiff for his protected speech.

56. Defendants violated the First Amendment (as incorporated against the states through the Fourteenth Amendment's Due Process Clause) by imposing adverse consequences on Plaintiff for his protected speech. Accordingly, they also violated 42 U.S.C. § 1983 in doing so, and Plaintiff is entitled to recover under that statute.

57. Defendants have acted intentionally, willfully, wantonly, and with callous and reckless disregard for Plaintiff's constitutional rights.

58. Plaintiff has suffered damages and will continue to suffer damages as a consequence of the adverse actions taken by defendants. Accordingly, he is entitled to both damages for past harm and injunctive and/or declaratory relief to prevent ongoing and future harm.

SECOND CLAIM FOR RELIEF (FOR VIOLATIONS OF TITLE VI AND SECTION 1981)

AGAINST UPMC AND PITT

59. Plaintiff incorporates all prior allegations.

60. UPMC receives federal funds for the purpose of funding residents and fellows.

61. UPMC retains residents and fellows by contract.

62. Among other reasons, Pitt receives federal funds so it can provide assistance for medical students in paying its tuition and fees.

63. Pitt has a contractual relationship with the medical students it admits to UPSOM. The students pay money in exchange for a medical education.

64. UPMC and Pitt discriminated against Plaintiff and imposed adverse consequences against him because he apprised Saba and Berlacher on July 31, 2020 (i) that UPMC's selection process for residents and fellows discriminated on the basis of race and ethnicity, and violated federal law; and (ii) that UPSOM's selection process for medical students discriminated on the basis of race and ethnicity and violated federal law.

65. Plaintiff had a reasonable belief that UPMC's selection process for residents and fellows discriminated on the basis of race and ethnicity, and violated federal law, and that UPSOM's selection process for medical students discriminated on the basis of race and ethnicity and violated federal law.

66. UPMC's and Pitt's discrimination against Plaintiff violated Title VI of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000d et seq.) and 42 U.S.C. § 1981.

67. Plaintiff has suffered damages and will continue to suffer damages as a consequence of the adverse actions taken by defendants. Accordingly, he is entitled to both

damages for past harm and injunctive and/or declaratory relief to prevent ongoing and future harm.

THIRD CLAIM FOR RELIEF (FOR DEFAMATION)

AGAINST PITT, UPMC, UPP, SABA, BERLACHER, SIMON, AHA,

WILEY, AND JOHN DOES 6-10

68. Plaintiff incorporates all prior allegations.

69. Under Pennsylvania Law, the publication or utterance of defamatory statements made with the intent to injure an individual regarding his business or chosen profession constitutes defamation *per se*.

70. "A statement is defamatory *per se* as an accusation of business misconduct if it " 'ascribes to another conduct, characteristics or a condition that would adversely affect his fitness for the proper conduct of his lawful business.' " *Synygy, Inc. v. Scott-Levin, Inc.*, 51 F. Supp. 2d 570, 580 (E.D. Pa. 1999) (quoting *Clemente v. Espinosa,* 749 F.Supp. 672, 677-78 (E.D. Pa. 1990) (quoting Restatement (Second) of Torts § 573 (1977)). *Clemente v. Espinosa,* 749 F. Supp. 672, 677 (E.D.Pa.1990).)

71. Defendants Pitt, UPMC, UPP, Saba, Berlacher, Simon, John Does 6-10, AHA, and Wiley made verbal and written statements in response to Plaintiff's scholarly article, which accused Plaintiff of professional incompetence, and academic dishonesty. Saba's statements were made on behalf of Pitt, UPMC, and UPP during the course of, within the scope of, and in his role as Chief of Cardiology at UPSOM. Berlacher's statements were made on behalf of Pitt, UPMC, and UPP during the course of, within the scope of, and in her role as a Professor of Cardiology at UPSOM. Simon's statements were made on behalf of Pitt, UPMC, and UPP during the course of, within the scope of, and in his role as a Professor of Cardiology at UPSOM.

72. Defendants Pitt, UPMC, UPP, Saba, Berlacher, Simon, John Does 6-10, AHA, and Wiley engaged in defamation *per se* by offering statements that would be particularly harmful to an individual engaged in Plaintiff's business or profession.

73. Defendants Pitt, UPMC, UPP, Saba, Berlacher, Simon, John Does 6-10, AHA, and Wiley had reviewed and read Plaintiff's article, and made their defamatory statements about it knowing they were false or with reckless disregard of whether they were true or false. The citations and quotations in Plaintiff's article were clearly attributed, easily verified, and correct.

74. Saba's assertion that the Dean of UPSOM had sought the retraction of Plaintiff's article was defamatory. Saba stated this knowing it was false or with reckless disregard of whether it was false.

75. The statements made by Defendants were clearly and intentionally false and communicated to a broad audience.

76. The statements made by Defendants were offered as statements of fact, not opinion, and in fact related to deliberately false and intentional representations about the substance of Plaintiff's scholarly article.

77. The statements made by Defendants, both verbal and written, were unquestionably targeted against Plaintiff and his credibility in both the medical profession and academia, with the clear impact that any recipient of those communications would understand that they related to Plaintiff and the article he published regarding race consciousness in selection procedures in the medical profession.

78. The Defendants' statements were made with clear malice and the intent to harm Plaintiff, to cause damage to his professional reputation, inflict monetary damage, and ultimately destroy Plaintiff's career.

79. Plaintiff has suffered damages and will continue to suffer damages as a consequence of this defamation.

FOURTH CLAIM FOR RELIEF (FOR BREACH OF CONTRACT)

AGAINST AHA AND WILEY

80. Plaintiff incorporates all prior allegations.

81. AHA and Wiley entered into a contract with Plaintiff for the publication of his article. Plaintiff paid $1600, among other consideration, in this contract in exchange for AHA and Wiley publishing the article in JAHA online. In retracting Plaintiff's article, AHA and Wiley breached its contract with Plaintiff.

82. Plaintiff has suffered damages and will continue to suffer damages as a consequence of AHA and Wiley's breach of contract.

FIFTH CLAIM FOR RELIEF (FOR TORTIOUS INTERFERENCE)

AGAINST PITT, UPP, UPMC, AND JOHN DOES 6-10

83. Plaintiff incorporates all prior allegations.

84. Pitt, UPP, UPMC, and John Does 6-10 knew that Plaintiff had an agreement with AHA and Wiley to publish Plaintiff's article in JAHA. Each of them tortiously interfered with the contract without justification, and Plaintiff's business relationship with AHA and Wiley, by inducing AHA and Wiley to breach the contract by retracting the article.

85. Plaintiff has suffered damages and will continue to suffer damages as a consequence of these defendants' tortious interference with his contract and business

relationship with AHA and Wiley, and their inducement of AHA and Wiley's breach of contract.

SIXTH CLAIM FOR RELIEF (FOR BREACH OF CONTRACT)

AGAINST UPP

86. Plaintiff incorporates all prior allegations.

87. By seeking retraction of the article, UPP breached the implied covenant of good faith and fair dealing under its contract with Plaintiff because it frustrated Plaintiff's ability to receive additional compensation for academic productivity. Accordingly, it breached the contract with Plaintiff.

88. Plaintiff has suffered damages and will continue to suffer damages as a consequence of UPP's breach of contract.

SEVENTH CLAIM FOR RELIEF (FOR TORTIOUS INTERFERENCE)

AGAINST PITT, UPMC, AND JOHN DOES 6-10

89. Plaintiff incorporates all prior allegations.

90. Pitt, UPMC, and John Does 6-10 knew that Plaintiff had an agreement with UPP under which he would receive additional compensation for academic productivity. By seeking retraction of the article, they interfered without justification with Plaintiff's efforts to receive such additional compensation.

91. Plaintiff has suffered damages and will continue to suffer damages as a consequence of these defendants' tortious interference with his contract and business relationship with UPP.

EIGHTH CLAIM FOR RELIEF (FOR VIOLATION OF PENNSYLVANIA WHISTLEBLOWER LAW – RETALIATION 43 P.S. §§ 1421, *et seq*)

AGAINST PITT, UPMC, UPP, GLADWIN, SABA, BERLACHER, AND JOHN DOES 1-5

92. Plaintiff incorporates all prior allegations.

93. UPSOM, PITT, UPMC, UPP, Gladwin, Berlacher, and Saba are classified as a "public body" under the Pennsylvania Whistleblower Law. *See* 43 P.S. § 1422 (defining "public body").

94. Specifically, each entity receives some amount of funding by or through the Commonwealth or a political subdivision authority thereof; and Gladwin, Berlacher, and Saba are either members of or employees of a "public body" as defined. *See* 43 P.S. § 1422.

95. UPP, UPMC, PITT and/or UPSOM are an appropriate "employer" as defined by the Pennsylvania Whistleblower Law. *See* 43 P.S. § 1422.

96. At all pertinent times, Plaintiff was employed by the UPP, wholly-owned by UPMC.

97. On July 31, 2020, Plaintiff reported to Saba and Berlacher that the selection processes for the medical education program at UPSOM and the GME program at UPMC were violating federal and state law based on the racial and ethnic preferences employed during the applicant admission process.

98. After reporting these violations of federal and state law to Saba and Berlacher, Plaintiff suffered adverse employment actions at the hands of UPP, UPMC, UPSOM, Pitt and their agents.

99. Gladwin, Saba, and Berlacher removed Plaintiff from his role as the director of the fellowship program in clinical cardiac electrophysiology.

100. Gladwin, Saba, and Berlacher forbade Plaintiff from having contact with students at UPSOM and its related programs at UPMC.

101. Administrators at UPMC and UPSOM, including Saba and Berlacher, derided Plaintiff's article published in JAHA and his professional integrity.

102. Because he reported to Saba and Berlacher the likely legal violations of UPMC and UPSOM, Plaintiff's career and professional stature has been diminished by the adverse actions taken by agents of Pitt, UPMC, UPSOM and UPP. See 43 P.S. § 1423(a).

103. The Pitt, UPMC, UPSOM and UPP, including Gladwin, Saba, and Berlacher, required Plaintiff to ignore the violations of federal and state law that he observed in order to avoid retaliation and loss of professional status and reputation.

104. Accordingly, Pitt, UPMC, UPSOM and UPP, including Gladwin, Saba, and Berlacher, retaliated against Plaintiff for reporting (and refusing to acquiesce to) "an instance of wrongdoing or waste" in direct violation of the Pennsylvania Whistleblower Law. *See* 43 P.S. § 1423(a).

105. Therefore, Pitt, UPMC, UPSOM and UPP, including Gladwin, Saba, and Berlacher, retaliated against Plaintiff for his decision to report the violations of federal and state law in the applicant admission process, where race and ethnicity were used improperly for preferential treatment and selection.

106. Plaintiff filed his claim under the Pennsylvania Whistleblower Law within the statutory time period. *See* 43 P.S. §§ 1421, *et seq*.

107. Plaintiffs suffered numerous instances of retaliation following his initial reporting on July 31, 2020; these adverse actions are within the 180-day time period for filing a

civil action arising from a violation of the Pennsylvania Whistleblower Law. See 43 P.S. § 1424(a).

108. In violation of the Pennsylvania Whistleblower Law, 43 P.S. §§ 1421, *et seq*., Pitt, UPMC, UPSOM and UPP, including Gladwin, Saba, and Berlacher, retaliated against Plaintiff for reporting violations of federal and state law in the admission process.

109. By the systematic actions of supervisors and policymakers at Pitt, UPMC, UPSOM and UPP, including Gladwin, Saba, and Berlacher, which are set forth in the preceding paragraphs of this complaint, violated the Pennsylvania Whistleblower Law, 43 P.S. §§ 1421, *et seq*., by and through the adverse employment actions taken against Plaintiff.

110. As a direct and proximate result of Defendants' violation of the Pennsylvania Whistleblower Law, 43 P.S. §§ 1421, *et seq*., Plaintiff has suffered, and continues to suffer, great harm in the form of, among other things, past and future pecuniary losses, emotional pain and suffering, humiliation, and a loss of life's pleasures.

111. As a result of the willful and unlawful actions of Defendants in violation of the Pennsylvania Whistleblower Law, 43 P.S. §§ 1421, *et seq*., Plaintiff has been caused to suffer a severe loss of professional status and reputation in the community of his peers, serious losses of pay, benefits and other employee remunerations, and an undeserved and painful diminution of his ability to provide himself and his family with the earned rewards of excellence in his career.

## Demand For Judgment

WHEREFORE plaintiff demands judgment:

A. A declaratory judgment that defendants violated, and are violating, 42 U.S.C. §§ 1981, 1983, and 2000d *et seq.* by their removal of plaintiff from his position as the director of

the fellowship program in clinical cardiac electrophysiology and by precluding him from having any contact with medical students, residents, or fellows;

B. Injunctive relief requiring Plaintiff's reinstatement as director of the fellowship program in clinical cardiac electrophysiology and precluding defendants from enforcing their prohibition against Plaintiff having any contact with residents or fellows;

C. Damages in an amount to be determined;

D. Attorney's fees and costs pursuant to 28 U.S.C. § 1920, 42 U.S.C. § 1988, 53 P.S. § 1425 of the Pennsylvania Whistleblower Statute, or any other applicable authority; and

E. Any other relief that is appropriate.

Dated: March 19, 2021

*<u>/s/ Shawn Rodgers</u>*
Shawn M. Rodgers
Jonathan S. Goldstein (pro hac vice application forthcoming)
GOLDSTEIN LAW PARTNERS, LLC
11 Church Road
Hatfield, PA 91440
(731) 426-8130

Michael E. Rosman (pro hac vice)
Michelle A. Scott (pro hac vice application forthcoming)
CENTER FOR INDIVIDUAL RIGHTS
1100 Connecticut Ave, NW, Ste. 625
Washington, D.C. 20036
(202) 833-8400

*Counsel for Plaintiff*

**JURY DEMAND**

Plaintiff demands trial by jury on all claims and issues triable by a jury.

*/s/Shawn M. Rodgers*
Shawn M. Rodgers
GOLDSTEIN LAW PARTNERS
11 Church Road
Hatfield, Pennsylvania 19440
Phone: 610.949.0444
E-mail: srodgers@goldsteinlp.com

*Counsel for Plaintiff*

Date: March 19, 2021

**CERTIFICATE OF SERVICE**

I hereby certify that on March 19, 2021, I electronically filed the foregoing Amended Complaint with the Clerk of the Court for the United States District Court for the Western District of Pennsylvania using the CM/ECF system. Counsel of record for all parties are registered CM/ECF users and will be served by the CM/ECF system.

March 19, 2021

*/s/Shawn M. Rodgers*

Shawn M. Rodgers
GOLDSTEIN LAW PARTNERS
11 Church Road
Hatfield, Pennsylvania 19440
Phone: 610.949.0444
E-mail: srodgers@goldsteinlp.com

*Counsel for Plaintiff*