UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA
------------------------------------------------------x

NORMAN WANG,                           :

     Plaintiff,                       :

        -against-                    :       Civ. No. 2:20-cv-1952

UNIVERSITY OF PITTSBURGH, et al.   :       Judge Horan

     Defendants.                    :

                                :
------------------------------------------------------x

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

Table Of Contents

Table Of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Table Of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.    Plaintiff's Article And Its Publication . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.    Adverse Actions Are Taken Against Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . 2

    C.    Defamatory Comments Are Made With Respect To The Article And It Is
        Retracted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    I.    DEFENDANTS IMPROPERLY RELY ON THEIR OWN "FACTS" . . . . . . . . 4

    II.    THE AMENDED COMPLAINT ADEQUATELY ALLEGES A FIRST
        AMENDMENT VIOLATION AGAINST PITT, UPMC, AND UPP;
        THEIR ARGUMENTS TO THE CONTRARY ARE MERITLESS . . . . . . . . . 7

        A.    The Amended Complaint Alleges Pitt's Involvement . . . . . . . . . . . . . . . 7

        B.    The Amended Complaint Alleges A Final Policymaker Decision . . . . . . 9

        C.    The Amended Complaint Alleges That UPMC And UPP
            Acted Under Color Of State Authority . . . . . . . . . . . . . . . . . . . . . . . . . 12

    III.    THE AMENDED COMPLAINT ADEQUATELY ALLEGES RETALIATION
        IN VIOLATION OF TITLE VI AND SECTION 1981; PITT AND UPMC'S
        ARGUMENTS FAIL TO READ THE ALLEGATIONS REASONABLY . . . 13

        A.    The Amended Complaint Alleges A Causal Relationship . . . . . . . . . . . 14

        B.    The Amended Complaint Adequately Alleges That A Primary Purpose Of
            Federal Funds That UPMC Receives Is For Employment . . . . . . . . . . . 17

    IV.    THE AMENDED COMPLAINT ADEQUATELY ALLEGES A CLAIM FOR
        DEFAMATION AND DEFENDANTS' ARGUMENTS SHOULD BE
        REJECTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        A.    The Amended Complaint Alleges Factual Defamatory Statements . . . . 18

            1.    The Amended Complaint Alleges Defamatory Facts . . . . . . . . . 24

            2.    The Defamatory Statements Were Not "Pure Opinions" . . . . . . 27

            3.    Defendants' Cases Are Inapposite . . . . . . . . . . . . . . . . . . . . . . . 31

B.     The Amended Complaint Does Not Allege That
Defendants' Statements Were True ........................... 35

     1.     Wiley Fails To Show That The Face Of The Complaint
Demonstrates That Its Defamatory Statements Were True ..... 36

     2.     Saba Fails To Show That The Face Of The Complaint
Demonstrates That His Defamatory Statement Was True ...... 39

C.     The Amended Complaint Adequately Alleges Fault ................ 39

D.     The Amended Complaint Adequately Alleges Pitt's Liability ........ 46

V.     THE FOURTH THROUGH SEVENTH CLAIMS PROPERLY ALLEGE
BREACHES OF CONTRACT AND TORTIOUS INTERFERENCE ........ 48

VI.     THE AMENDED COMPLAINT ADEQUATELY ALLEGES A
PENNSYLVANIA WHISTLEBLOWER CLAIM AGAINST PITT, UPMC, UPP,
GLADWIN, SABA AND BERLACHER ............................. 51

A.     The Amended Complaint Alleges a Report of "Wrongdoing" with the
Specificity Required by Rule 8(a) and Federal Notice Pleading ....... 51

B.     The Amended Complaint Alleges a Sufficient Causal Connection between
Plaintiff's Good Faith Report and the Suffered Retaliation .......... 54

C.     UPMC, UPP, Gladwin, Saba and Berlacher Are "Public Bodies"
Under The Pennsylvania Whistleblower Law ..................... 56

Conclusion ............................................................. 60

Table Of Authorities

Cases

*Abdul-Latif v. Cty. of Lancaster*, 990 F. Supp. 2d 517 (E.D. Pa. 2014) . . . . . . . . . . . . . . . . . . 55

*Ambrose v. Twp. of Robinson, Pa.*, 303 F.3d 488 (3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . 55, 56

*Arthur v. Offit*, 2010 U.S. Dist. LEXIS 21946 (E.D. Va. March 10, 2010) . . . . . . . . . . . . . . . 22

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 41

*Barger v. Playboy Enterprises*, 564 F. Supp. 1151 (N.D. Cal. 1983) . . . . . . . . . . . . . . . . . . . . 44

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . 17, 53, 54

*Braig v. Field Communications*, 310 Pa. Super. 569, 456 A.2d 1366 (Super. Ct. 1983) . . . . . . 24

*Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288 (2001) . . 9, 12

*Buckley v. Littell*, 539 F.2d 882 (2d Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21, 34, 36

*Calloway v. Green Tree Servicing, LLC*, 607 F. Supp. 2d 669 (D. Del. 2009) . . . . . . . . . . . . . 41

*Cantrill v. Herald Co.*, 1992 U.S. Dist. LEXIS 7620 (N.D.N.Y. May 22, 1992) . . . . . . 21, 22, 26

*CDI Int'l Inc. v. Marck*, 2005 U.S. Dist. LEXIS 23060 (E.D. Pa. Jan. 21, 2005) . . . . . . . . . . . 19

*City of St. Louis v. Proprotnik*, 485 U.S. 112 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Competitive Enterprise Institute v. Mann*, 150 A.3d 1213 (D.C. 2016) . . . 21, 26, 28, 30, 31, 34, 44, 45

*Corabi v. Curtis Pub. Co.*, 441 Pa. 432, 273 A2d 899 (1971) . . . . . . . . . . . . . . . . . 18, 19, 30, 43

*Crissman v. Dover Downs Entertainment, Inc.*, 289 F.3d 231 (3d Cir. 2002) . . . . . . . . . . . . . 13

*Croce v. Sanders*, 2021 U.S. App. LEXIS 2927 (6th Cir. Feb. 3, 2021) . . . . . . . . . . . . 26, 33, 34

*Dahl v. Kilgore*, 2018 U.S. Dist. LEXIS 210036 (E.D. Ky. Dec. 13, 2018) . . . . . . . . . . . . . . . 41

*Denton v. Silver Stream Nursing & Rehabilitation Ctr.*, 739 A.2d 571 (Pa. Super. 1999) . . . . . 58

*Dickey v. CBS, Inc.*, 583 F.2d 1221 (3d Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Dilworth v. Dudley*, 75 F.3d 307 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Dougherty v. Boyertown Times*, 377 Pa. Super. 462, 547 A.2d 778 (Super. Ct. 1988) . 20, 27, 29, 30

*Downs v. Anapol Schwartz, PC*, 2015 U.S. Dist. LEXIS 106147 (E.D. Pa. Aug. 12, 2015) . . . 31

*Eisenberg v. Alameda Newspapers, Inc.*, 74 Cal. App. 4th 1359 (1999) . . . . . . . . . . . . . . . . . 32

*Estate of Roman v. City of Newark*, 914 F.3d 789 (3d Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . 9

*Fagan v. U.S. Carpet Installation, Inc.*, 770 F. Supp. 2d 490 (E.D.N.Y. 2011) . . . . . . . . . . . . 16

*Fanelle v. LoJack Corp.*, 79 F. Supp. 2d 558 (E.D. Pa. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Farrell v. Planters Lifesavers Co.,* 206 F.3d 271 (3d Cir.2000) . . . . . . . . . . . . . . . . . . . . . . . . 55

*Fetters v. First Hospital Corp.*, 34 Pa. D. & C. 4th 366 (C.C.P. Phil. County 1997) . . . . . . . . 31

*Frazer v. Temple University*, 25 F. Supp. 3d 598 (E.D. Pa. 2014) . . . . . . . . . . . . . . . . . . . . . . . 10

*Frazier v. City of Philadelphia*, 441 F. Supp. 3d 76 (E.D. Pa. 2020) . . . . . . . . . . . . . . . . . . . . 55

*Galicki v. New Jersey*, 2016 U.S. Dist. LEXIS 126076 (D.N.J. Sept. 15, 2016) . . . . . . . 9, 11-13

*Giordano v. Claudio*, 714 F. Supp. 2d 508 (E.D. Pa. 2010) . . . . . . . . . . . . . . . . . . . . . 21, 29, 43

*Gorran v. Atkins Nutritionals*, 464 F. Supp. 2d 315 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . 31

*Graboff v. Colleran Firm*, 744 F.3d 128 (3d Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Gratz v. Bollinger*, 539 U.S. 244 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Groden v. Random House, Inc.*, 61 F.3d 1045 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Grutter v. Bollinger*, 539 U.S. 306 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Harte-Hanks Communications v. Connaughton*, 491 U.S. 657 (1989) . . . . . . . . . . . . . . . . . 42, 43

*Hatfill v. The New York Times Co.*, 532 F.3d 312 (4th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . 40

*Hildebrand v. Allegheny County*, 757 F.3d 99 (3d Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Hill v. Cosby*, 665 Fed. Appx. 169 (3d Cir. Dec. 14, 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Houchin v. Dallas Morning News, Inc.*, 2010 U.S. Dist LEXIS 33389 (N.D. Tex. Apr. 1, 2010)16

*Hussein v. UPMC Mercy Hosp.,* 466 Fed. Appx. 108 (3d Cir. 2012) . . . . . . . . . . . . . . . . . . . . 55

*Hutchinson v. Proxmire*, 443 U.S. 111 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Imperiale v. Hahnemann Univ.*, 776 F. Supp. 189 (E.D. Pa. 1991), *aff'd*, 966 F.2d 125 (3d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Jorjani v. New Jersey Institute of Technology*, 2019 U.S. Dist. LEXIS 39026 (D.N.J. March 12, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 34

iv

*Keefer v. Durkos*, 371 F. Supp. 2d 686 (W.D. Pa. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53, 54

*Koldjeski v. Colombo*, 2009 Pa. Dist. & Cnty. Dec. LEXIS 441 (Comm. Pleas Ct. Lackawanna
   Cty. Dec. 4, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Krynicky v. Univ. of Pittsburgh*, 742 F.2d 94 (3d Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Lott v. Levitt*, 469 F. Supp. 2d 575 (N.D. Ill. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*MacElree v. Philadelphia Newspapers*, 544 Pa. 117, 674 A.2d 1050 (1996) . . . . . . . . 22, 25, 26

*Mallory v. S&S Publishers*, 260 F. Supp. 3d 453 (E.D. Pa. 2017) . . . . . . . . . . . . . . . . . . . . . . 32

*Marcone v. Penthouse Int'l Magazine for Men*, 754 F.2d 1072 (3d Cir. 1985) . . . . . . . . . . . . 40

*Marier v. Lance*, 2007 U.S. Dist. LEXIS 78530 (W.D. Pa. Oct. 23, 2007) . . . . . . . . . . . . . . . 31

*McAndrew v. Bucks Cty. Bd. of Comm'rs*, 982 F. Supp. 2d 491 (E.D. Pa. 2013) . . . . . . . . . . 55

*McCafferty v. Newsweek Media Group, Ltd.*, 955 F.3d 352 (3d Cir. 2020) . . . . . . . . . . . . . . . 46

*McDowell v. Paiewonsky*, 769 F.2d 942 (3d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*McMillan v. Togus Regional Office*, 294 F. Supp. 2d 305 (E.D.N.Y. 2003) . . . . . . . . . . . . . . . 31

*McNamee v. Roman Catholic Diocese of Sacramento*, 2013 U.S. Dist. LEXIS 151807 (E.D. Cal.
   Oct. 22, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Menkowitz v. Peerless Publs., Inc.*, 211 A.3d 797 (Pa. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Meyers v. Certified Guaranty Co., LLC*, 221 A.3d 662 (Pa. Super. Ct. 2019) . . . . . . . . . . . . . 20

*Michel v. NYP Holdings, Inc.*, 816 F.3d 686 (11th Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Milican v. Home Depot U.S.A., Inc.*, 2020 U.S. Dist. LEXIS 123987 (E.D. Mich. July 15, 2020)
   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Milkovich v. Lorain Journal, Co.*, 497 U.S. 1 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 28, 31

*Morgenstern v. Fox Television Stations of Philadelphia*, 2008 U.S. Dist. LEXIS 92990 (E.D. Pa.
   Oct. 31, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Mzamane v. Winfrey*, 693 F. Supp. 442 (E.D. Pa. 2010) . . . . . . . . . . . . . . . . . . . . . . 19, 20, 42, 43

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490 (2d Cir. 2013) . . . . . . . . . . . . . . . 33

*Pace v. Baker-White*, 2021 U.S. App. LEXIS 7433 (3d Cir. March 5, 2021) . . . . . . . . . . . . . . 46

*Palin v. New York Times Co.*, 940 F.3d 804 (2d Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Palin v. New York Times, Co.*, 482 F. Supp. 3d 208 (S.D.N.Y. 2020) . . . . . . . . . . . . . . . . . . . . 28

*Pennsylvania v. Board of Directors of City Trusts of Philadelphia*, 353 U.S. 230 (1957) . . . . . 9

*Phantom Touring, Inc. v. Affiliated Publications*, 953 F.2d 724 (1st Cir. 1992) . . . . . . . . . . . 27

*Podgurski v. Pennsylvania State University*, 722 A.2d 730 (Pa. Super. 1998) . . . . . . . . . . . . . 53

*Popat v. Levy*, 328 F. Supp. 3d 106 (W.D.N.Y. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Project Veritas v. The New York Times Co.*, 2021 N.Y. Misc. LEXIS 2264 (Sup. Ct. Westchester County March 18, 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 31, 34, 41

*Pruden v. City of Easton*, 2012 U.S. Dist. LEXIS 189748 (E.D. Pa. 2012) . . . . . . . . . . . . . 57-60

*Rakestraw v. Nationstar Mortgage, LLC*, 2019 U.S. Dist LEXIS 135478 (N.D. Ga. May 29, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Rauser v. Horn*, 241 F.3d 330 (3d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Reager v. Williams*, 2009 U.S. Dist. LEXIS 88753 (M.D. Pa. Sept. 25, 2009) . . . . . . . . . . . . . 13

*Redco Corp. v. CBS, Inc.*, 758 F.2d 970 (3d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*RHN Inc. v. CNA Nat'l Warranty Corp.*, 2019 U.S. Dist. LEXIS 155941 (D. Ariz. Sept. 12, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Riggio v. Burns*, 711 A.2d 497 (Pa. Super. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 58-60

*Rollins v. Dignity Health*, 338 F. Supp. 3d 1025 (N.D. Cal. 2018) . . . . . . . . . . . . . . . . . . . . . . . 5

*RRZ Pub. Mkts. v. Bond Buyer*, 1995 U.S. Dist. LEXIS 604 (E.D. Pa. January 17, 1995) . . . . . 35

*Ruder v. Pequea Valley School Dist.*, 790 F. Supp. 2d 377 (E.D. Pa. 2011) . . . . . . . . . . . . . . . 19

*Saad v. American Diabetes Ass'n*, 123 F. Supp. 3d 175 (D. Mass. 2015) . . . . . . . . . . . 32, 33, 42

*Sacramento Metro. Cable TV Comm'n v. Comcast Cable Communications Management, LLC*, 2020 U.S. Dist. LEXIS 238915 (E.D. Cal. Dec. 18, 2020) . . . . . . . . . . . . . . . . . . . . . . . 6

*Schiavone Construction Co. v. Time, Inc.*, 847 F.2d 1069 (3d Cir. 1988) . . . . . . . . . . . . . . 40, 43

*Schmidt, Long & Assocs. v. Aetna U.S. Healthcare, Inc.*, 2000 U.S. Dist. LEXIS 17355 (E.D. Pa. Dec. 4, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Shadle v. Nexstar Broad. Group, Inc.*, 2014 U.S. Dist. LEXIS 98876 (M.D. Pa. July 21, 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Sprague v. American Bar Ass'n*, 2003 U.S. Dist. LEXIS 15518 (E.D. Pa. July 21, 2003) . . . . . 28

*St. Luke's Health Network, Inc. v. Lancester General Hospital*, 967 F.3d 295 (3d Cir. 2020) . . . 4

*Straw v. Chase Revel, Inc.*, 813 F.2d 356 (11th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Sunrise Pharmacy, Inc. v. Vision Pharma, LLC*, 799 Fed. Appx. 141 (3d Cir. 2020) . . . . . . . . 31

*Tanay v. Encore Healthcare*, 810 F. Supp. 2d 734 (E.D. Pa. 2011) . . . . . . . . . . . . . . . . . . . . . . 59

*Tawney v. Simonson, Whitcomb & Hurley Co.*, 109 Minn. 341, 124 N.W. 229 (1909) . . . . . . . 24

*ThermoLife Int'l, LLC v. Neogenesis Labs, Inc.*, 2021 U.S. Dist LEXIS 72375 (D. Ariz. April 14, 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Tress v. Axa Advisors*, 2013 U.S. Dist. LEXIS 205303 (E.D. Pa. June 6, 2013) . . . . . . . . . . . 47

*Tucker v. Fischbein*, 237 F.3d 275 (3d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Tucker v. Philadelphia Daily News*, 577 Pa. 598, 848 A.2d 113 (2004) . . . . . . . . . . . . . . . 45, 46

*Turntine v. Peterson*, 959 F.3d 873 (8th Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Underwager v. Salter*, 22 F.3d 730 (7th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Veno v. Meredith*, 357 Pa. Super. 85, 515 A.2d 571 (Super. Ct. 1986) . . . . . . . . . . . . . . . 26, 34

*Verdi v. City of New York*, 306 F. Supp. 3d 532 (S.D.N.Y. 2018) . . . . . . . . . . . . . . . . . . . . . . . 17

*Victaulic Co. v. Tieman*, 499 F.3d 227 (3d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

*Weaver v. Lancaster Newspapers, Inc.*, 592 Pa. 458, 926 A.2d 899 (2007) . . . . . . . . . . . . . . . 43

*Wolgin v. Smith*, 1996 U.S. Dist. LEXIS 18969 (E.D. Pa. Dec. 19, 1996) . . . . . . . . . . . . . . . . 31

Constitutional Provisions, Statutes And Rules

24 Pa. Cons. Stat. § 2510-202(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

24 Pa. Cons. Stat. § 2510-206 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

24 Pa. Cons. Stat. § 2510-207 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

24 Pa. Cons. Stat. §§ 2510-201 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

28 U.S.C. § 1864(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

42 Pa. Cons. Stat. § 8343 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

42 Pa. Cons. Stat. § 8343(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 35, 40

42 Pa. Cons. Stat. § 8343(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

42 Pa. Cons. Stat. § 8343(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

42 U.S.C. § 1981 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 54

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-10

42 U.S.C. § 2000d-3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

42 U.S.C. §§ 2000d *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 17, 18, 54

42 U.S.C. §§ 2000e *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

43 Pa. Cons. Stat. § 1422 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 53, 56-60

43 Pa. Cons. Stat. § 1423(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

43 Pa. Cons. Stat. §§ 1421 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51-53

63 Pa. Cons. Stat. § 422.41(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 11, 15, 35, 40, 45, 48

Fed. R. Civ. P. 50 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 31

Fed. R. Civ. P. 8(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52-54

Fed. R. Civ. P. 8(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Fed. R. Civ. P. 8(d)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Fed. R. Civ. P. 8(d)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 16

Fed. R. Civ. P. 9(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Fed. R. Evid. 201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

<u>Other Authority</u>

5A C. Wright & A. Miller, *Federal Practice and Procedure* § 1301 (3d ed. 2004) . . . . . . . . . 41

Arthur S. Levine, *et al.*, *The Relationship Between the University of Pittsburgh School of
    Medicine and University of Pittsburgh Medical Center – A Profile in Synergy*, 83
    Academic Medicine 816 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Restatement 3d Torts, Multiple Sufficient Causes § 27 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Plaintiff Norman Wang submits this brief in opposition to defendants' motions to dismiss.

Background

This case arises out of adverse actions taken against Plaintiff by defendants University of Pittsburgh ("Pitt"), University of Pittsburgh Medical Center ("UPMC"), and University of Pittsburgh Physicians ("UPP") and other related conduct.

The Amended Complaint in this action (Dkt. No. 43, "Am. Compl.") alleges that Plaintiff is on the faculty of the Medical School ("UPSOM") at the University of Pittsburgh as well as a cardiologist at UPMC.  His actual contract, though, is with UPP, a wholly-owned subsidiary of UPMC.  Pursuant to that contract, he performs services for both Pitt and UPMC.  Am. Compl. ¶¶ 5, 17-18.  Under that contract, his supervisor for all of that activity is a department head at UPSOM.  *Id.* ¶¶ 17-18.

A.    Plaintiff's Article And Its Publication

In 2019 and 2020, Plaintiff wrote an article on diversity and the cardiology workforce, tracing the history of the use of race and ethnicity as factors in determining admission into medical schools, residency programs, and fellowships.  It noted that programs to achieve those goals applied different standards to applications by members of underrepresented races and ethnicities and raised questions about whether the programs achieved their goals, and the legality, effectiveness, and wisdom of the programs.  Am. Compl. ¶ 20.  Plaintiff submitted his article to the Journal of the American Heart Association ("JAHA"), a medical journal published jointly by defendants American Heart Association ("AHA") and Wiley Periodicals ("Wiley").  Am. Compl. ¶¶ 10-11, 21.  JAHA reviewed and vetted the article, after which defendants AHA and Wiley offered to publish Plaintiff's article in JAHA provided that Plaintiff them paid $1600 for that privilege.  Am. Compl. ¶ 21.  Plaintiff did pay that fee, and the article was published on JAHA's website in March 2020.  *Id.*

1

B.     Adverse Actions Are Taken Against Plaintiff

Months later, some on social media objected to the conclusions reached by Plaintiff in his article.  On July 31, 2020, defendants Samir Saba and Kathryn Berlacher met with Plaintiff.  Am. Compl. ¶ 23.  Saba is the Chief of the Cardiology Division in the Department of Medicine at UPSOM and also is the state actor that, during the relevant time period, supervised all of Plaintiff's employment activities (both those for Pitt and those for UPMC).   Am. Compl. ¶¶ 12, 17-18.  Berlacher is a professor in that division.  *Id.* ¶ 14.

During the course of the conversation, Plaintiff told Saba and Berlacher that the selection processes for the medical education program at UPSOM and the graduate medical education ("GME") programs at UPMC were violating federal law because of the racial and ethnic preferences they employed.  Am. Compl. ¶ 23.  Pitt receives federal funds that assist it in providing a medical education for medical students at UPSOM.  Am. Compl. ¶ 6.  UPMC employs residents and operates fellowship programs for physicians who have completed their residencies.  It specifically receives federal funds to employ residents and fellows in these GME programs.  Am. Compl. ¶¶ 7-8.

Prior to the July 31 meeting, Plaintiff had been the director of one such GME program, a fellowship program in clinical cardiac electrophysiology, for which he received additional compensation.  Am. Compl. ¶¶ 5, 7, 35.  Shortly after the July 31 meeting – within days – Saba removed Plaintiff from his role as the director of that program.  Am. Compl. ¶¶ 24, 38.  He also forbade Plaintiff from having contact with individuals in any fellowship programs at UPMC, residents, or medical students at UPSOM.  Am. Compl. ¶ 27.  All of these adverse employment actions have had negative financial effects on Plaintiff.  Am. Compl. ¶¶ 35-36.

In taking these actions, Saba had the agreement not only of Berlacher, but the Chairman of the Department of Medicine at UPSOM, Mark Gladwin.  Am. Compl. ¶¶ 25, 27.  Indeed, Gladwin wrote an email to the UPSOM community just after these actions were taken, in his role as the Chairman of the Department of Medicine, in which he denounced Plaintiff's views as

2

"'antithetical to our values'" and "'hurtful to URM faculty.'"  "'*We*,'" he wrote, "'have taken immediate action and removed the person from their [sic] leadership position . . .'"  Am. Compl. ¶ 31 (emphasis added).

C.     <u>Defamatory Comments Are Made With Respect To The Article And It Is Retracted</u>

At around the same time as the adverse employment actions were taken against Plaintiff, various individual employees of UPSOM, UPP, and UPMC began a "systematic attack campaign" against Plaintiff and his article, and called for Wiley and AHA to retract it.  Am. Compl. ¶ 38.  Despite having vetted it beforehand, Wiley and AHA did retract the article, and announced the retraction on August 5, 2020.  *Id.* ¶ 39a.  (Wiley correctly points out that the Amended Complaint has two paragraphs with the number 39.  Plaintiff apologizes for that error, and adopts Wiley's suggested convention of distinguishing between the two.)  They have kept the $1600 paid by Plaintiff for the article's publication.

In announcing the retracting of the article, AHA and Wiley asserted that UPMC had told them that the article contained "many misconceptions and misquotes."  *Id.*  In the following days, they further asserted that the article was factually inaccurate, contained specific *scientific* errors and *deliberate* misinformation, used misleading and incomplete quotations, misrepresented facts, and misrepresented evidence.  *Id.* ¶¶ 39a, 39b, 45.  The latter two accusations (misrepresenting facts and evidence) were also included in an article authored by defendant Mark Simon (among others).  *Id.* ¶ 45.  Saba and Berlacher also asserted that the article used misquotes as well as other calumnies (like "racist thinking").  *Id.* ¶¶ 43-44.  Saba also claimed that the Dean of the Medical School sought retraction of the article.  *Id.* ¶ 43.

<u>Argument</u>

The basic parameters of a motion to dismiss are well known.  The Court is mostly confined to the allegations of the complaint and must assume the non-conclusory ones to be true. Here, defendants ask this Court to ignore many allegations, and rely upon assertions that appear

nowhere in the complaint.  They further rely on a heretofore unknown "academia exception" to the normal standards under which claims for defamation, tortious interference, and breach of contract are judged.  Their arguments are wrong; their motions should be denied.

## I.     DEFENDANTS IMPROPERLY RELY ON THEIR OWN "FACTS"

In ruling on a motion to dismiss pursuant to Rule 12(b)(6), (1) all well-pleaded allegations must be deemed as true, (2) those allegations must be interpreted in the light most favorable to the plaintiff, and (3) all reasonable inferences should be made in plaintiff's favor. *St. Luke's Health Network, Inc. v. Lancester General Hospital*, 967 F.3d 295, 299 (3d Cir. 2020). A complaint must state plausible factual matters sufficient to state a cause of action.  *Id.* at 300.

Defendants' motions make a number of cardinal errors on a motion to dismiss.  First, defendants fail to accept the allegations as true.  For example, Pitt insists that the retaliatory conduct against plaintiff "was carried out primarily by UPMC personnel."  Pitt Br. 1.  Indeed, this seems to be at the heart of the argument that it cannot be held liable for any violation of Plaintiff's First Amendment rights.  *Id.* at 7-8.  But this "fact" appears nowhere in the Amended Complaint; in fact, the Amended Complaint specifically alleges that Gladwin and others were acting in their roles as state actors.

Second, both Pitt and the UPMC Defendants (UPMC, Gladwin, Saba, and Berlacher) ask this Court to take judicial notice of "facts" asserted on UPMC's and Pitt's website.  *E.g.*, Pitt Br. 4-5 n.3; UPMC Br. 4 n.5.  But what appears on a private party's website is subject to "reasonable dispute" (Fed. R. Evid. 201) and courts do not take judicial notice of the underlying facts contained on them.  In *Victaulic Co. v. Tieman*, 499 F.3d 227, 236 (3d Cir. 2007), the Third Circuit vacated the dismissal of plaintiff's breach of contract (a covenant not to compete) claim and criticized the district court for relying on matters on plaintiff's website.  *Id.* ("[W]e allow judicial notice only from sources not reasonably subject to dispute.").  First, the Court noted, "[a]nyone may purchase an internet address, and so, without proceeding to discovery or some other means of authentication, it is premature to assume that a webpage is owned by a company

merely because its trade name appears in the uniform resource locator." *Id.* "Second, a
company's website is a marketing tool. Often, marketing material is full of imprecise puffery
that no one should take at face value . . . Thus, courts should be wary of finding judicially
noticeable facts amongst all the fluff; private corporate websites, particularly when describing
their own business, generally are not the sorts of sources whose accuracy cannot reasonably be
questioned." *Id.* Finally, the Court noted that "we believe that [judicial notice] should be done
sparingly at the pleadings stage. Only in the clearest of cases should a district court reach outside
the pleadings for facts necessary to resolve a case at that point." *Id.  See also, e.g.*, *ThermoLife
Int'l, LLC v. Neogenesis Labs, Inc.*, 2021 U.S. Dist LEXIS 72375, at *3-6 (D. Ariz. April 14,
2021) (refusing to take judicial notice of matters on crossclaim plaintiff's website on motion to
dismiss because they were being submitted to prove the truth of the matters asserted); *Rakestraw
v. Nationstar Mortgage, LLC*, 2019 U.S. Dist LEXIS 135478, *15 (N.D. Ga. May 29, 2019)
(refusing to take judicial notice of matters on a website on a motion to dismiss; "private, non-
governmental websites are not generally the proper subject of judicial notice"); *Rollins v.
Dignity Health*, 338 F. Supp. 3d 1025, 1032-33 (N.D. Cal. 2018):

> [T]he records of private parties have no . . . imprimatur of
> reliability, and neither do their websites.  There are at least a
> trillion web pages on the Internet, and many of the documents
> within those pages are unsupported, poorly supported, or even
> false. Of course, that does not make all of those documents
> inadmissible for all purposes. But they are not inherently reliable,
> and courts should be cautious before taking judicial notice of
> documents simply because they were published on a website. That
> is particularly so when a party seeks to introduce documents it
> created and posted on its own website, as [defendant] does here.
> When a nongovernmental entity to seek judicial notice of its paper
> records, the request is properly rejected because such documents
> are subject to reasonable dispute.[1]

---

[1]     At first glance, UPMC's website has a whole host of information with which others
might plausibly disagree.  *See* https://www.upmc.com/about/why-upmc/story ("Over the last 30
years, UPMC has ushered in a new era of health care excellence in Pittsburgh, western
Pennsylvania, and locations around the world.").  Although Pitt is a state actor, it is not a typical
government agency.  24 Pa. Cons. Stat. §§ 2510-201 *et seq.*  Nor can its website, which is not
above a bit of puffery, said to be beyond dispute.  *See* https://www.medschool.pitt.edu/about

(continued...)

Third, that a court may take judicial notice of a document's *existence* does not mean it can assume that statements within them are true, yet defendants assert facts as if there were no difference. *E.g.*, Simon Br. 2-3 ("Dr. Simon was a member of the editorial board at [JAHA]."); Pitt Br. 17 (Simon "is a UPMC employee"); *id.* (Simon "is a senior member" of the JAHA editorial board); AHA Br. 7 ("As the sponsoring institution of Dr. Wang, UPMC conducted an investigation into the Subject Article"). *E.g.*, *Sacramento Metro. Cable TV Comm'n v. Comcast Cable Communications Management, LLC*, 2020 U.S. Dist. LEXIS 238915, at *7 n.3 (E.D. Cal. Dec. 18, 2020) (taking judicial notice of certain documents, but not for the truth of the matters contained therein).

Fourth, even without asking the Court to take judicial notice, defendants simply assert "facts" that are not in the Amended Complaint or ignore facts that are. *E.g.*, AHA Br. 3 ($1600 fee was "[t]o defray the cost of publication"); *id.* (implying that Plaintiff's article has been "fully available to readers online" continuously since its retraction); *id.* n.3 (the retraction notice "was updated on August 6, 2020"); Pitt Br. 15 ("@Pitt_Cardiology is a *UPMC* account"). *Compare* AHA Br. 3 ("individuals from UPMC wrote to the Journal") *with* Am. Compl. ¶ 38 ("agents of UPSOM, UPP, and UPMC . . . made . . . statements to AHA and Wiley").

Fifth, defendants attach various documents to their papers, which they claim are referred to in the Amended Complaint, but with which Plaintiff disagrees. To be specific, Plaintiff disputes that the "retraction article " attached by various defendants (Dkt. Nos. 47-1, Dkt. No. 51-1 Ex. 3) is the retraction article referred to in paragraph 39a of the Amended Complaint as having been published on August 5, 2020. (Assuming *arguendo* that this submission is the "updated" retraction that AHA refers to (AHA Br. 3 n.3), there is nothing on the face of it that indicates August 6 as the publication date.) Similarly, although Wiley  attaches a "contract" to its motion (Dkt. No. 51-1, Ex. 2), Plaintiff contends that that document is incomplete and does

---

[1](...continued)
("At [UPSOM] . . . excellence is an everyday pursuit (and a goal that is almost always attained).")

not set forth all the terms identified in paragraph 21 of the Amended Complaint and, accordingly, should not be considered on this motion.

Finally, defendants rely on what may best be characterized as "magic words" arguments, basically that a claim must use some specific words in order to succeed in stating a claim. These arguments will be specifically discussed when they occur, but one example is UPMC's argument that the Amended Complaint's allegations that UPMC "employs residents" and "specifically receives federal funds to employ residents and fellows in its residency, GME, and fellowship programs" (Am. Compl. ¶¶ 7-8) is insufficient to allege that it receives federal funds whose "primary" purpose is employment. UPMC Br. 10-11. Even assuming (contrary to law) this argument were valid, whatever verbiage flaw UPMC perceives could be easily fixed. In any event, the federal rules do not require the pleading of any specific words.

## II.   THE AMENDED COMPLAINT ADEQUATELY ALLEGES A FIRST AMENDMENT VIOLATION AGAINST PITT, UPMC, AND UPP; THEIR ARGUMENTS TO THE CONTRARY ARE MERITLESS

The first claim for relief is asserted against defendants Pitt, UPMC, UPP, Gladwin, Saba, and Berlacher, as well as various John Doe defendants. It alleges that, acting under color of state authority, they retaliated against Plaintiff for his speech. Gladwin, Saba, and Berlacher do not move to dismiss. *See* Dkt. No. 53-1. The three entity defendants do. Pitt argues that the Amended Complaint does not allege that it was involved in any adverse action against Plaintiff and that whatever action was taken was not pursuant to a Pitt policy or custom. UPMC and UPP argue that the Amended Complaint does not adequately allege that they acted under color of state authority. These arguments turn a blind eye to the actual allegations of the Amended Complaint.

### A.   The Amended Complaint Alleges Pitt's Involvement

Pitt asserts that "Plaintiff does not allege that [Pitt, UPSOM,] or any of its employees ever demoted him [or] reduced his salary." Pitt Br. 6. This is astonishingly wrong. The Amended Complaint specifically alleges that each of Gladwin, Saba, and Berlacher have

positions at UPSOM and acted under color of state authority in imposing punishment on Plaintiff.  Am. Compl. ¶¶ 12-14, 17, 31, 32, 34.  Moreover, those three individuals do not move to dismiss and apparently concede that those allegations are sufficient to allege a claim under 42 U.S.C. § 1983.  Pitt's efforts to ignore the Amended Complaint should be rejected.

Pitt further claims that the Amended Complaint "does not allege that anyone acting as a University employee was responsible for his removal from UPMC's fellowship program" because the fellowship program is "not a University program."  Pitt Br. 7-8.  It claims a similar flaw in the allegation that Pitt was involved in precluding Plaintiff from having contact with residents and fellows.  *Id.* 8.

There are several odd aspects to this argument (aside from it being contradicted by the allegations of the Amended Complaint).  First, there is an obvious tension with Gladwin, Saba, and Berlacher's decision not to move to dismiss at least those parts of the First Amendment claim against them related to the adverse actions Pitt's argument addresses.  Second, Pitt apparently believes that Saba imposed certain adverse actions with his "UPMC" hat on, and then took it off and put on his "Pitt" hat to preclude Plaintiff from having contact with medical students.  This interesting "switching hats" theory is not alleged in the Amended Complaint.

What *is* alleged is that Saba had authority over Plaintiff's UPMC activities *because* of his role as a state actor.  Am. Compl. ¶ 17.  What is also alleged is that Gladwin wrote an email letter to those in the UPSOM community, in his role as the head of the Department of Medicine at UPSOM, in which he wrote about Plaintiff's perspective being antithetical to UPSOM's values and hurtful to UPSOM's minority faculty, and which further stated: "'We have taken immediate action and removed the person from their [sic] leadership position.'"  Am. Compl. ¶ 31.  Plaintiff had only one "leadership position" from which he was removed: the director of the fellowship program in clinical cardiac electrophysiology.  Gladwin's admission that he was one of the individuals responsible for that removal further demonstrates Pitt's involvement.

There is nothing implausible about a state entity and those associated with it using their

power as state actors to cause a private entity to take adverse actions against someone, particularly when the authority has been formally set down in contract. *E.g.*, *Pennsylvania v. Board of Directors of City Trusts of Philadelphia*, 353 U.S. 230, 231 (1957) (holding that Philadelphia board of directors of city trusts that administered private college acted under color of state authority in refusing admission based on race). And, even assuming *arguendo* that Saba was acting in a private capacity in imposing certain adverse actions, there is nothing implausible in alleging that he acted jointly with a state actor like Gladwin. *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288, 296 (2001) ("We have . . . held that a challenged activity may be state action . . . when the State provides 'significant encouragement, either overt or covert,' . . . or when a private actor operates as a 'willful participant in joint activity with the State or its agents.'") (internal citations omitted).

  B. <u>The Amended Complaint Alleges A Final Policymaker Decision</u>

  Pitt apparently concedes that the Amended Complaint alleges that the adverse action of precluding Plaintiff from having contact with medical students was taken under color of state authority. Nonetheless, it claims that the claim against it must be dismissed because (1) Pitt must be treated the same as a municipality under Section 1983 and (2) the Amended Complaint does not allege that Plaintiff was precluded from having contact with students pursuant to a Pitt policy. Pitt Br. 9-10. This argument ignores the law under Section 1983.

  While a constitutional violation must emanate from a municipal policy, "[p]olicy is made when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." *Estate of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019) (internal quotation marks and citations omitted); *Galicki v. New Jersey*, 2016 U.S. Dist. LEXIS 126076, at *29 (D.N.J. Sept. 15, 2016). Thus, the decision and actions of persons who possess final policymaking authority trigger municipal liability because they are ultimately attributable to the entity itself. *City of St. Louis v. Proprotnik*, 485 U.S. 112, 123 (1988). Plaintiff need not prove, as Pitt suggests, that it had a policy of violating

his rights.  Liability under Section 1983 attaches to an entity when *implementing* an official

policy or undertaking an official action would violate the plaintiff's constitutional rights.  *Frazer*

*v. Temple University*, 25 F. Supp. 3d 598, 608 (E.D. Pa. 2014) ("[I]n order to state a § 1983

claim . . . , Plaintiff must allege facts to demonstrate: (1) the deprivation of a constitutional right;

and (2) that such deprivation arose of an official policy or custom . . .").

The Amended Complaint alleges that Gladwin and/or Saba were final policymakers with

respect to the punishment imposed upon Plaintiff.  Am. Compl. ¶¶ 29, 32, 34.  Plaintiff works

under Saba's supervision.  *Id.* ¶ 17.  And Gladwin emphasized to the entire UPSOM community

that the adverse action against Plaintiff was taken because Plaintiff's views were contrary to

UPSOM's values and hurtful to its underrepresented minority faculty.  *Id.* ¶ 31.

Pitt would have this Court believe that these individuals were two rogue employees who

acted on their own, entirely separate from Pitt.  But the Amended Complaint alleges that their

actions proclaimed and implemented Pitt's official policy.  By banning Plaintiff from having

contact with medical students, they prevented him from participating as a member of the

UPSOM faculty.  And Plaintiff alleges that, in implementing this policy, Pitt violated his

constitutional rights.

Pitt further argues that Gladwin and Saba could not be final policymakers because the

Amended Complaint alleges that Dean Shekhar later rescinded the order precluding Plaintiff

from having contact with medical students.  Pitt Br. 10.  But the Amended Complaint does not

allege (as Pitt would have it) that Shekhar reviewed or reversed the punishment decision, Pitt Br.

1, 8, 10, and it does not allege the initial decision was subject to his review or approval.  Rather,

it alleges that Gladwin and Saba held the authority to declare *and* implement the adverse action

officially undertaken against Plaintiff.  Dean Shekhar's decision to rescind the order does not

signify that the original order was subject to his review, without which the order would not be

final and implemented.  It was simply a second order that the Dean had authority to issue.

Moreover, Pitt implemented the original order against Plaintiff.  He was, in fact,

prohibited from engaging with medical students.  Two reasonable inferences may – and, on a Rule 12(b)(6) motion, must – be drawn: (a) Gladwin and Saba possessed the policymaking authority to issue the order, prohibiting Plaintiff from having interactions with medical students; or (b) Dean Shekhar, indeed, had approved the original decision and the adverse action implemented against Plaintiff.

Pitt's argument would seem to require the conclusion that *all* personnel policies and decisions – many of which might be adverse actions – are subject to Dean Shekhar's review, and are not final until Dean Shekhar approves.  This seems a highly unlikely inference to draw from the allegations of the Amended Complaint and inappropriate on a motion to dismiss because it is unfavorable to Plaintiff's position.

Whether Gladwin and Saba had final policymaking authority to punish Plaintiff is a fact-sensitive inquiry.  *Galicki*, 2016 U.S. Dist. LEXIS 126076 at *31 (denying motion to dismiss Section 1983 claim against the Port Authority of New York and New Jersey based on the infamous Bridgegate lane closure scandal; "[t]he question of whether [two Port Authority employees associated with Governor Chris Christie] had 'final policymaking authority,' and thus whether Port Authority adopted a 'custom' or 'policy' for purposes of *Monell* liability, is one of fact that is not amendable to resolution at this early stage.").  The Court in *Galicki* noted that the Port Authority's By-Laws gave final policymaking authority to the Executive Director, not the two individuals involved with the lane closures.  *Id.* at *32-33.  The court held that it was nonetheless "inappropriate to definitively rule on this issue at this early stage because questions of fact remain as to whether the Executive Director . . . essentially delegated the relevant authority to [individual defendants]."  *Id.* at *34.

Finally, even if the allegation that Gladwin and/or Saba possessed final policymaking authority with respect to imposing punishment on Plaintiff for his speech were inconsistent with the allegation that someone else later rescinded part of that punishment, inconsistent allegations are explicitly permitted under the federal rules.  Fed. R. Civ. P. 8(d)(3).

11

C.      The Amended Complaint Alleges That UPMC And UPP
        Acted Under Color Of State Authority

UPMC and UPP assert that the Amended Complaint does not allege that they acted under

color of state authority.  UPMC Br. 7-10.  They are wrong.

The Amended Complaint alleges that, insofar as their relationship with Plaintiff is

concerned, UPMC and UPP delegate supervision over Plaintiff to a state actor.  Am. Compl.

¶¶ 17-18.  Thus, the state is entwined in their personnel decisions related to Plaintiff.  *See, e.g.*,

*Brentwood Academy*, 531 U.S. at 302 (2001) (holding that nominally private athletic association

acted under color of state authority in suspending private school for improper recruiting of

athletes where 84% of association's membership were public schools and each of them had a

vote in selecting the governing councils and boards of the association); *Popat v. Levy*, 328 F.

Supp. 3d 106, 129 (W.D.N.Y. 2018) (denying motion to dismiss Section 1983 action against

non-profit medical group affiliated with state university that allegedly discriminated against

plaintiff doctor; "to show state action in the context of an organization's employment decisions,

a plaintiff is required to show that the State is so entwined with the [the defendant's]

management that its personnel decisions are fairly attributable to the State.") (internal quotation

marks and citations omitted); *Galicki*, 2016 U.S. Dist. LEXIS 126076 at *38 (denying motion to

dismiss Section 1983 claim against Governor Christie's campaign organization when complaint

alleged that there were a number of state employees who also worked for the campaign

organization).

Here, the Amended Complaint alleges entwinement because it alleges that UPMC and

UPP have wholly delegated their supervisory authority over Plaintiff's employment activities to

a state actor.  Indeed, it alleges that state actors did, in fact, jointly remove him from his position

as the director of a fellowship program run by UPMC.  This is far more than was alleged in

*Galicki*, where the campaign organization argued (apparently without contradiction) that there

were "no allegations that any individual committed unlawful acts while specifically volunteering

for [campaign organization]."  *Id.*  As the Court there noted, "determining whether a private

12

entity can be considered a state actor is a fact-intensive inquiry." *Id.* (citing *Crissman v. Dover Downs Entertainment, Inc.*, 289 F.3d 231, 234 (3d Cir. 2002)).  Denying the motion to dismiss, it stated that "[d]iscovery is needed to aid the Court in determining the true nature of the relationship between the State and [campaign organization]." *Id.* at *38-39.

Further, as noted previously, the Amended Complaint alleges that Gladwin, as the Chair of the Department of Medicine at UPSOM, acted jointly with Saba and Berlacher in effecting the adverse action against Plaintiff.  Accordingly, even if Saba and Berlacher were deemed UPP and/or UPMC agents, the Amended Complaint also alleges joint action sufficient to render UPP and UPMC's actions as taken under color of state authority.  *See also, e.g.*, *Reager v. Williams*, 2009 U.S. Dist. LEXIS 88753, at *9-10 (M.D. Pa. Sept. 25, 2009) (denying motion to dismiss Section 1983 and defamation claims where complaint alleged that private businessmen conspired with state actors to produce false disciplinary reports against, and defame, police chief).

## III. THE AMENDED COMPLAINT ADEQUATELY ALLEGES RETALIATION IN VIOLATION OF TITLE VI AND SECTION 1981; PITT AND UPMC'S ARGUMENTS FAIL TO READ THE ALLEGATIONS REASONABLY

The Amended Complaint alleges that Pitt and UPMC retaliated against Plaintiff for apprising Saba and Berlacher in the July 31 meeting that the race-conscious selection procedures employed by Pitt (in selecting medical students for admission) and UPMC (in selecting residents and fellows) violated federal law.  Am. Compl. ¶¶ 26-27, 64.  It alleges illegal retaliation under Title VI and 42 U.S.C. § 1981.  *Id.* ¶¶ 59-67.

Pitt primarily argues that this claim is defective because it fails to allege a causal relationship between the protected activity and the adverse action.  Pitt Br. 10-14.  UPMC conspicuously makes no such argument, even though the same allegations of causation are used for both entities.  Indeed, UPMC does not move to dismiss the claim under Section 1981.  Rather, with respect only to the claim under Title VI, it asserts that the Amended Complaint fails to allege that the federal funds received by UPMC is for the primary purpose of employment.  UPMC Br. 10-12.  These arguments fail to read the Amended Complaint properly.

13

A.     The Amended Complaint Alleges A Causal Relationship

Pitt identifies the three elements of a claim for retaliation: engaging in a protected activity, an adverse action, and a causal relationship.  Pitt Br. 11.  It briefly claims that the Amended Complaint only alleges a protected activity in "the most conclusory manner" (Pitt Br. 12), but it (typically) ignores the allegations of the Amended Complaint where these elements are laid out. Paragraph 23 identifies the protected activity: a conversation on July 31, 2020 in which Plaintiff asserted (*inter alia*) that UPSOM's admissions processes violated federal law because of their racial preferences.  The adverse actions – being removed from a position as a director of a fellowship program in clinical cardiac electrophysiology and being precluded from contact with residents, fellows, and medical students – are repeatedly spelled out.  Am. Compl. ¶¶ 24, 27, 29-30.  Pitt does not even address these paragraphs of the Amended Complaint in its skimpy one paragraph "too conclusory" argument, much less explain what additional information would make them sufficient.

Pitt's main argument is that the Amended Complaint fails to allege the third element, causation, but this argument similarly ignores the allegations.  The Amended Complaint specifically alleges that Saba removed Plaintiff from his role as the director of the fellowship program, and forbade him from contact with fellows, residents, and medical students, *because* Plaintiff told him and Berlacher that admission processes and UPSOM, and selection processes for residents and fellows at UPMC, were violating federal law due to the racial and ethnic preferences those institutions employed. Am. Compl. ¶¶ 24 ("because of those statements"), 26 ("retaliated against Plaintiff because he expressed the view that . . . "), 27 ("because of those statements").  Pitt's argument that these unambiguous allegations of causation are insufficient is twofold: first, Plaintiff does not allege the exact date that Pitt retaliated against him; and, second, they are implausible because the "real" reason for the retaliation was Plaintiff's article.

These arguments are wholly misplaced in a motion to dismiss.  There is no requirement that a plaintiff alleging retaliation under Section 1981 and Title VI specify temporal proximity at

14

all, much less the exact period of time that transpired between the protected activity and the adverse action.  Pitt does not cite any case that says so.[2]

Worse, Pitt just ignores the time frame that the Amended Complaint sets forth:

\*      Plaintiff spoke with Saba and Berlacher on July 31, 2020 and told them that UPSOM's admissions procedures for medical students, and UPMC's selection procedures for its GME programs were illegal.  Am. Compl. ¶ 23.

\*      The adverse employment actions took place "[a]t around the same time" as various individuals made statements to Wiley and AHA criticizing Plaintiff's article and calling for its retraction.  Am. Compl. ¶ 38.

\*      Wiley and AHA retracted the article.  They announced the retraction on August 5, 2020.  Am. Compl. ¶ 39a.

Thus, any *reasonable* reader of the allegations, drawing inferences in Plaintiff's favor, would conclude that the adverse actions took place within a few days of the July 31 conversation.  Even if Pitt's "exact date" argument were correct, it is obviously fairly easy to correct, and the Court should permit Plaintiff to do so.

Pitt's second argument is that the causal relationship is implausible because the allegations of the Amended Complaint "makes clear" that Pitt acted because of Plaintiff's article and not the July 31 conversation.  Pitt Br. 13.  This is rather odd coming on the heels of the "temporal proximity" argument since the Amended Complaint alleges that Plaintiff's article was published in March, months before Plaintiff's conversation with Saba and Berlacher.  Am. Compl. ¶ 21.

In any event, Pitt cites no authority for the proposition that a Court should resolve a factual question concerning motivation on a motion to dismiss and, even at trial, Plaintiff need

---

[2]      None of the three Third Circuit cases cited toward the bottom of page 12 of Pitt's brief involved a 12(b)(6) motion.  The first two involved summary judgment motions, the third a Rule 50 motion.  And, curiously, all three decisions reversed a judgment for an employer in a Title VII retaliation case because the employee had created an issue of fact on causation.

15

only show that his protected activity was a motivating factor.  Nor does Pitt explain why it could

not have had more than one illegal motive.  General tort principles provide that a tortious

infliction of an injury is not excused because another tortious act would have inflicted the same

injury.  Restatement 3d Torts, Multiple Sufficient Causes § 27 ("each act is considered as a

factual cause of the harm").  There is no reason why the same rule should not apply for motives.

In any event, at the pleading stage, Pitt's argument should be rejected for the

straightforward reason that the Federal Rules specifically permit alternative and inconsistent

claims.  Fed. R. Civ. P. 8(d)(2), 8(d)(3).  Thus, when defendants claim that an age discrimination

claim should be dismissed on the pleadings because the plaintiff also alleges sex (or some other

kind of) discrimination, courts reject the argument.  *E.g.*, *Fagan v. U.S. Carpet Installation, Inc.*,

770 F. Supp. 2d 490, 496 (E.D.N.Y. 2011) (rejecting claim that plaintiff could not allege

plausible claim of age discrimination because she also had alleged sex discrimination):

> [R]eading the complaints in the light most favorable to the
> Plaintiffs, the Court finds that by identifying multiple "significant
> factors" that may have motivated the Defendants' ultimate decision
> to terminate their employment, the Plaintiffs did not, as a matter of
> law, affirmatively allege that age was *not* the "but for" cause.
>
> Furthermore, the Court rejects the Individual Defendants'
> contention that the Plaintiffs' [sic] were not permitted to plead
> alternate theories for their discharge, or that the alternate theories
> needed to be explicitly delineated in the complaint.  As set forth in
> Federal Rule of Civil Procedure 8(d)(2), a party pleading in the
> alternative does not have to separately identify the statements as
> alternative theories in separate counts or factual allegations.
> Rather, Rule 8(d)(2) states that "[i]f a party makes alternative
> statements, the pleading is sufficient if any one of them is
> sufficient."  Fed. R. Civ. P. 8(d)(2).  In addition, pursuant to
> Federal Rule of Civil Procedure 8(d)(3), "[a] party may state as
> many separate claims or defenses as it has, regardless of
> consistency."  Fed. R. Civ. P. 8(d)(3).  As the Second Circuit has
> noted, "[t]he flexibility afforded by Rule 8([d])(2) is especially
> appropriate in civil rights cases, in which complex inquiries into
> the parties' intent may sometimes justify raising multiple,
> inconsistent claims." (Emphasis in original, internal citations
> omitted).

*Houchin v. Dallas Morning News, Inc.*, 2010 U.S. Dist LEXIS 33389, at *7 (N.D. Tex. Apr. 1,

2010) (rejecting argument that "[p]laintiffs are precluded from asserting age discrimination

16

claims because they have brought claim of both age and sex discrimination" since they are allowed to plead in the alternative).

B.    The Amended Complaint Adequately Alleges That A Primary Purpose Of Federal Funds That UPMC Receives Is For Employment

Section 604 of Title VI (42 U.S.C. § 2000d-3) states that Title VI does not reach employment discrimination "except where a primary objective of the Federal financial assistance is to provide employment."  UPMC argues that the Amended Complaint does not adequately allege that the employment discrimination at UPMC about which Plaintiff apprised Saba and Berlacher in the July 31 meeting was violative of Title VI because it does not allege that a primary purpose of the federal funds received by UPMC is for employment in that area.[3]

The amended complaint states that UPMC "specifically receives federal funds to employ residents and fellows in its residency, GME, and fellowship programs."  Am. Compl. ¶ 8.  To say that a person "specifically receives" something "to" do something else is the same as saying that the "something else" is the purpose of receiving the "something."  For example: "I specifically received a per diem to pay for the expenses of my business trip" is understood by any reasonable listener to mean that the purpose – not just a primary purpose, but the sole purpose – of the per diem is to pay those business expenses.  *A fortiori*, if the rules for pleading complaints, in which all inferences are resolved in the pleader's favor, are followed, it is surely permissible to conclude that paragraph 8 alleges that a primary purpose of the UPMC's receipt of federal funds is employing residents and fellows.  Indeed, UPMC's whole argument seems to turn modern pleading rules on their head.  Cases like *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) supposedly stand for the proposition that a pleader should not just parrot the elements of a statute.  Yet it seems that is exactly what UPMC

---

[3]    Pitt joins this argument.  Pitt Br. 14 n.9.  Plaintiff did not allege that Pitt discriminated in employment in the July 31 meeting, but rather in its admission processes for medical students. Discrimination in admissions violates Title VI regardless of the purpose of the funds that a school receives.  *Gratz v. Bollinger*, 539 U.S. 244, 276 n.23 (2003).  The "primary purpose" requirement does not apply just because the victim of *retaliation* is an employee.  *Verdi v. City of New York*, 306 F. Supp. 3d 532, 545-46 (S.D.N.Y. 2018).

argues *must* be done.  The words "primary purpose" must appear *in haec verba*.

UPMC acknowledges that the Amended Complaint alleges that "UPMC employs residents" and "UPMC receives federal funds *for the purpose* of 'funding residents and fellows'" (UPMC Br. 12, emphasis added)) – funding what, their clothes? – and acknowledges the content of paragraph 8 of the Amended Complaint in passing (albeit omitting the word "specifically" (*id.*)).  But it never bothers to explain what paragraph 8 could possibly mean *other* than that a primary purpose of some funding UPMC receives is to employ residents and fellows.

Doubling down on this captious argument, UPMC insists that the Title VI claim against it should be dismissed *with prejudice*.  UPMC Br. 10.  Plaintiff submits that this is completely contrary to the spirit of the federal rules.  If the Court believes that the specific words "primary purpose" must be added, then it should allow Plaintiff to add them.

## IV.   THE AMENDED COMPLAINT ADEQUATELY ALLEGES A CLAIM FOR DE-FAMATION AND DEFENDANTS' ARGUMENTS SHOULD BE REJECTED

Defamation is primarily a state law claim, and Pennsylvania has codified its defamation tort in its statutory code.  42 Pa. Cons. Stat. § 8343.  (All appear to agree that Pennsylvania law is applicable here.)  Section 8343(a) lists seven elements that a plaintiff alleging defamation "has the burden of proving, when the issue is properly raised."  *Id.  See, e.g.*, AHA Br. 7 (listing elements).  *See also* Simon Br. 7.  Defendants focus on the first element, the "defamatory character of the communication."  (Thus, for example, defendants do not contend that any of the statements in the Amended Complaint were not about Plaintiff.)  Defendants also argue that plaintiff has not properly pled two other matters not listed in Section 8343(a): falsity and actual malice.  These arguments are wrong.

### A.   The Amended Complaint Alleges Factual Defamatory Statements

Pennsylvania law defines a defamatory statement as one that tends so to harm the reputation of the complaining parties as to lower them in the estimation of the community, to deter third persons from associating or dealing with them, or to injure them in their injury or profession.  *Corabi v. Curtis Pub. Co.*, 441 Pa. 432, 441, 273 A2d 899, 904 (1971) ("A libel is a

maliciously written or printed publication which tends to blacken a person's reputation or to expose him to public hatred, contempt, or ridicule, or to injure him in his business or profession."); *CDI Int'l Inc. v. Marck*, 2005 U.S. Dist. LEXIS 23060, at *22 (E.D. Pa. Jan. 21, 2005) ("A statement is defamatory if it tends to harm the plaintiff's reputation, lower plaintiff in the eyes of the community, or deter others from associating or dealing with the plaintiff in professional or business relationships").

Pennysylvania does not follow the "innocent construction" rule that other jurisdictions do, under which a potentially defamatory statement will not be actionable if it is capable of a non-defamatory contruction. *Mzamane v. Winfrey*, 693 F. Supp. 442, 470 (E.D. Pa. 2010) ("under Pennsylvania law, no such innocent construction rule exists"). Thus, "when the language is capable of both innocent and defamatory interpretations, it is for a jury to decide if the recipient understood the defamatory implications." *Menkowitz v. Peerless Publs., Inc.*, 211 A.3d 797, 802 (Pa. 2019). *See also Corabi*, 273 A.2d at 904; *Hill v. Cosby*, 665 Fed. Appx. 169, 174 (3d Cir. Dec. 14, 2016) (under Pennsylvania law, the "non-defamatory reading must constitute 'the only reasonable' interpretation of the statement for the court to dismiss the defamation cause of action.").[4] "Pennsylvania courts have shown a willingness to interpret relatively mild statements as being capable of a defamatory meaning." *Ruder v. Pequea Valley School Dist.*, 790 F. Supp. 2d 377, 399 (E.D. Pa. 2011) (internal quotation marks and citations omitted). *See also* AHA Br. 11 ("Such language [like "misrepresentation"] is always capable of a range of interpretations.").

Assertions of dishonesty or professional incompetence are routinely held to be capable of a defamatory meaning. *Graboff v. Colleran Firm*, 744 F.3d 128, 133 (3d Cir. 2014) (holding that jury's finding supported verdict in plaintiff's favor on defamation claim where American Academy of Orthopedic Surgeons (AAOS) had suspended plaintiff orthopedic surgeon for two

---

[4]     Thus, although the fourth element of a defamation claim is the "understanding by the recipient of its defamatory meaning," 42 Pa. Cons. Stat. § 8343(a)(4), this cannot be deemed a pleading element past the requirement that the statements be capable of a defamatory meaning.

years for an expert report he had authored that the AAOS claimed violated its rule requiring honest and accurate testimony; AAOS wrote an article which plaintiff testified "implied that he intentionally had falsified information rather than explaining that [his] report had been a preliminary draft based on limited information"); *Mzamane*, 693 F. Supp. 2d at 486 (denying motion for summary judgment, holding that statement by founder and owner of school in South Africa – that head of school told students she spoke with owner every day and that owner knew what was going on at the school and approved of everything – was defamatory because "this statement characterizes Plaintiff [head of school] as an untruthful person"); *Meyers v. Certified Guaranty Co., LLC*, 221 A.3d 662, 672 (Pa. Super. Ct. 2019) (reversing summary judgment for defendants on defamation claims where defendant's statements that plaintiffs' comic book "restorations felt 'thick' or 'like cardboard,' [defendant] could have been understood as making an accusation of fraud or incompetence against [plaintiffs]"); *Koldjeski v. Colombo*, 2009 Pa. Dist. & Cnty. Dec. LEXIS 441, at *16 (Comm. Pleas Ct. Lackawanna Cty. Dec. 4, 2009) (rejecting demurrer to defamation claim where defendant referred to plaintiff as "a son-of-a-bitch of a liar"; "The average listener would be less inclined to associate or deal with a "liar" on a personal or professional basis."); *Dougherty v. Boyertown Times*, 377 Pa. Super. 462, 473, 547 A.2d 778, 783 (Super. Ct. 1988) (assertion that chiropractor's treatment were ineffective and possibly harmful "plainly disparage [chiropractor's] professional competence" and assertions that patient was not told about charges prior to treatment "was capable of harming [his] reputation"); *Turntine v. Peterson*, 959 F.3d 873, 886-87 (8th Cir. 2020) (Missouri law: reversing dismissal of defamation claim where defendant accused plaintiff of being a liar and being dishonest in business dealings); *Buckley v. Littell*, 539 F.2d 882, 895-96 (2d Cir. 1975) ("an assertion . . . that [William F.] Buckley had lied about and implicitly libeled several people who . . . could take him to court for his lies" was defamatory because it "makes a factual assertion relation to Buckley's journalistic integrity"); *id.* at 896-97:

> In short, whatever might be said of a person's political views, any
> journalist, commentator or analyst is entitled not to be lightly

20

> characterized as inaccurate and dishonest or libelous. . . [I]t is
> 'crucial' to such a person's career that he or she not be so treated.
> To call a journalist a libeler and to say that he is so in reference to
> a number of people is defamatory in the constitutional sense, even
> if said in the overall context of an attack otherwise directed at his
> political views.

*See also Project Veritas v. The New York Times Co.*, 2021 N.Y. Misc. LEXIS 2264, at *7, 11

(Sup. Ct. Westchester County March 18, 2021) (holding that articles which described plaintiff's

video as "deceptive," "false," and "without evidence" were defamatory; "a reasonable reader

could very well believe that the challenged statements were conveying facts about Veritas").

Academia is not a defamation-free zone. As even defendants' own cases show, the same

rules apply there as elsewhere. *E.g.*, *Giordano v. Claudio*, 714 F. Supp. 2d 508, 526 (E.D. Pa.

2010) (AHA Br. 4 n.4) (denying motion to dismiss researcher's defamation claim where letter to

editor of the Journal of Cellular Physiology claimed that researcher was improperly seeking

authorship credit for an article in which the letter writer was the lead author; "A statement that a

professor did not deserve authorship credit would tend to affect his reputation, since a

professor's standing in the academic community is closely tied to the quality and quantity of that

professor's publications"); *Competitive Enterprise Institute v. Mann*, 150 A.3d 1213, 1224, 1243

(D.C. 2016) ("*CEI v. Mann*") (affirming the denial of a motion to dismiss defamation claim

under D.C.'s anti-SLAPP law; article that asserted that climate scientist was "the Jerry Sandusky

of climate science," who "molested and tortured data in service of politicized science" could

convey a defamatory meaning because "[a] jury could find that the article accuses [plaintiff

climate scientist] of engaging in specific acts of academic and scientific misconduct in the

manipulation of data"); *Lott v. Levitt*, 469 F. Supp. 2d 575, 583-84 (N.D. Ill. 2007) (denying

motion to dismiss defamation claim to the extent it was based on an email in which defendant

professor asserted that a review of plaintiff professor's research in the Journal of Law and

Economics was not a peer-refereed edition of the journal and that defendant had paid $15,000 to

buy an issue and put in only work that supported him); *Cantrill v. Herald Co.*, 1992 U.S. Dist.

LEXIS 7620, at *24 (N.D.N.Y. May 22, 1992) (denying motion for summary judgment on

21

defamation claim by debate coach and student based on article that suggested coach had engaged in improper recruiting of student):

> the accusation reasonably inferred from the article that plaintiffs committed acts of illegal recruiting is derogatory of plaintiffs' competency, honesty, and qualifications as forensics participants and academics. Such an accusation becomes particularly disparaging where honesty is integral to one's occupation or profession. Intercollegiate debate is an immediate extension of academic curricula, which both students and faculty are expected to pursue under the most stringent of ethical standards. [Coach's] position as a professor and forensics coach only aggravates the gravity of the charge . . . .

*Cf. Dilworth v. Dudley*, 75 F.3d 307, 310 (7th Cir. 1996) (AHA Br. 10; Simon Br. 13; Wiley Br. 18) (holding that accusation by a math professor that an author in the field was a "crank" not defamatory, but stating "[w]e do not suggest that scholars can never maintain a suit for defamation. . . If a professor is falsely accused of [misconduct] . . . he has the same right to damages as any other victim of defamation.").[5]

Defendants pretend that the accusations referred to in the Amended Complaint involve a simple academic disagreement. *E.g.*, AHA Br. 2 ("Plaintiff has alleged nothing more than an academic dispute"); Simon Br. 11 ("a disagreement in an area of academic discourse that is complicated"); *id.* at 12 ("a debate between two academics with differing opinions"); UPMC Br. 15 ("characterizations of an academic controversy"). But the Amended Complaint alleges that defendants' statements were part of a "systematic attack campaign" to delegitimize Plaintiff's

---

[5]      Wiley cites *Arthur v. Offit*, 2010 U.S. Dist. LEXIS 21946 (E.D. Va. March 10, 2010) for the proposition that "she lies" is not defamatory. Wiley Br. 12. The court there relied upon the fact that the two word phrase was "a very brief passage in a lengthy description of an ongoing, heated public health controversy" (*Arthur* at *8). Under those circumstances, the court held that "she lies" was "loose figurative" language in an "outpouring of exasperation" not intended to convey any facts. *Id.* at *15. The accusations against plaintiff, in contrast, were made against a specific article and were intended to be taken as the basis for retracting that article from publication. Defendants do not claim they were just blowing off steam in accusing plaintiff of using "misquotes" in the article. In any event, Pennsylvania law rejects the small-passage-in-a-large-article defense to defamation. *MacElree v. Philadelphia Newspapers*, 544 Pa. 117, 125, 674 A.2d 1050, 1054 (1996) (rejecting lower court's suggestion that "an allegedly defamatory remark which makes up only a small portion of an article is not defamatory" because "[t]here is no legal basis for such an implication.").

22

article (Am. Compl. ¶ 38).  The John Doe defendants (6-10) claimed that the article had "many miscitations and misquotations" (*id.*).  AHA and Wiley asserted that it had "many misconceptions and misquotes" (*id.* ¶ 39a), "inaccuracies [and] misstatements" (*id.*), a "misrepresentation of the facts" (*id.*), "specific scientific errors" (*id.*), "deliberate misinformation" and "misrepresentation" (*id.* ¶ 39b), "misrepresented facts" and a "misrepresentation of evidence" (*id.* ¶ 45).  (The last two assertions were made by defendant Simon in an article published in JAHA.)  Saba asserted that the article "used misquotes, false interpretations, and racist thinking," and claimed that the Dean of the UPSOM sought its retraction (*id.* ¶ 43).  Berlacher similarly asserted that it "misinterprets data and misquotes people" and was "scientifically invalid and racist" (*id.* ¶ 44).

These assertions against an academic surely can be interpreted in a way that would tend to blacken his reputation and make it more difficult for him to pursue an academic career.[6]  A reasonable interpretation of the foregoing accusations is that Plaintiff is an academic charlatan who twists facts towards his predetermined end and cannot even be trusted to accurately quote other sources.  As shown above, that is all that is needed to allege defamatory meaning.

Nonetheless, at least some of the defendants insist that the Amended Complaint does not allege *any* statements capable of defamatory meaning.  (Wiley appears to concede that some statements identified above are capable of defamatory meaning, but others are not.  Wiley Br. 11-16.  Saba appears to concede that the assertion that the Dean of UPSOM sought the retraction

---

[6]     AHA suggest that the relevant community for determining defamatory meaning is the cardiology community.  AHA Br. 9.  The size and scope of the readership of JAHA is not alleged in the Amended Complaint.  Nor does AHA explain why cardiologists would interpret a word like "misquotes" or phrases like "deliberate misinformation" and "specific scientific errors" differently from anyone else.  *Milkovich v. Lorain Journal, Co.*, 497 U.S. 1, 22 n.9 (1990) (expressing doubt that people in a small town view allegations of perjury differently from those in a large city).  In a similar vein, AHA also suggests that the statements here are not *per se* defamatory because Plaintiff is only a cardiologist.  AHA Br. 21 n.6.  Of course, the Amended Complaint alleges that Plaintiff is also a professor at UPSOM and thus an academic.  *See also* AHA Br. 2, 11, 12 (describing the differences between the parties as an "academic dispute"); Wiley Br. 2 (Plaintiff wrote article "[a]s part of his academic work").  In any event, accusations of dishonesty are *per se* defamatory for any occupation.

23

of Plaintiff's article is a factual statement, not an opinion.  UPMC Br. 17-18. )  Their argument is twofold: first, they claim that the assertions are opinions that cannot be established as false and second, if they are opinions that have factual implications, those factual implications have been disclosed.  Plaintiff takes each in turn.

       1.   <u>The Amended Complaint Alleges Defamatory Facts</u>. – Defendants cite any number of authorities for the proposition that unverifiable opinions cannot be the basis for a defamation claim.  None of them involve anything close to the accusations involved here.

To start with the most obvious, asserting that someone misquoted a source is not an opinion.  (All defendants but Simon made this accusation.)  A quote is a repetition of words from another source, signified by quotation marks around the repeated words.  The words inside the quotation marks are either the same as the original source or they are not.  If they are not, that is a misquote.  (Of course, this only need be a *possible* understanding of what a "misquote" is, but defendants do not offer any other understandings.)  This Court is capable of making that determination.  *E.g.*, *Tawney v. Simonson, Whitcomb & Hurley Co.*, 109 Minn. 341, 353, 124 N.W. 229, 233 (1909) (holding that statement that plaintiff falsified a public document by misquoting a letter was libelous; the statement "distinctly charges plaintiff with having 'misquoted.'  The truth of charge was not made out" where the plaintiff had not quoted the letter).  Indeed, far more ambiguous statements have been so held.  *Braig v. Field Communications*, 310 Pa. Super. 569, 581, 456 A.2d 1366, 1373 (Super. Ct. 1983) (rejecting argument that statement made on TV show was non-defamatory because it was a pure expression of opinion, and holding that "'Judge Braig is no friend of the Police Brutality Unit'" could "reasonably be interpreted as a simple statement of fact.").

The allegations that there were misstatements, misrepresentations of fact, and misrepresentations of evidence in the article are all capable of a factual interpretation.  *See* AHA Br. 11 ("Such language [like "misrepresentation"] is always capable of a range of interpretations.").  The most reasonable (and certainly a possible) interpretation of these claims

is that there are many things that are untrue in the article, either because Plaintiff is a charlatan espousing falsities or because he is incompetent.  (AHA's accusation that the article contained *deliberate* misinformation militates in favor of the first interpretation.  Conspicuously, AHA never mentions this accusation in their brief.  *See, e.g.*, AHA Br. 5 (describing "AHA Website Statement," but omitting that phrase).)  AHA and Wiley's assertion that the "errors" were both "specific" and "scientific" preclude any conclusion, particularly at the pleading stage, that the statements were too vague to be deemed defamatory.  As noted previously, there are many cases of defamation in which the defamatory statement is that someone is a liar or lied about something.  Those cases plainly stand for the proposition that a court can determine if a plaintiff had previously asserted something and, if so, whether a fact that plaintiff had previously asserted is true.  If it is, then the accusation of lying or misrepresentation by the defendant is false and defamatory.

A *misrepresentation* of a fact or piece of evidence is something quite different from drawing an inappropriate conclusion from a fact.  People might have good-faith differences of opinion about what conclusions can be drawn from a given fact.  What a fact or piece of evidence *is*, though, should not.  Indeed, the entire common-law of fraud, as well as numerous statutes on all levels, relies upon courts being able to detect misrepresentations of fact and call them such.  *E.g.*, 28 U.S.C. § 1864(b) (making the misrepresentation of a material fact on a juror questionnaire punishable by fine or jail).

Saba and Berlacher argue that their calling plaintiff's article racist (or using "racist thinking") is a non-defamatory opinion.  This argument is controlled by the Pennsylvania Supreme Court's opinion in *MacElree v. Philadelphia Newspapers*, 544 Pa. 117, 674 A.2d 1050 (1996), making it somewhat surprising that there is no discussion of it in their brief.  In *MacElree*, a newspaper stated that the district attorney was "the David Duke of Chester County running for office by attacking Lincoln."  *Id.* at 120, 674 A.2d at 1052.  (Lincoln was a historically black college.)  The court concluded that "a reasonable person could conclude that

25

this was an accusation that appellant was abusing his power as the district attorney, an elected office, to further racism and his own political aspirations.  Such an accusation amounts to a charge of misconduct in office . . ."  *Id.* at 125, 674 A.2d at 1054.  Further, after noting the standard definition of defamation (lower in the estimation of the community, deter others from associating, etc.), the court held: "A charge of racism clearly could have such an effect on the individual so charged."  *Id.* at 127, 674 A.2d at 1055.

Thus, *MacElree* holds that a charge of racism does not get a pass when it suggests racist-motivated misconduct.  *See also, e.g.*, *Jorjani v. New Jersey Institute of Technology*, 2019 U.S. Dist. LEXIS 39026, at *10-11 (D.N.J. March 12, 2019) (UPMC Br. 16) (N.J. law: "an allegation of racism alone is not actionable, but if the statement falsely implies someone engaged in specific acts . . . , it may be defamatory").  And that is exactly how a reasonable reader could understand Saba and Berlacher's tweets: racist thinking impelled Plaintiff to misquote people, use false interpretations, and misinterpret data.  Like AHA's accusation of "deliberate misinformation," it goes to Plaintiff's intent: not merely incompetent, not merely incapable of copying the words of a source in a quote, but malicious.

Two aspects of context further demonstrate that the statements were factual, not opinion. First, none of them use the language of opinion with the defamatory language.  *CEI v. Mann*, 150 A.3d at 1245 ("We note that in the article [defendant] does not employ language normally used to convey an opinion, such as 'in my view,' or 'in my opinion,' or 'I think.'  The article's assertions about [plaintiff's] deception and misconduct are stated objectively . . ."); *Cantrill v. Herald Co.*, 1992 U.S. Dist. LEXIS 7620, at *39-40 (holding that accusation of illegal recruiting for debate team was defamatory in part because it was placed as a news article and "is written in a straight-forward, matter-of-fact style and contains none of the phrasing typically associated with opinion reporting such as 'this author believes' or 'in this author's opinion.'").  *Cf. Veno v. Meredith*, 357 Pa. Super. 85, 89, 515 A.2d 571, 573 (Super. Ct. 1986) (dismissing defamation claim based on editorial under the phrase "Our Opinion"); *Croce v. Sanders*, 2021 U.S. App.

26

LEXIS 2927, at *9-11 (6th Cir. Feb. 3, 2021) (finding that certain statements were not defamatory because they were presented in the form of an argument); *Phantom Touring, Inc. v. Affiliated Publications*, 953 F.2d 724, 729 (1st Cir. 1992) (holding that language "insinuating that [musical play] was marketing its production dishonestly" was not defamatory in part because the articles "appeared in a regularly run theater column, a type of article generally known to contain more opinionated writing than the typical news report.").

Second, most of the statements are explaining a decision to retract an article that AHA and Wiley previously had vetted and published – and trying to explain why it was being retracted only after the article had come under heavy criticism in an effort to induce that retraction.[7]  They could not just *say* they were retracting it *solely* because it contained politically-incorrect opinions that people objected to; that would only reveal their own narrow-minded refusal to allow views other than their own.  *Cf.* AHA Br. 1 ("the AHA expressed that the . . . Article espoused views that are antithetical to the AHA").  Indeed, Simon's article emphasized that he "welcome[d] independent viewpoints . . . with the goal of creating an open dialogue" (Simon Br. 11, quoting his Ex. B); Plaintiff's article, though, did not qualify for participation in this "open dialogue" because it involved "a misrepresentation of evidence."  *Id.*  In short, defendants needed reasons (*i.e.*, pretexts) that would warrant retraction. They had to attack the article as riddled with factual misstatements and misquotes, which is exactly what they did.

2.    The Defamatory Statements Were Not "Pure Opinions". – Some defendants also assert that their opinions were based on disclosed facts and therefore were "pure opinions" and not defamatory.  *E.g.*, AHA Br. 12-16; Wiley Br. 14-15.  Not all of them rely on the *same* disclosure, though.  Regardless, all of them are wrong.

The first problem with the argument is that it applies to *opinions* with disclosed facts. The defamatory assertions defendants made were factual.  *Dougherty*, 547 A.2d at 785

---

[7]    *See, e.g.*, Dkt. Nos. 56-1 at 2 ("We are outraged that @JAHA_AHA published this shameful and infuriating piece."), 56-3 at 2 ("Rise up, colleagues.  The fact that this is published in 'our' journal should both enrage & activate all of us. #BeAntiracist . . .").

("Whether a particular statement constitutes a fact or an opinion is a question of law for the trial court to determine."); Wiley Br. 12 (same); UPMC Br. 13 (same).

A number of defendants rely on a retraction that several have attached to their papers, claiming it is the same as that referred to in the Amended Complaint.  *E.g.*, AHA Br. 14-15; Wiley Br. 14.  But, as already noted, Plaintiff disputes that this document was the one identified in the Amended Complaint, published on August 5, 2020.  (Plaintiff submits the document to which the Amended Complaint was referring as Exhibit 1 to this brief.)  Even if defendants subsequently "disclosed" the bases for their "opinions," it would not negate the defamatory content of the statement alleged in the Amended Complaint.  *E.g.*, *Sprague v. American Bar Ass'n*, 2003 U.S. Dist. LEXIS 15518, at *2-3 (E.D. Pa. July 21, 2003) (denying motion for summary judgment on defamation claim based on ABA Journal's reference to plaintiff as "perhaps the most powerful lawyer-cum-fixer in the state" even though, after plaintiff complained, the journal published a clarification explaining that it had intended "fixer" as laudatory); *Palin v. New York Times, Co.*, 482 F. Supp. 3d 208, 213 (S.D.N.Y. 2020) (denying defendants' motion for summary judgment where editorial alleged that plaintiff's rhetoric was responsible for shooting in Arizona even though the article was changed the next day to eliminate the defamatory references and a series of corrections were subsequently published).

Further, the "disclosed facts" defense is only available if the underlying statements are themselves *facts*, and are complete and true.  *Milkovich v. Lorain Journal, Co.*, 497 U.S. 1, 18-19 (1990) ("Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact."); *CEI v. Mann*, 150 A.3d at 1246 ("to claim this form of protection from liability, the facts on which the purported opinion is based must be accurate and complete"; holding that this defense was unavailable because writer claiming that climate scientist had "tortured data" had said that an investigation by the National Science Foundation relied entirely on an investigation by Penn State when, in fact, the NSF had also made

28

independent investigations and writer had omitted several other investigations exonerating climate scientist).  As shown in Part "B.1" of this section, *infra*, the bases for defendants' "opinion" in their version of the retraction fails this test.  They are neither facts nor true.

Finally, defendants' version of the retraction would not be a "disclosed facts opinion," even if the claims made therein were not themselves misleading and false.  AHA and Wiley state that the article contains "*many* misconceptions and misquotes" and, in their version, they further state that "[a] *sample* of the misconceptions and misquotes . . .include:" (Dkt. No. 47-1) (emphasis added).  AHA Br. 4 ("two examples"); Wiley Br. 11 ("[b]ased on errors *such as these*") (quoting Dkt. No. 51-1 Ex. 3) (emphasis added).  The plain import is that the "samples" are only the tip of the iceberg.  Indeed, a writer trying to imply the existence of undisclosed facts could hardly improve upon what Wiley and AHA wrote.

In *Giordano v. Claudio*, 714 F. Supp. 2d 508 (E.D. Pa. 2010), Giordano (the defamation defendant) had written a letter to the editor of the Journal of Cellular Physiology explaining why Claudio did not deserve authorship credit for an article in the journal on which Giordano had been the lead author.  According to the letter, Claudio "did not conduct the experiments or analyze the unexpected data the experiments produced."  *Id.* at 526.  But, Giordano added that "'[t]he whole thing with Dr. Claudio since he left our lab has been very sad.  I'm sorry that you got caught in the middle.'" *Id.* (quoting letter).  The court held that these additions "suggest that there was more to Giordano's opinion of Claudio's contributions to the article than the facts he disclosed in his explanation of Claudio's precise role in the generation of the Article."  *Id.* at 527-28.  Compared to the subtle innuendo in *Giordano*, this is an *a fortiori* case.  AHA and Wiley said that there were *many* flaws (misconceptions and misquotes) of which the cited ones were just samples.  *See also, e.g.*, *Dougherty*, 547 A.2d at 478-79 (rejecting trial court's conclusion that assertion in letter to the editor that chiropractor's treatments "'were ineffective and possibly harmful' referred only to the facts disclosed in the letter.  The letter does not disclose any information regarding the treatments [chiropractor] gave to [patient]. . .  Since the

29

author of the letter was the patient's wife, a reader of the letter could easily infer that the wife . . . was in a good position to know undisclosed facts concerning the treatments upon which she based her opinion.").

AHA intimates that the "disclosed facts" may be that other individuals (from UPMC) told AHA and Wiley that the article had misconceptions and misquotes.  AHA Br. 14.  But it cannot be that "someone else told me" is a sufficient fact to justify a defamatory assertion or else people could repeat defamatory statements at will and newspapers could never be liable for publishing letters to the editor containing opinions with undisclosed facts.  *Corabi*, 273 A.2d at 914 (noting that repetition of another's words will not automatically preclude a libel claim); *Dougherty*, 547 A.2d at 787-88 (concluding that trial court had erred in dismissing claim against newspaper based on letter to editor); *CEI v. Mann*, 150 A.3d at 1248.  Readers would not be able to assess the defamatory statement because "someone else told me" does not provide the real facts underlying the writer's opinion.

Simon claims that his own article discloses the bases for his "opinion" that Plaintiff's article misrepresented facts and evidence.  Simon Br. 12.  But his article only provides a basis for his own opinion about the use of race-conscious selection devices.  Dkt. No. 49-2; Simon Br. 17 ("based upon his own evidence to the contrary").  It says nothing at all about any specific fact or piece of evidence in Plaintiff's article and explain how Plaintiff "misrepresented" it.  Arguing that "diversity does indeed improve care and outcomes," and citing articles to support that view (Simon Br. 12), does not provide a basis for concluding that everyone who disagrees must be misrepresenting facts and evidence.

Finally, several defendants suggest that Plaintiff's own article is the "disclosed facts" for their opinion because, after all, readers could go to the library, review each quote and endnote and determine for themselves whether or not it contains "many misconceptions and misquotes" or factual misstatements.  *E.g.*, AHA Br. 15-16; Wiley Br. 14-16.  But to be a "pure opinion," it is the *defendants* who must disclose the facts on which their opinions are based, not the readers

30

of the article who must research them.  (This is quite ironic since defendants also assert that they have no duty to investigate, which they apparently interpret as a license to lie about articles even if they have not read them.  AHA Br. 19; Simon Br. 17; Wiley Br., 19, 22.)  Defendants can cite no case where any court has absolved defamation on the basis of a hypothetical research project *by readers* covering more than 100 endnotes, and it would mean the end of many defamation claims if they could be dismissed at the outset because readers could conduct their own research projects.  Nor would such research projects, assuming that errors were found, resolve whether the author *intentionally* misstated facts or evidence.  One could similarly argue that, in *Milkovich v. Lorain Journal Co.*, the readers could go read the transcript of the hearing in which the newspaper article claimed that school officials had lied and ascertain for themselves whether they agreed, *Milkovich*, 497 U.S. at 21-22; or that, in *CEI v. Mann*, the readers of CEI's and National Review's publication could review Dr. Mann's climate science work for themselves and determine whether he "tortured data" in the service of "politicized science"; or that, in *Project Veritas*, readers could watch the video themselves and determine if it was "deceptive" and "false."  This has never been the law, and it should not be.

       3.   <u>Defendants' Cases Are Inapposite</u>. – Defendants cite numerous cases for the proposition that the Amended Complaint does not allege defamatory statements, many of which do not involve defamation[8] or do not involve motions to dismiss.[9]  The ones on which

---

[8]     *E.g.*, *McMillan v. Togus Regional Office*, 294 F. Supp. 2d 305 (E.D.N.Y. 2003) (AHA Br. 10, Wiley Br. 12), *Gorran v. Atkins Nutritionals*, 464 F. Supp. 2d 315 (S.D.N.Y. 2006) (AHA Br. 10), *Groden v. Random House, Inc.*, 61 F.3d 1045 (2d Cir. 1995) (AHA Br. 11); *Sunrise Pharmacy, Inc. v. Vision Pharma, LLC*, 799 Fed. Appx. 141 (3d Cir. 2020) (Wiley Br. 6-7)

[9]     *E.g.*, *Tucker v. Fischbein*, 237 F.3d 275 (3d Cir. 2001) (AHA Br. 9) (summary judgment), *Downs v. Anapol Schwartz, PC*, 2015 U.S. Dist. LEXIS 106147 (E.D. Pa. Aug. 12, 2015) (AHA Br. 9) (summary judgment), *Underwager v. Salter*, 22 F.3d 730 (7th Cir. 1994) (AHA Br. 11) (summary judgment), *Marier v. Lance*, 2007 U.S. Dist. LEXIS 78530 (W.D. Pa. Oct. 23, 2007) (AHA Br. 15) (summary judgment), *Fetters v. First Hospital Corp.*, 34 Pa. D. & C. 4th 366 (C.C.P. Phil. County 1997) (AHA Br. 15) (summary judgment), *Wolgin v. Smith*, 1996 U.S. Dist. LEXIS 18969 (E.D. Pa. Dec. 19, 1996) (AHA Br. 15) (Rule 50 motion during trial), *Redco Corp. v. CBS, Inc.*, 758 F.2d 970 (3d Cir. 1985) (Simon Br. 9, AHA Br. 15, Wiley
(continued...)

they appear to rely the most do not support them.

In *Saad v. American Diabetes Ass'n*, 123 F. Supp. 3d 175 (D. Mass. 2015), the American Diabetes Association (ADA) raised questions about "image manipulation and duplication" in two articles that plaintiff (Dr. Saad) had published therein. He was given an opportunity to respond. *Id.* at 176. After the ADA asked Saad's university for assistance, it investigated, concluded that certain mistakes had been made, but concluded that there was "no evidence of dishonesty on the part of Dr. Saad." *Id.* After allegations about similar problems in two other articles were raised, and Dr. Saad was given another opportunity to respond, ADA wrote an "expression of concern" that described the entire proceedings, including the findings of plaintiff's university, and stated that the "ADA 'remains concerned about the reliability and credibility of some of the data presented'" in the four articles. *Id.* at 178. The court in *Saad* noted that "[t]he statement does not accuse Dr. Saad of dishonesty or conclude that he engaged in misconduct." *Id. See also* Simon Br. 10 (noting that same fact). It also held that the statement did not state that Dr. Saad's data was unreliable, only that the ADA "remain[ed] concerned" about its reliability. *Saad*, 123 F. Supp. 2d at 178. Finally, it held that ADA's statement "plainly discloses the non-defamatory facts undergirding its opinion." *Id.*

Defendants' analogy to *Saad* fails because, unlike there, the Amended Complaint alleges statements that plainly reflect on Plaintiff's competence and/or integrity as an academic. Their efforts to pretend otherwise – *see* Simon Br. 5 (Simon "did not . . . question . . . [Plaintiff's] professional abilities") and 14 (claiming he "did not degrade or challenge Dr. Wang's professional abilities or attack his character"); AHA Br. 14 ("did not address Plaintiff's character, competence, or capability") – simply ignore the language that was used. Defendants did not simply "express[] concern about the reliability of the 'facts' and 'evidence' cited by

---

[9] (...continued)
Br. 13) (summary judgment); *Mallory v. S&S Publishers*, 260 F. Supp. 3d 453 (E.D. Pa. 2017) (Simon Br. 8) (summary judgment); *Eisenberg v. Alameda Newspapers, Inc.*, 74 Cal. App. 4th 1359 (1999) (Wiley Br. 11) (summary judgment).

Plaintiff" (Simon Br. 11), but accused him of academic incompetence or dishonesty.  Moreover, as already discussed, and even assuming the defamatory statements were not simply factual assertions, defendants' criticisms (unlike the statements in *Saad*) did not disclose the facts that formed the basis of their defamation.

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490 (2d Cir. 2013) was not a defamation case at all, but one under the Lanham Act and New York state law.  Thus, the statements at issue were not an attack on plaintiff's product (surfactant, something used to aid the lung function of prematurely born infants), but (according to plaintiff) a misrepresentation of data that supported defendant's product.  The *ONY* court concluded that the matters stated in the study that touted defendant's product were "more closely akin to matters of opinion," and that "it is relevant that plaintiff does not allege that the data presented in the article were fabricated or fraudulently created."  *Id.* at 497.  The court concluded that no claim could be made under the Lanham Act or New York law where "the conclusions reached by experiments are presented alongside an accurate description of the data taken into account and the methods used."  *Id.* at 497-98.  Plaintiff is not asking this Court to determine whether defendants have presented data in a misleading way; they have not presented data at all.  Even it were a defamation case, *ONY* would be irrelevant.

Finally, in *Croce v. Sanders*, 2021 U.S. App. LEXIS 2927 (6th Cir. Feb. 3, 2021), the claim involved accusations that a professor/cancer researcher's published papers involved data manipulation.  It was undisputed that there had been instances of data manipulation and plagiarism in the papers.  *Id.* at *7.  Two aspects of the case deserve mention at the outset.  First, it was decided on summary judgment.  *Id.* at *1.  Second, it was decided under Ohio law, which unlike Pennsylvania law, follows the "innocent construction" rule.  *Id.* at *16 ("Under Ohio law, 'if allegedly defamatory words are susceptible of two meanings, one defamatory and one innocent, the defamatory meaning should be rejected and the innocent meaning adopted.'")

(internal citation omitted).[10]  The Sixth Circuit held that whether the researcher was "reckless" and whether the problems were "routine" was a matter of opinion given the undisputed existence of some problems.  Significantly, though, it held that assertions that a lab that had been violating scientific norms and that the plaintiff/researcher had appeared multiple times as a co-author on articles based on manipulated data *were* capable of being assessed as true or false.  The court affirmed a grant of summary judgment to defendant on those claims because there was no genuine issue of fact that, under Ohio law, they were substantially true.  *Id.* at *13-16.

To be sure, in some cases the alleged defamatory statements are too vague to support a defamation case.  *E.g.*, *Veno v. Meredith*, 515 A.2d at 574 (dismissing defamation claim by former reporters based on editorial under "Our Opinion" stating that an article by the former reporters was not "thoroughly researched" and contained "unsupported" charges); *Jorjani*. 2019 U.S. Dist. LEXIS 39026, at *13-14 (concluding that "unfit to teach" and "morally repugnant" were not capable of being verified).  But here, the allegations of "misquotes," "deliberate misinformation," and a misrepresentation of facts and evidence are at least as specific, and capable of being assessed as true or false, as the allegations in *CEI v. Mann* ("tortured data"), *Buckley v. Littell* (libeled several people), or *Project Veritas v. NY Times* (videos were "deceptive," "false," and "without evidence").

Defendants pretend that a resolution of Plaintiff's defamation claim will require this Court to resolve a difficult dispute over the efficacy of race-conscious selection procedures in cardiology, medicine, or the world at large.  This is nonsense.  This Court need only resolve

---

[10]  The *Croce* court also suggested another deviation from Pennsylvania (and most other jurisdictions') law when it held that an opinion (that plaintiff had knowingly engaged in scientific misconduct) could be based on a disclosed *opinion* (that problems in the plaintiff's papers were "routine"), rather than disclosed facts.  *Id.* at *7-11.  A more generous interpretation of the Sixth Circuit's unpublished opinion is that both ends of the entire statement were presented as an argument, and thus did not purport to be fact.  *See* discussion *supra* at 26.  This would reconcile that holding with the last part of the decision where defendant was granted summary judgment concerning an allegation that he had said that plaintiff had falsified data or plagiarized text in more than two dozen articles -- not because it was an opinion, but rather because plaintiff had not provided evidence that defendant said it.  *Id.* at *16-17.

whether one  article had "many . . . misquotes" or a "misrepresentation of evidence" or "deliberate misinformation," interpreting those phrases as defamatory if they are capable of being so interpreted.  Whether Plaintiff failed to properly weigh some evidence that defendants consider significant in the debate over race-conscious selection procedures, and thus reached a conclusion they consider wrong, is irrelevant to that inquiry.

      B.      The Amended Complaint Does Not Allege That
                Defendants' Statements Were True

Two defendants, Wiley and Saba, argue that their statements were true.  Wiley claims that all of the statements it published are true, and Saba claims that his statement that the dean of the medical school sought retraction of Plaintiff's article is true.  Wiley Br. 6-11; UPMC Br. 17-18.

Falsity is not a required element under Section 8343(a).  Rather, "the truth of the defamatory communication" is an affirmative defense under Section 8343(b)(1).  Accordingly, courts have held that a Rule 12(b)(6) motion is an inappropriate vehicle to assert that affirmative defense unless it appears obvious on the face of the complaint.  *E.g.*, *Shadle v. Nexstar Broad. Group, Inc.*, 2014 U.S. Dist. LEXIS 98876, at *13 (M.D. Pa. July 21, 2014) ("The other arguments Nexstar asserts are affirmative defense under § 8343(b) and are, therefore, inappropriate for resolution on a Rule 12(b)(6) motion."); *Morgenstern v. Fox Television Stations of Philadelphia*, 2008 U.S. Dist. LEXIS 92990, at *26 (E.D. Pa. Oct. 31, 2008) (noting that § 8343(b) affirmative defenses in a defamation suit are "not appropriate" at the motion to dismiss stage); *Fanelle v. LoJack Corp.*, 79 F. Supp. 2d 558, 563 (E.D. Pa. 2000) (holding that the defense of truth in a defamation claim is not considered at the motion to dismiss stage, unless the defense appears on the face of the complaint); *Schmidt, Long & Assocs. v. Aetna U.S. Healthcare, Inc.*, 2000 U.S. Dist. LEXIS 17355, at *12 (E.D. Pa. Dec. 4, 2000) (denying motion to dismiss on basis of truth as an affirmative defense, where the complaint "specifically alleges that Defendant's communications were false or misleading and lists supporting reasons," and "[n]o affirmative defense of truth appears on the face of the pleading."); *RRZ Pub. Mkts. v. Bond*

35

*Buyer*, 1995 U.S. Dist. LEXIS 604, at *8 (E.D. Pa. January 17, 1995) ("under Fed. R. Civ.

P. 12(b)(6), resolution of the substantial truth of defendants' article is not appropriate.  In

deciding a motion to dismiss, the court must accept all of plaintiff's factual allegations as true.

RRZ has pled sufficiently in its complaint that the statements in defendants' article regarding

RRZ were 'false and defamatory.'  Thus, the plaintiff has stated a cause of action and the court

cannot dismiss the complaint at this stage under a defense of 'substantial truth.'").

> 1.   <u>Wiley Fails To Show That The Face Of The Complaint Demonstrates That
> Its Defamatory Statements Were True</u>. – Wiley concedes that the Amended Complaint asserts

that the citations and quotations in Plaintiff's article were correct.  Wiley Br. 8 (citing Am.

Compl. ¶ 73).  Accordingly, the Amended Complaint does not, on its face, demonstrate that any

of defamatory statements it alleges Wiley made, such as that there were "many . . . misquotes" is

true.  Just the opposite.

Nonetheless, Wiley asserts that "it is indisputable that the Article *does* contain misquotes,

inaccuracies, and misstatements, just as *JAHA* stated in the Retraction" because "the documents

incorporated by reference into Dr. Wang's Amended Complaint reveal that his allegation is

demonstrably untrue."  Wiley Br. 8; *see also* AHA Br. 3-5.  There are many flaws to this

argument.

First, as already noted, the Amended Complaint did not incorporate the retraction Wiley

and AHA attach to their papers (Dkt. No. 47-1, Ex. A; Dkt. No. 51-1, Ex. 3).  The Amended

Complaint refers to a retraction published on August 5, 2020, and Plaintiff contends that it is the

one accompanying this brief.

Second, even if the document could be considered on Wiley's motion, it has the same

problem that it had to support the AHA's "opinion based on disclosed facts" argument.  Wiley's

version cites only two "samples" of purported misquotes, and that would hardly support the

proposition that there were many misquotes.  *E.g.*, *Buckley v. Littell*, 539 F.2d at 896 (affirming

judgment of defamation based on statement that journalist had libeled "several people";

36

statement was false even though journalist had been sued for libel and one such suit was successful by way of settlement).

Third, the document does not show that Wiley's defamations were true.  Indeed, what it shows is that Wiley and AHA, desparate to find some justification to support their decision to retract Plaintiff's article, were willing to double down on their false attacks.

Wiley's brief, and the document Wiley refers to as the retraction, claim that Plaintiff misquoted two articles, one by Auseon (Dkt. No. 51-1 Ex. 4) and one by Burnett (*id.* Ex. 5). Here is the full paragraph from Plaintiff's article in which he quotes the Auseon article:

> Alex J. Auseon, DO, and colleagues at the Ohio State University, in 2013, detailed efforts to augment diversity in their cardiology fellowship training program.  Outreach efforts to specifically increase the number of underrepresented minorities were exemplary of affirmative action for employment suggested by Executive Order 11246.  However, it was also revealed that ". . . . we simply made it a priority to rank [underrepresented in medicine] applicants more aggressively than in previous years, thus achieving success in matching them regardless of recruiting efforts, with the implication being that we accepted less competitive applicants in an effort to increase diversity." Encouraging the explicit use of race and ethnicity for employment reveals a lack of knowledge regarding legal permissibility and fellow status.

Dkt. No. 51-1 at 8 (page 5 of the article).  The part in quotes is from the Auseon article.

Thus, Plaintiff was quoting the Auseon article for the proposition that efforts to increase minority representation in the program in question were legally questionable.  The paragraph said nothing at all about the quality of the academic credentials of those admitted.

To twist this into a "misquote," AHA and Wiley lopped off everything in the paragraph but the quote from the Auseon article.  They do not claim that Plaintiff misquoted Auseon (as their own quote of Auseon demonstrates) but rather that the quote was "taken out of context and falsely implied that the Ohio State University (OSU) program ranked racial and ethnic groups underrepresented in medicine with lower academic credentials in order to achieve diversity." Wiley Br. 9 (quoting Dkt. No. 51-1 at 28, page 1 of Ex. 3).  Why precisely the quote from Auseon implies lower *academic* credentials (as opposed to, say, weaker references or lesser

37

clinical skills) they do not say.[11]  More importantly, this was plainly not the point for which *Plaintiff* was quoting the Auseon article.  He was using it to question the legality of ranking applicants "more aggressively" by race regardless of whether the "academic credentials" of those so ranked were lower, higher, or equivalent to others.

Thus, for the first "sample," AHA and Wiley used a variation of the "best defense is a good offense" strategy.  There was no misquote.  And they could only accuse Plaintiff of taking a quote "out of context" by themselves taking Plaintiff's *use* of that quote out of context.  It is hardly a "fact" which is indisputably true.

The salient feature of the second "sample" (Wiley Br. 10), relating to the Burnett article, is that it appears in form just like the first.  Both begin with the phrase "a quote from an article." Both use one set of quotation marks to indicate that Plaintiff's article was quoting another source.  (That is, the example related to the Auseon article did not use two sets of quotation marks, one to indicate that Wiley and AHA were quoting Plaintiff, and another to indicate that Plaintiff was quoting Auseon.  The first attribution is indicated solely by setting off the excerpt.) Thus, because it was introduced and looks exactly like the first example, where Plaintiff was, in fact, quoting the Auseon article, AHA and Wiley are plainly leading the reader to understand that Plaintiff was quoting the Burnett article in the second example.  *See also* Wiley Br. 3 (Plaintiff "'mischaracterized' a *quotation* from another article") (emphasis added).

But that was a deception on their part.  Plaintiff did not quote the Burnett article.  The excerpt that AHA and Wiley are quoting from Plaintiff's article *refers* to the Burnett piece, but it does not quote it.  Dkt. No. 51-1 at 14 (page 11 of the article, bottom right).  And this is of some consequence, since AHA and Wiley were trying to justify their contention that Plaintiff's article

---

[11]     Wiley and AHA claimed that this false implication of lower academic credentials, which they attribute to Plaintiff, is disproved by quoting the following sentence from the Auseon article which stated that scores on the medical licensing exam for underrepresented minorities showed "no significant difference" with scores for others.  Wiley Br. 9.  How this disproves "lower academic credentials" is somewhat of a mystery since the medical licensing exam is just one such credential.  The quote from the Auseon article in Wiley's retraction – like the paragraph in Plaintiff's article in which he quotes it – never discusses overall academic credentials.

had *misquotes*.  That is why they (falsely) introduced their second sample with these words: "A quote from an article . . ."   Plaintiff may have misunderstood the Burnett article, but he plainly did not misquote it.  To *mis*quote a source, you have to try to quote it first.

So the "samples" in the Wiley version of the retraction hardly *proves* that the defamatory statement that Plaintiff's article had misquotes was true.  It did not show "many" misquotes because it did not show *any* misquotes.[12]

> 2. <u>Saba Fails To Show That The Face Of The Complaint Demonstrates That His Defamatory Statement Was True</u>. – Saba claims that the Amended Complaint alleges that the Dean of the Medical School *did* seek retraction of Plaintiff's article, and therefore his statement to that effect could not be defamatory.  UPMC Br. 17-18.  He claims paragraphs 38 and 46 support his argument.  But paragraph 38 says nothing specific about the Dean Shekhar, but refers only to "agents" of UPSOM.  Paragraph 46 specifically states that the statements made by Saba and others were "false statements of fact" – including the statement in paragraph 43 that Shekhar "sought the retraction of Plaintiff's article."  Thus, paragraph 46 alleges that Plaintiff's "frequent[] misquoting [of] sources . . . necessitated the intervention of his school's dean to ensure the retraction of the article" is a *false* statement of fact.  Any reading that suggests otherwise is inconsistent with the obligation to interpret a complaint favorably to the plaintiff.

> C. <u>The Amended Complaint Adequately Alleges Fault</u>

Wiley, AHA, and Simon all assert that (1) Plaintiff is a limited public figure and thus must allege "actual malice," and (2) the Amended Complaint fails to do so.  AHA Br. 17-21; Simon Br. 14-18; Wiley Br. 16-22.

---

[12]   Perhaps recognizing the problems with these "samples," AHA claims that "[t]o the extent that . . . the examples provided were false, the AHA would have had no reason to suspect this alleged falsity."  AHA Br. 20.  The Amended Complaint, of course, does not allege that anyone gave AHA and Wiley these examples.  In any event, AHA initially vetted and published the article (along with Wiley).  It could determine the falsity of the examples because it previously had checked the accuracy of the article, and could do so again by checking the references in the examples.  If it did not know that "a quote from an article," referring to the Burnett article, was false, it was desperately avoiding the truth.

Fault is not an element for a defamation claim under Section 8343(a).  Thus, although it is true that Plaintiff will have to prove some kind of fault at trial – and "actual malice" by clear and convincing evidence if he is a limited public figure – that is not a *pleading* requirement.[13]

Because the Amended Complaint does not allege facts sufficient to conclude that Plaintiff is a limited public figure, it would be premature for the Court to resolve that question on a Rule 12(b)(6) motion.  While Plaintiff does not dispute that his article can be said to be part of a debate concerning race-conscious decision-making in medicine, there are no allegations in the Amended Complaint concerning how many people read JAHA.  *Straw v. Chase Revel, Inc.*, 813 F.2d 356, 361 (11th Cir. 1987) (holding that publisher of small circulation magazine that discussed potential investment opportunities was not a limited public figure although he was "well known in some circles"; "not every publisher is automatically a public figure by virtue of his access to a printing press").  Not everyone who posts an essay on an important policy issue to their public Facebook page is a limited public figure, even if, technically, it is available throughout the world.  As AHA states, a limited public figure is one whose conduct can be expected to have a *significant* impact on the resolution of a specific public dispute.  AHA Br. 17. *See also Schiavone Construction Co. v. Time, Inc.*, 847 F.2d 1069, 1078 (3d Cir. 1988) (holding that limited public figure analysis requires courts to "perform a case-by-case determination, scrutinizing the nature and scope of the plaintiffs' involvement in the controversy.").

In any event, the Amended Complaint adequately alleges "actual malice."  "Actual malice" requires knowledge or reckless disregard of the falsity of the statements and, accordingly, is covered by the second sentence of Rule 9(b) of the Federal Rules: "Malice,

---

[13]    Wiley cites *Marcone v. Penthouse Int'l Magazine for Men*, 754 F.2d 1072 (3d Cir. 1985) for the proposition that whether a public figure has met the burden of proving actual malice is a question of law for the Court.  Wiley Br. 20.  *Marcone*, though, involved an appeal of a denial of judgment notwithstanding the verdict, where the trial court had instructed the jury that the plaintiff was not a limited public figure.  So, too, other cases Wiley relies upon were decided on summary judgment (*Hatfill v. The New York Times Co.*, 532 F.3d 312 (4th Cir. 2008)) or after trial (*Dickey v. CBS, Inc.*, 583 F.2d 1221 (3d Cir. 1978) and *McDowell v. Paiewonsky*, 769 F.2d 942 (3d Cir. 1985)) (Wiley Br. 17).

intent, knowledge, and other conditions of a person's mind may be alleged generally."  *See also Iqbal v. Ashcroft*, 556 U.S. 662, 687 (2009)("'[A] rigid rule requiring the detailed pleading of a condition of mind would be undesirable because, absent overriding considerations pressing for a specificity requirement, as in the case of averments of fraud or mistake, the general "short and plain statement of the claim" mandate in Rule 8(a) . . . should control the second sentence of Rule 9(b)'") (quoting 5A C. Wright & A. Miller, *Federal Practice and Procedure* § 1301, p 291 (3d ed. 2004)); *Dahl v. Kilgore*, 2018 U.S. Dist. LEXIS 210036, at *20 (E.D. Ky. Dec. 13, 2018) (denying motion to dismiss defamation claim alleging that Kentucky state trooper's various statements that plaintiff was stalking his ex-girlfriend were made with knowledge of their falsity); *McNamee v. Roman Catholic Diocese of Sacramento*, 2013 U.S. Dist. LEXIS 151807, at *10-11 (E.D. Cal. Oct. 22, 2013) (granting motion to amend complaint to allege defamation claim and rejecting defendants' argument that proposed amendment was futile because "malice must be specifically alleged and shown with detailed facts."); *Calloway v. Green Tree Servicing, LLC*, 607 F. Supp. 2d 669, 675-76 (D. Del. 2009) (holding that plaintiff's claim adequately alleged a claim for defamation under Delaware law, and was not preempted by the Fair Credit Report Act, where it "generally alleges that defendant engaged in its defamatory conduct with malice or intent to injure").  *Cf. Hildebrand v. Allegheny County*, 757 F.3d 99, 112 (3d Cir. 2014) (holding that conditions precedent may be alleged generally under Fed R. Civ. P. 9(c); "Neither *Iqbal* nor *Twombly* purport to alter Rule 9").

Here, the Amended Complaint provides various facts that, when accepted as true with inferences favoring plaintiff, adequately allege actual malice.  It alleges that all of the defendants reviewed and read Plaintiff's article and thus knew that the citations and quotations were correct. Am. Compl. ¶ 73.  *E.g.*, *Project Veritas v. N.Y. Times Co.*, 2021 N.Y. Misc. LEXIS 2264, at *20 (holding that complaint adequately alleged actual malice because it alleged, *inter alia*, that reporters "knew their claims about the video report were false because they had themselves reviewed the video report").  With respect to AHA and Wiley, it further alleges that they vetted

41

Plaintiff's article *before* it was published (Am. Compl. ¶¶ 21, 39), and a reasonable inference from this allegation is that they checked the quotations and citations for accuracy. *Palin v. New York Times Co.*, 940 F.3d 804, 814 (2d Cir. 2019) (holding that complaint adequately alleged actual malice; "the district court rejected a permissible inference from the articles [that had rejected a link between Palin's political ad and an Arizona shooting]: that one who had risen to editor-in-chief at The Atlantic knew their content and thus that there was no connection between Palin and the Loughner shooting."). Further, it alleges that they retracted the article within days of receiving complaints concerning it and without notifying Plaintiff or asking him to respond. *Id.* ¶¶ 38, 39a. Indeed, they refused to respond when he asked for specifics. Am. Compl. ¶ 42. *Compare Saad*, 123 F. Supp. 3d at 176 (Dr. Saad repeatedly asked for his response to allegations).

Defendants assert that they have no duty to investigate. AHA Br. 19; Simon Br. 17; Wiley Br., 19, 22. But the Amended Complaint alleges that they *did* "investigate" by reading Plaintiff's article and checking the quotes and cites, and thus knew what they alleged was not true. In any event, the Supreme Court has distinguished between a failure to investigate and purposefully avoiding the truth. *E.g.*, *Harte-Hanks Communications v. Connaughton*, 491 U.S. 657, 692 (1989) ("Although failure to investigate will not alone support a finding of actual malice . . . the purposeful avoidance of the truth is in a different category"). *See also Mzamane v. Winfrey*, 693 F. Supp. 2d at 509 n.35 (explaining the difference between a duty to investigate and purposeful avoidance: "purposeful avoidance is when the information is readily available and yet discarded in order to avoid learning facts which may undermine the speaker's subjective beliefs"). In *Harte-Hanks*, the Supreme Court upheld a defamation verdict and concluded that the evidence supported a finding of actual malice. It placed great emphasis on the fact that the newspaper failed to listen to a tape of the conversation in which its key informant had claimed that the plaintiff-candidate had suggested that he had an improper motive and/or made improper offers to the informant and her sister; and the fact that it did not try to contact the sister to

confirm the informant's story. *Harte-Hanks* 491 U.S. at 684-85 (noting that other discrepancies in testimony "may have given the jury the impression that the failure to conduct a complete investigation involved a deliberate effort to avoid the truth").

More generally, and as *Harte-Hanks* suggests, actual malice is a fact-sensitive inquiry in which all the circumstances must be considered. *E.g.*, *Schiavone Construction*, 847 F.2d at 1092 (affirming trial court's denial of summary judgment on actual malice issue); *Weaver v. Lancaster Newspapers, Inc.*, 592 Pa. 458, 466, 926 A.2d 899, 903 (2007) (reversing grant of summary judgment in defamation action by police officer over allegations of rape and sexual abuse; "immunity from defamation liability is not guaranteed merely because a defendant protests that he published in good faith"); *id.* at 473, 926 A.2d at 907 ("It also bears note that the Supreme Court of the United States expressed its doubts generally about the use of summary judgment to dispose of public figure defamation cases . . . stating that, 'The proof of "actual malice" calls a defendant's state of mind into question and does not readily lend itself to summary disposition.'") (quoting *Hutchinson v. Proxmire*, 443 U.S. 111, 120 n.9 (1979)); *Corabi*, 273 A.2d at 915 (affirming jury's finding that use of a quote from a police investigator, to the effect that plaintiff should be put where she belongs, was defamatory; actual malice could be inferred because writer knew that investigator had a fixation about putting plaintiff behind bars); *Giordano v. Claudio*, 714 F. Supp. 2d at 534 (holding that complaint adequately stated malice for defamation claim arising out of letter in which defamation defendant claimed that colleague did not deserve authorship credit for publication in Journal of Cellular Physiology); *Mzamane v. Winfrey*, 693 F. Supp. 2d at 505-06 (denying motion for summary judgment on defamation claim by head of school against founder and owner; "a party seeking to demonstrate actual malice need not rely solely on an admission from the mouth of the publisher . . . Rather, a plaintiff may rely on objective circumstantial evidence in order to 'override defendants' protestations of good faith and honest belief' as to the truth of the statements"); *id.* at 508 n.32 ("The fact that Winfrey elected to schedule the November Press Conference and present a 'story' which . . . implicated

43

Plaintiff's involvement with the allegations of abuse without first receiving input from Plaintiff creates a reasonable inference that Winfrey intended to 'spin' the story with her version of the facts and avoid receiving contradictory information"); *CEI v. Mann*, 150 A.3d at 1255 (affirming denial of motion to dismiss under D.C. Anti-SLAPP statute and rejecting argument that "because the challenged statements reflect [defendants'] subjective and honest belief in the truth of their statement actual malice cannot be proven.").[14]

Thus, the failure to speak with Plaintiff at all, or even to respond to his inquiries concerning the alleged flaws in his article (Am. Compl. ¶ 42), is hardly irrelevant to whether AHA and Wiley either knew of the falsity of their statements or were trying to avoid the truth. The fact that unidentified individuals from UPMC, UPP, and Pitt – contrary to AHA's contention (AHA Br. 7, 20), the Amended Complaint does not allege an "investigation" by UPMC -- conveyed some of the defamatory statements to them is also hardly dispositive when *AHA and Wiley vetted the article before publishing it*, and could easily have asked Plaintiff about any discrepancies brought to their attention.  (Thus, AHA's suggestion that it "would have had no reason to suspect" (AHA Br. 20) that anyone was feeding it bad information is, to put it kindly, self-serving.  It had every reason to suspect because it vetted the article itself.)  This is particularly so to the extent that various statements – *e.g.*, that the article contained *deliberate* misinformation – speak to Plaintiff's intent.  Conspicuously, AHA does not contend that anyone told it about Plaintiff's intent.

Nor is it irrelevant that defendants apparently feel quite strongly about their opposition to Plaintiff's position concerning the use of race-conscious selection methods.  *E.g.*, Am. Compl.

---

[14]    In this regard, it deserves mention that only one of the four cases AHA cites at the top of page 21 of its brief involved a motion to dismiss (*Barger v. Playboy Enterprises*, 564 F. Supp. 1151 (N.D. Cal. 1983)), and the pleading there was a second amended complaint.  The remaining cases involved either summary judgment or j.n.o.v. motions.  *See also Michel v. NYP Holdings, Inc.*, 816 F.3d 686 (11th Cir. 2016) (Wiley Br. 19) (holding that complaint failed to allege "actual malice" but that "[a] dismissal based on the failure to plead facts giving rise to an inference of actual malice should be without prejudice and the plaintiff should have the opportunity to amend his complaint.").

44

¶ 38 ("contrary to our organization's core values and historic commitment to promoting diversity and inclusion in medicine and science."). *See CEI v. Mann*, 150 A.3d at 1259 ("Although animus against Dr. Mann and his research is by itself insufficient to support a finding of actual malice, . . . bias providing a motive to defame by making a false statement may be a relevant consideration in evaluating other evidence to determine whether a statement was made with reckless disregard for its truth. . .  In evaluating the evidence in this case, . . . the jury could consider that appellants' zeal in advancing their cause against the hockey stick graph's depiction of a warming global climate led them to accuse Dr. Mann, one of its most prominent proponents, of deception and misconduct in producing the graph . . ."). Simon asserts that the Amended Complaint does not plead "any facts suggestive of personal animosity between the two physicians," Simon Br. 4 n.3, but it does allege animosity to Plaintiff's views.  Simon Br. 11.

If a further basis for alleging actual malice were needed, the version of the retraction discussed in Part B.1 of this Section would provide it.  As noted there, AHA and Wiley provided two "samples" of Plaintiff's "many misconceptions and misquotes," one of which took Plaintiff's quote of a source out of context to create a false implication that a full reading of the quote in context easily dispels; and the second of which they deceptively presented as a quote. So if this Court were to consider that evidence on this motion to dismiss, and weigh it with all reasonable inferences favoring Plaintiff, it would further militate in favor of denying the motion.

The cases on which defendants rely are distinguishable and only underscore that actual malice is a fact-sensitive inquiry and should not be resolved, in this case, on a Rule 12(b)(6) motion. *Tucker v. Philadelphia Daily News*, 577 Pa. 598, 848 A.2d 113 (2004) involved newspaper reports asserting that plaintiffs' separate loss of consortium lawsuit sought recovery for loss of sexual relations.  Since loss of consortium usually involves that element of damages, the court simply concluded that the defendant newspapers had no obvious way of knowing that plaintiffs were not seeking such damages.  Significantly, it allowed plaintiffs to amend their complaint to allege that their attorney had apprised some of the defendants that the case did not

involve that element of damages. *Id.* at 633, 848 A.2d at 135. In *McCafferty v. Newsweek Media Group, Ltd.*, 955 F.3d 352 (3d Cir. 2020), the court held that there were no actionable statements at all. Its *dicta* regarding actual malice relied on the standard that a failure to investigate or a departure from journalistic standards, *standing alone*, is not sufficient. *Id.* at 359. As already noted, defendants here *did* investigate and then ignored what they learned. To the extent that they did not, it reasonably can be characterized as an effort to avoid the truth. In *Pace v. Baker-White*, 2021 U.S. App. LEXIS 7433 (3d Cir. March 5, 2021), the Court concluded that the allegations of actual malice were indeed conclusory (*id.* at *6), and that the specific objective circumstances relied upon by plaintiff there (a failure by defendants to investigate Plaintiff's motive in commenting favorably on a Facebook post that mocked a student arrested in North Korea and suggested that police mete our harsh punishments to protesters and to be familiar with plaintiff's professional reputation) did not suffice.

*        *        *

Defendants would have this Court believe that their statements were just part of a typical, run-of-the-mill academic disagreement, and they urge the Court not to get involved lest it chill academic freedom. *E.g.*, AHA Br. 11 (emphasizing the need to protect criticism "[i]n a free debate of ideas"); Simon Br. 13-14 ("these debates and academic conversations are necessary to promote the free flow of ideas"); Wiley Br. 5 ("'we welcome independent viewpoints . . . with the goal of creating an open dialogue'") (quoting Simon article). Plaintiff invites the Court to review the underlying statements and tweets, keeping in mind the breakneck speed at which Defendants launched their attack, hit their target, and paid fealty to their never-to-be-questioned use of race, and ask itself the following question. Are defendants genuinely interested in a "free debate of ideas" or in silencing those who disagree?

       D.     <u>The Amended Complaint Adequately Alleges Pitt's Liability</u>

Pitt claims that the Amended Complaint does not allege facts sufficient to hold it vicariously liable for anyone else's statements. Pitt Br. 14-18. It is wrong.

46

The defamation claim is based in part upon defamatory statements made by John Doe defendants 6-10 to AHA and Wiley and, of course, Plaintiff does not know exactly who those individuals are.  Am. Compl. ¶ 38.  But it seems reasonable to believe that some were agents of Pitt.  The head of the Department of Medicine at UPSOM distributed an email letter to the UPSOM community stating that Plaintiff's article was "antithetical to our values and deeply hurtful to many of our URM faculty."  *Id.* ¶ 31.  That agents of Pitt acted to defend UPSOM's values and its faculty by defaming Plaintiff's article is a reasonable inference to draw.  *E.g.*, *Tress v. Axa Advisors*, 2013 U.S. Dist. LEXIS 205303, at *31 (E.D. Pa. June 6, 2013) (denying motion to dismiss by investment firm that employed investment advisor that invested plaintiff's money in a Ponzi scheme because "it is reasonable to infer that [advisor] was motivated, at least in part, by a desire to bring in more income for himself and for [firm].").  *See also* Pitt Br. 22 ("[Pitt] and its employees plainly have . . . a legitimate interest in protecting their academic reputations.").

Pitt claims that the allegation that the John Doe defendants acted on behalf of Pitt is "contradicted by the Amended Complaint itself, which allege that it was '[UPMC],' and not the University or its agents, that 'notified the [JAHA] Editor-in-Chief that the article contains many misconceptions and misquotes . . .'"  Pitt Br. 17 (quoting Am. Compl. ¶ 39a).  This is wrong; the Amended Complaint alleges no such thing.  Paragraph 39a alleges only that AHA and Wiley *said* that UPMC notified the Editor-in-Chief; in the part that Pitt quotes, Paragraph 39a is quoting the retraction published on August 5, 2020.  Since assertions in that retraction are part of Plaintiff's defamation claim against AHA and Wiley, the Amended Complaint is obviously not alleging that the matters contained therein are true.

The Amended Complaint also alleges that Simon acted on behalf of Pitt.  Am. Compl. ¶¶ 15, 71.  (Indeed, Simon concedes that the Amended Complaint alleges "statements published by . . . UPSOM disavowing [Plaintiff's] [a]rticle."  Simon Br. 4.)  Pitt does not dispute that Simon is its employee but asserts that this Court may ignore the allegation because Simon's

47

article says that he is an editor of JAHA.  Pitt Br. 17.  But, as already noted, even if the Court

may take notice of what the article says, it cannot deem its contents true.  The article is hearsay

for the proposition that Simon is an editor of JAHA, and it is no more appropriate to assume that

fact is true on a Rule 12(b)(6) motion than it would be to assume that Simon's claim therein that

Plaintiff 's article "misrepresented facts" is true.  Moreover, Pitt does not explain why Simon's

academic duties at Pitt could not include writing for, or serving on the board of, a publication in

his field and/or using his role as an editor at JAHA to defend UPSOM's "values."

So, too, with defendants Saba and Berlacher.  Faculty members of a medical school can

be expected to uphold its "values," and to the extent that they perceive an attack on those values,

it is not implausible that they acted on behalf of their principal in rebutting that attack by lying

about the article.

## V.    THE FOURTH THROUGH SEVENTH CLAIMS PROPERLY ALLEGE BREACHES OF CONTRACT AND TORTIOUS INTERFERENCE

The fourth claim alleges breach of contract against Wiley and AHA; the fifth claim

asserts a claim against Pitt, UPP, and UPMC for inducing that breach.  The sixth claim alleges a

breach of contract claim against UPP; the seventh asserts a claim against Pitt and UPMC for

inducing that breach.  Defendants' arguments with respect to these claims are all quite similar

and can be addressed together.

The fourth claim for relief alleges that AHA and Wiley breached a contract to publish

Plaintiff's article.  Both AHA and Wiley argue that the fourth claim does not identify a provision

of the contract that was breached.  AHA Br. 21-22; Wiley Br. 22-24.  Wiley claims that they did

publish it and that, therefore, it complied with its contractual obligations.  Wiley Br. 23.  They

point out that the article is currently available to the public, albeit with a watermark across each

page with the word "RETRACTED ARTICLE."  Wiley Br. 23 & Dkt. No. 51-1, Ex. 1.

As UPMC and UPP's brief correctly states, the covenant of good faith and fair dealing is

deemed an implied part of every contract.  UPMC Br. 19.  (UPMC and UPP also do not move

against the fifth claim for relief, for tortious interference with the publishing contract, which at

least tacitly acknowledges that the Amended Complaint adequately alleges a breach of that contract.)  If Wiley and AHA were correct, a vanity publisher (a company that assists authors in self-publishing) could take an aspiring author's money and publish a book with a jacket or label that says "REALLY LOUSY BOOK," and claim that it complied with its contractual obligation because, after all, it did publish the book.  Plaintiff submits that any such attempt would violate the covenant of good faith and fair dealing, as does AHA and Wiley's retraction.

Pitt (but not UPMC or UPP) moves to dismiss the fifth claim for relief, which alleges that Pitt, UPP, and UPMC tortiously interfered with Plaintiff's publishing agreement with Wiley and AHA.  Pitt Br. 20-22.  Pitt's argument is twofold.  The first part is the same as their argument on the defamation claim, that it is not vicariously liable, and fails for the same reason.  Pitt asserts that "Plaintiff concedes that it was employees of '*the University of Pittsburgh Medical Center (UPMC)*' who 'notified the [*JAHA*] Editor-in-Chief that [Plaintiff's] article contains many misconceptions and misquotes.'"  Pitt Br. 22 (quoting Am. Compl. ¶ 39a) (italics and brackets as in brief).  As already noted, Paragraph 39a does not concede that Pitt agents did not communicate with AHA and Wiley when it repeats the defamatory statements that AHA and Wiley made in the retraction notice published on August 5, 2020.

Pitt's second argument is that the Amended Complaint does not allege purposeful action to harm the contractual relationship between Plaintiff and the JAHA publishers without justification because, Pitt claims, its agents were only correcting miscitations and misquotations by Plaintiff, a fellow faculty member "whose errors would reflect on the University and the reputation of its faculty."  Pitt Br. 22.  But, of course, the Amended Complaint does not allege that Pitt's agents were actually correcting miscitations and misquotations; rather, it alleges that they were defaming him in an effort to pressure AHA and Wiley to retract his article.

The sixth claim for relief alleges that, under Plaintiff's contract with UPP, he receives compensation for "academic productivity," and that UPP breached the contract and the covenant of good faith and fair dealing by seeking retraction of the article, thus frustrating Plaintiff's

49

ability to receive additional compensation for academic productivity.  UPP's brief argument on this point is that Plaintiff does not identify a "specific and essential term" providing that publishing of an article in JAHA "is the type of academic productivity for which UPP agreed to compensate him."  UPMC Br. 19.  It also argues that the Amended Complaint has not identified a contractual benefit that UPP frustrated Plaintiff's ability to receive.  *Id.* at 20.

The first part of the argument appears to be another "magic words" argument; UPP is arguing that the Amended Complaint does not specifically state: "academic productivity includes publishing articles in academic journals."  But that is plainly implicit in the allegations of the Amended Complaint, read reasonably and with any inferences favoring Plaintiff.  *E.g.*, *Milican v. Home Depot U.S.A., Inc.*, 2020 U.S. Dist. LEXIS 123987, at *17-18 (E.D. Mich. July 15, 2020) (denying motion to dismiss breach of contract claim where complaint alleged that employee was promised, but did not receive, the bonus structure of a Regional Vice President; "Plaintiff states a plausible claim for relief for breach of contract. He does not need to describe the term Defendant allegedly breached in extensive detail, quote the term, or attach the alleged contract to his complaint."); *RHN Inc. v. CNA Nat'l Warranty Corp.*, 2019 U.S. Dist. LEXIS 155941, at *7 (D. Ariz. Sept. 12, 2019) (denying motion to dismiss claim that defendant breached an oral profit sharing agreement; defendant "fails to cite any authority to support its position that specific terms of the contract must be set forth in the complaint to satisfy Rule 8. . . At the motion to dismiss stage, allegations detailing the specific terms of the contract are not required.").  UPP offers no reason why publishing in academic journals would not be part of "academic productivity."

The second argument is just wrong.  The Amended Complaint specifically states that "academic productivity" entitles him to "additional compensation."  UPMC Br. 19 (quoting Am. Compl. ¶ 19.)

The seventh claim for relief, asserted against Pitt and UPMC, asserts tortious interference with Plaintiff's contract with UPP.  Am. Compl. ¶¶ 89-91.  Pitt and UPMC's arguments here are

50

just derivative of other arguments.  Pitt's argument is the same as its argument with respect to

the fifth claim for relief.  Pitt Br. 20-22.  UPMC's argument piggybacks on UPP's argument with

respect to the sixth claim.  UPMC Br. 20.  They are wrong for the same reasons discussed above.

## VI.   THE AMENDED COMPLAINT ADEQUATELY ALLEGES A PENNSYLVANIA WHISTLEBLOWER CLAIM AGAINST PITT, UPMC, UPP, GLADWIN, SABA AND BERLACHER

Plaintiff's eighth claim for relief asserts a cause of action under the Pennsylvania

Whistleblower Law ("PWL"), 43 Pa. Cons. Stat. §§ 1421 *et seq*., against Defendants Pitt,

UPMC, UPP, Gladwin, Saba, and Berlacher.  Plaintiff maintains that he suffered retaliation and

adverse action, in part, as a result of his exchange with Berlacher and Saba on July 31, 2020.

Am. Compl. ¶¶ 64-66, 97-99.  During this meeting, Plaintiff described how "the selection

processes for the medical education program at UPSOM and the GME program at UPMC were

violating federal and state law based on the racial and ethnic preferences employed during the

applicant admission process."  *Id*. at ¶ 97.  The Amended Complaint further avers that Plaintiff

identified Title VI as the specific statutory provision that Defendants' policies and programs are

violating through, *inter alia*, the way in which racial preferences are employed to distribute

funding and program benefits.  *Id*. at ¶¶ 60-65, 92.

Defendants argue that Plaintiff failed to adequately plead a PWL claim and, accordingly,

that he is not entitled to relief.  These arguments lack merit.  The allegations in Plaintiff's

Amended Complaint set forth a *prima facie* case for violation of the Pennsylvania Whistleblower

Law.

### A.   The Amended Complaint Alleges a Report of "Wrongdoing" with the Specificity Required by Rule 8(a) and Federal Notice Pleading

Pitt challenges Plaintiff's PWL claim for two separate and distinct reasons.  First, Pitt

argues that Plaintiff failed to plead "any specific law the University's policies allegedly violated"

or specific facts demonstrating how the UPSOM's admissions policies are objectively unlawful.

Pitt Br. at 19.  According to Pitt, at this stage of the litigation, Plaintiff's PWL claim requires

him to identify the precise chapter, verse, and line citation for both (a) the law being violated and

(b) the offending University policy. *Id.* To support the notion that the pleading requirements for a PWL claim require this level of specificity, Pitt erroneously relies upon the Pennsylvania Superior Court's decision in *Riggio v. Burns*, 711 A.2d 497 (Pa. Super. 1998). Pitt's argument overstates the facts required to allege a valid PWL claim under the standards of federal notice pleading. Plaintiff identifies Pitt's "wrongdoing," as defined under 43 Pa. Cons. Stat. § 1422, with the requisite level of specificity to satisfy Rule 8(a).

As a preliminary issue, the *Riggio* decision is inapposite on the issue of federal pleading requirements for two reasons. First, *Riggio* is a Pennsylvania state court decision that, by its nature, must examine any pleading requirement from Pennsylvania's fact pleading standard. *See also Reager*, 2009 U.S. Dist. LEXIS 88753, at *13 (comparing federal and state requirements for pleading defamation). Second, and perhaps more importantly, the Superior Court in *Riggio* was reviewing the trial court's grant of summary judgment. The parties in *Riggio* had conducted and competed discovery. The Superior Court, in part, decided that the plaintiff could not satisfy Pennsylvania's summary judgment standard without identifying what specific conduct by defendant the cited law prohibited. *Riggio*, 711 A.2d at 501. The plaintiff in *Riggio* cited a law subjecting a physician to disciplinary measures "for '[b]eing guilty of immoral or unprofessional conduct.'" *Id.* (quoting 63 Pa. Cons. Stat. § 422.41(8)). The Superior Court found the plaintiff's facts insufficient when, following the close of discovery, plaintiff did not identify the defendant's "prohibited conduct" under 63 Pa. Cons. Stat. § 422.41(8). *Id.*

The Superior Court's analysis in *Riggio* also indicates that the legal standard cited by Plaintiff "[was] subject to interpretation" and failed itself to "specifically define prohibited conduct[.]" *Id.* Here, as Pitt points out, there are established standards for evaluating whether UPSOM's preferential treatment practices and policies based upon race, in fact, violate federal law. *See* Pitt Br. at 19 (citing *Grutter v. Bollinger*, 539 U.S. 306, 328 (2003)). Regardless, assessing this level of specificity is wholly inappropriate until *after* the close of discovery. The Pennsylvania Whistleblower Law prohibits Pitt and UPSOM from taking any adverse action

against Plaintiff – including any form of "discriminat[ion] or retaliat[ion] against [Plaintiff] regarding [his] compensation, terms, conditions, location or privileges of employment" – because he

> … makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority *an instance of wrongdoing or waste* by a public body or an instance of waste by any other employer as defined in this act.

43 Pa. Cons. Stat. § 1423(a) (emphasis added). The PWL defines "wrongdoing" as "[a] violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interest of the public or the employer." 43 Pa. Cons. Stat.. § 1422.

Under Rule 8(a) of the Federal Rules of Civil Procedure, Plaintiff's PWL claim "must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). The statement required by Rule 8(a)(2) "must give [Pitt and UPSOM] fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Contrary to Pitt's argument, federal courts considering the pleading requirements for claims asserted under the Pennsylvania Whistleblower Law "find[] no reason for [a] [p]laintiff to enumerate specific laws within her Complaint to withstand [a] [d]efendant['s] Motion to Dismiss." *Keefer v. Durkos*, 371 F. Supp. 2d 686, 692 (W.D. Pa. 2005) (citing *Podgurski v. Pennsylvania State University*, 722 A.2d 730 (Pa. Super. 1998)). Pennsylvania courts also agree that the pleading requirements under the Pennsylvania Whistleblower Law do not require plaintiffs to allege violations of specific statutory provisions. *See Podgurski*, 722 A.2d at 732-33.

Here, Plaintiff's Amended Complaint alleges facts sufficient to demonstrate that he "ma[de] a good faith report" of "wrongdoing" by UPSOM to Saba and Berlacher on July 31, 2020. *See* Am. Compl. ¶¶ 64-66, 92, 97-99. The Amended Complaint explains that Plaintiff discussed with Saba and Berlacher (1) "the selection process for the medical education program at UPSOM and the GME program at UPMC[;]" (2) how those practices and programs awarded

preferences based upon racial and ethnic classifications; and (3) why such practices and programs were impermissible under federal and state law, specifically denoting Title VI and its prohibitions upon allocating benefits based on race. *Id*. at ¶¶ 60-65, 92, 97. The pleading requirements under Rule 8(a) do not require that Plaintiff allege further factual details. These facts offer Pitt and UPSOM "fair [and ample] notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. These facts indicate that, during his conversation with Saba and Berlacher, Plaintiff explained that UPSOM's current method of affording medical students preferences and other benefits based on race violates Title VI and other laws. At this stage of the litigation, *Keefer* indicates federal pleading requires no further factual allegations. *See Keefer*, 371 F. Supp. 2d at 692 ("This conclusion is also consistent with the 'notice pleading' of the Federal Rules of Civil Procedure. The Court trusts the parties will further explore these allegations in discovery.").

      B.    The Amended Complaint Alleges a Sufficient Causal Connection between Plaintiff's Good Faith Report and the Suffered Retaliation

Pitt's second argument challenges the causal link between Plaintiff's report of "wrongdoing" to Saba and Berlacher, and the retaliation he suffered. Pitt Br. at 20. This is similar to its argument concerning Title VI and Section 1981 retaliation, which is addressed in Part III.A of this Argument and Plaintiff incorporates that argument here. Pitt contends Plaintiff bases causation solely upon allegations that the adverse actions taken by Pitt and UPSOM "occurred '[a]fter' his statements" to Berlacher and Saba. *Id*. This argument dramatically oversimplifies the allegations contained in Plaintiff's Amended Complaint, and it disregards the well-established precept that temporal proximity can – in fact – provide strong factual support for a causal link in retaliation cases. Importantly, the concept of temporal proximity here is distinct from Pitt's rudimentary description of the fact that the subsequent retaliation *merely* occurred some time after Plaintiff's report of "wrongdoing." Pitt's argument lacks merit.

Under the Pennsylvania Whistleblower Law, a plaintiff must offer facts that demonstrate a causal connection between the report of "wrongdoing" and the acts of retaliation. *McAndrew*

*v. Bucks Cty. Bd. of Comm'rs*, 982 F. Supp. 2d 491, 505 (E.D. Pa. 2013).  Courts in the Third

Circuit apply the same causation analysis as employed in First Amendment retaliation cases.  *See*

*Frazier v. City of Philadelphia*, 441 F. Supp. 3d 76, 97 (E.D. Pa. 2020).  Close temporal

proximity between adverse actions and protected conduct offers factual support for retaliatory

motive:

> In analyzing whether the motive for an adverse employment action is retaliatory,
> courts in the Third Circuit have looked at two factors: "(1) the temporal proximity
> between the protected activity and the alleged discrimination and (2) the existence
> of a pattern of antagonism in the intervening period."  *Hussein v. UPMC Mercy
> Hosp.,* 466 Fed. Appx. 108, 112 (3d Cir. 2012). In the absence of either of these
> factors, courts may consider the record as a whole to determine whether
> a retaliatory motive can be inferred.  *Farrell v. Planters Lifesavers Co.,* 206 F.3d
> 271, 281 (3d Cir.2000).  Indeed, case law in this circuit "has set forth no limits on
> what [courts] have been willing to consider." *Id.* With that in mind, it is worth
> emphasizing that "it is causation, not temporal proximity or evidence of
> antagonism, that is an element of plaintiff's prima facie case,
> and temporal proximity or antagonism merely provides an evidentiary basis from
> which an inference can be drawn." *Id.*

*McAndrew*, 982 F. Supp. 2d at 505 (delineating causation standard for Pennsylvania

Whistleblower Claim).  The Third Circuit has recognized, " 'suggestive temporal proximity' is

relevant to establishing a causal link between protected conduct and retaliatory action."

*Ambrose v. Twp. of Robinson, Pa*., 303 F.3d 488, 494 (3d Cir. 2002) (*citing*, *inter alia*, *Rauser v.

Horn*, 241 F.3d 330, 334 (3d Cir. 2001)).  "Circumstantial evidence of temporal proximity is

relevant to showing that the protected activity was a substantial factor in the retaliation[.]"

*Abdul-Latif v. Cty. of Lancaster*, 990 F. Supp. 2d 517, 535 (E.D. Pa. 2014).

 Here, the Amended Complaint alleges a close temporal proximity that infers retaliatory

animus motivated Pitt in perpetrating the adverse actions against Plaintiff.  Only days after

"Plaintiff told Saba and Berlacher of the illegal nature of the programs at UPMC and

UPSOM[,]" Pitt "forbade Plaintiff from having contact with individuals in any fellowship

programs at UPMC, with residents, or with medical students at UPSOM."  Am. Compl. ¶ 27.

Plaintiff was "a member of the faculty of UPSOM" and "contact with medical students was part

of his job[.]"  *Id*. at ¶ 28.  The close temporal proximity between the adverse action and

Plaintiff's meeting with Saba and Berlacher is sufficient, particularly at this stage of the litigation, to infer a causal link.  *See Ambrose*, 303 F.3d at 493-94.  Numerous months did not elapse between the Plaintiff's report of "wrongdoing" and UPSOM's decision to ban Plaintiff from interactions with students.  Rather, the adverse action followed closely after the protected activity, thus giving rise to the inference of retaliatory animus.

The allegations contained in the Amended Complaint do not support the inference that Pitt's argument asks this Court to draw.  Pitt erroneously suggests, not only that the adverse action occurred *sometime after* Plaintiff's meeting with Saba and Berlacher, but also that the temporal proximity between the two events is somewhat lengthy.  *But see* Argument Section III.A, *supra*.  Without this supporting premise, Pitt's argument utterly collapses.  The Amended Complaint contains facts indicating the "'suggestive temporal proximity'" offers concrete factual support that Pitt acted in retaliation.  *See Ambrose*, 303 F.3d at 493-94.  Plaintiff has adequately pleaded causation.

C.  UPMC, UPP, Gladwin, Saba and Berlacher Are "Public Bodies" Under The Pennsylvania Whistleblower Law

UPMC, UPP, Saba, Gladwin and Berlacher contend that Plaintiff's PWL claim against them must fail because they do not fall within the definition of "public body" set forth in Section 1422 of the Pennsylvania Whistleblower Law, 43 Pa. Cons. Stat. § 1422.  UPMC Br. at 21-23.  The applicable case law and the statutory language belie this argument.  The Amended Complaint describes the existence of a contractual relationship between UPP, UPMC, and UPSOM, which is adequate to classify UPP and UPMC as "public bodies" under Section 1422.  *See* Am. Compl. ¶¶ 5-7, 9.[15]  For purposes of the Pennsylvania Whistleblower Law, courts have routinely recognized private entities as "public bod[ies]" based upon far less tangible connections than exist with respect to UPMC and UPP.  This includes Saba, Gladwin, and

---

[15]  *See generally* Arthur S. Levine, *et al.*, *The Relationship Between the University of Pittsburgh School of Medicine and University of Pittsburgh Medical Center – A Profile in Synergy*, 83 Academic Medicine 816 (2008).

Berlacher as agents and employees of UPMC and UPP.

As a threshold point, facts recognized by the Third Circuit establish that Pitt and UPSOM are a "public body" under Section 1422; *see also* Am. Compl. ¶¶ 93-94 (identifying Pitt and UPSOM as a "public body" under Section 1422). It is well-established in the Third Circuit that Pitt and UPSOM are considered state actors. *See Krynicky v. Univ. of Pittsburgh*, 742 F.2d 94, 103 (3d Cir. 1984). Under laws enacted by the General Assembly, "Pitt [is] designated by the Pennsylvania legislature as [a] 'state-related' institution[]." *Imperiale v. Hahnemann Univ*., 776 F. Supp. 189, 197 (E.D. Pa. 1991), *aff'd*, 966 F.2d 125 (3d Cir. 1992) (citing 24 Pa. Cons. Stat. § 2510-202(6)). Pennsylvania statutory law "provide[s] that annual appropriations will be made to . . . Pitt, to be used as specified by the state." *Id*. (citing 24 Pa. Cons. Stat. §§ 2510-206, -207). Pennsylvania appoints one-third of Pitt's Trustees, leading the Third Circuit to conclude "Pitt [is] not merely [a] 'private contractor[] performing services for the government[;]'" Pitt "not only receive[s] funding and [is] subject to routine state regulations, but [is] [an] instrumentalit[y] of the state, both in name and in fact." *Krynicky*, 742 F.2d at 103 (internal citations omitted).

In *Pruden v. City of Easton*, 2012 U.S. Dist. LEXIS 189748 (E.D. Pa. 2012), the court addressed "what circumstances [under the Pennsylvania Whistleblower Law] an otherwise private entity will become a public body by virtue of" receiving compensation from the Commonwealth or a political subdivision. *Id*. at *15. There, the plaintiff alleged that a private company was a "public body" because it "contracted with the City of Easton to provide services in exchange for payment." *Id*. at *19. In pertinent part, Section 1422 of the Pennsylvania Whistleblower Law defines a "public body" in the following manner:

> (3) *Any other body* which is created by Commonwealth or political subdivision authority or *which is funded in any amount by or through Commonwealth or political subdivision authority or a member or employee of that body*.

43 Pa. Cons. Stat. § 1422 (emphasis added). The *Pruden* Court found that the contractual relationship between the private company and the municipality was "sufficiently direct" to

57

render the private company a "public body" under Section 1422.  *Pruden*, 2012 U.S. Dist. LEXIS 189748 at *19-20.  The Court reasoned, "the government approved of and entered into a contract with [the private company].  The contract directly benefits [the private company], and [the private company] provides services directly for the City of Easton."  *Id*. at *19.

In reaching this conclusion, the *Pruden* Court relied upon two leading decisions of the Pennsylvania Superior Court.  *See Denton v. Silver Stream Nursing & Rehabilitation Ctr.*, 739 A.2d 571, 576 (Pa. Super. 1999); *Riggio*, 711 A.2d at 500.  Both cases indicate Pennsylvania courts have determined that the General Assembly intends the definition of "public body" under Section 1422 to be construed rather expansively.  *See id*.  In *Denton*, the Superior Court held that receipt of Medicaid funds was sufficient to transform an otherwise private entity into a "public body" for purposes of the Pennsylvania Whistleblower Law.  739 A.2d at 576.  According to the *Denton* court, the General Assembly contemplated both appropriated funds and "pass-through" funds.  *Id*.  As such, the court determined, "[t]he Law clearly indicates that it is intended to be applied to bodies that receive not only money appropriated *by* the Commonwealth, but also public money that passes *through* the Commonwealth."  *Id*.  Similarly, in *Riggio*, the Superior Court held that the Medical College of Pennsylvania – an otherwise private institution – was a "public body" because it received specific appropriations from the Pennsylvania General Assembly.  711 A.2d at 500.  The court held, "A more direct and patent form of funding is difficult to imagine."  *Id*.

Importantly, in analyzing the jurisprudential landscape, the *Pruden* Court acknowledged that some federal courts have expressed concerns of "line-drawing" if the definition of "public body" is over-extended.  *Pruden*, 2012 U.S. Dist. LEXIS 189748, at *18-19.  As the *Pruden* Court articulates, the reimbursement of Medicaid funds implicates this "line-drawing" problem:

> [B]ecause Medicaid-eligible patients choose a healthcare provider that is then reimbursed by government funding, the relationship is more remote, tangential and, "controlled by the whims of patients eligible for Medicaid," not the government. *Tanay v. Encore Healthcare*, 810 F. Supp. 2d 734, 743-44 (E.D. Pa. 2011).

58

*Id.* at *19.  Nevertheless, the *Pruden* Court determined that compensation through a contractual relationship with a government entity "does not implicate the line-drawing problem identified in *Tanay*[.]" *Id.* at *20. Specifically, the *Pruden* Court reasoned that its decision – which transforms a private entity into a "public body" by virtue of a government contract – "[does] *not* expand the scope of the Whistleblower Law 'to include any private business that accepted payment from a recipient of government assistance.'"  *Pruden*, 2012 U.S. Dist. LEXIS 189748, at *20 (quoting *Tanay*, 810 F. Supp. 2d at 744).

The *Pruden* Court, therefore, concluded that "the directness or remoteness of the funding to the government" is the determinative factor.  *Pruden*, 2012 U.S. Dist. LEXIS 189748 at *18. If the government appropriation is "direct" and "patent" – as it was in *Riggio* – the private entity will be categorized as a "public body" under Section 1422.  *Id*. at *17-19 (quoting *Riggio*, 711 A.2d at 500).

The "directness" of the contractual relationship between UPP, UPMC and the state-related institution of UPSOM is apparent.  The precise scenario alleged in the Amended Complaint describes how UPP and UPMC have pervasive contractual relationships with UPSOM.  *See* Am. Compl. ¶¶ 5-7, 9.  Under these contractual relationships, UPP, UPMC, and UPSOM share doctors, personnel, equipment, facilities and funding.  *Id*.  "Defendant UPP is a group medical practice that employs faculty physicians [at UPSOM] and is affiliated with, and wholly-owned by, UPMC."  *Id*. at ¶ 9.  "[UPP] supplies physician services to UPMC facilities and its employees also serve as faculty at UPSOM."  *Id*.

No appropriation could be more "direct" and "patent" than the contractual relationship described in the Amended Complaint.  *See Pruden*, 2012 U.S. Dist. LEXIS 189748 at *17-19 (quoting *Riggio*, 711 A.2d at 500).  The *Pruden* Court expressly held, based largely upon the reasoning of leading state appellate decisions, that a contractual relationship between a private company and a state-related entity like UPSOM is "sufficiently direct" to transform that private entity into a "public body" under Section 1422.  *Id*. at *19-20.  Just as in *Pruden*, Plaintiff avers

59

that UPP, UPMC, and UPSOM enjoy a pervasive and direct contractual relationship.  *See* Am. Compl. ¶¶ 5-7, 9.  The directness of these contractual relationships here squarely lies in the area described by *Riggio* and *Pruden*.[16]

<u>Conclusion</u>

For the foregoing reasons, defendants' motions should be denied.

Dated:  May 14, 2021

Respectfully submitted,

*/s/ Shawn Rodgers*
Shawn Rodgers
GOLDSTEIN LAW PARTNERS, LLC
11 Church Road
Hatfield, PA 91440
(731) 426-8130

Michael E. Rosman (admitted pro hac vice)
Michelle A. Scott (admitted pro hac vice)
CENTER FOR INDIVIDUAL RIGHTS
1100 Connecticut Ave, NW, Ste. 625
Washington, D.C. 20036
(202) 833-8400

---

[16] Gladwin, Berlacher, and Saba have an employment or agency relationship with both UPP and UPMC.  As agents of UPP and UPMC, the three individuals are agents of a "public body" under Section 1422 of the Pennsylvania Whistleblower Law.  There is no bar to *respondeat superior* liability under the PWL.

60