**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| NORMAN WANG, | ) | |
| | ) | |
| Plaintiff, | ) | 2:20-cv-1952 |
| | ) | |
| vs. | ) | District Judge Marilyn J. Horan |
| | ) | |
| UNIVERSITY OF PITTSBURGH, | ) | |
| UNIVERSITY OF PITTSBURGH | ) | |
| MEDICAL CENTER, UNIVERSITY | ) | |
| OF PITTSBURGH PHYSICIANS, | ) | |
| AMERICAN HEART ASSOCIATION | ) | |
| INC., WILEY PERIODICALS, INC., | ) | |
| SAMIR SABA, MARK GLADWIN, | ) | |
| KATHRYN BERLACHER, MARC | ) | |
| SIMON, and JOHN DOES 1-10, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Plaintiff, Dr. Norman Wang, brings an eight-count Amended Complaint against the University of Pittsburgh, University of Pittsburgh Medical Center (UPMC), University of Pittsburgh Physicians (UPP), American Heart Association, Inc. (AHA), Wiley Periodicals, Inc., Dr. Mark Gladwin, Dr. Samir Saba, Dr. Kathryn Berlacher, Dr. Marc Simon, and John Does 1-10, alleging claims for violations of 42 U.S.C. § 1983, Title VI of the Civil Rights Act of 1964, and 42 U.S.C. § 1981, plus Pennsylvania state law claims for defamation, breach of contract, tortious interference with contract, and the Pennsylvania Whistleblower Law.  (ECF No. 43). Presently before the Court are five Motions to Dismiss Dr. Wang's Amended Complaint.  (ECF Nos. 46, 48, 50, 52 & 54).  Dr. Wang filed a Motion to respond to all five Motions to Dismiss in one Omnibus Response, which the Court granted.  (ECF No. 59 & 60).  Dr. Wang filed his Omnibus Response, (ECF No. 64), and the Defendants filed their respective Reply Briefs, (ECF Nos. 65, 67, 68, 69 & 70).

1

For the reasons stated herein, Defendant AHA's Motion to Dismiss, (ECF No. 46), will be granted.  Defendant Dr. Simon's Motion to Dismiss, (ECF No. 48), will be granted. Defendant Wiley Periodicals' Motion to Dismiss, (ECF No. 50), will be granted.  Defendants UPMC, UPP, Dr. Gladwin, Dr. Saba, and Dr. Berlacher's Partial Motion to Dismiss, (ECF No. 52), will be granted.  Defendant the University of Pittsburgh's Motion to Dismiss, (ECF No. 54), will be granted.

## I.    Background[1]

Dr. Wang is a cardiologist, employed by UPP, who also serves as a member of the faculty at the University of Pittsburgh School of Medicine.  (ECF No. 43, at ₧ 5).  Until sometime after July 31, 2020, Dr. Wang directed the clinical cardiac electrophysiology fellowship program at UPMC.  (ECF No. 43, at ₧ 5).

The University of Pittsburgh School of Medicine is part of the University of Pittsburgh. (ECF No. 43, at ₧ 6).  The University of Pittsburgh receives federal funds that, among other things, assist the students at the School of Medicine.  (ECF No. 43, at ₧ 6).

UPMC is affiliated with the University of Pittsburgh and operates hospitals and medical centers in Pennsylvania.  (ECF No. 43, at ₧ 7).  UPMC employs residents and operates fellowship programs for physicians who have completed their residencies.  (ECF No. 43, at ₧ 7). UPMC receives federal funds to employ residents and fellows in its residency, Graduate Medical Education, and fellowship programs.  (ECF No. 43, at ₧ 8).

---

[1] The background facts are taken from Dr. Wang's Amended Complaint.  (ECF No. 43). Because the case is presently before the Court on a Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court accepts as true all allegations in the Amended Complaint and all reasonable inferences that can be drawn therefrom, viewing them in the light most favorable to Dr. Wang.  *See Trzaska v. L'Oreal USA, Inc.*, 865 F.3d 155, 162 (3d Cir. 2017).

UPP is a group medical practice that employs physicians who work at UPMC facilities. (ECF No. 43, at ¶ 9).  UPP is wholly owned by UPMC.  (ECF No. 43, at ¶ 9).  UPP physicians also serve as faculty at the University of Pittsburgh School of Medicine.  (ECF No. 43, at ¶ 9).

Dr. Saba is the Chief of the Cardiology Division at the University of Pittsburgh School of Medicine's Department of Medicine.  (ECF No. 43, at ¶ 12).  Dr. Gladwin is the Chairman of the University of Pittsburgh School of Medicine's Department of Medicine.  (ECF No. 43, at ¶ 13). Dr. Berlacher is a professor at the University of Pittsburgh School of Medicine's Cardiology Division.  (ECF No. 43, at ¶ 14).  Dr. Simon is a professor at the University of Pittsburgh School of Medicine's Cardiology Division.  (ECF No. 43, at ¶ 15).

AHA publishes the *Journal of the American Heart Association* (*JAHA*), which is published online.  (ECF No. 43, at ¶ 10).  Wiley Periodicals publishes and distributes online journals, including *JAHA*.  (ECF No. 43, at ¶ 11).

Dr. Wang's employment contract with UPP requires him to provide academic services to the University of Pittsburgh School of Medicine as well as physician services to UPMC.  (ECF No. 43, at ¶ 17).  Dr. Wang's contract delegates supervision of both his academic and physician services to a department head at the University of Pittsburgh School of Medicine.  (ECF No. 43, at ¶ 17).  At all relevant times, Dr. Saba supervised Dr. Wang's work.  (ECF No. 43, at ¶ 17). Dr. Wang's employment contract with UPP provides that Dr. Wang is eligible for additional compensation above his base salary for academic productivity.  (ECF No. 43, at ¶ 19).  The contract also provides that Dr. Wang is to be paid sums above his base salary for serving as the director of the clinical cardiac electrophysiology fellowship program.  (ECF No. 43, at ¶ 35).  Dr. Wang's contract with UPP also provides that Dr. Wang is to be paid above his base salary for

consulting with groups needing his expertise in clinical cardiac electrophysiology at UPMC. (ECF No. 43, at ⁋ 36).

In 2019 and 2020, Dr. Wang wrote an article, titled "Diversity, Inclusion, and Equity: Evolution of Race and Ethnicity Considerations for the Cardiology Workforce in the United States of America from 1969 to 2019," about diversity in the cardiology workforce, wherein he traced the history of the use of race and ethnicity as factors in determining admission into medical schools, residency programs, and fellowship programs. (ECF No. 43, at ⁋ 20). The article "asserted that the medical profession had not been successful in reaching its goals of increasing the percentages of underrepresented races and ethnicities in the medical profession generally, and cardiology in particular. It also noted that programs to achieve those goals applied different standards to applications by members of underrepresented races and ethnicities and raised questions about the legality, effectiveness, and wisdom of doing so." (ECF No. 43, at ⁋ 20).

Dr. Wang submitted his article to *JAHA*. (ECF No. 43, at ⁋ 21). After the article underwent *JAHA*'s normal review process, AHA and Wiley Periodicals offered to published Dr. Wang's article. (ECF No. 43, at ⁋ 21). Under the contract, Dr. Wang was to pay $1,600 to AHA and Wiley Periodicals in exchange for publishing his article in *JAHA* with open access to the public. (ECF No. 43, at ⁋ 21). In March 2020, *JAHA* published Dr. Wang's article on its website. (ECF No. 43, at ⁋ 21).

On July 31, 2020, Dr. Saba and Dr. Berlacher met with Dr. Wang. (ECF No. 43, at ⁋ 23). In the meeting, Dr. Wang told them of his concerns that the application processes at the University of Pittsburgh School of Medicine and UPMC violated federal law because of the racial and ethnic preferences used to select candidates for admission into the University of

Pittsburgh School of Medicine and UPMC's residency and fellowship programs. (ECF No. 43, at ¶ 23). Soon after this meeting, Dr. Saba removed Dr. Wang from his role as the director of the clinical cardiac electrophysiology fellowship program. (ECF No. 43, at ¶ 24). Dr. Saba and Dr. Berlacher also forbade Dr. Wang from having any contact with any UPMC fellows or residents or any University of Pittsburgh medical students. (ECF No. 43, at ¶ 27). Shortly after this meeting, Dr. Gladwin, the Chairman of the Department of Medicine, wrote an email letter addressed to his colleagues in the University of Pittsburgh School of Medicine about Dr. Wang's scholarly article. (ECF No. 43, at ¶ 31). Without explicitly mentioning Dr. Wang's name, the email letter stated that "a faculty member" recently published a scholarly article that "was antithetical to our values and deeply hurtful to many of our URM faculty." (ECF No. 43, at ¶ 31). The email letter further stated that "[w]e have taken immediate action and removed the person from their leadership position." (ECF No. 43, at ¶ 31).

Dr. Wang no longer receives compensation for serving as the director of the clinical cardiac electrophysiology fellowship program. (ECF No. 43, at ¶ 35). Because Dr. Wang can no longer consult with groups that include fellows, residents, and medical students, he cannot consult as frequently as he once did, and he has lost income due to his reduced consulting fees. (ECF No. 43, at ¶ 36).

Dr. Wang alleges that, at around this same time, employees from the University of Pittsburgh School of Medicine, UPP, and UPMC began making statements to AHA and Wiley Periodicals that Dr. Wang's *JAHA* article contained miscitations and misquotations. (ECF No. 43, at ¶ 38). Dr. Wang does not know the names or identities of these individuals, but he alleges that he will uncover their names in discovery. (ECF No. 43, at ¶ 38).

On August 2, 2020, Dr. Saba retweeted a Twitter post from the University of Pittsburgh's Cardiology Department's Twitter feed that said, "@PittCardiology stands for diversity equity and inclusion across the board.  This article uses misquotes, false interpretations and racist thinking to defend a single person's conclusion.  We are outraged that @JAHA_AHA published this shameful and infuriating piece."  (ECF No. 56-2, at 2).

On August 2, 2020, Dr. Berlacher tweeted, "@PittCardiology I'm looking at you.  What do we stand for?  What do you think of this OPINION piece that misinterprets data and misquotes people?  @JAHA_AHA this is scientifically invalid and racist."  (ECF No. 56-1, at 2).

On August 5, 2020, Wiley and AHA retracted the article.  (ECF No. 43, at 8, first ¶ 39).  Along with the retraction AHA and Wiley Periodicals issued the following statement: "The author's institution, the University of Pittsburgh Medical Center (UPMC), has notified the Editor-in-Chief that the article contains many misconceptions and misquotes and that together those inaccuracies, misstatements, and selective misreading of source materials strip the paper of its scientific validity."  (ECF Nos. 43, at 8, first ¶ 39; 51-1, at 28).  On August 6, 2020, AHA and Wiley Periodicals updated the Retraction Notice to include two examples of the misstatements and misquotations that influenced their decision to retract Dr. Wang's article.  (ECF No. 51, at 9-10; 51-1, at 28-29).

On August 5, 2020, AHA issued a Press Statement on its website about the decision to retract Dr. Wang's article, which was then updated on August 6, 2020.  (ECF No. 47, at 9).  AHA stated: "The Wang paper has rightfully drawn criticism for its misrepresentations and conclusions.  As an organization focused on the relentless pursuit of longer, healthier lives for *everyone everywhere*, the American Heart Association (AHA) denounces the views expressed in the article and regrets its role in enabling those views to be promoted.  Those views are a

misrepresentation of the facts and are contrary to our organization's core values and historic commitment to promoting diversity and inclusion in medicine and science."  (ECF Nos. 43, at 8, first ⁋ 39; 47, at 9; 47-2); *see also* Wang Paper Is Wrong: Diversity, Equity and Inclusiveness in Medicine and Cardiology Are Important and Necessary, *AHA* https://newsroom.heart.org/news/wang-paper-is-wrong-diversity-equity-and-inclusiveness-in-medicine-and-cardiology-are-important-and-necessary (updated Aug. 6, 2020).   AHA's Press Statement continues: "While the Journal of the American Heart Association (JAHA) and the other AHA scientific journals are editorially independent of the Association, we take our responsibility to ensure factual accuracy seriously.  The independent editors of JAHA and the American Heart Association are reviewing the journal's peer-review and publication processes to ensure future submissions containing deliberate misinformation or misrepresentation are never published.  The journal can and will do better."  (ECF Nos. 43, at 8, first ⁋ 39; 47, at 9; 47-2); *see also* Wang Paper Is Wrong, *supra*.

At around this same time *JAHA* also published an Editor's Note, titled "A Path Forward," which stated: "The author's institution, UPMC, requested that the AHA and the editorially independent *JAHA* retract the published article on the basis of specific scientific errors as well as misleading and incomplete quotations."  (ECF Nos. 43, at 9, first ⁋ 39; 47, at 9; 47-3, at 2).

In August 2020, Dr. Simon, with other authors, published an article in *JAHA*, titled "Equity, Diversity, and Inclusiveness in Cardiovascular Medicine and Health Care," that asserted, "the retracted article by Wang misrepresented facts to argue against affirmative action in the field of cardiology."  (ECF Nos. 43, at ⁋ 45; 47-4 at 2).

After the retraction, Dr. Wang asked AHA and Wiley to identify the flaws in his article.  (ECF No. 43, at ⁋ 42).  AHA and Wiley Periodicals did not respond to Dr. Wang's request.

7

(ECF No. 43, at ⁋ 42).  Additionally, AHA and Wiley Periodicals have not returned the $1,600 that Dr. Wang paid them to publish his article in *JAHA*.  (ECF No. 43, at ⁋ 41).

On August 6, 2020, Dr. Saba sent an email to the UPMC community where he stated that Dean Anantha Shekhar, a Vice Provost for Health Sciences at the University of Pittsburgh and the Dean of the University of Pittsburgh School of Medicine, sought the retraction of Dr. Wang's article.  (ECF No. 43, at ⁋ 43).

On October 27, 2020, Dean Shekhar rescinded Dr. Saba's order preventing Dr. Wang from having any contact with University of Pittsburgh medical students.  (ECF No. 43, at ⁋ 37). Dr. Saba's order restricting Dr. Wang from having contact with UPMC fellows or residents remains in place.  (ECF No. 43, at ⁋ 37).

## II.    Standard of Review

When reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  *Eid v. Thompson*, 740 F.3d 118, 122 (3d Cir. 2014) (quoting *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The Supreme Court clarified that this plausibility standard should not be conflated with a higher probability standard.  *Iqbal*, 556 U.S. at 678.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556); *see also Thompson v. Real Estate Mortg. Network*, 748 F.3d 142, 147 (3d Cir. 2014).  "Threadbare recitals of the elements

of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. "Factual allegations of a complaint must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

A pleading party need not establish the elements of a *prima facie* case at this stage; the party must only "put forth allegations that 'raise a reasonable expectation that discovery will reveal evidence of the necessary element[s].'" *Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 (3d Cir. 2009) (quoting *Graff v. Subbiah Cardiology Assocs., Ltd.*, 2008 WL 2312671 (W.D. Pa. June 4, 2008)); *see also Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 790 (3d Cir. 2016). Nonetheless, a court need not credit bald assertions, unwarranted inferences, or legal conclusions cast in the form of factual averments. *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 n.8 (3d Cir. 1997). The primary question in deciding a motion to dismiss is not whether the plaintiff will ultimately prevail, but rather whether he or she is entitled to offer evidence to establish the facts alleged in the complaint. *Maio v. Aetna*, 221 F.3d 472, 482 (3d Cir. 2000). The purpose of a motion to dismiss is to "streamline[] litigation by dispensing with needless discovery and factfinding." *Neitzke v. Williams*, 490 U.S. 319, 326-27 (1989).

Furthermore, "in evaluating a motion to dismiss, courts are not limited to the complaint, but may also consider evidence integral to or explicitly relied upon therein." *Tanksley v. Daniels*, 902 F.3d 165, 172 (3d Cir. 2018) (internal quotations omitted). "In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) (citation omitted).

When a court grants a motion to dismiss, the court "must permit a curative amendment unless such an amendment would be inequitable or futile." *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 174 (3d Cir. 2010) (internal quotations omitted).  Further, amendment is inequitable where there is "undue delay, bad faith, dilatory motive, [or] unfair prejudice." *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002).  Amendment is futile "where an amended complaint 'would fail to state a claim upon which relief could be granted.'" *M.U. v. Downingtown High Sch. E.*, 103 F. Supp. 3d 612, 631 (E.D. Pa. 2015) (quoting *Great W. Mining*, 615 F.3d at 175).  In a civil rights case, when the court grants a motion to dismiss for a failure to state a claim, the court must offer the plaintiff leave to amend, even if it was not requested by the plaintiff, "unless doing so would be inequitable or futile." *Phillips*, 515 F.3d at 246; *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 251 (3d Cir. 2007).

## III.   Discussion

### a.   Count I Section 1983 First Amendment Claim

Defendants UPMC, UPP, and the University of Pittsburgh move to dismiss Dr. Wang's Count I Section 1983 claims that they violated his First Amendment free speech rights by removing him from his role as the director of the clinical cardiac electrophysiology fellowship program and by forbidding him from interacting with UPMC fellows, residents, and University of Pittsburgh medical students.  (ECF No. 52 & 54).  Dr. Wang also brought Section 1983 claims against Dr. Saba, Dr. Gladwin, and Dr. Berlacher.  (ECF No. 43).  The individual doctors do not move to dismiss the Section 1983 claims brought against them; thus, those claims remain in the case.

Section 1983 provides that a state actor who "subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983.  A plaintiff bringing a claim under section 1983 therefore must allege that he was "deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999).  "[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (citation omitted).  To establish a First Amendment retaliation claim, a plaintiff "must prove (1) that he engaged in constitutionally-protected activity; (2) that the government responded with retaliation; and (3) that the protected activity caused the retaliation." *George v. Rehiel*, 738 F.3d 562, 585 (3d Cir. 2013).

To distinguish between a state and private actor, "[t]he principal question at stake is whether there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Leshko v. Servis*, 423 F.3d 337, 339 (3d Cir. 2005) (internal quotation marks and citations omitted).  The Third Circuit has outlined three broad tests for determining whether state action exists: "(1) whether the private entity has exercised powers that are traditionally the exclusive prerogative of the state; (2) whether the private party has acted with the help of or in concert with state officials; and (3) whether the state has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity." *Kach v. Hose*, 589 F.3d 626, 646 (3d Cir. 2009) (internal quotations and citations omitted).  "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have

exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *West v. Atkins*, 487 U.S. 42, 49 (1988) (internal quotations and citations omitted).

Dr. Wang alleges that he engaged in a protected activity when he told Dr. Saba and Dr. Berlacher that the racial and ethnic preferences used in UPMC and the University of Pittsburgh School of Medicine's admissions were illegal. Dr. Wang alleges that he suffered a retaliatory action for this protected activity when Dr. Saba removed him from his role as the director of the clinical cardiac electrophysiology fellowship program at UPMC and when Dr. Saba and Dr. Berlacher forbade him from interacting with UPMC fellows and residents and University of Pittsburgh medical students after the July 31, 2020 meeting.

First, it is necessary for the Court to analyze whether the alleged adverse employment actions were taken by UPMC, UPP, or the University of Pittsburgh. The doctors employed by UPP provide physician services at UPMC facilities but also serve as faculty at the University of Pittsburgh School of Medicine. As a result, it is necessary to determine whether UPMC, UPP, or the University of Pittsburgh took the alleged retaliatory adverse employment actions against Dr. Wang.

Like Dr. Wang, Dr. Saba, Dr. Berlacher, and Dr. Gladwin are UPP physicians who provided physician services at UPMC facilities and academic services at the University of Pittsburgh School of Medicine. Thus, it is necessary to separate out whether Dr. Wang was discussing potentially illegal admissions processes at UPMC or the University of Pittsburgh. At the July 31, 2020 meeting, Dr. Wang told Dr. Saba and Dr. Berlacher about his concerns about illegal admissions activities at UPMC in their residency and fellowship programs and the University of Pittsburgh at the School of Medicine. Thus, as regards the protected activity prong

of Dr. Wang's section 1983 First Amendment retaliation claim, Dr. Wang engaged in protected activities regarding both UPMC and the University of Pittsburgh.

Having determined that the protected activity involved both UPMC and the University of Pittsburgh, the Court must next decide whether the alleged adverse employment action involved decisions made by UPMC or decisions made by the University of Pittsburgh.  With regard to Dr. Wang's removal as the director of the clinical cardiac electrophysiology fellowship program, this action was taken by Dr. Saba and Dr. Berlacher in their roles as UPP physicians providing physician services at UPMC.  The clinical cardiac electrophysiology fellowship program is affiliated with UPMC, rather than the University of Pittsburgh School of Medicine, and the fellows who work in the program are employed by UPMC.  The Amended Complaint contains no allegations of how Dr. Wang, in his role as the director of UPMC's clinical cardiac electrophysiology fellowship program, was specifically associated with the University of Pittsburgh or its School of Medicine.  Thus, the Court finds that pursuant to the Amended Complaint Dr. Saba was acting on behalf of UPMC when he made the decision to remove Dr. Wang from his position as the director of UPMC's clinical cardiac electrophysiology fellowship program.  The Court further holds that Dr. Saba was not acting within his role as a University of Pittsburgh School of Medicine faculty member when he made the decision to remove Dr. Wang from his role as the director of the clinical cardiac electrophysiology fellowship program.

Next, the Court must analyze whether Dr. Saba and Dr. Berlacher's decision, to forbid Dr. Wang from interacting with fellows, residents, or University of Pittsburgh's medical students, was made within Dr. Saba and Dr. Berlacher's roles as UPP physicians providing physician services at UPMC and/or within their roles as University of Pittsburgh School of Medicine faculty members.  The fellowship and residency programs are affiliated with UPMC,

not the University of Pittsburgh School of Medicine, and the fellows and residents who work in

those programs are employed by UPMC.  The Amended Complaint contains no allegations as to

Dr. Wang's specific association on behalf of University of Pittsburgh or its School of Medicine

in his interactions with UPMC fellows or residents.  Thus, the Court finds that pursuant to the

Amended Complaint Dr. Saba and Dr. Berlacher were acting on behalf of UPMC when they

made the decision to forbid Dr. Wang from interacting with UPMC fellows or residents.  The

Court further finds that pursuant to the Amended Complaint Dr. Saba and Dr. Berlacher were not

acting within their roles as University of Pittsburgh School of Medicine faculty members when

they made the decision to forbid Dr. Wang from interacting with UPMC fellows or residents.

It is less clear whether Dr. Saba and Dr. Berlacher were acting within their roles as UPP

physicians and/or University of Pittsburgh School of Medicine faculty members when they

forbade Dr. Wang from interacting with University of Pittsburgh medical students.  The

Amended Complaint's only allegations of Dr. Wang's involvement with University of Pittsburgh

medical students is that medical students would sometimes be among groups that he would be

called to consult with.  This interaction with University of Pittsburgh medical students was at

UPMC facilities and based on Dr. Wang's role as a UPMC consulting physician.  The decision to

forbid Dr. Wang from interacting with medical students was made at the same time that Dr. Saba

and Dr. Berlacher likewise forbade Dr. Wang from interacting with UPMC fellows and residents.

There are no allegations in the Amended Complaint that Dr. Wang's involvement with the

medical students extended beyond his work as a UPP physician providing physician services at

UPMC.  Likewise, there are no allegations in the Amended Complaint that Dr. Wang interacted

with medical students at the University of Pittsburgh School of Medicine or that this decision

otherwise limited his role as a University of Pittsburgh School of Medicine faculty member.

Thus, the Court finds that, as pleaded, Dr. Saba and Dr. Berlacher's decision to limit Dr. Wang's interactions with University of Pittsburgh medical students was made within their roles as UPP physicians who provide physician services at UPMC and was not made within their roles as University of Pittsburgh School of Medicine faculty members.

### i. Defendants UPMC and UPP

Defendants UPMC and UPP argue that Dr. Wang's Count I Section 1983 claims must be dismissed because Dr. Wang failed to adequately allege that UPMC and UPP acted under the color of state law. (ECF No. 53, at 7). Dr. Wang argues that UPMC and UPP were acting under the color of state law in making these adverse employment decisions. (ECF No. 64, at 21).

UPMC and UPP are private entities that do not act under the color of state law when they make business decisions on how to operate their medical facilities and physician group. UPMC and UPP's affiliation with the University of Pittsburgh School of Medicine does not convert their personnel decisions into state action. UPMC and UPP fail all three of the *Koch v. Hose* tests for determining state action. As to the first *Kach v. Hose* test, a medical facility or physician group has never been considered to fall under the exclusive prerogative of the state. Likewise, the second *Kach v. Hose* test fails. Although Dr. Saba and Dr. Berlacher each hold leadership positions at the University of Pittsburgh School of Medicine, the decisions to remove Dr. Wang as the director of the clinical cardiac electrophysiology fellowship program or to forbid him from having contact with UPMC fellows and residents or University of Pittsburgh medical students does not convert Dr. Saba or Dr. Berlacher into state officials. Finally, under the third *Kach v. Hose* test, it cannot be said that "the state has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity." 589 F.3d at 646. As has been discussed at length above, Dr. Saba and Dr.

15

Berlacher were acting within their capacities as UPP physicians offering physician services at UPMC rather than as University of Pittsburgh faculty members.  Although Dr. Gladwin sent an email to the faculty of the University of Pittsburgh School of Medicine, this does not equate to the insinuation by a state actor into the adverse employment decisions taken against Dr. Wang by UPMC and UPP.  No other cases have found UPMC or UPP to be state actors.  *See Untract v. Fikri*, 454 F. Supp. 2d 289, 321 (W.D. Pa. 2006) (holding that UPMC's affiliation with the University of Pittsburgh does not convert UPMC into a state actor for the purposes of a section 1983 claim).  As a result, there was no state action taken by UPMC and UPP, and Dr. Wang's Count I Section 1983 claims will be dismissed against those Defendants.

As Dr. Saba was acting in his role as a UPP physician providing physician services at UPMC when he removed Dr. Wang as the director of the clinical cardiac electrophysiology fellowship program, and where Dr. Saba and Dr. Berlacher were acting in their roles as UPP physicians providing physician services at UPMC when they forbade him from interacting with UPMC fellows and residents and University of Pittsburgh medical students at UPMC facilities, the Court holds that amendment would be futile.  UPMC and UPP are not considered state actors for the purposes of a section 1983 claim, and there are no facts that Dr. Wang can plead to convert UPMC and UPP into state actors.  As amendment will be futile, Dr. Wang is not granted leave to amend in regard to his Count I Section 1983 claims against UPMC and UPP.

### ii.  Defendant University of Pittsburgh

Defendant University of Pittsburgh argues that Dr. Wang's Count I Section 1983 must be dismissed because the University cannot be held liable for actions taken by UPMC and UPP, which are separate legal entities from the University of Pittsburgh.  (ECF No. 55, at 13).  The University also argues that it should be treated as a municipal entity, and as a municipal entity,

the University cannot be held vicariously liable under section 1983 for the acts of its employees. (ECF No. 55, at 13).  Dr. Wang argues that because of the University's close affiliation with UPMC and UPP, that the University is actually the entity responsible for the decisions to remove Dr. Wang from his position as the director of UPMC's clinical cardiac electrophysiology fellowship program and to forbid him from having contact with UPMC fellows and residents, or University of Pittsburgh medical students at UPMC facilities.  (ECF No. 64, at 16-17).

As per the allegations in the Amended Complaint, all actions taken by Dr. Saba and Dr. Berlacher related to their roles as UPP physicians providing physician services at UPMC.  These decisions did not relate to their roles as University of Pittsburgh School of Medicine faculty members.

As argued in the University of Pittsburgh's Brief, the University of Pittsburgh should be treated as a municipality for  the purposes of finding state action.  For a municipality to be found liable under section 1983, the plaintiff is required to prove that the adverse action taken against the plaintiff was a result of a state policy, not the result of an individual actor.  *Porter v. City of Phila.*, 975 F.3d 374, 383 (3d Cir. 2020).  Indeed, there is no theory of respondeat superior in a municipality section 1983 claim.  *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 691 (1978).  Thus, in order for Dr. Wang to succeed in his section 1983 claim, he would need to show that the actions taken by Dr. Saba and Dr. Berlacher were the results of an official policy of the University rather than an isolated decision by individual employees.

Dr. Wang argues that Dr. Gladwin's email to the University of Pittsburgh School of Medicine faculty discussing Dr. Wang's scholarly article converts Dr. Saba and Dr. Berlacher's decisions into official University policy.  The email does not support that Dr. Gladwin made any official policy decisions when he addressed that letter to the School of Medicine faculty.

Instead, he only addressed concerns that the faculty may have had about Dr. Wang's article and explained that the views expressed in the article were "antithetical to our values." (ECF No. 43, at ⸿ 31). Writing such an email does not convert the decision made by Dr. Saba and Dr. Berlacher to forbid Dr. Wang from interacting with University of Pittsburgh medical students into an official University policy. Because the adverse action taken against Dr. Wang was made by individual employees who work for a state actor, the University of Pittsburgh is not vicariously liable for such action. As such, the University of Pittsburgh's Motion to Dismiss Dr. Wang's Count I Section 1983 claim will be granted. As the Court cannot say that amendment would be inequitable or futile, Dr. Wang is granted leave to amend his Amended Complaint in regard to his Count I Section 1983 claim against the University of Pittsburgh.

### b.   Count II Title VI Discrimination Claim

Dr. Wang brings his Count II Title VI Discrimination claims against UPMC and the University of Pittsburgh. (ECF No. 43, at 13-14). Dr. Wang alleges that he engaged in a protected activity when he told Dr. Saba and Dr. Berlacher about the illegal admissions practices at UPMC and University of Pittsburgh School. Dr. Wang further alleges that he was subsequently retaliated against by being removed as the director of UPMC's clinical cardiac electrophysiology fellowship program and by being forbidden to interact with UPMC fellows and residents and University of Pittsburgh medical students.

Title VI provides that no person "shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Title VI is designed to protect "individuals from discriminatory practices carried out by recipients of federal funds." *Gebser v. Lago Vista Ind. Sch. Dist.*, 524 U.S. 274, 287 (1998). 42 U.S.C. § 2000d-3

further provides that "[n]othing contained in [Title VI] shall be construed to authorize action under [Title VI] . . . with respect to any employment practice of any employer, employment agency, or labor organization except where a primary objective of the Federal financial assistance is to provide employment."  To state a Title VI employment claim, a plaintiff must show that: (1) the defendant receives federal funding and (2) the "primary objective" of the funding is to provide employment.  *Johnson v. Cmty. Coll. of Allegheny Cty.*, 566 F. Supp. 2d 4015, 457-89 (W.D. Pa. 2008).  To establish a prima facie case of retaliation, a plaintiff must show that "(1) he engaged in protected activity, (2) his employer took an adverse employment action against him, and (3) there was a causal connection between his participation in the protected activity and the adverse employment action."  *Estate of Oliva ex rel. McHugh v. New Jersey*, 604 F.3d 788, 798 (3d Cir. 2010) (citation omitted).

### i. Defendant UPMC

Defendant UPMC argues that Dr. Wang does not allege that UPMC receives federal funding for the primary purpose of providing employment.  (ECF No. 53, at 12).  Dr. Wang argues that his Amended Complaint adequately alleged that UPMC receives federal funding to employ residents and fellows.  (ECF No. 64, at 26).  Although Dr. Wang stated within his Amended Complaint that UPMC receives federal funding to "help support the residency and fellowship programs," he did not allege or provide any facts that UPMC receives such federal funds for the primary purpose of funding employment.  (ECF No. 43, at ⁋ 8).  As bare, conclusory allegations do not meet the pleading standard, Dr. Wang must explicitly bring forth allegations that UPMC receives federal funds for the primary purpose of funding employment. As such, the UPMC Defendant's Motion to Dismiss Dr. Wang's Count II Title VI Discrimination claim will be granted.  As the Court cannot say that amendment would be

inequitable or futile, Dr. Wang is granted leave to amend his Amended Complaint in regard to his Count II Title VI Discrimination claim against UPMC.

### ii.   Defendant University of Pittsburgh

Defendant the University of Pittsburgh argues that Dr. Wang did not plead enough facts in his Amended Complaint to show a causal connection between Dr. Wang's protected activity and the adverse employment actions taken against him.  (ECF No. 55, at 16).  Dr. Wang argues that he has pled enough facts to show a causal connection between the protected activity and the adverse action taken against him.  (ECF No. 64, at 22).

As regards Dr. Wang's Title VI Discrimination claim against the University of Pittsburgh, Dr. Wang must first show that the University was the entity that took the adverse action against Dr. Wang.  As discussed above, the pleadings do not support that the University of Pittsburgh took any adverse employment action against Dr. Wang.  All actions taken by Dr. Saba and Dr. Berlacher related their roles as UPP physicians providing physician services at UPMC. As such, the University of Pittsburgh did not take any adverse action against Dr. Wang.  Thus, the University of Pittsburgh's Motion to Dismiss Dr. Wang's Count II Title VI Discrimination claim will be granted.  As the Court cannot say that amendment would be inequitable or futile, Dr. Wang is granted leave to amend his Amended Complaint in regard to his Count II Title VI Discrimination claim against the University of Pittsburgh.

### c.   Count II Section 1981 Retaliation Claim

Defendant, University of Pittsburgh, moves to dismiss Dr. Wang's Count II Section 1981 Retaliation claim.  (ECF No. 52 & 54).  Dr. Wang also brought a section 1981 retaliation claim against UPMC.  (ECF No. 43).   UPMC does not move to dismiss Dr. Wang's Count II Section

1981 Retaliation claim.  (ECF No. 54).  As a result, Dr. Wang's Count II Section 1981 Retaliation claim against UPMC remains in the case.

Dr. Wang alleges that he engaged in a protected activity when he told Dr. Saba and Dr. Berlacher about the illegal admissions practices at UPMC and University of Pittsburgh School. Dr. Wang further alleges that he was subsequently retaliated against by being removed as the director of UPMC's clinical cardiac electrophysiology fellowship program and being forbidden to interact with UPMC fellows and residents and University of Pittsburgh medical students.

In its Motion to Dismiss, Defendant, University of Pittsburgh, argues that Dr. Wang did not plead enough facts in his Amended Complaint to show a causal connection between the protected activity and the adverse employment actions taken against him.  (ECF No. 55, at 16). Dr. Wang argues that he did in fact plead enough facts showing a causal connection between the protected activity and the adverse action taken against him in order to survive the University of Pittsburgh's present Motion to Dismiss.  (ECF No. 64, at 22).  To establish a prima facie case of retaliation, a plaintiff must show that "(1) he engaged in protected activity, (2) his employer took an adverse employment action against him, and (3) there was a causal connection between his participation in the protected activity and the adverse employment action." *Oliva*, 604 F.3d at 798 (3d Cir. 2010) (citation omitted).

As regards Dr. Wang's section 1981 retaliation claim against the University of Pittsburgh, Dr. Wang must first show that the University of Pittsburgh was the entity that took the adverse action against Dr. Wang.  Dr. Wang has not sufficiently pled facts to establish that the University of Pittsburgh took any adverse employment action against Dr. Wang.  As pled, all actions taken by Dr. Saba and Dr. Berlacher related to their roles as UPP physicians providing physician services at UPMC.  Thus, the University of Pittsburgh's Motion to Dismiss Dr.

Wang's Count II Section 1981 Retaliation claim will be granted.  As the Court cannot say that amendment would be inequitable or futile, Dr. Wang is granted leave to amend his Amended Complaint in regard to his Count II Section 1981 Retaliation claim against the University of Pittsburgh.

### d.   Count III Defamation Claim

Dr. Wang brought Pennsylvania state law defamation claims against Dr. Saba, Dr. Berlacher, Dr. Simon, UPMC, UPP, the University of Pittsburgh, AHA, and Wiley Periodicals. (ECF No. 43).  Although each Defendants' allegedly defamatory statements will be assessed individually, the Defendants generally argue that Dr. Wang cannot prove falsity, that their statements are statements of opinion rather than statements of fact, and that Dr. Wang is a limited purpose public figure who cannot prove actual malice.  Dr. Wang argues in his Omnibus Response that he can prove that each of the Defendants' statements are false, that each of the Defendants' statements are offered as statements of fact rather than statements of opinion, and that he can prove that the Defendants' statements were made with actual malice.  (ECF No. 64, at 27).

In an action for defamation, the plaintiff must prove:

1. The defamatory character of the communication;
2. Publication by the defendant;
3. Its application to the plaintiff;
4. Understanding by the recipient of its defamatory meaning;
5. Understanding by the recipient of it as intended to be applied to the plaintiff;
6. Special harm to the plaintiff; and
7. Abuse of a conditionally privileged occasion.

*Forbes v. King Shooters Supply*, 230 A.3d 1181, 1187 (Pa. Super. 2020).  Whether a statement is a defamatory statement is a question of law to be decided by the court.  *Pierce v. Capital Cities Commc'ns, Inc.*, 576 F.2d 495, 502 (3d Cir. 1978); *Corabi v. Curtis Publishing Co.*, 273 A.2d

889, 904 (Pa. 1971); *Fox v. Kahn*, 221 A.2d 181, 184 (Pa. 1966).  A publication is defamatory if "it tends so to harm the reputation of another as to lower him in the estimation in the community or to deter third persons from associating or dealing with him."  *Graboff v. Colleran Firm*, 744 F.3d 128, 135 (3d Cir. 2014).  Courts routinely hold that assertions of dishonesty or professional incompetence are capable of having a defamatory meaning.  *Id.*

In Pennsylvania, truth is an affirmative defense to a defamation claim.  *Bobb v. Kraybill*, 511 A.2d 1379, 1380 (Pa. Super. Ct. 1986).  While affirmative defenses are typically not considered at the Motion to Dismiss stage of litigation, they can be considered when they appear on the face of the complaint.  *Fanelle v. LoJack Corp.*, 79 F. Supp. 2d 558, 563 (E.D. Pa. 2000).

Statements of opinion that are based on disclosed facts are not capable of having a defamatory meaning.  *Braig v. Field Commc'ns*, 456 A.2d 1366, 1373-74 (Pa. Super. 1983).  However, opinion statements that are based on undisclosed facts are capable of having a defamatory meaning.  *Id.*  The Pennsylvania Supreme Court has adopted § 566 of the Restatement (Second) of Torts, which states: "A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion."  Whether a particular statement constitutes a fact or opinion is a question of law to be decided by the court.  *Dougherty v. Boyertown* Times, 547 A.2d 778, 785 (Pa. Super. 1988).

In cases where the defendant has made a defamatory statement about a public figure, the plaintiff must be able to show that the statement was made with actual malice in order for the plaintiff's claim to survive.  *Am. Future Sys., Inc. v. Better Bus. Bureau of E. Pa.*, 923 A.2d 389, 400 (Pa. 2007).  Likewise, the First Amendment requires limited purpose public figures to meet the actual malice standard because they "voluntarily put themselves in a position of greater

public scrutiny and thus assume the risk that disparaging remarks will be negligently made about them." *McDowell v. Paiewonsky*, 769 F.2d 942, 948 (3d Cir. 1985). A "limited purpose public figure" is an individual who "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *Gertz v. Robert Welch*, 418 U.S. 323, 351 (1974). Actual malice requires proof that the publisher knew that the statement was false or was made with a reckless disregard for its truth. *Gertz*, 418 U.S. at 399 n. 12. To show reckless disregard, the defendant must have made the false publication with a "high degree of awareness of . . . probable falsity." *Harte-Hanks Commc'ns Inc. v. Connaughton*, 491 U.S. 657, 667 (1989). The plaintiff can also show such reckless disregard by showing that the defendant "entertained serious doubts as to the truth of his publication." *Id.* at 667. A finding of actual malice is only appropriate where the defendant had "obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968).

### i. Defendant Dr. Saba

#### 1. August 2, 2020 Retweet

On August 2, 2020, Dr. Saba posted a retweet that said "@PittCardiology stands for diversity equity and inclusion across the board. This article uses misquotes, false interpretations, and racist thinking to defend a single person's conclusions. We are outraged that @JAHA_AHA published this shameful and infuriating piece." (ECF No. 56-2, at 2). Dr. Saba argues that the statements in his August 2, 2020 retweet are non-defamatory opinions. (ECF No. 53, at 13). Dr. Wang argues that Dr. Saba's statements are defamatory opinions based on undisclosed defamatory facts. (ECF No. 64, at 33-34).

As Dr. Wang correctly points out in his brief, Dr. Saba's statements are defamatory opinions based on undisclosed facts.  Although Dr. Saba argues that this retweet was his personal non-actionable opinion, the statements in this tweet are presented as statements of fact.  The author of the initial tweet, @PittCardiology, does not use any language to indicate that the statements were solely @PittCardiology's opinion.  Instead, @PittCardiology states that Dr. Wang uses "misquotes" and "false interpretations" within his article.  These statements concerning misquotes and false interpretations are presented as factual statements rather than statements of @PittCardiology's opinion.  Dr. Saba does not rectify these problems with the initial tweet in his retweet.  Furthermore, even if this tweet and retweet were opinion statements, the statements fall under the exception for opinion statements that are based on undisclosed facts.

The Court must next consider whether Dr. Saba's statements were made with actual malice.  Although Dr. Saba did not address actual malice in his Brief or Reply Brief, the Court will now examine whether Dr. Saba's August 2, 2020 retweet was made with actual malice.  Dr. Wang argues in his Omnibus Response that he is not a limited purpose public figure; however, the topic of affirmative action in academic institutions and medical programs is a current topic of public debate.  Thus, although Dr. Wang is not a public figure in the traditional sense, he has become a limited purpose public figure by injecting himself into the affirmative action debate through the publication of his article.

As a limited purpose public figure, in order to succeed in his defamation action, Dr. Wang must prove that Dr. Saba's August 2, 2020 retweet was made with actual malice.  The Amended Complaint contains no factual allegations to support that Dr. Saba retweeted these statements with actual malice beyond mere conclusory allegations.  There are no allegations that Dr. Saba knew that these statements were false or that he published these statements with

reckless disregard for their truthfulness.  The actual malice standard holds a high constitutional bar under the First Amendment, and Dr. Wang cannot satisfy this burden based on the allegations in the Amended Complaint.[2]  Thus, Dr. Saba's Motion to Dismiss Dr. Wang's Count III Defamation claim, with regard to Dr. Saba's August 2, 2020 retweet, will be granted.  As the Court cannot say that amendment would be inequitable or futile, Dr. Wang is granted leave to amend his Amended Complaint in regard to his Count III Defamation claim against Dr. Saba for the August 2, 2020 retweet.

### 2.  August 6, 2020 Email Statement

On August 6, 2020, Dr. Saba sent an email letter to the UPMC community that said that Dean Shekhar, Dean of the University of Pittsburgh School of Medicine, sought the retraction of Dr. Wang's article.  (ECF No. 43, at ¶ 43).  Dr. Saba argues that the allegedly defamatory statements that he made in his August 6, 2020 email are true and that truth is an absolute bar to a defamation action.  (ECF No. 53, at 17-18).  Dr. Wang argues that the statements made in Dr. Saba's August 6, 2020 email are false statements of fact capable of having defamatory meaning. (ECF No. 64, at 48).

As truth is an absolute bar to a defamation action, if Dr. Saba's statements in the August 6, 2020 email are true, then Dr. Wang's Count III Defamation claim in regard to Dr. Saba's August 6, 2020 email must be dismissed.  Dr. Saba points out in his Brief that Dr. Wang's Amended Complaint suggests that Dean Shekhar did indeed seek the retraction of his article. (ECF No. 53, at 17).  Specifically, Dr. Wang stated in his Amended Complaint that the

---

[2] The Court could also analyze statements made in Dr. Saba's August 2, 2020 retweet for their truthfulness, as supported by statements made in AHA and Wiley Periodicals' August 5, 2020 Retraction Notice.  However, with regard to his August 2, 2020 retweet, Dr. Saba did not raise the defense of truthfulness in his Brief or Reply Brief.  Regardless, the Court reaches the same result when examining the statements for their truthfulness or whether the statements were made with actual malice.

defamatory statements made by Defendants AHA, Wiley Periodicals, Dr. Saba, Dr. Berlacher, Dr. Simon, and John Does 6-10 "necessitated the intervention of his school's dean to ensure the retraction of the article." (ECF No. 43, at ₱ 46). As Dr. Wang himself alleges within his Amended Complaint that the Dean of University of Pittsburgh School of Medicine sought the retraction of the article, Dr. Saba's Motion to Dismiss Dr. Wang's Count III Defamation claim with regard to his August 6, 2020 email letter will be granted. As the Amended Complaint contains allegations regarding the truthfulness of Dr. Saba's August 6, 2020 email, the Court holds that amendment would be futile. Thus, Dr. Wang will not be granted leave to amend his Count III Defamation claim against Dr. Saba with regard to the August 6, 2020 email.

### ii. Defendant Dr. Berlacher

On August 2, 2020, Dr. Berlacher tweeted "@PittCardiology I'm looking at you. What do we stand for? What do you think of this OPINION piece that misinterprets data and misquotes people? @JAHA_AHA this is scientifically invalid and racist." (ECF No. 56-1, at 2). Dr. Berlacher argues that the statements in her August 2, 2020 Twitter post are non-defamatory opinions. (ECF No. 53, at 13). Dr. Wang argues that Dr. Berlacher's statements are defamatory opinions based on undisclosed defamatory facts. (ECF No. 64, at 33-34).

As Dr. Wang correctly points out in his brief, Dr. Berlacher's statements are defamatory opinions based on undisclosed facts. Although Dr. Berlacher argues that the statements made in her Twitter post were her personal opinions, the statements in this tweet were presented as statements of fact. Dr. Berlacher does not use any language to indicate that the statements were solely her opinion. Instead, Dr. Berlacher affirmatively states that Dr. Wang "misinterprets data and misquotes people" within his article and that his article is "scientifically invalid and racist." These statements concerning misinterpretation of data, misquotations, and scientific invalidity, are presented as factual statements rather than statements of Dr. Berlacher's opinion.

27

Furthermore, even if this Twitter post was Dr. Berlacher's opinion, it falls under the exception for opinion statements that are based on undisclosed facts.

As discussed above, through the publication of his article, Dr. Wang became a limited purpose public figure.  As such, in order to succeed in his defamation action, Dr. Wang must prove that Dr. Berlacher's August 2, 2020 Twitter post was made with actual malice.  The Amended Complaint contains no factual allegations to support that Dr. Berlacher tweeted these statements with actual malice beyond mere conclusory allegations.  There are no allegations that Dr. Berlacher knew that this statement was false or that she published this statement with reckless disregard of its truthfulness.[3]  As with Dr. Saba, as discussed above, Dr. Wang does not sufficiently plead defamation against Dr. Berlacher in Count III.  Thus, Dr. Berlacher's Motion to Dismiss Dr. Wang's Count III Defamation claim will be granted.  As the Court cannot say that amendment would be inequitable or futile, Dr. Wang is granted leave to amend his Amended Complaint in regard to his Count III Defamation claim against Dr. Berlacher.

### iii.  Defendant Dr. Simon

In August 2020, Dr. Simon published an article in *JAHA* titled, "Equity, Diversity, and Inclusiveness in Cardiovascular Medicine and Health Care," that asserted that Dr. Wang's article "misrepresented facts to argue against affirmative action in the field of cardiology."  (ECF Nos. 43, at ¶ 45; 49-2, at 1).  The Court notes that the Amended Complaint alleges that Dr. Simon's *JAHA* article also stated that Dr. Wang's article included a "misrepresentation of evidence." (ECF No. 43, at ¶ 45).  The Court could not find this quoted statement in Dr. Simon's *JAHA*

---

[3] As discussed in Footnote 2, the Court could also analyze Dr. Berlacher's statements for their truthfulness.  Like Dr. Saba, Dr. Berlacher did not raise the defense of truthfulness in her Brief or Reply Brief.  However, the Court reaches the same result under either analysis.

article.  As such, the Court will not consider this statement from the Amended Complaint as a part of Dr. Wang's Count III Defamation claim against Dr. Simon.

Dr. Simon argues that the statements made in his August 2020 *JAHA* article are non-defamatory opinions.  (ECF No. 49, at 12).  Dr. Simon also argues that, if the Court was to find that the statements made in his August 2020 article were statements of fact rather than statements of opinion, that Dr. Wang is a limited purpose public figure for the purpose of this controversy and Dr. Wang cannot prove actual malice.  (ECF No. 49, at 19).  Dr. Wang argues that the statements made in Dr. Simon's article are defamatory opinions based on undisclosed facts and are thus actionable under defamation law.  (ECF No. 64, at 33-34).  Dr. Wang further argues that he is not a limited purpose public figure and that he has made adequate allegations of actual malice to survive Dr. Simon's present Motion to Dismiss.  (ECF No. 64, at 48-50).

As Dr. Wang correctly points out in his Omnibus Response, the statements in Dr. Simon's article are defamatory opinions based on undisclosed facts.  Although Dr. Simon argues that the statements made in his article are his personal non-actionable opinions, these statements are presented as statements of fact.  Dr. Simon does not use any language in his article to indicate that the statements are statements of his personal opinion.  Instead, Dr. Simon affirmatively states that Dr. Wang's article "misrepresented facts in its efforts to argue against affirmative action in the field of cardiology."  This statement is presented as a factual statement rather than as a statement of Dr. Simon's opinion.  Furthermore, even if this statement was a statement of his personal opinion, such would fall under the exception for opinion statements that are based on undisclosed facts.

As determined above, Dr. Wang is properly regarded as a limited purpose public figure.  Thus, he must plead facts to establish that Dr. Simon published the statements in his August

2020 article with actual malice.  The Amended Complaint contains no factual allegations to support that Dr. Simon wrote this article with actual malice beyond mere conclusory allegations. There are no allegations that Dr. Simon knew these statements were false or that he published these statements with reckless disregard of their truthfulness.[4]  As with Dr. Saba and Dr. Berlacher, discussed above, Dr. Wang does not sufficiently plead defamation against Dr. Simon in Count III.  Thus, Dr. Simon's Motion to Dismiss Dr. Wang's Count III Defamation claim will be granted.  As the Court cannot say that amendment would be inequitable or futile, Dr. Wang is granted leave to amend his Amended Complaint in regard to his Count III Defamation claim against Dr. Simon.

### iv.  Defendants AHA and Wiley Periodicals

Wiley Periodicals is the publisher that publishes *JAHA*.  Dr. Wang brings Defamation claims against AHA for three different statements: *JAHA*'s August 5, 2020 Retraction Notice (updated August 6, 2020), AHA's August 5, 2020 Press Release (updated August 6, 2020), and a *JAHA* Editor's Note titled "A Path Forward."  (ECF No. 43, at 8, first ℙ 39, at 9, second ℙ 39). As *JAHA*'s publisher, Dr. Wang only brings Defamation claims against Wiley Periodicals for *JAHA*'s August 5, 2020 Retraction Notice (updated August 6, 2020) and the *JAHA* Editor's Note titled "A Path Forward."  (ECF No. 43, at 8, first ℙ 39, at 9, second ℙ 39).  Because the statements and issues in the three statements are related, the Court will analyze Dr. Wang's Defamation claims against AHA and Wiley Periodicals together.

---

[4] As discussed in Footnotes 2 and 3, the Court could also analyze Dr. Simon's statements for their truthfulness.  Like Dr. Saba and Dr. Berlacher, Dr. Simon did not raise the defense of truthfulness in his Brief or Reply Brief.  However, the Court reaches the same result under either analysis.

1.  **August 5, 2020 Retraction Notice and "A Path Forward"**
    **Editor's Note**

On August 5, 2020, AHA and Wiley Periodicals issued a statement explaining why they retracted Dr. Wang's article.  (ECF No. 43, at ⁋ 39).  AHA and Wiley Periodicals' Retraction Notice stated: "The author's institution, the University of Pittsburgh Medical Center (UPMC), has notified the Editor-in-Chief that the article contains many misconceptions and misquotes that together those inaccuracies, misstatements, and selective misreading of source material strip the paper of its scientific validity."  (ECF Nos. 43, at ⁋ 39; 51-1, at 28).  In addition, *JAHA* published an Editor's Note, titled "A Path Forward," which stated: "The author's institution, UPMC, requested that the AHA and the editorially independent *JAHA* retract the published article on the basis of specific scientific errors as well as misleading and incomplete quotations."  (ECF Nos. 43, at 9, first ⁋ 39; 47, at 9; 47-3, at 2).

As to both statements, Defendants AHA and Wiley Periodicals argue that the challenged statements are protected statements of opinion.  (ECF Nos. 47, at 13; 51, at 17).  They also argue that, if the Court were to find that its statements are defamatory in nature, that Dr. Wang is a limited purpose public figure for the purpose of this controversy and Dr. Wang cannot prove actual malice.  (ECF No. 47, at 21; 51, at 22).  Defendant Wiley Periodicals also argues that Dr. Wang did not plead that the challenged statements are materially false.  (ECF No. 51, at 12).

Dr. Wang argues that AHA and Wiley Periodicals' statements are defamatory statements of opinion based on undisclosed defamatory facts.  (ECF No. 64, at 33-34).  Dr. Wang further argues that he is not a limited purpose public figure and that he made adequate allegations of actual malice.  (ECF No. 64, at 48-50).  Dr. Wang also argues that AHA and Wiley Periodicals cannot raise truth as a defense at this phase of the litigation.  (ECF No. 64, at 45-48).

As discussed above, truth can be considered when the basis for the defense appears on the face of the complaint. *Fanelle*, 79 F. Supp. 2d at 563. AHA and Wiley Periodicals attach to their Briefs the August 5, 2020 Retraction Notice and the "A Path Forward" Editor Note at issue. As such, in this context, the defense of truth can be addressed. As truth is an absolute bar to a defamation action, if the statements in AHA and Wiley Periodicals' August 5, 2020 Retraction Notice and Editor's Note are true, then Dr. Wang's Count III Defamation claims against AHA and Wiley Periodicals must be dismissed. Wiley Periodicals argues in its Brief that Dr. Wang did in fact misquote sources within his article. (ECF No. 51, at 14). Dr. Wang argues that these two examples of misquotations were not true misquotations but were instead quotes that he took out of context. (ECF No. 64, at 47).

As an initial matter, Dr. Wang argues that the Court cannot consider the specific statements made in AHA and Wiley Periodicals' Retraction Notice or Editor's Note because they were not attached to his Amended Complaint. (ECF No. 64, at 45). Wiley Periodicals argues that the Retraction Notice and Editor's Note are incorporated by reference into Dr. Wang's Amended Complaint. (ECF No. 69, at 9). Although Dr. Wang did not attach the full Retraction Notice or Editor's Note to his Amended Complaint, his claims against AHA and Wiley Periodicals are specifically based on the statements within the Retraction Notice and Editor's Note. Thus, the full Retraction Notice and Editor's note attached to Wiley Periodicals' Brief are incorporated by reference to Dr. Wang's Amended Complaint. As such, the Court may consider the full Retraction Notice and Editor's Note within its Motion to Dismiss analysis.

Now, the Court turns to the merits of whether AHA and Wiley Periodicals' statements in the August 5, 2020 Retraction Notice and Editor's Note are indeed true and are thus incapable of having a defamatory meaning. In the Retraction Notice, AHA and Wiley Periodicals provide

two examples of quotations that Dr. Wang took out-of-context to support a different position

from the positions stated within the source material.  (ECF No. 51-1, at 28-29).  AHA and Wiley

Periodicals explain in their Retraction Notice that these types of "inaccuracies, misstatements,

and selective misreading of source materials strip the paper of its scientific validity," and thus

support their decision to retract the article.  (ECF No. 51-1, at 28-29).

   In the first example, Dr. Wang included improperly quoted material out of context to

support his position that diversity initiatives resulted in accepting candidates with lower

academic credentials.  (ECF No. 51-1, at 28).[5]  In the second example, Dr. Wang incorrectly

characterized statistics from the source material.  (ECF No. 51-1, at 28-29).[6]  These two

examples support Wiley Periodicals' argument that Dr. Wang did in fact misquote and

mischaracterize these two particular statements within his article.  As truth is an absolute bar to a

defamation claim, AHA and Wiley Periodicals' Motion to Dismiss Dr. Wang's Count III

Defamation claims against them will be granted.  As the Retraction Notice and Editor's Note

---

[5] The quote from Dr. Wang's article states: ". . . we simply made it a priority to rank
[underrepresented in medicine] applicants more aggressively than in previous years, thus
achieving success in matching them regardless of recruiting efforts, with the implication being
that we accepted less competitive applicants in an effort to increase diversity."  (ECF No. 51-1,
at 28).  Dr. Wang however excluded the next sentence within the paragraph, which said:
"Although the measurement of an applicant's achievement reflected in his or her application and,
by extrapolation, the applicant's potential for being a successful fellow, cannot be fairly
quantified, USMLE score comparison shows no significant difference between URM and non-
URM fellows matched to the OSU program."  (ECF No. 51-1, at 28).

[6] The quote from Dr. Wang's article states: "This hypothesis was supported by a 1995 California
study that demonstrated primary care physicians who were not board certified were 1.6 times
more likely to work in rural underserved areas when compared with board-certified
counterparts."  (ECF No. 51-1, at 29).  The actual statement from the source material said:
"Among physicians completing postgraduate medical education after 1974, board-certified
family physicians were 3 times more likely to locate in medically underserved rural communities
than were other primary care physicians.  Non-board-certified family and general physicians
were 1.6 times more likely than other non-board-certified primary care physicians to locate in
rural underserved areas."  (ECF No. 51-1, at 29).

contain verifiably true statements about misquotations and mischaracterizations contained in Dr.

Wang's article, the Court holds that amendment would be futile.  Thus, Dr. Wang will not be

granted leave to amend his Count III Defamation claims against AHA and Wiley Periodicals

with regard to the August 5, 2020 Retraction Notice and Editor's Note.

### 2.   August 5, 2020 Press Statement

On August 5, 2020, AHA issued a Press Statement on its website about the decision to

retract Dr. Wang's article, which was then updated on August 6, 2020.  (ECF No. 47, at 9).

AHA stated: "The Wang paper has rightfully drawn criticism for its misrepresentations and

conclusions.  As an organization focused on the relentless pursuit of longer, healthier lives for

*everyone everywhere*, the American Heart Association (AHA) denounces the views expressed in

the article and regrets its role in enabling those views to be promoted.  Those views are a

misrepresentation of the facts and are contrary to our organization's core values and historic

commitment to promoting diversity and inclusion in medicine and science."  (ECF Nos. 43, at 8,

first ⁋ 39; 47, at 9; 47-2); *see also* Wang Paper Is Wrong, *supra*.  AHA's Press Statement

continued: "While the Journal of the American Heart Association (JAHA) and the other AHA

scientific journals are editorially independent of the Association, we take our responsibility to

ensure factual accuracy seriously.  The independent editors of JAHA and the American Heart

Association are reviewing the journal's peer-review and publication processes to ensure future

submissions containing deliberate misinformation or misrepresentation are never published.  The

journal can and will do better."  (ECF Nos. 43, at 8, first ⁋ 39; 47, at 9; 47-2); *see also* Wang

Paper Is Wrong, *supra*.

Defendant AHA argues that the challenged statements are protected statements of

opinion.  (ECF No. 47, at 13).  AHA also argues that, if the Court were to find that its statements

are defamatory in nature, that Dr. Wang is a limited purpose public figure for the purpose of this controversy and Dr. Wang cannot prove actual malice.  (ECF No. 47, at 21).

Dr. Wang argues that the statements contained in AHA's Press Statement are statements of opinion based on undisclosed defamatory facts.  (ECF No. 64, at 33-34).  Dr. Wang further argues that he is not a limited purpose public figure and that he made adequate allegations of actual malice.  (ECF No. 64, at 48-50).  Dr. Wang also argues that the AHA cannot raise truth as a defense at this phase of the litigation.  (ECF No. 64, at 45-48).

As truth is an absolute bar to a defamation action, if AHA can prove that the statements in its August 5, 2020 Press Statement are true, then Dr. Wang's Count III Defamation claim against AHA must be dismissed.  Like AHA and Wiley Periodicals' August 5, 2020 Retraction Notice and Editor's Note, discussed above, the Court holds that it can properly consider that Press Statement even though it was not attached to Dr. Wang's Amended Complaint.  The statements made in AHA's August 5, 2020 Press Statement form the basis of Dr. Wang's defamation claim, and the full Press Statement is properly incorporated by reference into Dr. Wang's Amended Complaint.  As such, the Court may consider the full Press Statement within its Motion to Dismiss analysis.

As discussed above, AHA and Wiley Periodicals' August 5, 2020 Retraction Notice provided two examples of quotations that Dr. Wang took out-of-context and used to support a different position than the positions stated within the source material.  (ECF No. 51-1, at 28-29).  These examples of misquotations and mischaracterizations support the truthfulness of AHA's statements in its August 5, 2020 Press Release.  Thus, as above, AHA's Motion to Dismiss Dr. Wang's Count III Defamation claim against it with regard to August 5, 2020 Press Release will be granted.  As the Press Statement contains verifiably true statements about misquotations and

mischaracterizations contained in Dr. Wang's article, the Court holds that amendment would be futile.  Thus, Dr. Wang will not be granted leave to amend his Count III Defamation claim against AHA with regard to the defamatory statements contained within the August 5, 2020 Press Statement.

### v.  Defendants UPMC and UPP

As regards Dr. Wang's Count III Defamation claims against Defendants UPMC and UPP, said Defendants argue that said claims are derivative of Dr. Wang's defamation claims against Dr. Saba, Dr. Berlacher, and Dr. Simon and that, because the claims against the individual Defendants should be dismissed, the defamation claims against UPMC and UPP should likewise be dismissed.  (ECF No. 53, at 18-19).  Dr. Wang's Brief does not specifically address his defamation claims against UPMC and UPP, but his Amended Complaint specifically states that UPMC and UPP are liable because Dr. Saba, Dr. Berlacher, and Dr. Simon made their allegedly defamatory statements on behalf of UPMC and UPP.  (ECF No. 43, at ¶¶ 50-53).  As the defamation claims against Dr. Saba, Dr. Berlacher, and Dr. Simon are being dismissed in their entirety, Dr. Wang's Count III Defamation claims will be likewise dismissed against UPMC and UPP.

As with Dr. Wang's dismissed Count III Defamation claim against Dr. Saba for statements made in his August 2, 2020 retweet, Dr. Wang will be granted leave to amend said claims against UPMC and UPP.  And, as with Dr. Wang's dismissed Count III Defamation claim against Dr. Saba for statements made in his August 6, 2020 email, Dr. Wang will not be granted leave to amend said claims against UPMC and UPP.

As with Dr. Wang's dismissed Count III Defamation claim against Dr. Berlacher for statements made in her August 6, 2020 Twitter post, Dr. Wang will be granted leave to amend said claims against UPMC and UPP.

As with Dr. Wang's dismissed Count III Defamation claim against Dr. Simon for statements made in his August 2020 *JAHA* article, Dr. Wang will be granted leave to amend said claims against UPMC and UPP.

### vi.   Defendant University of Pittsburgh

The University of Pittsburgh argues that Dr. Wang's Count III Defamation claims against it are derivative of Dr. Wang's defamation claims against Dr. Saba, Dr. Berlacher, and Dr. Simon, and thus, dismissal of said claims against the individual Defendants also supports dismissal of the claims against the University of Pittsburgh. (ECF No. 55, at 20). The University of Pittsburgh further argues that even if those individual Defendants made defamatory statements, the University cannot be held vicariously liable for any such statements. (ECF No. 55, at 20). Dr. Wang argues that the John Doe 6-10 Defendants were acting as University of Pittsburgh agents when they made defamatory statements concerning Dr. Wang's article to AHA and Wiley Periodicals. (ECF No. 64, at 56). The University of Pittsburgh replies that the Amended Complaint pleads no facts to plausibly suggest that the unnamed John Doe 6-10 Defendants made defamatory statements to AHA and Wiley Periodicals or that they made such statements on behalf of the University of Pittsburgh. (ECF No. 70, at 13).

As the defamation claims against Dr. Saba, Dr. Berlacher, and Dr. Simon will be dismissed in their entirety, Dr. Wang's Count III Defamation claims will also be dismissed against the University of Pittsburgh. Furthermore, there are no statements in the Retraction Notice or allegations in the Amended Complaint to support Dr. Wang's claim that the John Doe 6-10 Defendants made defamatory statements to AHA or Wiley Periodicals on behalf of the University of Pittsburgh. In fact, AHA and Wiley Periodicals specifically state in their Retraction Notice that "The author's institution, the University of Pittsburgh Medical Center

(UPMC), has notified the Editor-in-Chief that the article contains many misconceptions and misquotes that together those inaccuracies, misstatements, and selective misreading of source material strip the paper of its scientific validity." (ECF No. 51-1, at 28). Additionally, there are no factual allegations besides mere conclusory allegations that the John Doe 6-10 Defendants were acting as agents of the University of Pittsburgh when they made the allegedly defamatory statements about Dr. Wang's article. As such, the University of Pittsburgh's Motion to Dismiss Dr. Wang's Count III Defamation claims will be granted. As the Court cannot say that amendment would be inequitable or futile, Dr. Wang is granted leave to amend his Amended Complaint in regard to his Count III Defamation claims against the University of Pittsburgh.

### e. Count IV Breach of Contract Claim – Dr. Wang's Contract with AHA and Wiley Periodicals

Dr. Wang brings his Count IV Breach of Contract claims against AHA and Wiley Periodicals for breaching Dr. Wang's contract with AHA and Wiley Periodicals when they decided to retract Dr. Wang's *JAHA* article. (ECF No. 43). Defendants AHA and Wiley Periodicals argue that the retraction of Dr. Wang's article does not violate any express terms of the contract. (ECF Nos. 47, at 25-26; 51, at 28-29). Dr. Wang's argues that by retracting the article, AHA and Wiley Periodicals violated the terms of good faith and fair dealing that are implied within every contract. (ECF No. 64, at 57-58).

AHA and Wiley Periodicals agreed with Dr. Wang to publish his article in *JAHA* for consideration for $1,600. Dr. Wang wrote his article and paid AHA and Wiley Periodicals $1,600. In March 2020, AHA and Wiley Periodicals published Dr. Wang's article. On August 5, 2020, AHA and Wiley Periodicals retracted Dr. Wang's article, citing two specific instances of misquotations and mischaracterizations that influenced their decision to retract article. (ECF No. 51-1, at Exhibit 3).

In order to sufficiently plead a claim for breach of contract under Pennsylvania law, a plaintiff must allege facts showing: "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages." *Haywood v. Univ. of Pittsburgh*, 976 F. Supp. 2d 606, 625 (W.D. Pa. 2013).  To establish the existence of an enforceable contract, the court must consider: "(1)  whether both parties manifested an intention to be bound by the agreement; (2) whether the terms of the agreement are sufficiently definite to be enforced; and (3) whether there was consideration." *Blair v. Scott Specialty Gases*, 283 F.3d 595, 603 (3d Cir. 2002).  The terms of the agreement "are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy." *Encore Int'l, Inc. v. Downey*, 343 F. Supp. 3d 459, 489 (E.D. Pa. 2018) (quoting Restatement (Second) of Contracts § 33).

Pennsylvania courts imply within commercial contracts a duty of good faith and fair dealing. *Donahue v. Federal Express Corp.*, 753 A.2d 238, 242 (Pa. Super. 2000).  The Pennsylvania Superior Court has adopted § 205 of the Restatement (Second) of Contracts, which states: "Every contract imposes on each party a duty of good faith and fair dealing in its performance and its enforcement."  Some examples of bad faith include: "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." *Somers v. Somers*, 613 A.2d 1211, 1213 (Pa. Super. 1992) (citing Restatement (Second) of Contracts § 205).

First, the Court must analyze whether the Dr. Wang has alleged facts showing the existence of the contract, including its essential terms.  All three parties agree that AHA, Wiley Periodicals, and Dr. Wang manifested an intent to be bound by an agreement.  Additionally, it is

39

not contested that Dr. Wang paid AHA and Wiley Periodicals a sum of $1,600 to publish his *JAHA* article.  However, the agreement is silent as to any intent concerning post-publication retraction of any article.  The agreement does not define any duties or remedies in the event of post-publication retraction.  Therefore, the Court cannot infer, from the agreement itself, any agreement or duty concerning retraction.  Dr. Wang did not cite, and the Court has not found, any cases standing for the proposition that a publisher is in breach of contract if the publisher later retracts an article.  AHA and Wiley Periodicals made a promise within the contract to publish Dr. Wang's article.  AHA and Wiley Periodicals satisfied this promise when they published Dr. Wang's article in *JAHA* in March of 2020.  At that point, contract performance was satisfied.  Once AHA and Wiley Periodicals published Dr. Wang's article in *JAHA*, their obligations under the contract were fulfilled.

Although Dr. Wang argues that AHA and Wiley Periodicals violated the duty of good faith and fair dealing when they decided to retract his article, such duty speaks to contract performance.  As the contract had already been performed when AHA and Wiley Periodicals retracted Dr. Wang's article, the implied duty of good faith and fair dealing does not apply to any post-publication retraction.

As such, AHA and Wiley Periodicals' Motion to Dismiss Dr. Wang's Count IV Breach of Contract claims will be granted.  Because this decision rests upon the Court's legal interpretation of Dr. Wang's contract with AHA and Wiley Periodicals, amendment would be futile.  Thus, Dr. Wang is not granted leave to amend in regard to his Count IV Breach of Contract claims against AHA and Wiley Periodicals.

**f.   Count V Tortious Interference with Contract Claim – Dr. Wang's Contract with AHA and Wiley Periodicals**

Dr. Wang's Count V Tortious Interference with Contract claim alleges that University of Pittsburgh, UPMC, and UPP tortiously interfered with Dr. Wang's contract with AHA and Wiley Periodicals.  (ECF No. 43).  University of Pittsburgh moves to dismiss said claim; however, UPMC and UPP did not move for dismissal.  (ECF No. 54).  As a result, the Count V Tortious Interference with Contract claims brought against UPMC and UPP remain in the case.

In its Motion to Dismiss, Defendant, University of Pittsburgh, argues that Dr. Wang's tortious interference with contract claim brought against it must be dismissed because Dr. Wang failed to allege that the individuals who allegedly interfered with the contract were acting in their capacities as University employees.  (ECF No. 55, at 27-28).  Dr. Wang argues that his Amended Complaint alleges that University of Pittsburgh agents made defamatory statements that harmed his contract with AHA and Wiley Periodicals.  (ECF No. 64, at 58).

Under Pennsylvania law, the elements of a cause of action for intentional interference with a contractual relation, whether existing or prospective, are:

1.  The existence of a contractual, or prospective contractual relation between the complainant and a third party;
2.  Purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring;
3.  The absence of privilege or justification on the part of the defendant; and
4.  The occasioning of actual legal damage as a result of the defendant's conduct.

*Crivelli v. Gen. Motors Corp.*, 215 F.3d 386, 394 (3d Cir. 2000).  The Pennsylvania Supreme Court has expressly adopted §§ 766 and 767 of the Restatement (Second) of Torts, which states that improper conduct by the alleged tortfeasor is a necessary element of this tort.  *See Adler, Barish, Daniels, Levin & Creskoff v. Epstein*, 393 A.2d 1175, 1183 (Pa. 1978); Restatement

(Second) of Torts §§ 766-67.  The "nature of the actor's conduct is a chief factor" in determining whether the conduct is improper.  Restatement (Second) of Torts § 767 cmt. c.  Examples of improper conduct include threats of physical violence, fraudulent misrepresentations, threats of unmerited civil or criminal litigation, economic pressure, and unlawful conduct.  *See id.*

Before beginning an analysis of the elements of Dr. Wang's tortious interference with contract claim against the University of Pittsburgh, Dr. Wang must first show that the University of Pittsburgh was the entity that took action against him.  As discussed above, as pleaded, neither the University of Pittsburgh nor its agents took any action to defame Dr. Wang's *JAHA* article.  As such, the University of Pittsburgh's Motion to Dismiss Dr. Wang's Count V Tortious Interference with Contract claim against it will be granted.

Even if the Amended Complaint contained allegations that University of Pittsburgh agents had defamed Dr. Wang's *JAHA* article, Dr. Wang's tortious interference with contract claim would still fail at the first element.  As discussed above, Dr. Wang's Count IV Breach of Contract claim fails as a matter of law because the parties to that contract did not create any duties regarding post-publication retraction.  Thus, once the contract was performed by publication, no subsequent action by others interfered with said completed contract.  The parties do not cite, and the Court could not find, any cases suggesting that a plaintiff can sustain a tortious interference with contract claim for interfering with a completed contract.  Because this decision rests upon the Court's legal interpretation of Dr. Wang's contract with AHA and Wiley Periodicals, amendment would be futile.  Thus, Dr. Wang is not granted leave to amend his Count V Tortious Interference with Contract claim against the University of Pittsburgh.

**g.  Count VI Breach of Contract Claim – Dr. Wang's Contract with UPP**

In his Count VI Breach of Contract claim against UPP, Dr. Wang asserts that he had an employment contract with UPP where he receives additional compensation for academic productivity.  (ECF No. 43, at ⁋ 87).  Dr. Wang alleges that UPP breached this employment contract by defaming his *JAHA* article.  (ECF No. 43, at ⁋ 87).

In its Motion to Dismiss, Defendant, UPP, argues Dr. Wang did not meet the pleading standard to identify the specific and essential term of his employment contract with UPP that was breached.  (ECF No. 53, at 19-20).  Dr. Wang argues that he properly plead in his Amended Complaint that under his UPP contract he received additional compensation for academic productivity and that his allegations in the Amended Complaint are sufficient to survive a 12(b)(6) motion to dismiss.  (ECF No. 64, at 58-59).

As neither Dr. Wang nor UPP attached Dr. Wang's contract to the Amended Complaint or Briefings, the Court does not have the benefit of examining the employment contract. However, the Amended Complaint alleges that Dr. Wang receives additional compensation for academic productivity under his contract with UPP.  (ECF No. 43, at ⁋ 19).

First, the Court must analyze whether the Dr. Wang has alleged facts showing the existence of the contract, including its essential terms.  Both parties agree that UPP and Dr. Wang manifested an intent to be bound by an employment agreement.  Additionally, it is not contested that Dr. Wang provided physician services at UPMC and academic services at the University of Pittsburgh School of Medicine, for which he received compensation from UPP. UPP correctly argues that because Dr. Wang cannot point to the specific and definite terms of the contract that were violated, Dr. Wang's Count VI Breach of Contract claim against it must fail. The Amended Complaint does not allege any definition of "academic productivity" under the

43

contract.  There are no allegations in the Amended Complaint of how Dr. Wang is compensated for academic productivity.  These threadbare and conclusory allegations do not meet the pleading standard for a breach of contract claim.  Dr. Wang does not sufficiently plead the terms of his employment contract to establish any measurable compensatory relationship between productivity and the article at issue.  There are no contract terms pled to assess duty, breach, or damages in relation to the alleged conduct leading to the retraction.

Although Dr. Wang argues that UPP violated the duty of good faith and fair dealing, such duty speaks to contract performance.  As Dr. Wang has not plead sufficiently definite terms in his employment contract with UPP, analyzing the duty of good faith and fair dealing, which goes to contract performance, would be premature.

As such, UPP's Motion to Dismiss Dr. Wang's Count VI Breach of Contract claim will be granted.  As the Court cannot say that amendment would be inequitable or futile, Dr. Wang is granted leave to amend his Amended Complaint in regard to his Count VI Breach of Contract claim against the UPP.

### h.  Count VII Tortious Interference with Contract Claim – Dr. Wang's Contract with UPP

Dr. Wang brings his Count VII Tortious Interference with Contract claims against UPMC and the University of Pittsburgh for tortiously interfering with his employment contract with UPP by defaming his *JAHA* article.  (ECF No. 43, at ¶¶ 90-91).

### i.  Defendant UPMC

As regards Dr. Wang's Count VII Tortious Interference with Contract claim against UPMC, Defendant UPMC moves to dismiss, arguing that the Amended Complaint does not plead the specific and essential terms of the UPP employment contract.  (ECF No. 53, at 20).  As such, UPMC argues that Dr. Wang's tortious interference with contract claim against UPMC for

interfering with Dr. Wang's employment contract with UPP must likewise fail. (ECF No. 53, at 20). Dr. Wang argues that the Amended Complaint sufficiently pleads that under his UPP contract he received additional compensation for academic productivity and that UPMC interfered with that contract, thereby depriving him of said additional compensation. (ECF No. 64, at 58-60).

Dr. Wang's Tortious Interference with Contract claim against UPMC fails at the first element. As discussed above, while it is undisputed that there was an employment contract between UPP and Dr. Wang, Dr. Wang's Amended Complaint does not sufficiently plead the terms of said contract to establish duty, breach, or damages. As such, UPMC's Motion to Dismiss Dr. Wang's Count VI Tortious Interference with Contract claim will be granted. As the Court cannot say that amendment would be inequitable or futile, Dr. Wang is granted leave to amend his Amended Complaint in regard to his Count VII Tortious Interference with Contract claim against UPMC.

### ii.  Defendant University of Pittsburgh

Defendant University of Pittsburgh argues that Dr. Wang's Count VII Tortious Interference with Contract claim brought against it must be dismissed because the claim did not allege that any of the individuals who interfered with Dr. Wang's employment contract with UPP were acting in their capacities as University employees. (ECF No. 55, at 27-28). Dr. Wang argues that the University of Pittsburgh can be held vicariously liable for its employees' unjustified actions in defaming Dr. Wang and interfering with his contract with UPP. (ECF No. 64, at 58-60).

Before beginning an analysis of the elements of Dr. Wang's tortious interference with contract claim against the University of Pittsburgh, Dr. Wang must first show that the University

of Pittsburgh was the entity that took action against him.  As discussed above, as pleaded, neither the University of Pittsburgh nor its agents took any action to defame Dr. Wang's *JAHA* article. As such, the University of Pittsburgh's Motion to Dismiss Dr. Wang's Count VII Tortious Interference with Contract claim against it will be granted.

Even if the Amended Complaint contained allegations that University of Pittsburgh agents had defamed Dr. Wang's *JAHA* article, Dr. Wang's tortious interference with contract claim would still fail at the first element.  As discussed above, while it is undisputed that there was an employment contract with UPP and Dr. Wang, the Amended Complaint does not sufficiently plead the terms of said contract to establish duty, breach, or damages.  Because Dr. Wang failed to plead sufficiently definite terms under his employment contract with UPP, his tortious interference with contract claim against the University of Pittsburgh must likewise fail. As the Court cannot say that amendment would be inequitable or futile, Dr. Wang is granted leave to amend his Amended Complaint in regard to his Count VII Tortious Interference with Contract claim against the University of Pittsburgh.

### i.   Count VIII Pennsylvania Whistleblower Law Claim

Dr. Wang brought claims pursuant to the Pennsylvania Whistleblower Law against UPMC, UPP, Dr. Gladwin, Dr. Saba, Dr. Berlacher, and the University of Pittsburgh.  (ECF No. 43).  Dr. Wang alleges that he engaged in a protected activity when he told Dr. Saba and Dr. Berlacher about the illegal admissions practices at UPMC and University of Pittsburgh School of Medicine.  Dr. Wang further alleges that he was subsequently retaliated against by being removed as the director of UPMC's clinical cardiac electrophysiology fellowship program and being forbidden to interact with UPMC fellows and residents and University of Pittsburgh medical students.

46

Pennsylvania's Whistleblower Law states that "[n]o employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste by a public body or an instance of waste by any other employer." 43 P.S. § 1423(a). Under 43 P.S. § 1422, public body is defined as: "(1) A State officer, agency, department, division, bureau, board, commission, council, authority or other body in the executive branch of State government. (1.1) The General Assembly and its agencies. (2) A county, city, township, regional governing body, council, school district, special district or municipal corporation, or a board, department, commission, council or agency. (3) Any other body which is created by Commonwealth or political subdivision authority or which is funded in any amount by or through Commonwealth or political subdivision authority or a member or employee of that body."

### i. Defendants UPMC, UPP, Dr. Gladwin, Dr. Saba, and Dr. Berlacher

The allegations in Dr. Wang's Amended Complaint are for wrongdoing rather than waste. In actions for wrongdoing rather than waste, the Pennsylvania Whistleblower Statute only applies to public bodies who receive funds from the Commonwealth. *Adams v. HCF Mgmt.*, 2018 WL 3388404, at *2-*3 (W.D. Pa. July 12, 2018).

Defendants UPMC, UPP, Dr. Gladwin, Dr. Saba, and Dr. Berlacher argue that Dr. Wang's Pennsylvania Whistleblower Law claims against them should be dismissed because they are not public body that receive funding from the Commonwealth. (ECF No. 53, at 20-23). Dr. Wang argues that the relationship between UPMC, UPP, Dr. Gladwin, Dr. Saba, Dr. Berlacher,

and the University of Pittsburgh is sufficiently direct that they all satisfy the "public body" requirement under the Pennsylvania Whistleblower Law.  (ECF No. 64, at 68-69).

For a non-governmental entity to qualify as a "public body," it must have been created by or funded through the state.  *See* 43 P.S. § 1422.  If the entity is funded through the state, the funding must come from the "Commonwealth or political subdivision or authority"—not a federal source.  *See Davis v. Point Park Univ.*, 2010 WL 4929104, at *12 (W.D. Pa. Nov. 30, 2010).  As the adverse actions taken against Dr. Wang by Dr. Saba and Dr. Berlacher were in their roles as UPP physicians providing physician services at UPMC rather than in their roles as University of Pittsburgh School of Medicine faculty members, the focus of this analysis must be on whether UPMC and UPP qualify as public bodies under the Pennsylvania Whistleblower Law.  The Amended Complaint alleges that UPMC and UPP "receives some amount of funding by or through the Commonwealth or a political subdivision authority thereof."  (ECF No. 43, at ¶ 94).  Beyond this mere conclusory allegation, the Amended Complaint does not specifically identify what types of funding UPMC and UPP receives from the Commonwealth.  The Amended Complaint contains no allegations that UPMC and UPP satisfy the public body requirements under the Pennsylvania Whistleblower Law.  As such, UPMC, UPP, Dr. Gladwin, Dr. Saba, and Dr. Berlacher's Motion to Dismiss Dr. Wang's Count VIII Pennsylvania Whistleblower Law claims will be granted.  As the Court cannot say that amendment would be inequitable or futile, Dr. Wang is granted leave to amend his Count VIII Pennsylvania Whistleblower Statute claims against UPMC, UPP, and Dr. Saba, Dr. Gladwin, and Dr. Berlacher in their roles as UPMC and UPP agents.

### ii. Defendant University of Pittsburgh

Defendant University of Pittsburgh argues that Dr. Wang did not plead enough facts in his Amended Complaint to show a causal connection between Dr. Wang's protected activity and the adverse employment actions taken against him.  (ECF No. 55, at 24-26).  Dr. Wang argues that he made sufficient factual allegations to survive the Motion to Dismiss standard.  (ECF No. 64, at 60-65).  Before beginning an analysis of the elements of Dr. Wang's Pennsylvania Whistleblower Law claim against the University of Pittsburgh, Dr. Wang must first show that the University of Pittsburgh was the entity that took the adverse action against him.  As discussed above, as pleaded, the University of Pittsburgh did not take adverse employment action against Dr. Wang.  Thus, the University of Pittsburgh's Motion to Dismiss Dr. Wang's Count VIII Pennsylvania Whistleblower Law claim will be granted.  As the Court cannot say that amendment would be inequitable or futile, Dr. Wang is granted leave to amend his Amended Complaint in regard to his Count VIII Pennsylvania Whistleblower Law claim against the University of Pittsburgh.

### IV. Conclusion

#### a. UPMC

For the reasons stated above, UPMC's Partial Motion to Dismiss will be granted as follows.

UPMC's Partial Motion to Dismiss will be granted without leave to amend as to Dr. Wang's:

1. Count I Section 1983 First Amendment claim and
2. Count III Defamation claim for Dr. Saba's statements in his August 6, 2020 email.

UPMC's Partial Motion to Dismiss will be granted with leave to amend as to Dr. Wang's:

1. Count II Title VI Discrimination claim,
2. Count III Defamation claims (except the Count III Defamation claim for Dr. Saba's statements in his August 6, 2020 email),
3. Count VII Tortious Interference with Contract claim, and
4. Count VIII Pennsylvania Whistleblower Law claim.

### b.  UPP

For the reasons stated above, UPP's Partial Motion to Dismiss will be granted as follows.

UPP's Partial Motion to Dismiss will be granted without leave to amend as to Dr.

Wang's:

1. Count I Section 1983 First Amendment claim and
2. Count III Defamation claim for Dr. Saba's statements made in his August 6, 2020 email.

UPP's Partial Motion to Dismiss will be granted with leave to amend as to Dr. Wang's:

1. Count III Defamation claims (except the Count III Defamation claim for Dr. Saba's statements in his August 6, 2020 email),
2. Count VI Breach of Contract claim, and
2. Count VIII Pennsylvania Whistleblower Law claim.

### c.  Dr. Gladwin

For the reasons stated above, Dr. Gladwin's Partial Motion to Dismiss will be granted

with leave to amend as to Dr. Wang's Count VIII Pennsylvania Whistleblower Law claim.

### d.  Dr. Saba

For the reasons stated above, Dr. Saba's Partial Motion to Dismiss will be granted as

follows.

Dr. Saba's Partial Motion to Dismiss will be granted without leave to amend as to Dr.

Wang's:

1. Count III Defamation claim for statements made in his August 6, 2020 email.

Dr. Saba's Partial Motion to Dismiss will be granted with leave to amend as to Dr.

Wang's:

1. Count III Defamation claim for statements made in his August 2, 2020 retweet and
2. Count VIII Pennsylvania Whistleblower Law claim.

### e. Dr. Berlacher

For the reasons stated above, Dr. Berlacher's Partial Motion to Dismiss will be granted as

follows.

Dr. Berlacher's Partial Motion to Dismiss will be granted with leave to amend as to Dr.

Wang's:

1. Count III Defamation claim and
2. Count VIII Pennsylvania Whistleblower Law claim.

### f. Dr. Simon

For the reasons stated above, Dr. Simon's Motion to Dismiss will be granted as follows.

Dr. Simon's Motion to Dismiss will be granted with leave to amend as to Dr. Wang's Count III

Defamation claim.  As such, absent amendment regarding Dr. Simon, Dr. Simon will be

dismissed from the case.

### g. University of Pittsburgh

For the reasons stated above, University of Pittsburgh's Motion to Dismiss will be

granted without leave to amend as regards to Dr. Wang's:

1. Count V Tortious Interference with Contract claim.

For the reasons stated above, University of Pittsburgh's Motion to Dismiss will be granted with leave to amend as regards to Dr. Wang's:

1. Count I Section 1983 First Amendment claim,
2. Count II Title VI Discrimination claim,
3. Count II Section 1981 Retaliation claim,
4. Count III Defamation claims,
5. Count VII Tortious Interference with Contract claim, and
6. Count VIII Pennsylvania Whistleblower Law claim.

As such, absent amendment regarding the University of Pittsburgh, the University of Pittsburgh will be dismissed from the case.

### h.  AHA

For the reasons stated above, AHA's Motion to Dismiss will be granted as follows.

AHA's Motion to Dismiss will be granted without leave to amend as to Dr. Wang's:

1. Count III Defamation claims and
2. Count IV Breach of Contract claim.

As such, AHA will be dismissed from the case.

### i.  Wiley Periodicals

For the reasons stated above, Wiley Periodicals' Motion to Dismiss will be granted as follows.

Wiley Periodicals' Motion to Dismiss will be granted without leave to amend as to Dr. Wang's:

1. Count III Defamation claims and
2. Count IV Breach of Contract claim.

As such, Wiley Periodicals will be dismissed from the case.

**j.   Claims Dismissed with Leave to Amend**

For any claims that the Court dismissed but granted leave to amend, Dr. Wang may file a

second Amended Complaint by January 4, 2022.  If Dr. Wang files a second Amended

Complaint, the necessary Defendants shall file their responsive pleadings within 14 days of Dr.

Wang's filing of a second Amended Complaint, or by January 18, 2022, whichever occurs first.

An appropriate Order will be entered.

DATE:  _12/21/2021_____

Marilyn J. Horan
United States District Judge