**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| NORMAN WANG, | ) | |
| | ) | |
| Plaintiff, | ) | 2:20-cv-1952 |
| | ) | |
| vs. | ) | District Judge Marilyn J. Horan |
| | ) | |
| UNIVERSITY OF PITTSBURGH, | ) | |
| UNIVERSITY OF PITTSBURGH | ) | |
| MEDICAL CENTER, SAMIR SABA, | ) | |
| MARK GLADWIN, and KATHRYN | ) | |
| BERLACHER, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Plaintiff, Dr. Norman Wang, brings a two-count, Second Amended Complaint against the University of Pittsburgh, University of Pittsburgh Medical Center (UPMC), Dr. Mark Gladwin, Dr. Samir Saba, and Dr. Kathryn Berlacher, alleging claims for violations of 42 U.S.C. § 1983 and 42 U.S.C. § 1981.[1]  (ECF No. 82).

Dr. Wang's first Amended Complaint brought claims against the University of Pittsburgh, UPMC, University of Pittsburgh Physicians (UPP), American Heart Association (AHA), Wiley Periodicals, Dr. Gladwin, Dr. Saba, Dr. Berlacher, Dr. Marc Simon, and John Does 1-10, alleging violations of 42 U.S.C. § 1983, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and Pennsylvania state law claims for defamation, breach of contract, tortious interference with contract, and the Pennsylvania Whistleblower Law.  (ECF No. 43).  The Defendants each filed respective Motions to Dismiss Dr. Wang's Amended Complaint.  (ECF Nos. 46, 48, 50, 52 & 54).  On December 21, 2021 this Court dismissed Defendants AHA, Wiley

---

[1] The Second Amended Complaint also contained claims for tortious interference with contract against UPMC and University of Pittsburgh Physicians (UPP), but said claims were dismissed by stipulation and agreement of the parties on January 25, 2022.  (ECF No. 81).

Periodicals, Dr. Simon, and John Does 1-10 from the case and dismissed various claims against

Defendants University of Pittsburgh, UPMC, UPP, Dr. Gladwin, Dr. Saba, and Dr. Berlacher.

(ECF Nos. 72).  Of relevance here, the Court granted Dr. Wang leave to amend his § 1983 claim

brought against the University of Pittsburgh.  (ECF No. 72).  In their Partial Motion to Dismiss

Dr. Wang's first Amended Complaint, Dr. Gladwin, Dr. Saba, and Dr. Berlacher did not move to

dismiss Dr. Wang's § 1983 claims against them.  (ECF No. 52).

Presently before the Court are two Motions to Dismiss Dr. Wang's Second Amended

Complaint filed by the University of Pittsburgh and by Dr. Gladwin, Dr. Saba, and Dr.

Berlacher.[2]  (ECF Nos. 82 & 84).  Dr. Wang filed his Response, (ECF No. 87), and the

Defendants filed their respective Reply Briefs, (ECF Nos. 88 & 89).  For the reasons stated

herein, the individual Defendants' Motion to Dismiss will be denied, and the University of

Pittsburgh's Motion to Dismiss will be granted.

## I.     Facts[3]

Dr. Wang, a cardiologist employed by UPP, also serves as a member of the faculty at the

University of Pittsburgh School of Medicine.  (ECF No. 78, at ⁋ 5).  Until sometime after July

31, 2020, Dr. Wang directed the clinical cardiac electrophysiology fellowship program, which

was jointly operated by UPMC and the University of Pittsburgh School of Medicine.  (ECF No.

78, at ⁋ 5).

The University of Pittsburgh School of Medicine is part of the University of Pittsburgh.

(ECF No. 78, at ⁋ 6).  UPMC is affiliated with the University of Pittsburgh, and it operates

---

[2] Defendant UPMC has already answered Dr. Wang's Second Amended Complaint with regard
to his § 1981 claim brought against UPMC.  (ECF No. 86).
[3] The facts of this case are provided in greater detail in the Court's previous Opinion in this
matter.  Because the Court writes primarily for the parties, the Court provides only a condensed
statement of facts here.

hospitals and medical centers in Pennsylvania. (ECF No. 78, at ¶ 7). UPP is a group medical practice that employs physicians who work at UPMC facilities. (ECF No. 78, at ¶ 9). UPP is wholly owned by UPMC. (ECF No. 78, at ¶ 9). Some UPP physicians also serve as faculty at the University of Pittsburgh School of Medicine. (ECF No. 78, at ¶ 9).

The Second Amended Complaint alleges that UPMC and the University of Pittsburgh School of Medicine jointly operate residency programs for medical school graduates and fellowship programs for physicians who have completed their residencies. (ECF No. 78, at ¶ 8). The Second Amended Complaint further alleges that the fellowship and residency programs are part of the Graduate Medical Education program at UPMC and the University of Pittsburgh School of Medicine. (ECF No. 78, at ¶ 8).

Dr. Saba is the Chief of the Cardiology Division at the University of Pittsburgh School of Medicine's Department of Medicine. (ECF No. 78, at ¶ 10). The Second Amended Complaint alleges that Dr. Saba's actions with regard to Dr. Wang's employment were taken within his role at the University of Pittsburgh School of Medicine. (ECF No. 78, at ¶ 10).

Dr. Gladwin is the Chairman of the Department of Medicine at the University of Pittsburgh School of Medicine. (ECF No. 78, at ¶ 11). The Second Amended Complaint alleges that Dr. Gladwin oversees the Graduate Medical Education program that is jointly operated by UPMC and the University of Pittsburgh School of Medicine. (ECF No. 78, at ¶ 11). The Second Amended Complaint further alleges that Dr. Gladwin's actions with regard to Dr. Wang's employment were taken within his role at the University of Pittsburgh School of Medicine. (ECF No. 78, at ¶ 11).

Dr. Berlacher is a professor at the University of Pittsburgh School of Medicine's Cardiology Division. (ECF No. 78, at ¶ 12). The Second Amended Complaint alleges that, as a

part of her duties in this role, she is the director of a cardiovascular fellowship training program jointly operated by UPMC and the University of Pittsburgh School of Medicine. (ECF No. 78, at ⁋ 12). The Second Amended Complaint further alleges that Dr. Berlacher's actions with regard to Dr. Wang's employment were taken within her role at the University of Pittsburgh School of Medicine. (ECF No. 78, at ⁋ 12).

Dr. Wang's employment contract with UPP requires him to provide academic services to the University of Pittsburgh School of Medicine as well as physician services to UPMC. (ECF No. 78, at ⁋ 13). Dr. Wang's contract with UPP delegates supervision of both his academic and physician services to a department head at the University of Pittsburgh School of Medicine. (ECF No. 78, at ⁋ 13). At all relevant times, Dr. Saba supervised Dr. Wang's work. (ECF No. 78, at ⁋ 13). The UPP employment contract also provides that Dr. Wang is to be paid sums above his base salary for serving as the director of the clinical cardiac electrophysiology fellowship program. (ECF No. 78, at ⁋ 31). Dr. Wang's contract with UPP also provides that Dr. Wang is to be paid above his base salary for consulting with groups needing his expertise in clinical cardiac electrophysiology at UPMC. (ECF No. 78, at ⁋ 32).

In 2019 and 2020, Dr. Wang wrote an article about diversity in the cardiology workforce, wherein he traced the history of the use of race and ethnicity as factors in determining admission into medical schools, residency programs, and fellowship programs. (ECF No. 78, at ⁋ 15). The article "asserted that the medical profession had not been successful in reaching its goals of increasing the percentages of underrepresented races and ethnicities in the medical profession generally, and cardiology in particular. It also noted that programs to achieve those goals applied different standards to applications by members of underrepresented races and ethnicities

4

and raised questions about the legality, effectiveness, and wisdom of doing so."  (ECF No. 78, at

¶ 15).

Dr. Wang submitted his article to the *Journal of the American Heart Association* (*JAHA*).

(ECF No. 78, at ¶ 16).  After the article underwent *JAHA*'s normal review process, AHA and

Wiley Periodicals offered to publish Dr. Wang's article.  (ECF No. 78, at ¶ 16).  Under the

contract, Dr. Wang was to pay AHA and Wiley Periodicals $1,600 in exchange for publishing

his article in *JAHA* with open access to the public.  (ECF No. 78, at ¶ 16).  In March 2020, *JAHA*

published Dr. Wang's article on its website.  (ECF No. 78, at ¶ 16).

On July 31, 2020, Dr. Saba and Dr. Berlacher met with Dr. Wang.  (ECF No. 78, at ¶ 18).

In the meeting, Dr. Wang told them of his concerns that the application processes at the

University of Pittsburgh School of Medicine and UPMC violated federal law because of the

racial and ethnic preferences used to select candidates for admission into the University of

Pittsburgh School of Medicine and UPMC's residency and fellowship programs.  (ECF No. 78,

at ¶ 18).  Soon after this meeting, Dr. Saba removed Dr. Wang from his role as the director of the

UPMC clinical cardiac electrophysiology fellowship program.  (ECF No. 78, at ¶ 18).  Dr. Saba

and Dr. Berlacher also forbade Dr. Wang from having any contact with any UPMC fellows or

residents or any University of Pittsburgh medical students.[4]  (ECF No. 78, at ¶ 20).

Shortly after this meeting, Dr. Gladwin, the Chairman of the Department of Medicine,

wrote an email letter addressed to his colleagues in the University of Pittsburgh School of

---

[4] The Court notes that the first Amended Complaint contained allegations that Dean Anantha
Shekhar, a Vice Provost for Health Sciences at the University of Pittsburgh and the Dean of the
University of Pittsburgh School of Medicine, rescinded Dr. Saba's order preventing Dr. Wang
from having any contact with University of Pittsburgh medical students; however, the Second
Amended Complaint contains no such allegations about the rescission of the order or Dean
Shekhar's role in rescinding the order.  (ECF No. 43, at ¶¶ 37, 43).

Medicine about Dr. Wang's scholarly article.  (ECF No. 78, at ℙ 27).  Without explicitly

mentioning Dr. Wang's name, the email letter stated that "a faculty member" recently published

a scholarly article that "was antithetical to our values and deeply hurtful to many of our URM

faculty."  (ECF No. 78, at ℙℙ 27, 29).  The email letter further stated that "[w]e have taken

immediate action and removed the person from their leadership position."  (ECF No. 78, at ℙ 27).

Dr. Wang no longer receives compensation from UPP for serving as the director of the

clinical cardiac electrophysiology fellowship program.  (ECF No. 78, at ℙ 31).  Because Dr.

Wang can no longer consult with groups that include fellows and residents, he cannot consult as

frequently as he once did, and he has lost income due to his reduced consulting fees.  (ECF No.

78, at ℙ 32).

At around this time, and as discussed in further detail in the Court's December 21, 2021

Opinion, members of the University of Pittsburgh and UPMC communities began questioning

the scientific validity of Dr. Wang's *JAHA* article.  (ECF No. 78, at ℙ 33; *see also* ECF No. 71, at

6-8).  On August 5, 2020, Wiley and AHA retracted Dr. Wang's article.  (ECF No. 78, at ℙ 34;

*see also* ECF No. 71, at 6).

## II.     Standard of Review

When reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure

12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light

most favorable to the plaintiff, and determine whether, under any reasonable reading of the

complaint, the plaintiff may be entitled to relief."  *Eid v. Thompson*, 740 F.3d 118, 122 (3d Cir.

2014) (quoting *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).  "To survive a

motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a

claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The Supreme Court clarified

that this plausibility standard should not be conflated with a higher probability standard. *Iqbal*, 556 U.S. at 678. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556); *see also Thompson v. Real Estate Mortg. Network*, 748 F.3d 142, 147 (3d Cir. 2014). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. "Factual allegations of a complaint must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

A pleading party need not establish the elements of a *prima facie* case at this stage; the party must only "put forth allegations that 'raise a reasonable expectation that discovery will reveal evidence of the necessary element[s].'" *Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 (3d Cir. 2009) (quoting *Graff v. Subbiah Cardiology Assocs., Ltd.*, 2008 WL 2312671 (W.D. Pa. June 4, 2008)); *see also Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 790 (3d Cir. 2016). Nonetheless, a court need not credit bald assertions, unwarranted inferences, or legal conclusions cast in the form of factual averments. *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 n.8 (3d Cir. 1997). The primary question in deciding a motion to dismiss is not whether the plaintiff will ultimately prevail, but rather whether he or she is entitled to offer evidence to establish the facts alleged in the complaint. *Maio v. Aetna*, 221 F.3d 472, 482 (3d Cir. 2000). The purpose of a motion to dismiss is to "streamline[] litigation by dispensing with needless discovery and factfinding." *Neitzke v. Williams*, 490 U.S. 319, 326-27 (1989).

Furthermore, "in evaluating a motion to dismiss, courts are not limited to the complaint, but may also consider evidence integral to or explicitly relied upon therein." *Tanksley v. Daniels*, 902 F.3d 165, 172 (3d Cir. 2018) (internal quotations omitted). "In deciding a Rule

12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) (citation omitted).

When a court grants a motion to dismiss, the court "must permit a curative amendment unless such an amendment would be inequitable or futile." *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 174 (3d Cir. 2010) (internal quotations omitted). Further, amendment is inequitable where there is "undue delay, bad faith, dilatory motive, [or] unfair prejudice." *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002). Amendment is futile "where an amended complaint 'would fail to state a claim upon which relief could be granted.'" *M.U. v. Downingtown High Sch. E.*, 103 F. Supp. 3d 612, 631 (E.D. Pa. 2015) (quoting *Great W. Mining*, 615 F.3d at 175). In a civil rights case, when the court grants a motion to dismiss for a failure to state a claim, the court must offer the plaintiff leave to amend, even if it was not requested by the plaintiff, "unless doing so would be inequitable or futile." *Phillips*, 515 F.3d at 246; *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 251 (3d Cir. 2007).

## III.    Discussion

### A.  Dr. Gladwin, Dr. Saba, and Dr. Berlacher

Defendants Dr. Gladwin, Dr. Saba, and Dr. Berlacher argue that Dr. Wang's § 1983 claims brought against them must be dismissed because Dr. Wang failed to adequately allege that the individual doctors acted under the color of state law when they made the decision to remove him from his role as the director of UPMC's clinical cardiac electrophysiology fellowship program and forbade him from interacting with UPMC fellows and residents and

University of Pittsburgh medical students.  (ECF No. 85, at 6).  Dr. Wang argues that the individual doctors were acting under the color of state law in making these adverse employment decisions.  (ECF No. 87, at 4).

Section 1983 provides that a state actor who "subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured."  42 U.S.C. § 1983.  A plaintiff bringing a claim under § 1983 therefore must allege that he was "deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law."  *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999).  "[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out."  *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (citation omitted).  To establish a First Amendment retaliation claim, a plaintiff "must prove (1) that he engaged in constitutionally-protected activity; (2) that the government responded with retaliation; and (3) that the protected activity caused the retaliation."  *George v. Rehiel*, 738 F.3d 562, 585 (3d Cir. 2013).  "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law."  *West v. Atkins*, 487 U.S. 42, 49 (1988) (internal quotations and citations omitted).

Dr. Wang alleges that he engaged in a protected activity when he told Dr. Saba and Dr. Berlacher that the racial and ethnic preferences used in UPMC and the University of Pittsburgh School of Medicine's admissions decisions were illegal.  Dr. Wang alleges that he suffered a retaliatory action for this protected activity when Dr. Saba removed him from his role as the

director of the UPMC clinical cardiac electrophysiology fellowship program and when Dr. Saba and Dr. Berlacher forbade him from interacting with UPMC fellows and residents and University of Pittsburgh medical students after the July 31, 2020 meeting.  Dr. Wang alleges that he suffered further retaliation when Dr. Gladwin sent an email about Dr. Wang's article to University of Pittsburgh faculty.

The Court must first analyze the allegations in the Second Amended Complaint to determine whether the alleged adverse employment actions taken by Dr. Saba, Dr. Berlacher, and Dr. Gladwin were made within their roles at UPMC and/or the University of Pittsburgh School of Medicine.  Dr. Saba removed Dr. Wang from his position as the director of UPMC's clinical cardiac electrophysiology fellowship program.  The Second Amended Complaint alleges that the clinical cardiac electrophysiology fellowship program is jointly operated by UPMC and the University of Pittsburgh School of Medicine and that Dr. Saba took such action in his role as Chief of the Cardiology Division at the University of Pittsburgh School of Medicine.  Thus, Dr. Wang's Second Amended Complaint sufficiently alleges that Dr. Saba was acting on behalf of the University of Pittsburgh when he made the decision to remove Dr. Wang from his position as the director of the clinical cardiac electrophysiology fellowship program.

Dr. Saba and Dr. Berlacher also forbade Dr. Wang from interacting with UPMC fellows and residents and University of Pittsburgh's medical students.  The Second Amended Complaint alleges that this decision was made within Dr. Saba and Dr. Berlacher's respective roles at the University of Pittsburgh School of Medicine.  Thus, Dr. Wang's Second Amended Complaint sufficiently alleges that Dr. Saba and Dr. Berlacher were acting on behalf of the University of Pittsburgh when they made the decision to forbid Dr. Wang from interacting with UPMC fellow and residents and University of Pittsburgh medical students.

Finally, Dr. Gladwin sent an email letter to members of the University of Pittsburgh School of Medicine faculty expressing concerns about Dr. Wang's article.  In this email letter Dr. Gladwin stated, "[w]e have taken immediate action and removed the person from their leadership position."  (ECF No. 78, at ⁋ 27).  The Second Amended Complaint alleges that Dr. Gladwin sent this email within his role as the Chair of Medicine at the University of Pittsburgh School of Medicine.  Thus, Dr. Wang's Second Amended Complaint sufficiently alleges that Dr. Gladwin was acting on behalf of the University of Pittsburgh in taking such adverse employment actions against Dr. Wang.

Through these allegations against Dr. Gladwin, Dr. Saba, and Dr. Berlacher, Dr. Wang's § 1983 claims against the individual Defendants, at this stage, are sufficiently pled and their Motion to Dismiss will be denied.

### B.  University of Pittsburgh

Defendant University of Pittsburgh argues that Dr. Wang's § 1983 claim must be dismissed against it because the University cannot be held vicariously liable under § 1983 for the actions of its employees.  (ECF No. 83, at 13).  Dr. Wang argues that the adverse employment actions taken against Dr. Wang reflect an official University policy that supports his *Monell* claim.  (ECF No. 87, at 4).

For a local government entity, such as the University of Pittsburgh, to be found liable under § 1983, the plaintiff is required to prove that the adverse action taken against the plaintiff was a result of a state policy, not the result of an individual actor.  *Porter v. City of Phila.*, 975 F.3d 374, 383 (3d Cir. 2020).  Indeed, there is no theory of respondeat superior in a municipality § 1983 claim.  *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 691 (1978).  "[A] municipality may only be liable for the torts of its employees in one of three ways: First, the

municipality will be liable if its employee acted pursuant to a formal government policy or a standard operating procedure long accepted within the government entity, *Jett v. Dallas Independent School District*, 491 U.S. 701, 737 (1989); second, liability will attach when the individual has policy making authority rendering his or her behavior an act of official government policy, *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986); third, the municipality will be liable if an official with authority has ratified the unconstitutional actions of a subordinate, rendering such behavior official for liability purposes, *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)."  *McGreevy v. Stroup*, 413 F.3d 359, 367 (3d Cir. 2005).

In order for Dr. Wang to succeed in his § 1983 claim, he would need to show that the actions taken by Dr. Saba, Dr. Berlacher, and Dr. Gladwin were actions taken by individuals who have policy making authority at the University of Pittsburgh or that their actions were ratified by an individual with policy making authority at the University.  Dr. Wang alleges that both Dr. Saba and Dr. Gladwin were individuals who had policy making authority at the University of Pittsburgh.  (ECF No. 78, at ¶ 24).  Dr. Wang further argues in his brief that Dr. Gladwin's email to the University of Pittsburgh School of Medicine faculty discussing Dr. Wang's scholarly article converts Dr. Saba and Dr. Berlacher's decisions into official University policy.  (ECF No. 87, at 8-9).  While Dr. Wang alleges that Dr. Saba and Dr. Gladwin had final policy making authority at the University of Pittsburgh, he does so in a conclusory fashion.  Dr. Wang has not alleged sufficient facts in support of his contention that Dr. Saba and Dr. Gladwin are final decision makers for the purposes of his *Monell* action against the University of Pittsburgh.  As the Court cannot say that amendment would be inequitable or futile, Dr. Wang is granted leave to amend his Second Amended Complaint in regard to his § 1983 claim against the University of Pittsburgh.

**IV.    Conclusion**

For the reasons stated above, the individual Defendants' Motion to Dismiss will be denied.  Defendant University of Pittsburgh's Motion to Dismiss will be granted.  Dr. Wang will be granted leave to file a Third Amended Complaint with regard to his § 1983 claim against the University of Pittsburgh by April 18, 2022.  If Dr. Wang files a Third Amended Complaint, the remaining Defendants shall file their respective responsive pleadings within 14 days of Dr. Wang's filing of a Third Amended Complaint, or by May 2, 2022, whichever occurs first.  If Dr. Wang does not file a Third Amended Complaint, the individual doctor Defendants shall file their Answer to Dr. Wang's Second Amended Complaint by May 2, 2022.  An appropriate Order will be entered.

DATE:  April 4, 2022

Marilyn J. Horan
United States District Judge