UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

-----------------------------------------------------------------------------x

NORMAN WANG, :

Plaintiff, :

-against- : No. 2:20-cv-01952

UNIVERSITY OF PITTSBURGH, UNIVERSITY OF PITTSBURGH MEDICAL CENTER, UNIVERSITY OF PITTSBURGH PHYSICIANS, SAMIR SABA, MARK GLADWIN, and KATHRYN BERLACHER, :

Defendants. :

-----------------------------------------------------------------------------x

## THIRD AMENDED COMPLAINT

This complaint alleges a violation of the First and Fourteenth Amendments, and other federal law. With respect to the claims that the Court's orders of December 21, 2021 (Dkt. No. 72) and April 4, 2022 (Dkt. No. 90) dismissed without prejudice and granted leave to amend regarding the factual predict of the *Monell* claim against the University of Pittsburgh, Plaintiff hereby repleads only the First Amendment claim against defendant University of Pittsburgh. With respect to all other such claims (those dismissed without prejudice) against any parties named in his previous complaints (the First and Second Amended Complaints; Dkt. Nos. 43 and 78, respectively), Plaintiff chooses to stand on the allegations of his previous complaints.

## JURISDICTION AND VENUE

1 This is an action arising under the Constitution and laws of the United States. Jurisdiction is vested in this Court pursuant to 28 U.S.C. § 1331 and 1343(a)(3)-(4).

2 Plaintiff seeks relief under 42 U.S.C. § 1981, 1983, and 1988.

3 Jurisdiction over the state law claim is invoked pursuant to the doctrine of supplemental jurisdiction because the state law claim forms part of the same case or controversy as the federal claims.

4 Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred in this district.

PARTIES

5 Plaintiff Norman Wang is a cardiologist, a member of the faculty of the University of Pittsburgh School of Medicine ("UPSOM"), and a doctor employed by University of Pittsburgh Physicians ("UPP"). He resides and works in this district. Prior to the events described herein, he directed the fellowship program in clinical cardiac electrophysiology jointly operated by UPSOM and the University of Pittsburgh Medical Center ("UPMC"). Wang is an American citizen who is ethnically Chinese by birth.

6 Defendant University of Pittsburgh ("Pitt") is an educational institution in, and supported by, the State of Pennsylvania. It is part of the Commonwealth System of Higher Education in Pennsylvania and is a state-related institution. The individual employees and agents acting on its behalf act under color of state authority. UPSOM is a part of Pitt.

7 Defendant UPMC is a Pennsylvania corporation doing business in Pennsylvania. It operates hospitals and medical centers in Pennsylvania and is affiliated with Pitt.

8 UPSOM and UPMC jointly operate residency programs for medical school graduates and fellowship programs for physicians who have completed their residencies. The fellowship program for which Plaintiff was the director was one such fellowship program. The fellowship and residency programs are part of a Graduate Medical Education ("GME") program.

Pitt promoted the GME program on its website and identifies various Pitt employees (including defendant Gladwin, who was listed as one of the directors of the residency program) as having responsibility for the GME program.

9 Defendant UPP is a group medical practice that employs faculty physicians and is affiliated with, and wholly-owned by, UPMC. It supplies physician services to UPMC facilities, and at least some of its employees also serve as faculty at UPSOM.

10 Defendant Samir Saba is the Chief of the Cardiology Division in the Department of Medicine at UPSOM and is a faculty member at Pitt. The actions taken by Defendant Saba described below were taken in his role as Chief of the Cardiology Division at UPSOM where he was Plaintiff's direct supervisor and were thus taken as part of his role as a Pitt supervisor and were made under color of state authority.

11 Defendant Mark Gladwin is the Chairman of the Department of Medicine at UPSOM and is a faculty member at Pitt. In that role, Gladwin oversees the internal medicine GME program that Pitt and UPMC jointly operate, including the fellowship program of which Plaintiff was the director. The actions taken by Defendant Gladwin described below were taken in that role, on behalf of UPSOM and Pitt, and under color of state authority.

12 Defendant Kathryn Berlacher is a Professor in the Cardiology Division in the Department of Medicine at UPSOM and is a faculty member at Pitt. As part of her duties there, she is the director of a cardiovascular fellowship training program jointly operated by UPSOM and UPMC. The actions taken by her described below were taken as part of her role as a Pitt supervisor and were made under color of state authority.

## FACTUAL BACKGROUND

13 Plaintiff's employment contract with UPP requires him to provide both academic services to UPSOM and physician services to UPMC. In his employment contract, UPP delegates supervision of all of Plaintiff's activities required by the contract "both his academic activities and the physician services" to a department head at UPSOM. Thus, a state actor supervises and controls all of Plaintiff's employment activities. During the events described below, that state actor was Saba, the Chief of the Cardiology Division at UPSOM.

14 Similarly, UPMC delegates much of the supervision of the physicians who work in its facilities to UPP and, accordingly, with respect to Plaintiff, to the same state actor identified in Plaintiff's employment contract with UPP.

15 At all times relevant, Plaintiff was a Pitt employee in his capacity as a faculty member at the UPSOM.

16 While employed by UPSOM and Pitt, Plaintiff received and carried a Pitt Faculty ID card. Plaintiff was covered by and accrued service time in a Pitt pension plan and was offered and used a Pitt-funded, Pitt-provided health insurance plan. Plaintiff received from Pitt a W-2 tax form delineating wages earned from his work as a Pitt employee. Finally, while employed by UPSOM and Pitt, Plaintiff's employment agreement required that his primary and secondary supervisors both have Pitt appointments who supervised him in Pitt's name. A true and correct copy of documentation corroborating these Pitt connections is attached as Exhibit "A."

17. Upon information and belief, in their capacity as UPSOM faculty members and Plaintiff's supervisors with respect to his Pitt employment, Saba and Gladwin enjoyed the same

benefits as Plaintiff as Pitt employees – also receiving W-2 forms for wages earned from Pitt as Pitt employees.

18 In 2019 and 2020, Plaintiff wrote an article on diversity and the cardiology workforce, tracing the history of the use of race and ethnicity as factors in determining admission into medical schools, residency programs, and fellowships. The article asserted that the medical profession had not been successful in reaching its goals of increasing the percentages of underrepresented races and ethnicities in the medical profession generally, and cardiology in particular. It also noted that programs to achieve those goals applied different standards to applications by members of underrepresented races and ethnicities and raised questions about the legality, effectiveness, and wisdom of doing so.

19 Plaintiff submitted his article to the Journal of the American Heart Association ("JAHA"). After it went through JAHA's normal review and vetting process, including a review of Plaintiff's cites and sources for accuracy, JAHA's publishers offered to publish Plaintiff's article in JAHA in exchange for Plaintiff paying $1600. Plaintiff agreed to those terms and paid $1600 to the publishers to publish the article in JAHA. The article was placed online by JAHA in March 2020.

20 Four months later, in late July 2020, various individuals on social media objected to the conclusions that Plaintiff drew in his article. Defendants Gladwin, Saba, and Berlacher also objected to Plaintiff's conclusions and resolved and agreed as his Pitt supervisors to impose adverse employment consequences upon Plaintiff because of the views he expressed in his article. The actions described below were taken pursuant to that agreement.

21 On July 31, 2020, defendants Saba and Berlacher, Plaintiff's Pitt supervisors, met

with Plaintiff. During the course of the meeting, Plaintiff told Saba and Berlacher that the selection processes for the GME programs were violating federal law because of the racial and ethnic preferences they employed.

22 Shortly after Plaintiff told Saba and Berlacher of the illegal nature of the GME programs, Saba, pursuant to his agreement with, and with the approval of, Gladwin and Berlacher – all Pitt faculty and all Plaintiff's Pitt supervisors – removed Plaintiff from his role as the director of the fellowship program in clinical cardiac electrophysiology.

23 In addition, Saba, pursuant to the agreement with Gladwin and Berlacher, diminished Plaintiff's job responsibilities and negatively impacted Plaintiff's professional reputation by forbidding Plaintiff from having contact with individuals in any GME program (fellows and residents) or medical students at UPSOM, both duties which were part of Plaintiff's job responsibilities prior to these diminutions by his chain of Pitt supervisors.

24 Saba imposed adverse consequences on Plaintiff because of the views Plaintiff expressed in his article. Alternatively, Saba imposed adverse consequences on Plaintiff because of Plaintiff's contention that the selection processes for the GME programs were violating federal law because of the racial and ethnic preferences they employed.

25 Plaintiff's contact with medical students was part of his job as a member of the faculty of UPSOM, an employment position for which Plaintiff received a W-2 tax form for wages earned as a Pitt employee. *See* Ex. A (including Plaintiff's W-2 from Pitt for wages earned).

26 In his capacity as a Pitt employee at the UPSOM, Plaintiff's primary supervisor is and was Saba, the Chief of Cardiology at the UPSOM. *See* Saba's Pitt Faculty Profile

(https://profiles.dom.pitt.edu/card/faculty_info.aspx/Saba5201).

27 Plaintiff's annual disclosures to Pitt – required as an employee of Pitt – identify Saba as Plaintiff's primary supervisor, who *must be* a "Department Chair, Division Chief or equivalent faculty supervisor from [Plaintiff's] department" at the UPSOM. A true and correct copy of Plaintiff's annual disclosure form is attached as Exhibit "B."

28 Accordingly, Saba "completes [Plaintiff's] annual performance evaluation" for his Pitt employment, and "must have a Pitt appointment or affiliation." *See* Ex. B.

29 Under Pitt's policies and procedures, therefore, Saba is Plaintiff's direct supervisor as to Plaintiff's employment with Pitt and has final decision-making authority (for purposes of employment-related determinations) with regard to the Pitt employees under his primary supervision – which includes Plaintiff. *See* Ex. B.

30 Saba – in concert with Gladwin and Berlacher – had the authority (1) to remove Plaintiff as the director of the fellowship program and (2) to restrict Plaintiff's ability to interact with residents and members of the fellowship programs. Moreover, as Chief of the Cardiology Division at UPSOM, Saba had the authority to restrict Plaintiff's ability to interact with medical students. *See* Ex. B (indicating Saba is Plaintiff's primary supervisor as Pitt employee and is a Department Chair or Division Chief at UPSOM).

31 Gladwin and Saba had final decision-making authority to take the foregoing adverse actions. *See* Ex. B (indicating Saba is Plaintiff's primary supervisor as Pitt employee and is a Department Chair or Division Chief at UPSOM); Gladwin's Pitt Faculty Profile (https://profiles.dom.pitt.edu/paccm/faculty_info.aspx/Gladwin5751).

32 Pitt implemented the decision by Saba and Gladwin against Plaintiff, as UPSOM

– in fact – prohibited Plaintiff from engaging with medical students at the medical school and elsewhere, a diminution of his responsibilities and a change in the circumstances of his employment based on his writing and factual assertions around those writing.

33 The implementation by Pitt itself of Saba and/or Gladwin's adverse action against Plaintiff provides evidence that one or both "possess[ed] final authority to establish municipal policy **with respect to the action**" – that is, with respect to implementing adverse employment action to employees under their primary supervision. *See* " *Estate of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019) (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990)) (emphasis supplied); Ex. B (indicating Saba is Plaintiff's primary supervisor with respect to his Pitt employment).

34 In the alternative, the fact that Pitt implemented the adverse action against Plaintiff demonstrates, and plaintiff believes that further discovery will provide additional evidentiary support to show, that the adverse action received authorization from the decision-maker (upon information and belief, Dean Shekhar) who possessed final decision-making authority to establish policy for Pitt and UPSOM with respect to employment matters for Pitt and UPSOM faculty.

35 Otherwise, upon information and belief, Pitt *itself* could not implement the unauthorized directives from Saba and Gladwin – implementing adverse action against Plaintiff – if they were simply two rogue employees who acted on their own accord, entirely separate from Pitt's official policy position.

36 Pitt *itself* through its duly appointed supervisors took and implemented adverse employment action against Plaintiff based upon a decision from Saba and/or Gladwin, who

ostensibly held the requisite final decision-making authority to implement such measures (or had been delegated such authority by Dean Shekhar); Plaintiff's annual disclosures identify Saba as his primary Pitt supervisor with authority to evaluate Plaintiff's performance and take appropriate actions with respect to Plaintiff's Pitt employment. At all times during his employment with Pitt, Plaintiff understood Saba to have the authority to act on behalf of Pitt as Plaintiff's employer. *See* Ex. B.

37 If Saba and/or Gladwin did not hold decision-making authority with respect to matters concerning employees under their supervision, then Dean Shekhar ratified their decision since Pitt *itself* implemented the adverse action against Plaintiff. *See Galicki v. New Jersey*, 2016 U.S. Dist. LEXIS 126076, *31 (D.N.J. Sept. 15, 2016) (denying motion to dismiss Section 1983 claim against the Port Authority of New York and New Jersey based on the infamous Bridgegate lane closure scandal; "[t]he question of whether [two Port Authority employees associated with Governor Chris Christie] had 'final policymaking authority,' and thus whether Port Authority adopted a 'custom' or 'policy' for purposes of *Monell* liability, is one of fact that is not amendable to resolution at this early stage.").

38 Gladwin and Saba as supervisors in the Pitt supervisory chain of command have the authority to reinstate Plaintiff to his position as director of the fellowship program in clinical cardiac electrophysiology and to rescind the restriction on Plaintiff's employment placed on Plaintiff in contravention of his protected speech rights.

39 The decisions (1) to remove the director of the fellowship program, and (2) to order a faculty member to restrict his interactions with students represent the official policy of UPSOM expressed through its Pitt-affiliated, Pitt-appointed supervisory personnel.

40 Shortly after Plaintiff's meeting with Saba and Berlacher, Gladwin wrote a "Dear Colleague" email to the UPSOM community. It was sent in his role as the Chair of the Department of Medicine at UPSOM and described the adverse employment action that was taken against Plaintiff pursuant to Gladwin's agreement with Saba and Berlacher. Among other things, it stated that many of those in the UPSOM community might have heard about a "perspective" published by "a faculty member" at UPSOM that "was antithetical to our values and deeply hurtful to many of our URM faculty." It further stated: "*We* have taken immediate action and removed the person from their [sic] leadership position . . ." (emphasis added).

41 Gladwin's letter reflects the decision he made as the Chair of the Department of Medicine at UPSOM in concert with his supervisory peers, and ascribes that decision to UPSOM's values. Gladwin – a Pitt faculty member – had authority on behalf of UPSOM on issues of policy regarding employment matters concerning the GME programs and those under his supervision, including whether a Pitt-affiliated, Pitt-appointed faculty member could have contact with medical students at UPSOM.

42 Although Gladwin did not mention Plaintiff by name, he was referring to Plaintiff and the article that was published under Plaintiff's name in JAHA. That he was referring to Plaintiff was well understood by members of the UPSOM community who received Gladwin's email, which had been sent from Gladwin's Pitt-affiliated email address.

43 Defendant Gladwin used his final decision-making authority as the Chair of the Department of Medicine at UPSOM to effect the adverse employment actions undertaken against Plaintiff; as a result, the adverse employment actions taken against Plaintiff establish the official policy of UPSOM.

44 The adverse employment actions taken by defendants have had a negative financial and reputational impact on Plaintiff. Plaintiff was paid sums in addition to his base salary to be the director of the fellowship in clinical cardiac eletrophysiology. Because he was removed from that position, he is no longer paid those additional sums. Plaintiff's removal from his supervisory role contemporaneous with the leveling of a false accusation by Pitt-supervisory personnel of Plaintiff's professional impropriety have reduced Plaintiff's reputation and his career prospects.

45 Plaintiff was also paid sums in addition to his base salary for consulting with groups needing his expertise in clinical cardiac eletrophysiology. Because the groups with which he consults frequently include medical students, residents, or fellows, and because he was prohibited from contact with those individuals, Plaintiff was no longer able to consult as frequently as he did previously and lost income as a consequence.

46 At around the same time as these adverse employment actions were taken against Plaintiff, a number of employees of UPP and UPMC acting on behalf of UPP and UPMC, began a campaign of attack against Plaintiff's article. Among other things, these agents of UPP and UPMC falsely asserted that the article contained miscitations and misquotations. They made these statements to the publishers of JAHA and called upon JAHA to retract the article.

47 Despite the fact that the publishers of JAHA had vetted the article pursuant to the usual procedures for review of all articles in JAHA, and had checked the accuracy of the citations and sources, the publishers retracted the article, and did not return the $1600 fee that Plaintiff paid to have it published, thereby depriving Plaintiff of the value he should have received for the fees he paid to see his article published.

48 Plaintiff's removal from the position of director of the fellowship program in clinical cardiac electrophysiology, and severe limitations on his ability to consult, remain in effect. In the absence of injunctive relief from this Court, these adverse actions against him will continue and Plaintiff will continue to suffer both economic harm and reputational damage.

FIRST CLAIM FOR RELIEF (for violations of the First Amendment and Section 1983)

49 Plaintiff hereby incorporates all of the previous allegations of this complaint.

50 Plaintiff's article on the history of race-conscious selection procedures in the field of medicine and cardiology was on a topic of public concern. His speech was not made on behalf of UPSOM, UPP, or UPMC.

51 Defendants Pitt, Pitt faculty member and supervisor Gladwin, Pitt faculty member and supervisor Saba, and Pitt faculty member and supervisor Berlacher acted individually and collectively under color of state authority in removing Plaintiff from his position as the director of the fellowship program in clinical cardiac eletrophysiology, and in precluding him from having contact with medical students, residents, and fellows.

52 These defendants imposed adverse consequences against Plaintiff because of the views expressed in his article. They had and have no adequate, lawful justification for imposing adverse consequences on Plaintiff for his protected speech.

53 These defendants violated the First Amendment (as incorporated against the states through the Fourteenth Amendment's Due Process Clause) by imposing adverse consequences on Plaintiff for his protected speech. Accordingly, they also violated 42 U.S.C. § 1983 in doing so, and Plaintiff is entitled to recover under that statute.

54 Plaintiff has suffered damages and will continue to suffer damages as a

consequence of the adverse actions taken by defendants. Accordingly, he is entitled to both damages for past harm and injunctive and/or declaratory relief to prevent ongoing and future harm.

SECOND CLAIM FOR RELIEF (for violations of Section 1981)

55 Plaintiff incorporates all prior allegations.

56 UPMC retains residents and fellows by contract.

57 Because UPMC delegated supervision of Plaintiff's employment to Pitt faculty member and supervisor Saba as the Chief of the Cardiology Division at UPSOM, Saba had the ability to impose adverse consequences on Plaintiff's employment at UPMC. UPMC discriminated against Plaintiff and imposed adverse consequences against him in part because he apprised Saba and Berlacher on July 31, 2020 that the selection process for residents and fellows discriminated on the basis of race and ethnicity and violated federal law.

58 Plaintiff had a reasonable belief that the selection process for residents and fellows discriminated on the basis of race and ethnicity and violated federal law.

59 UPMC's discrimination against Plaintiff violated 42 U.S.C. § 1981.

60 Plaintiff has suffered economic and reputational damages and will continue to suffer economic and reputational damages as a consequence of the adverse actions taken by defendants. Accordingly, he is entitled to both damages for past harm and to injunctive and/or declaratory relief to prevent ongoing and future harm.

Demand For Judgment

WHEREFORE plaintiff demands judgment:

A. A declaratory judgment that defendants are violating 42 U.S.C. § 1983 by their

removal of plaintiff from his position as the director of the fellowship program in clinical cardiac electrophysiology and by restricting his contacts with medical students and others;

B. Injunctive relief requiring Plaintiff's reinstatement as director of the fellowship program in clinical cardiac electrophysiology and precluding defendants from enforcing their prohibition restricting Plaintiff's contacts with medical students and others;

C. Damages in an amount to be determined;

D. Attorney's fees and costs pursuant to 28 U.S.C. § 1920 and 42 U.S.C. § 1988, or any other applicable authority; and

E. Any other relief that is appropriate.

JURY DEMAND

Plaintiff hereby demands a jury for all claims triable by right by a jury.

Dated: May 18, 2022

*/s/ Shawn Rogers*
Shawn Rodgers (PA 307598)
srodgers@goldsteinlp.com
GOLDSTEIN LAW PARTNERS, LLC
11 Church Road
Hatfield, PA 91440
(731) 426-8130

Michael E. Rosman (admitted pro hac vice)
rosman@cir-usa.org
Michelle A. Scott (admitted pro hac vice)
scott@cir-usa.org
CENTER FOR INDIVIDUAL RIGHTS
1100 Connecticut Ave, NW, Ste. 625
Washington, D.C. 20036
(202) 833-8400