# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NORMAN WANG, | ) |
| Plaintiff, | ) 2:20-cv-1952 |
| vs. | ) District Judge Marilyn J. Horan |
| UNIVERSITY OF PITTSBURGH, UNIVERSITY OF PITTSBURGH MEDICAL CENTER, SAMIR SABA, MARK GLADWIN, and KATHRYN BERLACHER, | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

Plaintiff, Dr. Norman Wang, brings a two-count, Third Amended Complaint against the University of Pittsburgh, University of Pittsburgh Medical Center (UPMC), Dr. Mark Gladwin, Dr. Samir Saba, and Dr. Kathryn Berlacher, alleging claims for violations of 42 U.S.C. § 1983 and 42 U.S.C. § 1981.  (ECF No. 94).

Dr. Wang's first Amended Complaint brought claims against the University of Pittsburgh, UPMC, University of Pittsburgh Physicians (UPP), American Heart Association (AHA), Wiley Periodicals, Dr. Gladwin, Dr. Saba, Dr. Berlacher, Dr. Marc Simon, and John Does 1-10, alleging violations of 42 U.S.C. § 1983, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and Pennsylvania state law claims for defamation, breach of contract, tortious interference with contract, and the Pennsylvania Whistleblower Law.  (ECF No. 43).  The Defendants each filed respective Motions to Dismiss Dr. Wang's Amended Complaint.  (ECF Nos. 46, 48, 50, 52 & 54).  On December 21, 2021 this Court dismissed Defendants AHA, Wiley Periodicals, Dr. Simon, and John Does 1-10 from the case and dismissed various claims against Defendants University of Pittsburgh, UPMC, UPP, Dr. Gladwin, Dr. Saba, and Dr. Berlacher.

1

(ECF Nos. 72).  The Court granted Dr. Wang leave to amend his § 1983 claim brought against the University of Pittsburgh.  (ECF No. 72).  In their Partial Motion to Dismiss Dr. Wang's first Amended Complaint, Dr. Gladwin, Dr. Saba, and Dr. Berlacher did not move to dismiss Dr. Wang's § 1983 claims against them.  (ECF No. 52).

Dr. Wang's Second Amended Complaint brought claims against the University of Pittsburgh, University of Pittsburgh Medical Center (UPMC), Dr. Mark Gladwin, Dr. Samir Saba, and Dr. Kathryn Berlacher, alleging claims for violations of 42 U.S.C. § 1983 and 42 U.S.C. § 1981.  (ECF No. 78).  UPMC filed an Answer, and the University of Pittsburgh, Dr. Gladwin, Dr. Saba, and Dr. Berlacher filed respective Motions to Dismiss Dr. Wang's Second Amended Complaint.  (ECF Nos. 82, 84, 86).  On April 4, 2022, this Court granted the University of Pittsburgh's Motion to Dismiss but denied the individual Defendants' Motion to Dismiss.  (ECF No. 90).  The Court granted Dr. Wang leave to amend his § 1983 claim brought against the University of Pittsburgh.  (ECF No. 90).

Presently before the Court is the University of Pittsburgh's Motion to Dismiss Dr. Wang's Third Amended Complaint.[1]  (ECF No. 95).  Dr. Wang filed his Response, (ECF No. 100), and the University of Pittsburgh filed its Reply, (ECF No. 101).  For the reasons stated herein, the University of Pittsburgh's Motion to Dismiss will be granted.

I. Facts[2]

Dr. Wang, a cardiologist employed by UPP, also serves as a member of the faculty at the University of Pittsburgh School of Medicine.  (ECF No. 94, at ¶ 5).  Until sometime after July

---

[1] Defendants UPMC, Dr. Gladwin, Dr. Saba, and Dr. Berlacher have answered Dr. Wang's Third Amended Complaint.  (ECF No. 97).
[2] The facts of this case are provided in greater detail in the Court's previous two Opinions in this matter.  Because the Court writes primarily for the parties, the Court provides only a condensed statement of facts here.

31, 2020, Dr. Wang directed the clinical cardiac electrophysiology fellowship program, which was jointly operated by UPMC and the University of Pittsburgh School of Medicine. (ECF No. 94, at ¶ 5).

The University of Pittsburgh School of Medicine is part of the University of Pittsburgh. (ECF No. 94, at ¶ 6). UPMC is affiliated with the University of Pittsburgh, and it operates hospitals and medical centers in Pennsylvania. (ECF No. 94, at ¶ 7). UPP is a group medical practice that employs physicians who work at UPMC facilities. (ECF No. 94, at ¶ 9). UPP is wholly owned by UPMC. (ECF No. 94, at ¶ 9). Some UPP physicians also serve as faculty at the University of Pittsburgh School of Medicine. (ECF No. 94, at ¶ 9).

The Third Amended Complaint alleges that UPMC and the University of Pittsburgh School of Medicine jointly operate residency programs for medical school graduates and fellowship programs for physicians who have completed their residencies. (ECF No. 94, at ¶ 8). The Third Amended Complaint further alleges that the fellowship and residency programs are part of the Graduate Medical Education program at UPMC and the University of Pittsburgh School of Medicine. (ECF No. 94, at ¶ 8).

Dr. Saba is the Chief of the Cardiology Division at the University of Pittsburgh School of Medicine's Department of Medicine. (ECF No. 94, at ¶ 10). The Third Amended Complaint alleges that Dr. Saba's actions with regard to Dr. Wang's employment were taken within his role at the University of Pittsburgh School of Medicine. (ECF No. 94, at ¶ 10).

Dr. Gladwin is the Chairman of the Department of Medicine at the University of Pittsburgh School of Medicine. (ECF No. 94, at ¶ 11). The Third Amended Complaint alleges that Dr. Gladwin oversees the Graduate Medical Education program that is jointly operated by UPMC and the University of Pittsburgh School of Medicine. (ECF No. 94, at ¶ 11). The Third

Amended Complaint further alleges that Dr. Gladwin's actions with regard to Dr. Wang's employment were taken within his role at the University of Pittsburgh School of Medicine. (ECF No. 94, at ¶ 11).

Dr. Berlacher is a professor at the University of Pittsburgh School of Medicine's Cardiology Division. (ECF No. 94, at ¶ 12). The Third Amended Complaint alleges that, as a part of her duties in this role, she is the director of a cardiovascular fellowship training program jointly operated by UPMC and the University of Pittsburgh School of Medicine. (ECF No. 94, at ¶ 12). The Third Amended Complaint further alleges that Dr. Berlacher's actions with regard to Dr. Wang's employment were taken within her role at the University of Pittsburgh School of Medicine. (ECF No. 94, at ¶ 12).

Dr. Wang's employment contract with UPP requires him to provide academic services to the University of Pittsburgh School of Medicine as well as physician services to UPMC. (ECF No. 94, at ¶ 13). Dr. Wang's contract with UPP delegates supervision of both his academic and physician services to a department head at the University of Pittsburgh School of Medicine. (ECF No. 94, at ¶ 13). At all relevant times, Dr. Saba supervised Dr. Wang's work. (ECF No. 94, at ¶ 13). The UPP employment contract also provides that Dr. Wang is to be paid sums above his base salary for serving as the director of the clinical cardiac electrophysiology fellowship program. (ECF No. 94, at ¶ 44). Dr. Wang's contract with UPP also provides that Dr. Wang is to be paid above his base salary for consulting with groups needing his expertise in clinical cardiac electrophysiology at UPMC. (ECF No. 94, at ¶ 45).

In 2019 and 2020, Dr. Wang wrote an article about diversity in the cardiology workforce, wherein he traced the history of the use of race and ethnicity as factors in determining admission into medical schools, residency programs, and fellowship programs. (ECF No. 94, at ¶ 18). The

article "asserted that the medical profession had not been successful in reaching its goals of increasing the percentages of underrepresented races and ethnicities in the medical profession generally, and cardiology in particular. It also noted that programs to achieve those goals applied different standards to applications by members of underrepresented races and ethnicities and raised questions about the legality, effectiveness, and wisdom of doing so." (ECF No. 94, at ¶ 18).

Dr. Wang submitted his article to the *Journal of the American Heart Association* (*JAHA*). (ECF No. 94, at ¶ 19). After the article underwent *JAHA*'s normal review process, AHA and Wiley Periodicals offered to publish Dr. Wang's article. (ECF No. 94, at ¶ 19). Under the contract, Dr. Wang was to pay AHA and Wiley Periodicals $1,600 in exchange for publishing his article in *JAHA* with open access to the public. (ECF No. 94, at ¶ 19). In March 2020, *JAHA* published Dr. Wang's article on its website. (ECF No. 94, at ¶ 19).

On July 31, 2020, Dr. Saba and Dr. Berlacher met with Dr. Wang. (ECF No. 94, at ¶ 21). In the meeting, Dr. Wang told them of his concerns that the application processes at the University of Pittsburgh School of Medicine and UPMC violated federal law because of the racial and ethnic preferences used to select candidates for admission into the University of Pittsburgh School of Medicine and UPMC's residency and fellowship programs. (ECF No. 94, at ¶ 21). Soon after this meeting, Dr. Saba removed Dr. Wang from his role as the director of the UPMC clinical cardiac electrophysiology fellowship program. (ECF No. 94, at ¶ 22). Dr. Saba and Dr. Berlacher also forbade Dr. Wang from having any contact with any UPMC fellows or residents or any University of Pittsburgh medical students.[3] (ECF No. 94, at ¶ 23).

---

[3] The Court notes that the first Amended Complaint contained allegations that Dean Anantha Shekhar, a Vice Provost for Health Sciences at the University of Pittsburgh and the Dean of the University of Pittsburgh School of Medicine, rescinded Dr. Saba's order preventing Dr. Wang

Shortly after this meeting, Dr. Gladwin, the Chairman of the Department of Medicine, wrote an email letter, addressed to his colleagues in the University of Pittsburgh School of Medicine, about Dr. Wang's scholarly article. (ECF No. 94, at ¶ 39). Without explicitly mentioning Dr. Wang's name, the email letter stated that "a faculty member" recently published a scholarly article that "was antithetical to our values and deeply hurtful to many of our URM faculty." (ECF No. 94, at ¶¶ 40, 42). The email letter further stated that "[w]e have taken immediate action and removed the person from their leadership position." (ECF No. 94, at ¶ 40).

Dr. Wang no longer receives compensation from UPP for serving as the director of the clinical cardiac electrophysiology fellowship program. (ECF No. 94, at ¶ 44). Because Dr. Wang can no longer consult with groups that include fellows and residents, he cannot consult as frequently as he once did, and he has lost income due to his reduced consulting fees. (ECF No. 94, at ¶ 45).

At around this time, and as discussed in further detail in the Court's December 21, 2021 Opinion, members of the University of Pittsburgh and UPMC communities began questioning the scientific validity of Dr. Wang's *JAHA* article. (ECF No. 94, at ¶ 46); *see also* ECF No. 71, at 6-8). On August 5, 2020, Wiley and AHA retracted Dr. Wang's article. (ECF No. 94, at ¶ 47; *see also* ECF No. 71, at 6).

## II.  Standard of Review

When reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the

---

from having any contact with University of Pittsburgh medical students; however, neither the Second nor Third Amended Complaints contain such allegations about the rescission of the order or about Dean Shekhar's role in rescinding the order. (ECF No. 43, at ¶¶ 37, 43; *see also* ECF No. 96, at 19).

6

complaint, the plaintiff may be entitled to relief." *Eid v. Thompson*, 740 F.3d 118, 122 (3d Cir. 2014) (quoting *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Supreme Court clarified that this plausibility standard should not be conflated with a higher probability standard. *Iqbal*, 556 U.S. at 678. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556); *see also Thompson v. Real Estate Mortg. Network*, 748 F.3d 142, 147 (3d Cir. 2014). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. "Factual allegations of a complaint must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

A pleading party need not establish the elements of a *prima facie* case at this stage; the party must only "put forth allegations that 'raise a reasonable expectation that discovery will reveal evidence of the necessary element[s].'" *Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 (3d Cir. 2009) (quoting *Graff v. Subbiah Cardiology Assocs., Ltd.*, 2008 WL 2312671 (W.D. Pa. June 4, 2008)); *see also Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 790 (3d Cir. 2016). Nonetheless, a court need not credit bald assertions, unwarranted inferences, or legal conclusions cast in the form of factual averments. *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 n.8 (3d Cir. 1997). The primary question in deciding a motion to dismiss is not whether the plaintiff will ultimately prevail, but rather whether he or she is entitled to offer evidence to establish the facts alleged in the complaint. *Maio v. Aetna*, 221 F.3d 472, 482 (3d Cir. 2000). The purpose of

a motion to dismiss is to "streamline[] litigation by dispensing with needless discovery and factfinding." *Neitzke v. Williams*, 490 U.S. 319, 326-27 (1989).

Furthermore, "in evaluating a motion to dismiss, courts are not limited to the complaint, but may also consider evidence integral to or explicitly relied upon therein." *Tanksley v. Daniels*, 902 F.3d 165, 172 (3d Cir. 2018) (internal quotations omitted). "In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) (citation omitted).

When a court grants a motion to dismiss, the court "must permit a curative amendment unless such an amendment would be inequitable or futile." *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 174 (3d Cir. 2010) (internal quotations omitted). Further, amendment is inequitable where there is "undue delay, bad faith, dilatory motive, [or] unfair prejudice." *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002). Amendment is futile "where an amended complaint 'would fail to state a claim upon which relief could be granted.'" *M.U. v. Downingtown High Sch. E.*, 103 F. Supp. 3d 612, 631 (E.D. Pa. 2015) (quoting *Great W. Mining*, 615 F.3d at 175). In a civil rights case, when the court grants a motion to dismiss for a failure to state a claim, the court must offer the plaintiff leave to amend, even if it was not requested by the plaintiff, "unless doing so would be inequitable or futile." *Phillips*, 515 F.3d at 246; *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 251 (3d Cir. 2007).

### III.     Discussion

Defendant University of Pittsburgh argues that Dr. Wang's § 1983 claim must be dismissed against it because the University cannot be held vicariously liable under § 1983 for the actions of its employees. (ECF No. 96, at 13). Dr. Wang argues that the adverse employment actions taken against Dr. Wang reflect an official University policy that was directed or approved by a final decision-maker. (ECF No. 100, at 11).

Section 1983 provides that a state actor who "subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. A plaintiff bringing a claim under § 1983 therefore must allege that he was "deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999). "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *West v. Atkins*, 487 U.S. 42, 49 (1988) (internal quotations and citations omitted).

For a local government entity, such as the University of Pittsburgh, to be found liable under § 1983, the plaintiff is required to prove that the adverse action taken against the plaintiff was a result of a state policy, not the result of an individual actor. *Porter v. City of Phila.*, 975 F.3d 374, 383 (3d Cir. 2020). Indeed, there is no theory of respondeat superior in a municipality § 1983 claim. *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 691 (1978). "[A] municipality may only be liable for the torts of its employees in one of three ways: First, the municipality will be liable if its employee acted pursuant to a formal government policy or a

9

standard operating procedure long accepted within the government entity, *Jett v. Dallas Independent School District*, 491 U.S. 701, 737 (1989); second, liability will attach when the individual has policy making authority rendering his or her behavior an act of official government policy, *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986); third, the municipality will be liable if an official with authority has ratified the unconstitutional actions of a subordinate, rendering such behavior official for liability purposes, *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)." *McGreevy v. Stroup*, 413 F.3d 359, 367 (3d Cir. 2005).

"An employee who lacks policymaking authority can still bind the municipality if a municipal policymaker delegated power to the employee or ratified his decision." *Kelly v. Borough of Carlisle*, 622 F.3d 248, 264 (3d Cir. 2010). However, "[s]imply going along with the discretionary decisions made by one's subordinates . . . is not a delegation to them of the authority to make policy." *Praprotnik*, 485 U.S. at 130. In order to determine whether ratification occurred for the purposes of *Monell* liability, the Court must examine whether a "particular decision by a subordinate was cast in the form of a policy statement and expressly approved by the supervising policymaker." *Id.*

In order for Dr. Wang to succeed in his § 1983 claim, he would need to show that the actions taken by Dr. Saba, Dr. Berlacher, and Dr. Gladwin were actions taken by individuals who have policy-making authority at the University of Pittsburgh or that their actions were ratified by an individual with policy making authority at the University. Dr. Wang alleges that both Dr. Saba and Dr. Gladwin were individuals who had policy making authority at the University of Pittsburgh. (ECF No. 94, at ¶¶ 29-31). Dr. Wang further alleges that Dr. Gladwin's email to the University of Pittsburgh School of Medicine faculty discussing Dr. Wang's scholarly article converts Dr. Saba and Dr. Berlacher's decisions into official University policy. (ECF No. 94, at

¶¶ 41-43). While Dr. Wang alleges that Dr. Saba and Dr. Gladwin had final policy making authority at the University of Pittsburgh, he does so in a conclusory fashion. Dr. Wang has added additional facts to his Third Amended Complaint, demonstrating that Dr. Saba has direct supervisory authority over Dr. Wang, but these do not impute *Monell* liability on the University of Pittsburgh for the actions of its supervisors.

Dr. Wang further alleges, that even if Dr. Saba and Dr. Gladwin did not hold final policy making authority, Dean Shekar ratified the adverse employment actions taken against Dr. Wang, and that Dean Shekar does indeed possess final policy making authority for the purposes of *Monell* liability. (ECF No. 94, at ¶ 37). The Third Amended Complaint contains no further information about whether Dean Shekar ratified the adverse employment actions against Dr. Wang or whether Dean Shekar possessed final policy making authority to convert the adverse employment actions taken against Dr. Wang into official University policy. As such, Dr. Wang has not pled enough facts to support his claim that Dean Shekar ratified the adverse employment actions taken by Dr. Saba and Dr. Gladwin.

Dr. Wang has not alleged sufficient facts to support his contention that Dr. Saba and Dr. Gladwin are final policy makers for the purposes of his *Monell* action against the University of Pittsburgh. Nor has he alleged sufficient facts to support his contention that Dean Shekar ratified the adverse employment actions taken against Dr. Wang so as to convert such actions into official University policy. As such, the University of Pittsburgh's Motion to Dismiss will be granted.

Because Dr. Wang has had four chances to properly plead a § 1983 claim against the University of Pittsburgh, granting any further leave to amend would be inequitable. As such, no further leave to amend will be granted.

**IV.     Conclusion**

For the reasons stated above, University of Pittsburgh's Motion to Dismiss will be granted. Dr. Wang will not be granted leave to amend. University of Pittsburgh is dismissed from the case. As the remaining Defendants have already filed their Answer, a Telephonic Initial Case Management Conference will be held on October 5, 2022 at 11 a.m. in a Telephone Conference. An appropriate Order will be entered.

DATE: August 31, 2022

Marilyn J. Horan
United States District Judge