UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA
-------------------------------------------------------------------------------x

NORMAN WANG,                                                              :

    Plaintiff,                                                           :

        -against-                                                      :    No. 2:20-cv-01952

UNIVERSITY OF PITTSBURGH, UNIVERSITY                          :
OF PITTSBURGH MEDICAL CENTER, UNIVERSITY
OF PITTSBURGH PHYSICIANS, SAMIR SABA,                         :
MARK GLADWIN, and KATHRYN BERLACHER,
                                                                           :

    Defendants.                                                         :

-------------------------------------------------------------------------------x

## FOURTH AMENDED COMPLAINT

This complaint alleges a violation of the First and Fourteenth Amendments, and other federal law.

### JURISDICTION AND VENUE

1. This is an action arising under the Constitution and laws of the United States. Jurisdiction is vested in this Court pursuant to 28 U.S.C. §§ 1331, 1343(a)(3)-(4), and 1367, and 42 U.S.C. § 2000e-5(f)(3).

2. Plaintiff seeks relief under 42 U.S.C. §§ 1981, 1983, 1988, and 2000e-3(a), and the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 955(d).

1

3.       Jurisdiction over the state law claim is invoked pursuant to the doctrine of supplemental jurisdiction because the state law claim forms part of the same case or controversy as the federal claims.

4.       Venue is proper under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3) because, *inter alia*, a substantial part of the events giving rise to Plaintiff's claims occurred in this district.

## PARTIES

5.       Plaintiff Norman Wang is a cardiologist, a member of the faculty of the University of Pittsburgh School of Medicine ("UPSOM"), and a doctor employed by University of Pittsburgh Physicians ("UPP").   He resides and works in this district.   Prior to the events described herein, he directed the fellowship program in clinical cardiac electrophysiology jointly operated by UPSOM and the University of Pittsburgh Medical Center ("UPMC").   Wang is an American citizen who is ethnically Chinese by birth.

6.       Defendant University of Pittsburgh ("Pitt") is an educational institution in, and supported by, the State of Pennsylvania.   It is part of the Commonwealth System of Higher Education in Pennsylvania and is a state-related institution.   The individual employees and agents acting on its behalf act under color of state authority.   UPSOM is a part of Pitt.

7.        Defendant UPMC is a Pennsylvania corporation doing business in Pennsylvania under the name University of Pittsburgh Medical Center.   It operates hospitals and medical centers in Pennsylvania, including teaching hospitals, and is affiliated with Pitt.   Indeed, linked together by numerous formal affiliation agreements, UPMC (through its teaching hospitals) and UPSOM function as a single integrated academic health center.

8.      UPSOM and UPMC jointly operate residency programs for medical school graduates and fellowship programs for physicians who have completed their residencies. The fellowship program for which Plaintiff was the director was one such fellowship program. The fellowship and residency programs are part of a Graduate Medical Education ("GME") program. Pitt promoted the GME program on its website and identifies various Pitt employees (including defendant Gladwin, who was listed as one of the directors of the residency program) as having responsibility for the GME program.

9.      Defendant UPP is a group medical practice that employs UPSOM faculty physicians and is affiliated with, and wholly-owned by, UPMC. It supplies physician services to UPMC facilities, and its employees also serve as faculty at UPSOM.

10.     Defendant Samir Saba is the Chief of the Cardiology Division in the Department of Medicine at UPSOM and is a faculty member at Pitt. The actions taken by Defendant Saba described below were taken in his role as Chief of the Cardiology Division at UPSOM where he was Plaintiff's direct supervisor and were thus taken as part of his role as a Pitt supervisor and were made under color of state authority.

11.     Defendant Mark Gladwin is the Chairman of the Department of Medicine at UPSOM and is a faculty member at Pitt. In that role, Gladwin oversees the internal medicine GME program that Pitt and UPMC jointly operate, including the fellowship program of which Plaintiff was the director. The actions taken by Defendant Gladwin described below were taken in that role, on behalf of UPSOM and Pitt, and under color of state authority.

12.     Defendant Kathryn Berlacher is a Professor in the Cardiology Division in the Department of Medicine at UPSOM and is a faculty member at Pitt. As part of her duties there,

3

she is the director of a cardiovascular fellowship training program jointly operated by UPSOM and UPMC. The actions taken by her described below were taken as part of her role as a Pitt supervisor and were made under color of state authority.

## FACTUAL BACKGROUND

13. Like almost all faculty at UPSOM, Plaintiff has two interrelated, overlapping employment agreements, one with Pitt and one with UPP. Plaintiff receives W-2s from both Pitt and UPP. Plaintiff's employment contract with UPP requires him to provide both academic services to UPSOM and physician services to UPMC. In his UPP employment contract, UPP delegates supervision of all of Plaintiff's activities required by the contract "both his academic activities and the physician services" to a department head at UPSOM. Thus, a state actor supervises and controls all of Plaintiff's employment activities. During the events described below, that state actor was Saba, the Chief of the Cardiology Division at UPSOM.

14. Similarly, UPMC delegates much of the supervision of the physicians who work in its facilities to UPP and, accordingly, with respect to Plaintiff, to the same state actor identified in Plaintiff's employment contract with UPP.

15. At all times relevant, Plaintiff was a Pitt employee in his capacity as a faculty member at the UPSOM.

16. While employed by UPSOM and Pitt, Plaintiff received and carried a Pitt Faculty ID card. Plaintiff was covered by and accrued service time in a Pitt pension plan and was offered and used a Pitt-funded, Pitt-provided health insurance plan. Plaintiff received from Pitt a W-2 tax form delineating wages earned from his work as a Pitt employee. Finally, while employed by UPSOM and Pitt, Plaintiff's employment agreement required that his primary and

4

secondary supervisors both have Pitt appointments who supervised him in Pitt's name. A true and correct copy of documentation corroborating these Pitt connections is attached as Exhibit "A."

17. Upon information and belief, in their capacity as UPSOM faculty members and Plaintiff's supervisors with respect to his Pitt employment, Saba and Gladwin enjoyed the same benefits as Plaintiff as Pitt employees – also receiving W-2 forms for wages earned from Pitt as Pitt employees.

18. In 2019 and 2020, Plaintiff wrote an article on diversity and the cardiology workforce, tracing the history of the use of race and ethnicity as factors in determining admission into medical schools, residency programs, and fellowships. The article asserted that the medical profession had not been successful in reaching its goals of increasing the percentages of underrepresented races and ethnicities in the medical profession generally, and cardiology in particular. It also noted that programs to achieve those goals applied different standards to applications by members of underrepresented races and ethnicities and raised questions about the legality, effectiveness, and wisdom of doing so. Finally, the article opined that the cardiology field was violating the laws against discrimination in the way it used race as a factor in hiring, recruitment, promotion, and admissions.

19. Plaintiff submitted his article to the Journal of the American Heart Association ("JAHA"). After it went through JAHA's normal review and vetting process, including a review of Plaintiff's cites and sources for accuracy, JAHA's publishers offered to publish Plaintiff's article in JAHA in exchange for Plaintiff paying $1600. Plaintiff agreed to those terms and paid $1600 to the publishers to publish the article in JAHA. The article was placed

online by JAHA on March 14, 2020, and was published in a print edition on April 7, 2020. A true and correct copy of the article – *Diversity, Inclusion, and Equity: Evolution of Race and Ethnicity Considerations for the Cardiology Workforce in the United States of America from 1969 to 2019* – is attached hereto as Exhibit B and is incorporated herein by reference.

20. Plaintiff's article concludes with the following passage:

> As Fitzgerald envisioned, "We will have succeeded when we no longer think we require black doctors for black patients, chicano doctors for chicano patients, or gay doctors for gay patients, but rather good doctors for all patients." Evolution to strategies that are neutral to race and ethnicity is essential. Ultimately, all who aspire to a profession in medicine and cardiology must be assessed as individuals on the basis of their personal merits, not their racial and ethnic identities.

(Endnotes omitted.)

21. Some four months later, in late July 2020, certain faculty physicians and executives employed by Defendants Pitt, UPP, and UPMC learned about the existence of Plaintiff's article, and objected to his conclusions – which were potentially problematic or embarrassing for UPSOM and UPMC, since these institutions were publicly committed to a policy of race discrimination in favor of "underrepresented in medicine" candidates. Defendants Pitt, UPP, and UPMC resolved and agreed to impose adverse consequences upon Plaintiff with respect to his employment at Pitt and UPP as a result of the content and ideas in his article.

22. Defendants Gladwin, Saba, and Berlacher were among those who objected to Plaintiff's conclusions and resolved and agreed as his Pitt supervisors to impose adverse employment consequences upon Plaintiff because of the views he expressed in his article. The actions described below were taken pursuant to that agreement. On July 31, 2020, defendants

Saba and Berlacher, Plaintiff's Pitt supervisors, met with Plaintiff. During the course of the conversation, Plaintiff told Saba and Berlacher that the selection processes for the GME programs were violating federal law because of the racial and ethnic preferences they employed.

23. Shortly after Plaintiff told Saba and Berlacher of the illegal nature of the GME programs, Saba, pursuant to his agreement with, and with the approval of, Gladwin and Berlacher – all Pitt faculty and all Plaintiff's Pitt supervisors – removed Plaintiff from his role as the director of the fellowship program in clinical cardiac electrophysiology.

24. In addition, Saba, pursuant to the agreement with Gladwin and Berlacher, diminished Plaintiff's job responsibilities and negatively impacted Plaintiff's professional reputation by forbidding Plaintiff from having contact with individuals in any GME program (fellows and residents) or medical students at UPSOM, both duties which were part of Plaintiff's job responsibilities prior to these diminutions by his chain of Pitt supervisors.

25. All of the Defendants discriminated and retaliated against Plaintiff because he had expressed the view that the cardiology field in general, and UPMC and UPSOM in particular, were violating anti-discrimination law by discriminating on the basis of race and ethnicity in their hiring, recruitment, promotion, and admission practices.

26. Plaintiff's contact with medical students was part of his job as a member of the faculty of UPSOM, an employment position for which Plaintiff received a W-2 tax form for wages earned as a Pitt employee. *See* Exh. A (including Plaintiff's W-2 from Pitt for wages earned).

27. In his capacity as a Pitt employee at the UPSOM, Plaintiff's primary supervisor is and was Saba, the Chief of Cardiology at the UPSOM. *See* Saba's Pitt Faculty Profile (https://profiles.dom.pitt.edu/card/faculty_info.aspx/Saba5201).

28. Plaintiff's annual disclosures to Pitt – required as an employee of Pitt – identify Saba as Plaintiff's primary supervisor, who *must be* a "Department Chair, Division Chief or equivalent faculty supervisor from [Plaintiff's] department" at the UPSOM. A true and correct copy of Plaintiff's annual disclosure form is attached as Exhibit "C."

29. Accordingly, Saba "completes [Plaintiff's] annual performance evaluation" for his Pitt employment, and "must have a Pitt appointment or affiliation." *See* Ex. C.

30. Under Pitt's policies and procedures, therefore, Saba is Plaintiff's direct supervisor as to Plaintiff's employment with Pitt and has final decision-making authority (for purposes of employment-related determinations) in regard to the Pitt employees under his primary supervision – which includes Plaintiff. *See* Ex. C.

31. Saba – in concert with Gladwin and Berlacher – had the authority (1) to remove Plaintiff as the director of the fellowship program and (2) to restrict Plaintiff's ability to interact with residents and members of the fellowship programs. Moreover, as Chief of the Cardiology Division at UPSOM, Saba had the authority to restrict Plaintiff's ability to interact with medical students. *See* Ex. C (indicating Saba is Plaintiff's primary supervisor as Pitt employee and is a Department Chair or Division Chief at UPSOM).

32. Gladwin and Saba had final decision-making authority to take the foregoing adverse actions. *See* Ex. C (indicating Saba is Plaintiff's primary supervisor as Pitt employee

8

and is a Department Chair or Division Chief at UPSOM); Gladwin's Pitt Faculty Profile (https://profiles.dom.pitt.edu/paccm/faculty_info.aspx/Gladwin5751).

33. Pitt implemented the decision by Saba and Gladwin against Plaintiff, as UPSOM – in fact – prohibited Plaintiff from engaging with medical students at the medical school and elsewhere, a diminution of his responsibilities and a change in the circumstances of his employment based on his writing and factual assertions around those writings.

34. The implementation by Pitt itself of Saba and/or Gladwin's adverse action against Plaintiff provides evidence that one or both "possess[ed] final authority to establish municipal policy **with respect to the action**" – that is, with respect to implementing adverse employment action to employees under their primary supervision. See *Estate of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019) (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990)) (emphasis supplied); Ex. C (indicating Saba is Plaintiff's primary supervisor with respect to his Pitt employment).

35. In the alternative, the fact that Pitt implemented the adverse actions against Plaintiff demonstrates, and indeed Plaintiff believes that the discovery conducted to date has already confirmed, that the adverse actions taken against Plaintiff received express authorization and approval from the decision-maker (Dean Anantha Shekhar of UPSOM) who possessed final decision-making authority to establish policy for Pitt and UPSOM with respect to employment matters for Pitt and UPSOM faculty.

36. Otherwise, upon information and belief, Pitt *itself* could not implement the unauthorized directives from Saba and Gladwin – implementing adverse action against Plaintiff

9

– if they were simply two rogue employees who acted on their own accord, entirely separate from Pitt's official policy position.

37. Pitt *itself* through its duly appointed supervisors took and implemented adverse employment action against Plaintiff based on a decision from Saba and/or Gladwin, who ostensibly held the requisite final decision-making authority to implement such measures (or had been delegated such authority by Dean Shekhar); Plaintiff's annual disclosures identify Saba as his primary Pitt supervisor with authority to evaluate Plaintiff's performance and take appropriate actions with respect to Plaintiff's Pitt employment. At all times during his employment with Pitt, Plaintiff understood Saba to have authority to act on behalf of Pitt as Plaintiff's employer. *See* Ex. C.

38. If Saba and/or Gladwin did not hold decision-making authority with respect to matters concerning employee under their supervision, then Dean Shekhar ratified their decision since Pitt *itself* implemented the adverse action against Plaintiff. *See Galicki v. New Jersey*, 2016 U.S. Dist. LEXIS 126076, *31 (D.N.J. Sept. 15, 2016) (denying motion to dismiss Section 1983 claim against the Port Authority of New York and New Jersey based on the infamous Bridgegate lane closure scandal; "[t]he question of whether [two Port Authority employees associated with Governor Chris Christie] had 'final policymaking authority,' and thus whether Port Authority adopted a 'custom' or 'policy' for purposes of *Monell* liability, is one of fact that is not amendable to resolution at this early stage.").

39. Gladwin and Saba as supervisors in the Pitt supervisory chain of command have the authority to reinstate Plaintiff to his position as director of the fellowship program in clinical

cardiac electrophysiology and to rescind the restriction on Plaintiff's employment place on Plaintiff in contravention of his protected speech rights.

40. The decisions (1) to remove the director of the fellowship program, and (2) to order a faculty member to restrict his interactions with students represent the official policy of UPSOM expressed through its Pitt-affiliated, Pitt-appointed supervisory personnel.

41. Shortly after Plaintiff's meeting with Saba and Berlacher, Gladwin wrote a "Dear Colleague" email to the UPSOM community. It was sent in his role as the Chair of the Department of Medicine at UPSOM and described the adverse employment action that was taken against Plaintiff pursuant to Gladwin's agreement with Saba and Berlacher. Among other things, it stated that many of those in the UPSOM community might have heard about a "perspective" published by "a faculty member" at UPSOM that "was antithetical to our values and deeply hurtful to many of our URM faculty." It further stated: "*We* have taken immediate action and removed the person from their [sic] leadership position . . ." (emphasis added).

42. Gladwin's letter reflects the decision he made as the Chair of the Department of Medicine at UPSOM in concert with his supervisory peers, and ascribes that decision to UPSOM's values. Gladwin – a Pitt faculty member – had authority on behalf of UPSOM on issues of policy regarding employment matters concerning the GME programs and those under his supervision, including whether a Pitt-affiliated, Pitt-appointed faculty member could have contact with medical students at UPSOM.

43. Although Gladwin did not mention Plaintiff by name, he was referring to Plaintiff and the article that was published under Plaintiff's name in JAHA. That he was referring to

11

Plaintiff was well understood by members of the UPSOM community who received Gladwin's email, which had been sent from Gladwin's Pitt-affiliated email address.

44. Defendant Gladwin used his final decision-making authority as the Chair of the Department of Medicine at UPSOM to effect the adverse employment actions undertaken against Plaintiff; as a result, the adverse employment actions taken against Plaintiff establish the official policy of UPSOM.

45. The adverse employment actions taken by defendants have had a negative financial and reputational impact on Plaintiff. Plaintiff was to be paid sums in addition to his base salary to be the director of the fellowship in clinical cardiac electrophysiology. Because he was removed from that position, he is no longer paid those additional sums. Plaintiff's removal from his supervisory role contemporaneously with the leveling of a false accusation by Pitt-supervisory personnel of Plaintiff's professional impropriety have reduced Plaintiff's reputation and his career prospects.

46. Plaintiff was also paid sums in addition to his base salary as a "Value Performance Incentive" based on the number of wRVUs (work relative value units) he earned in excess of an annual target, with the number of wRVUs calculated based on the number of patient consultations and clinical procedures performed. Because the groups with which he consults frequently included medical students, residents, or fellows, and because he is (or was in the case of students) prohibited from contact with those individuals, Plaintiff is no longer able to consult as frequently as he did previously and has lost income as a consequence. Indeed, after the contact restrictions were imposed, it was no longer possible for Plaintiff to see any patients at UPMC's flagship hospital, UPMC Presbyterian.

47. Plaintiff has lost paid outside speaking opportunities because of the loss of his position as director of the fellowship program in clinical cardiac electrophysiology.

48. Plaintiff has suffered damage to his reputation, and emotional distress. At around the same time as these adverse employment actions were taken against Plaintiff, a number of employees and agents of Pitt, UPP, and UPMC (including but not limited to Dean Anantha Shekhar of UPSOM) acting on behalf of Pitt, UPP, and UPMC, began a campaign of attack against Plaintiff's article. Among other things, these agents of Pitt, UPP, and UPMC falsely asserted that the article contained "blatant scientific falsehoods" and "misquotes." They made these statements to the publishers of JAHA and called upon JAHA to retract the article.

49. An overlapping group of employees and agents of Pitt, UPP, and UPMC, acting on behalf of Pitt, UPP, and UPMC, organized a campaign to denigrate Plaintiff and his article on Twitter, using Pitt's official @PittCardiology Twitter account. The following initial postings appeared on Twitter on August 2, 2020:

> **Tweet**
>
> **Pitt Cardiology**
> @PittCardiology
>
> @PittCardiology stands for diversity equity and inclusion across the board. This article uses misquotes, false interpretations and racist thinking to defend a single person's conclusion. We are outraged that @JAHA_AHA published this shameful and infuriating piece.
>
> **katie berlacher** @KBerlacher · Aug 2, 2020
>
> @PittCardiology I'm looking at you. What do we stand for? What do you think of this OPINION piece that misinterprets data and misquotes people? @JAHA_AHA this is scientifically invalid and racist.

13

7:22 PM · Aug 2, 2020

Many similar postings followed.

50. Within days, on August 7, 2020, despite the fact that the publishers of JAHA had vetted the article pursuant to the usual procedures for review of all articles in JAHA, and had checked the accuracy of the citations and sources, the publishers retracted the article in response to this attack campaign, without affording Plaintiff any opportunity to respond, and did not return the $1600 fee that Plaintiff paid to have it published, thereby depriving Plaintiff of the value he should have received for the fees he paid to see his article published.

51. At no point was Plaintiff accorded the procedural protections traditionally accorded to a Pitt faculty member. *See, e.g.*, Pitt Policies and Procedures, RI 07 Research Integrity Policy (formerly 11-01-01), https://www.policy.pitt.edu/research-integrity.

52. Defendants attempted to compound their retaliation by ostracizing and isolating Plaintiff within his work environment, in the hopes that he would resign.

53. Months later, on October 27, 2020, Dean Anantha Shekhar of UPSOM withdrew the restriction on Plaintiff's contact with medical students, but left the other restrictions in place.

54. Plaintiff's removal from the position of director of the fellowship program in clinical cardiac electrophysiology, and severe limitations on his ability to consult, remains in effect. In the absence of injunctive relief from this Court, these adverse actions against him will continue and Plaintiff will continue to suffer both economic harm and reputational damage.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

55. On January 12, 2021, Plaintiff filed an administrative complaint against Pitt, UPP, and UPMC with the Pennsylvania Human Relations Commission ("PHRC") and the Equal

Employment Opportunity Commission ("EEOC"). (The two agencies have a work-sharing agreement; a filing with one agency is a filing with the other.) A true and correct copy of the administrative complaint is attached hereto as Exhibit D. On March 17, 2023, Plaintiff received notice of his right to sue from the United States Department of Justice ("DOJ"). A true and correct copy of the DOJ's right-to-sue letter is attached hereto as Exhibit E. Plaintiff has fulfilled the necessary administrative prerequisites to bring this action. Suit is timely under 42 U.S.C. §§ 2000e-5(e)(1), 2000e-5(f)(1), and 43 Pa. Cons. Stat. § 962(c).

<u>FIRST CLAIM FOR RELIEF (against Gladwin, Saba, and Berlacher for violations of the First Amendment and Section 1983)</u>

56.  Plaintiff hereby incorporates all of the previous allegations of this complaint.

57.  Plaintiff's article on the history of race-conscious selection procedures in the field of medicine and cardiology was on a topic of public concern. His speech was not made on behalf of UPSOM, UPP, or UPMC.

58.  Defendants Pitt faculty member and supervisor Gladwin, Pitt faculty member and supervisor Saba, and Pitt faculty member and supervisor Berlacher acted individually and collectively under color of state authority in removing Plaintiff from his position as the director of the fellowship program in clinical cardiac electrophysiology, and in precluding him from having contact with medical students, residents, and fellows.

59.  These defendants imposed adverse consequences against Plaintiff because of the views expressed in his article. They had and have no adequate, lawful justification for imposing adverse consequences on Plaintiff for his protected speech.

60.  These defendants violated the First Amendment (as incorporated against the states through the Fourteenth Amendment's Due Process Clause) by imposing adverse consequences

on Plaintiff for his protected speech. Accordingly, they also violated 42 U.S.C. § 1983 in doing so, and Plaintiff is entitled to recover under that statute.

62. Plaintiff has suffered damages and will continue to suffer damages as a consequence of the adverse actions taken by defendants. Accordingly, he is entitled to both damages for past harm and injunctive and/or declaratory relief to prevent ongoing and future harm.

SECOND CLAIM FOR RELIEF (against UPMC for violations of Section 1981)

62. Plaintiff incorporates all prior allegations.

63. UPMC retains residents and fellows by contract.

64. Because UPMC delegated supervision of Plaintiff's employment to Pitt faculty member and supervisor Saba as the Chief of the Cardiology Division at UPSOM, Saba had the ability to impose adverse consequences on Plaintiff's employment at UPMC. UPMC discriminated against Plaintiff and imposed adverse consequences against him in part because he apprised Saba and Berlacher on July 31, 2020 that the selection process for residents and fellows discriminated on the basis of race and ethnicity and violated federal law.

65. Plaintiff had a reasonable belief that the selection process for residents and fellows discriminated on the basis of race and ethnicity and violated federal law.

66. UPMC's discrimination against Plaintiff violated 42 U.S.C. § 1981.

67. Plaintiff has suffered economic and reputational damages and will continue to suffer economic and reputational damages as a consequence of the adverse actions taken by defendants. Accordingly, he is entitled to both damages for past harm and injunctive and/or declaratory relief to prevent ongoing and future harm.

16

THIRD CLAIM FOR RELIEF (against Pitt, UPMC, and UPP for violations of Title VII, 42 U.S.C. § 2000e-3(a), and the Pennsylvania Human Relations Statute, 43 Pa. Cons. Stat. § 955(d))

68. Plaintiff hereby incorporates all of the previous allegations of this complaint.

69. Defendants Pitt, UPMC, and UPP retaliated against Plaintiff, and imposed the foregoing adverse employment actions against him, for his expression of views that the cardiology field in general, and UPSOM and UPMC in particular, were engaging in illegal discrimination on the basis of race and national origin.

70. Plaintiff had a reasonable belief that UPSOM and UPMC and other employers in the field of academic cardiology (specifically, medical schools and academic health centers) were discriminating on the basis of race and ethnicity in violation of federal and Pennsylvania law.

71. Defendants Pitt, UPMC, and UPP accordingly violated Title VII, 42 U.S.C. § 2000e-3(a), and the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 955(d).

72. Plaintiff has lost pay and will continue to lose pay as a consequence of the adverse actions taken by Defendants Pitt, UPMC, and UPP. Accordingly, he is entitled to both backpay for past harm and frontpay or injunctive and/or declaratory relief to prevent ongoing and future harm.

73. Plaintiff has suffered other damages as a consequence of the adverse actions taken by Defendants Pitt, UPMC, and UPP, and is entitled to compensation.

## Demand For Judgment

WHEREFORE plaintiff demands judgment:

A. A declaratory judgment that Defendants Gladwin, Saba, and Berlacher are violating 42 U.S.C. § 1983 by their removal of plaintiff from his position as the director of the

17

fellowship program in clinical cardiac electrophysiology and by restricting his contacts with medical students and others;

B.      A declaratory judgment that Defendants Pitt, UPMC, and UPP are violating Title VII of the Civil Rights Act of 1964 and the Pennsylvania Human Relations Act by their removal of plaintiff from his position as the director of the fellowship program in clinical cardiac electrophysiology, by restricting his contacts and teaching responsibilities, and by otherwise retaliating against him.

C.      Injunctive relief requiring Plaintiff's reinstatement as director of the fellowship program in clinical cardiac electrophysiology and precluding defendants from enforcing their prohibition restricting Plaintiff's contacts with medical students and others;

D.      Backpay, frontpay, and damages in an amount to be determined;

E.      Attorney's fees and costs pursuant to 28 U.S.C. § 1920, 42 U.S.C. § 1988, 42 U.S.C. § 2000e-5(k), 43 Pa. Cons. Stat. § 962, or any other applicable authority; and

F.      Any other relief that is appropriate.

## JURY DEMAND

Plaintiff hereby demands a jury for all claims triable by right by a jury.

Dated:   June 14, 2023

                                 /s/ J. Robert Renner
                                 Michael E. Rosman (admitted pro hac vice)
rosman@cir-usa.org
J. Robert Renner (admitted pro hac vice)
renner@cir-usa.org
Michelle A. Scott (admitted pro hac vice)
scott@cir-usa.org
CENTER FOR INDIVIDUAL RIGHTS
1100 Connecticut Ave, NW, Ste. 625
Washington, D.C. 20036
(202) 833-8400

Shawn Rodgers (PA 307598)
srodgers@goldsteinlp.com
GOLDSTEIN LAW PARTNERS, LLC
11 Church Road
Hatfield, PA 91440
(610) 949-0444