IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PITTSBURGH

| | | |
|---|---|---|
| NORMAN WANG, | ) | |
| | ) | |
| Plaintiff, | ) | **2:20-CV-01952-MJH** |
| | ) | |
| vs. | ) | |
| | ) | |
| UNIVERSITY OF PITTSBURGH, | ) | |
| UNIVERSITY OF PITTSBURGH | ) | |
| MEDICAL CENTER,  UNIVERSITY OF | ) | |
| PITTSBURGH PHYSICIANS, SAMIR | | |
| SABA, MARK GLADWIN, KATHRYN | | |
| BERLACHER, | | |
| | | |
| Defendants, | | |

**MEMORANDUM OPINION**

On June 14, 2023, plaintiff, Dr. Norman Wang, brought a three-count, Fourth Amended

Complaint against the University of Pittsburgh ("the University"), University of Pittsburgh

Medical Center ("UPMC"), University of Pittsburgh Physicians ("UPP"), Dr. Mark Gladwin, Dr.

Samir Saba, and Dr. Kathryn Berlacher, alleging claims for violations of 42 U.S.C. § 1983, 42

U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, and the Pennsylvania Human Relations

Act ("PHRA"). (ECF No. 152). On March 29, 2024, UPMC, UPP, and Drs. Gladwin, Saba, and

Berlacher filed a Motion for Summary Judgment, accompanying brief, and Concise Statement of

Material Facts. (ECF Nos. 184-186). On the same day, the University filed a Motion for

Summary Judgment, accompanying brief, and Concise Statement of Material Facts. (ECF Nos.

189-191). On May 14, 2024, Dr. Wang filed his Response to the Defendants' Motions for

Summary Judgment, an accompanying brief, and Counter Statement of Material Facts. (ECF

Nos. 199-201). The issues have been fully briefed, argued, and are ripe for decision. For the following reasons, Defendants' Motions for Summary Judgment will be granted.

## I.    Statement of Facts

Plaintiff, Dr. Norman Wang, is a cardiologist, who is dually employed by University of Pittsburgh Physicians ("UPP"), a subsidiary of the University of Pittsburgh Medical Center ("UPMC"), and by the University of Pittsburgh School of Medicine ("UPSOM"). (ECF No. 211, at ¶ 1). Dr. Mark Gladwin was the former chair of the Department of Medicine at UPMC as well as UPSOM. (*Id.* ¶ 6). Dr. Samir Saba is the Chief of the Division of Cardiology at UPMC and UPSOM. (*Id.* ¶ 7). Dr. Saba also serves as the Co-Director of the Heart and Vascular Institute ("HVI"), a clinical service line for cardiovascular care at UPMC. (*Id.*) In his capacity as the Co-Director of the HVI, Dr. Saba reported to Dr. Stephen Shapiro, president of the Physicians Services Division, which oversees all UPP-employed physicians. (*Id.* ¶ 34). Dr. Kathryn Berlacher is the director of the Cardiovascular Fellowship Training Program at UPMC, and she is a professor in the Division of Cardiology at UPSOM. (*Id.* at ¶ 8).

UPMC and the University are separate and independent legal entities. (*Id.* at ¶ 9). UPMC and the University maintain an affiliation to, among other purposes, "enhance the combined ability of the University and UPMC Health System, as a leading academic medical center, to attract and retain outstanding clinicians, teachers, and researchers," and "provide a structure for the more efficient management of the Faculty group practices through UPP.". (*Id.* ¶ 10). UPMC and the University have an affiliation agreement, which governs the relationship between the University and UPMC. (*Id.* ¶ 11). UPMC Graduate Medical Education ("GME") is a graduate education program operated by UPMC, affiliated with the University, where fellows and residents are hired by and trained by UPMC to become physicians in many different specialties. (ECF No. 208, at ¶

13). UPMC residents and fellows are employed by UPMC, while medical students are the responsibility of the University. (*Id.* ¶¶ 14-15).

In February 2017, Dr. Wang was selected as the Director of the Clinical Electrophysiological Fellowship Program ("EP Program"). (ECF No. 208, at ¶ 29). The EP Program is part of the UPMC GME Program. (*Id.* ¶ 18). In his capacity as EP Program Director, Dr. Wang reported, to Dr. Saba, through the head of electrophysiology, Dr. Sandeep Jain. (*Id.* ¶ 33).

In July 2019, Dr. Wang wrote an article titled, "Diversity, Inclusion, and Equity: Evolution of Race and Ethnicity Considerations for the Cardiology Workforce in the United States of America from 1969 to 2019." (*Id.* ¶ 56). Dr. Wang submitted and paid for his article to be published in the Journal of the American Heart Association ("JAHA"). (*Id.* ¶ 57). The JAHA published Dr. Wang's article in March 2020. (*Id.*). Drs. Saba and Berlacher learned about the article on July 29, 2020. (*Id.* at ¶ 58). Members of the UPMC and University communities disagreed with the content of Dr. Wang's article, and many were vocal about their disapproval.

On July 31, 2020, Drs. Saba and Berlacher met with Dr. Wang to remove him as UPMC's EP Program Director. (ECF No. 208, at ¶ 70). Drs. Saba and Berlacher decided to remove Dr. Wang as EP Program Director "in the day to two days preceding the meeting". (ECF No. 208, at ¶ 67). Dr. Saba testified that Dr. Wang was removed as Program Director on behalf of UPMC. (ECF 192-6, at 229). Dr. Wang testified that, during the July 31, 2020 meeting, Dr. Saba told him, "You know what we are trying to do here, Norm." (ECF No. 192-17, at 98-99). Dr. Wang further testified that he took Dr. Saba's comment to mean that UPMC was discriminating based on race; but Dr. Wang also acknowledged, "maybe [Dr. Saba] didn't mean it that way." (*Id.* at 99). Dr. Wang testified that he did not recall telling Drs. Saba and Berlacher that the UPMC GME program implemented any racial and ethnic preferences. (*Id.* at 102). Dr. Wang further testified

that he told Dr. Saba that he wrote his article, because he "just wanted us to follow the law;" but, when asked if he discussed that UPMC in particular violated the law, he stated "no, we did not get into that." (*Id.* at 100-101). Further, Drs. Berlacher and Saba both testified that Dr. Wang did not mention that the UPMC GME program specifically violated the law during the July 31, 2020 meeting. (ECF No. 192-6, at 108-110); (ECF No. 192-7, at 102). On August 1, 2020, Dr. Saba sent Dr. Wang an email, documenting the conversation they had on July 31, 2020. (ECF No. 208, at ¶ 79).

On August 2, 3, and 4, 2020, Dr. Berlacher voiced her opposition to Dr. Wang's article via tweets from the @PittCardiology account[1], as well as from her own professional twitter account. (ECF No. 192-32, at 2). On August 2, 2020, Dr. Berlacher posted a tweet from her own professional twitter account, which she used to communicate as Program Director for the Cardiovascular Fellowship, stating, "@PittCardiology I'm looking at you. What do we stand for? What do you think of this OPINION piece that misinterprets data and misquotes people? @JAHA_AHA this is scientifically invalid and racist." (ECF No. 208, at 95). On the same day, Dr. Berlacher responded to this tweet from the @PittCardiology account, stating "@PittCardiology stands for diversity equity and inclusion across the board. This article uses misquotes, false interpretations and racist thinking to defend a single person's conclusion. We are outraged that @JAHA_AHA published this shameful and infuriating piece." (*Id.*). On August 5, 2020, Dr. Saba emailed Barry London, Editor-in-Chief of JAHA, requesting that JAHA retract Dr. Wang's article. (ECF No. 192-38, at 1). The retraction request was signed by members of UPMC and the University as well as a professor from Duke University School of Medicine. (*Id.*).

---

[1] Dr. Berlacher testified that the @PittCardiology account is an account for the cardiology fellowship, and that it did not have any official affiliation with either the University or UPMC. (ECF No. 192-8, at 127-132). Dr. Berlacher further testified that she had created the account with Dr. Josh Levenson, an associate program director at GME, and that both of them had the ability to post from the account. (*Id.*).

The email to JAHA expressed that, the "request for retracting [Dr. Wang's] paper is based primarily on it containing blatant scientific falsehoods and misquotes." (ECF No. 192-38, at 1). JAHA retracted Dr. Wang's article on August 6, 2020. (ECF No. 192-39, at 1).

On August 4, 2020, Drs. Saba and Berlacher sent an email to Dr. Wang, informing him that he was restricted from interacting with fellows, residents, and medical students. (ECF No. 208, at ¶ 91). On October 27, 2020, Anantha Shekhar, Dean of UPSOM, emailed Dr. Wang, informing him that Drs. Saba and Berlacher's removal of Dr. Wang as EP Program Director did not restrict his ability to interact with medical students at UPSOM or in any way affect his status as a UPSOM faculty member. (ECF No. 187-7, at 19). On the same day, Dean Shekhar also sent a memorandum to Drs. Saba, Berlacher, and Gladwin, informing them of Dr. Wang's unaffected and continuing status as a faculty member at UPSOM. (*Id.* ¶ 98). It also informed Drs. Berlacher and Saba that Dr. Wang was not restricted in his ability to interact with medical students. (*Id.*).

Dr. Wang alleges that he has suffered economic, reputational, and emotional damages because of the actions taken against him by Defendants.

## II.    Relevant Legal Standard

According to Federal Rule of Civil Procedure 56, a court must grant summary judgment where the moving party "shows that there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For a dispute to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." *Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 213 (3d Cir. 2017) (internal quotations omitted). Additionally, for a factual dispute to be material, it must have an effect on the outcome of the suit. *Id.* In reviewing and evaluating the evidence to rule upon a

motion for summary judgment, the court must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the" non-moving party. *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014) (internal quotations omitted). However, where "the non-moving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,'" the moving party is entitled to judgment as a matter of law. *Moody*, 870 F.3d at 213 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

"The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). "Discredited testimony is not normally considered a sufficient basis for drawing a contrary conclusion. Instead, the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Id.* at 256-57 (internal citation omitted). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted). Judges are not "required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of the party." *Id.* at 251 (internal citation omitted).

### III.    Discussion

### A.  Count I: § 1983 First Amendment Claims against Individual Defendants

Dr. Wang sues Drs. Gladwin, Saba, and Berlacher, in Count I of his Fourth Amended Complaint, under § 1983, for violations of his First Amendment rights. (ECF No. 153, at ¶¶ 56-61). Dr. Wang alleges that, by removing him from his role as Program Director for the EP

Fellowship Program and barring him from contacting medical students, residents, and fellows, Drs. Gladwin, Berlacher and Saba retaliated against him, because of his article that he published and the statements he made to Drs. Saba and Berlacher during the July 31, 2020 meeting. (*Id.*).

To establish a claim under 42 U.S.C. § 1983, the plaintiff must demonstrate that (1) the conduct at issue was committed by a person acting under the color of state law, and (2) the complained of conduct deprived the plaintiff of rights secured under the Constitution or laws of the United States. *Bologa v. Pittston Area Sch. Dist.*, 927 F.3d 742, 753 n.6 (3d Cir. 2019). UPMC argues that Dr. Wang has not produced evidence that any of the Individual Defendants acted under the color of state law, or that any of them deprived him of a federal right. (ECF No. 185, at 4-13). Dr. Wang argues that genuine issues of material fact exist as to whether Drs. Gladwin, Saba, and Berlacher acted under the color of state law, and as to whether they violated his First Amendment rights pursuant to § 1983. (ECF No. 199, at 22-38).

In determining whether a person has acted under color of state law, "[t]he issue is not whether the state is involved in some way in the relevant events, but whether the action can be fairly attributed to the state itself." *Groman v. Township of Manalapan*, 47 F.3d 628, 638 (3d Cir. 1995). A person acts under color of state law only when exercising power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *United States v. Classic*, 313 U.S. 299, 326 (1941). There are three tests for determining whether or not an individual acts under color of state law: (1) whether the private party has exercised powers that are traditionally the exclusive prerogative of the state; (2) whether the private party has acted with the help of or in concert with state officials; and (3) whether the state has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity. *Kach v. Hose*, 589 F.3d 626, 646 (3d

Cir. 2009). In *Borrell v. Bloomsburg University,* 870 F.3d 154, 160 (3d Cir. 2017), the Third

Circuit addressed the issue of determining when an individual, dually employed by both a private

and public entity, acts under color of state law. The relevant question is whether there exists

"such a close nexus between the State and the challenged action that seemingly private behavior

may be fairly treated as that of the State itself." *Id.* (citing *Leshko v. Servis*, 423 F.3d 337, 339

(3d Cir. 2005) (internal quotations omitted). For state action to be found, "the government must

be 'responsible for the specific conduct of which the plaintiff complains.'" *Id.* (quoting *Blum v.

Yaretsky*, 457 U.S. 991, 1004 (1982)).

In *Borrell*, a former nurse anesthetist student alleged that the Director of the Nurse

Anesthetist Program violated § 1983 by dismissing her from the program. *Id.* at 157-59. The

Director was employed by Geisinger Medical Center, a private hospital, and she was also

employed by Bloomsburg University, a public university. *Id.* The two institutions operated under

a collaboration agreement. *Id.* at 157. The nurse anesthetist student had violated a Geisinger drug

policy, for which the Director terminated her from the Nurse Anesthetist Program. *Id.* at 157-

159. The Director informed the student of her termination by a letter, with a letterhead reflecting

both institutions. *Id.* That letter was signed by both the Director of the Nurse Anesthetist

program and by a Bloomsberg University employee, who had aided in drafting the letter. *Id.* In

determining whether the Director, a dually employed employee, was a state actor, the Third

Circuit emphasized that it is important to consider what "hat" the decision maker was wearing

when he made his decision. *Id.* at 160. The Third Circuit held that the Director had not acted as a

state actor when he terminated the student, because the collaboration agreement was clear that

Geisinger had unilateral authority to exclude a student from clinical training if that student

violated Geisinger policy. *Id.* at 162. The Third Circuit opined that the Director's Geisinger

employee capacity was not altered by the Bloomberg employee's involvement with the decision process or his signature on the termination letter. *Id.*

i.    Dr. Gladwin

UPMC argues that Dr. Gladwin was not personally involved in any of the challenged actions. (ECF No.165, at 4). Dr. Wang argues that Dr. Gladwin was involved in Dr. Wang's removal, and that Dr. Gladwin was solely employed by the University at the time. (ECF No. 199, at 24-25). In support, Dr. Wang cites an August 7, 2020 email, sent by Dr. Gladwin from his University email account to the Department of Medicine, stating, "we have taken immediate action and removed the person from their leadership position." (ECF No. 192-49). Dr. Gladwin testified that he meant the royal "we" in the August 7, 2020 email. (ECF No. 192-4, at 189). In its Reply, UPMC argues that Dr. Galdwin's August 7, 2020 email does not prove that he was involved in making any of the challenged prior decisions, because the decision to remove Dr. Wang as EP Program Director occurred on July 30, 2020, eight days before Dr. Gladwin's email was sent. (ECF No. 207, at 4). UPMC also argues that the decision to preclude Dr. Wang from interacting with fellows, residents, and medical students was made and communicated to Dr. Wang on August 4, 2020, before Dr. Gladwin's August 7, 2020 email. (*Id.*). UMPC further argues that Dr. Gladwin's use of the so-called royal "we" does not prove that he was involved with the decision to remove Dr. Wang as Program Director or the decision to restrict his contacts with fellows, residents, and medical students. (*Id.*). Dr. Wang argues that Dr. Gladwin's use of the "royal we" actually means, "I" and that, because such language was used, a reasonable jury could conclude that Dr. Gladwin was the driving force behind Dr. Wang's removal and restrictions. (ECF No. 199, at 24-25).

Dr. Gladwin's email correspondence does not establish that he had, or exercised, any authority in the decisions to remove Dr. Wang as EP Program Director or to restrict his contact with residents, fellows, or medical students. Drs. Saba and Berlacher informed Dr. Wang of his removal as EP Program Director on July 31, 2020. Drs. Saba and Berlacher emailed Dr. Wang on August 4, 2020, restricting his contact with fellows, residents, and medical students. Dr. Gladwin's email was sent on August 7, 2020, after Drs. Berlacher and Saba had taken actions against Dr. Wang. If anything, Dr. Gladwin's August 7, 2020 email, sent eight days after Dr. Wang had been removed as Program Director, merely expresses knowledge and agreement with the removal and restriction decisions. The email does not establish any question that Dr. Gladwin had, or exercised, any authority or participation in the decision to remove Dr. Wang as EP Program Director or to restrict his contact with residents, fellows, and medical students. Knowledge and agreement alone are not sufficient to establish state action. *See Borrell*, 870 F.3d at 162 ("Action taken by private entities with the *mere approval or acquiescence* of the State is not state action.") (citing *Kach*, 589 F.3d at 649).

Further, in an email thread on July 31, 2020, before Drs. Saba and Berlacher's meeting with Dr. Wang, Dr. Gladwin expressed that "removing [Dr. Wang] . . . runs counter to academic protections." (ECF 192-30, at UPMC_001383). Dr. Gladwin's email suggests that he did not necessarily agree with the impending removal of Dr. Wang as EP Program Director. Based upon the record before the Court, Dr. Wang has not established any genuine issue of material fact that Dr. Gladwin was involved in the decision to remove Dr. Wang as EP Program Director in such a way that would constitute state action. Accordingly, Dr. Gladwin's Motion for Summary Judgment, as to Dr. Wang's § 1983 claim against Dr. Gladwin, at Count I of the Fourth Amended Complaint, will be granted.

10

ii.    Drs. Saba and Berlacher

Dr. Wang argues that Drs. Saba and Berlacher acted in their University capacities as state actors when they removed Dr. Wang as EP Program Director and restricted him from interacting with medical students. (ECF No. 199, at 24-31). UPMC argues that Drs. Saba and Berlacher's decisions to remove Dr. Wang as EP Program Director and to restrict his interaction with fellows, residents, and medical students were made in their capacities as employees of UPP, and thus they were private actors. (ECF No. 185 at 7).

In this Court's December 21, 2021 Memorandum Opinion, it held that Drs. Saba and Berlacher were acting in their capacities as UPP employees when they removed Dr. Wang as EP Program Director and restricted his contact with residents, fellows, and medical students. (ECF No. 71, at 13-16). Presently, following discovery, Dr. Wang has not produced sufficient record evidence to establish any genuine issue of material fact that changes this Court's prior decision. Pursuant to *Borrell*, the Court must determine what so-called "hats" Drs. Saba and Berlacher were wearing when they removed Dr. Wang from his position as the EP Program Director, and when they restricted his interactions with fellows, residents, and medical students. Dr. Wang makes four main arguments to support that Drs. Saba and Berlacher acted as state actors when they made the challenged decisions: (1) that Dr. Saba had no formal position within the UPMC GME program; and thus, could not be acting within his UPMC capacity; (2) that Drs. Saba and Berlacher restricted Dr. Wang's communication with University medical students; (3) that University officials, Dr. Gladwin and Dean Shekhar, were involved in the challenged decisions; and (4) that Dr. Berlacher critically tweeted about Dr. Wang's article from an @PittCardiology account on August 2, 3, and 4, 2020. (ECF No. 199, at 22-32).

11

As to Dr. Wang's first argument, the EP Program is a part of the GME Program, which is operated by UPMC. (ECF No. 192-15, at 122). Residents and fellows at UPMC hospitals within the GME program are fully and exclusively hired and compensated by UPMC Medical Education, a subsidiary of UPMC. (ECF No. 208, at ¶ 14). It is undisputed that Dr. Saba held no direct role within the GME; however, as Co-Director of UPMC's HVI, he frequently met with the Program Directors responsible for cardiology specialties and subspecialties to discuss residencies and fellowships. (*Id.* at ¶ 37). The HVI, a clinical service line for cardiovascular care at UPMC, is a UPMC program. (ECF No. 211, at ¶ 7). As EP Program Director, Dr. Wang reported to Dr. Saba, through his supervisor, the head of electrophysiology, Dr. Sandeep Jain. (*Id.* ¶ 33). As Co-Director of UPMC's HVI, Dr. Saba reported to Dr. Stephen Shapiro, president of the Physicians Services Division, which oversees UPP. (*Id.* ¶ 34). Dr. Saba's participation in the decision to remove, and in the removal of, Dr. Wang as UPMC's EP Program Director, was consistent with his role and capacity as Co-Director of UPMC's HVI. There is no record evidence that Dr. Saba acted under the authority of the University. As such, Dr. Saba, on behalf of UPMC, was acting in a private capacity, and not as a state actor, when he removed Dr. Wang as EP Program Director.

As to Dr. Wang's second argument, concerning Drs. Saba and Berlacher's August 4, 2020 email to Dr. Wang, restricting Dr. Wang's contact with fellows, residents, and medical students, Dean Shekhar rejected Dr. Wang's restriction of contact with medical students in his October 27, 2020 email to Dr. Wang and in his subsequent memorandum to Drs. Saba and Berlacher. Such rejection of Drs. Saba and Berlacher's restriction of contact with University medical students supports the notion that Drs. Saba and Berlacher did not operate within their University capacity or authority when they made the challenged decisions. Dean Shekhar's

12

actions support that the University did not participate in or ratify the actions by Drs. Saba and Berlacher as regards contact with medical students. Indeed, the University, through Dean Shekhar, confirmed that the restriction, concerning University medical students, had no effect upon Dr. Wang's ability to interact with medical students or with his position and privileges within the University, as Drs. Saba and Berlacher had no authority to restrict Dr. Wang's contact with medical students at UPSOM. As such, there is no question of material fact; Drs. Saba and Berlacher acted on behalf of UPMC, in their private capacities, when they restricted Dr. Wang's contact with residents, fellows, and medical students.

As to Dr. Wang's third argument, that University officials, Dr. Gladwin and Dean Shekhar's involvement in the challenged decisions establish that Drs. Saba and Berlacher were state actors, the record does not support such a finding. For the reasons discussed above, there is no evidence to establish any question of material fact that Dr. Gladwin was involved in the challenged decisions to sufficiently establish state action. As to Dean Shekhar's involvement, there is no evidence to raise any question of material fact that Dean Shekhar participated in the decision process or discussions. On July 31, 2020, Dean Shekar emailed Patrick Gallagher, University Chancellor, discussing Dr. Wang's removal as UPMC's Program Director earlier that day, Dean Shekar wrote, "I would have been less reactive – and it was done without any knowledge from me – but these roles are at the discretion of the division chief and controlled by UPMC." (ECF No. 192-30, at 1). Such communication demonstrates that Dean Shekhar, and the University, did not participate or exercise any authority in the removal of Dr. Wang as EP Program Director, or in the restriction of his contact with fellows and residents and medical students. Further, Dean Shekar's action to repudiate the restrictions upon Dr. Wang, as to contact with medical students, and his clarification of no change in Dr. Wang's privileges as a faculty

member of UPSOM, supports that Drs. Saba and Berlacher did not act for the University; thus, Drs. Saba and Berlacher acted as private actors.

Dr. Wang's fourth argument asserts that Dr. Berlacher was acting as a state actor, because she criticized Dr. Wang, using the @PittCardiology twitter account, which Dr. Wang alleges was a University account. Dr. Berlacher testified that the @PittCardiology account was not a University account; rather, it was an "account of the UPMC cardiology fellowship." (ECF No. 192-8, at 146-147). Dr. Wang has produced no evidence to raise any issue of material fact that the @PittCardiology account was a University account. Further, these tweets, criticizing Dr. Wang's article, post-dated Dr. Saba and Berlacher's decision and action to remove Dr. Wang as EP Program Director. Thus, they do not support any finding of state action in the decision to remove Dr. Wang as EP Program Director. Additionally, while the tweets expressed Dr. Berlacher's disagreement with Dr. Wang's article, they do not reference the restriction of Dr. Wang's interactions with fellows, residents, and medical students in any manner. Thus, the tweets do not raise any question of material fact that Dr. Berlacher's involvement in the decision to restrict Dr. Wang's interaction with fellows, residents, and medical students was done in her University capacity.

As such, the record does not present evidence sufficient to establish any genuine issue of material fact that Drs. Saba and Berlacher acted in their University capacities when they removed Dr. Wang as EP Program Director, or when they restricted Dr. Wang's interactions with residents, fellows, and medical students. Absent state action, Dr. Wang's § 1983 claims against Drs. Saba and Berlacher fail. Accordingly, Drs. Saba and Berlacher's Motion for Summary Judgment, as to the § 1983 claims against them, at Count I of the Fourth Amended Complaint, will be granted.

**B.  Count III: Title VII and PHRA Claims**

Dr. Wang's Title VII and PHRA retaliation claims against the University, UPMC, and UPP, allege that they retaliated against him, for opposing race discrimination within GME. (ECF No. 199, at 38-47). Each of the defendants argue that Dr. Wang fails to establish a prima facie case for retaliation under Title VII and the PHRA, because Dr. Wang fails to establish a protected activity, any adverse action, or that a causal connection between any protected activity and adverse action exists. (ECF No. 185, 14-22); (ECF No. 190, at 11-24). UPMC and UPP further argue that they established legitimate, non-discriminatory reasons for the challenged actions taken against Dr. Wang, and that Dr. Wang has failed to establish that such reasons were pretextual. (*Id.* at 21-22). To establish a prima facie case of retaliation, a plaintiff must establish (1) he engaged in a protected activity; (2) his employer took an adverse employment action after or contemporaneous with the protected activity; and (3) a causal link exists between the adverse action and the protected activity. *Andreoli v. Gates*, 482 F.3d 641, 649 (3d Cir. 2007).

Dr. Wang's Title VII and PHRA claims are analyzed under the burden shifting analysis established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). Under this framework, Dr. Wang bears the initial burden of establishing a prima facie case of retaliation. *See Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). If Dr. Wang establishes a prima facie case, the burden then shifts to Defendants to articulate legitimate non-discriminatory reasons for the adverse actions against him. *McDonnell Douglas Corp.*, 411 U.S. at 802-04. If Defendants establish a legitimate non-discriminatory reason, then Dr. Wang must prove, by a preponderance of the evidence, that Defendants' reason was "false, and that retaliation was the real reason for the adverse employment action." *Moore v. City of Phila.*, 461 F.3d 331, 342 (3d Cir. 2006) (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500-01 (3d Cir. 1997)).

As an initial matter, as discussed above, the decisions to remove Dr. Wang as EP Program Director and restrict his contact with residents, fellows, and medical students were made in Drs. Saba and Berlacher's private capacities. Accordingly, the University was not involved in any of the alleged adverse actions taken against Dr. Wang, and thus, the University's Motion for Summary Judgment, as to the Title VII and PHRA claims against it, at Count II of the Fourth Amended Complaint, will be granted.

i.    Protected Activities

UPMC and UPP argue that Dr. Wang fails to establish a genuine issue of material fact that he engaged in any protected activity under Title VII or the PHRA. (ECF No. 185, at 15-17). Dr. Wang contends that his article, and the comments he made to Drs. Saba and Berlacher at the July 31, 2020 meeting, were protected activities under Title VII and the PHRA. (ECF No. 199, at 38-45).

To satisfy the first element of a Title VII retaliation claim, Dr. Wang must have "opposed any unlawful employment practice" or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing" related to an employer's discriminatory conduct. *Collins v. Kimberly-Clark Pennsylvania, LLC*, 247 F. Supp. 3d 571, 601 (E.D. Pa. 2017) (citing 42 U.S.C. § 2000e-3(a)). "A general complaint of unfair treatment is insufficient to establish protected activity." *Curay-Cramer v. Ursuline Academy of Wilmington, De., Inc.*, 450 F.3d 130, 135 (3d Cir. 2006) (citing *Barber v. CSX Distribution Servs.*, 68 F.3d 694, 701-02 (3d Cir. 1995)).

Dr. Wang acknowledges this Court's August 22, 2023 Opinion, holding that Dr. Wang's article does not serve as the basis for a protected employment activity as related to the

16

University. (*Id.* at 41). However, Dr. Wang argues that, given the present record, his article *can serve* as a protected activity as related to his employment with UPMC and UPP. (*Id.*). As discussed in this Court's August 22, 2023 Opinion, Dr. Wang's article "generally criticized the field of cardiology's use of racial and ethnic preferences for medical school admissions and residency and fellowship selections. The article did not specifically mention or criticize that the University of Pittsburgh or UPMC used such racial and ethnic preferences within their specific programs." (ECF No 172, at 10). Further, this Court determined that, "[g]iven the general nature of Dr. Wang's article, it cannot serve as the basis for a protected employment activity for any claims under Title VII or the PHRA against the University of Pittsburgh." (*Id.*). Discovery in this case has not produced any basis to alter this Court's determination. Further, said determinations of the absence of a protected employment activity also applies to UPMC and UPP. Thus, the only present protected activity at issue concerns the comments made by Dr. Wang at the July 31, 2020 meeting.

In relation to the July 31, 2020 meeting, the University, UPMC, and UPP contend that the record evidence supports that Dr. Wang failed to complain about racial discrimination in UPMC's hiring of residents and fellows in a way that violated Title VII. (ECF No. 185, at 16); (ECF No. 190, at 21). Dr. Wang contends that his article provides context for the comments made during the July 31, 2020 meeting with Drs. Saba and Berlacher. (ECF No. 199, at 43). The depositions that discuss the July 31, 2020 meeting are too non-specific and vague as to establish that any comments about specific discriminatory UPMC employment policies and practices were made sufficient to establish a protected activity for the purposes of a retaliation claim. Even with the added context of the article, the topics discussed therein, and the discussion at the July 31, 2020 meeting did not touch upon UPMC practices in the hiring of fellows and residents and DEI

issues at UPMC in general. Thus, the record, concerning the July 31, 2020 meeting, does not support any finding that Dr. Wang made statements that challenged UPMC, or UPPs practices or policies regarding the hiring of fellows or residents for the GME program. As such, the discussions at the July 31, 2020 meeting do not sufficiently support a protected activity. *See Laymon v. Honeywell Int'l Inc.*, 645 F. Supp. 3d 443, 459 (W.D. Pa. 2022) ("[a]t a minimum, [it] must be sufficiently specific to put the employer on notice of the specific kind of unlawful discrimination being alleged and being complained of.").

Thus, Dr. Wang fails to establish a genuine issue of material fact that his comments at the July 31, 2020 meeting with Drs. Saba and Berlacher constituted a protected activity. As such, UPMC and UPP's Motion for Summary Judgment, as to Dr. Wang's Title VII and PHRA retaliation claim, at Count III of the Fourth Amended Complaint, will be granted.

ii.    Adverse Action, Causal Connection, and Legitimate Non-Discriminatory Reason

If Dr. Wang could establish that his comments at the July 31, 2020 meeting constituted a protected activity, he must further establish the second and third elements of a prima facie case for Title VII retaliation, that UPMC or UPP took an adverse action against him and that the adverse action was causally connected to his comments at the July 31, 2020 meeting. In his Brief in Opposition, Dr. Wang alleges that UPMC, and UPP took the following adverse employment actions against him: (1) that he was removed as EP program director; (2) that he was restricted from interacting with residents, fellows, and medical students; (3) that his colleagues petitioned JAHA to remove his article from publication; (4) that he was criticized on twitter by Dr. Berlacher via the @Pittcardiology account; (5) that he was denied traditional academic due process as relates to his article; (6) that he was isolated in his work environment in hopes that he would resign; and (7) that his pay was decreased. (ECF No. 199, at 45). Dr. Wang argues that

18

each of these adverse actions were materially adverse and causally connected to his comments made at the July 31, 2020 meeting. (ECF No. 199, at 43-46). UPMC and UPP argue that Dr. Wang fails to establish that any of the alleged adverse actions were materially adverse or causally connected to his comments made at the July 31, 2020 meeting. (ECF No. 185, at 18-20). UPMC and UPP further argue that even if Dr. Wang could establish the second and third elements, he fails to establish that UPMC and UPP's proposed legitimate non-discriminatory reasons for his removal as EP Program Director and restriction of contact with residents, fellows, and medical students were pretextual. (*Id.* at 20-23).

To show that an adverse action was taken against him, Dr. Wang must establish that "a reasonable employee would have found the alleged retaliatory actions 'materially adverse' in that they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Moore v. City of Philadelphia*, 461 F.3d 331, 341 (3d Cir. 2006) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). "Whether a retaliatory action is sufficiently serious to meet the materiality and reasonableness requirements 'depend[s] upon the particular circumstances.'" *Morrison v. Carpenter Tech. Corp.*, 193 F. App'x 148, 154 (3d Cir. 2007).

To satisfy the causal connection element of a Title VII retaliation claim, Dr. Wang must prove either "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Summy-Long v. Pennsylvania State Univ.*, 226 F. Supp. 3d 371 (M.D. Pa. 2016), *aff'd,* 715 F. App'x 179 (3d Cir. 2017) (citing *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)). "An employer need not refrain from carrying out a previously reached employment decision because an employee subsequently claims to be engaging in

protected activity." *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 137 (3d Cir. 2006) (citing *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 272 (2001)). A causal connection cannot be established if an employment decision is made before the alleged protected activity. *See Breeden*, 532 U.S. at 272 (protected activity took place "one day after" supervisor stated she was considering transferring plaintiff) (emphasis original); *Yan Yan v. Penn State Univ.*, 529 F. App'x 167, 172 (3d Cir. 2013) (decision to reschedule exam made "two days prior" to receiving a letter that complained of discrimination); *Gale v. UPMC Horizon*, 2013 WL 5534238, at *7 (W.D. Pa. 2013) (finding no causal connection because "the wheels of Plaintiff's termination had already been set in motion" when he engaged in alleged protected activity).

After careful review of the record, briefings, and arguments, and taking all the facts in the light most favorable to Dr. Wang, as the Court must at this stage, genuine issues of material fact exist as to the restriction of contact with fellows, residents, and students, the alleged adverse actions, and their causal connection to Dr. Wang's comments at the July 31, 2020 meeting. Further, genuine issues of material facts exist as to UPMC and UPP's proposed legitimate non-discriminatory reasons.

### C.  Count II: § 1981 Claim against UPMC

Dr. Wang brings a § 1981 retaliation claim against UPMC. (ECF No. 152, at 16). § 1981 retaliation claims, like Title VII and PHRA claims, are analyzed under the *McDonnell Douglas* framework. The elements for a prima facie case for § 1981 retaliation claims are the same as those for a Title VII and PHRA discrimination claim. *See Estate of Olivia v. New Jersey*, 604 F.3d 788, 798 (3d Cir. 2010); *Brown v. J. Kaz, Inc.*, 581 F.3d 175, 181-82 (3d Cir. 2009) ("the substantive elements of a claim under section 1981 are generally identical to the elements of an employment discrimination claim under Title VII.").

i.    <u>Protected Activity</u>

Dr. Wang and UPMC make the same arguments for the §1981 retaliation claim as they did for the Title VII retaliation claim above, as related to the protected activity element. (ECF No. 185, at 13-22); (ECF No. 199, at 49). As discussed above, Dr. Wang fails to establish any genuine issue of material fact that UPMC retaliated against him, for engaging in a protected activity, in violation of § 1981. UPMC's Motion for Summary Judgment, as to Dr. Wang's § 1981 claim, at Count II of the Fourth Amended Complaint, will be granted. As such, UPMC's Motion for Summary Judgment, as to Dr. Wang's § 1981 claim at Count II of the Fourth Amended Complaint, will be granted.

ii.    <u>Adverse Action, Causal Connection, and Legitimate Non-Discriminatory Reason</u>

Dr. Wang and UPMC make the same arguments for the §1981 retaliation claim as they did for the Title VII retaliation claim above as relates to the adverse action and causal connection elements as well as UPMC's proposed non-discriminatory reason. (ECF No. 185, at 13-22); (ECF No. 199, at 49). For the reasons discussed above, genuine issues of material fact exist as to the restriction of contact with fellows, residents, and students, the alleged adverse actions, and their causal connection to Dr. Wang's comments at the July 31, 2020 meeting. Further, genuine issues of material facts exist as to UPMC's proposed legitimate non-discriminatory reasons.

**IV.    Conclusion**

For the reasons discussed above, Defendants' Motions for Summary Judgment will be granted in full. Judgment will be entered in favor of Defendants and against Plaintiff. The Clerk shall mark this case as closed.

DATE: March 26, 2025

Marilyn J. Horan
United States District Judge