**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| NORMAN WANG,<br><br>*Plaintiff*,<br><br>v.<br><br>UNIVERSITY OF PITTSBURGH, UNIVERSITY OF PITTSBURGH MEDICAL CENTER, UNIVERSITY OF PITTSBURGH PHYSICIANS, AMERICAN HEART ASSOCIATION, INC., SAMIR SABA, and KATHRYN BERLACHER,<br><br>*Defendants*. | No. 2:20-cv-01952 |

**FIFTH AMENDED COMPLAINT**

This complaint alleges defamation and violations of state and federal civil rights laws. The case is on remand from the Third Circuit, which restored most of Plaintiff's defamation and civil rights retaliation claims, noting that "[a] culture that cancels instead of counsels sacrifices persuasion on the altar of power." *Wang v. Univ. of Pittsburgh*, 181 F.4th 301, 306 (3d Cir. 2026).

**JURISDICTION AND VENUE**

1. This is an action arising under the laws of the United States. Jurisdiction is vested in this Court pursuant to 28 U.S.C. §§ 1331, 1343(a)(3)-(4), and 1367, and 42 U.S.C. § 2000e-5(f)(3).

2. Plaintiff seeks relief under 42 U.S.C. §§ 1981, 1988, 2000d *et seq.* (Title VI), 2000e *et seq.* (Title VII), state law defamation, 42 Pa. Cons. Stat. §§ 8341-45, and the Pennsylvania Human Relations Act, 43 Pa. Stat. § 955(d).

3. Jurisdiction over the state law claims exists because the state law claims form part of the same case or controversy as the federal claims.

4. Venue is proper under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3) because a substantial part the events giving rise to Plaintiff's claims occurred in this district.

**PARTIES**

5. Plaintiff Norman Wang is a cardiologist, a member of the faculty of the University of Pittsburgh School of Medicine ("UPSOM"), and a doctor employed by University of Pittsburgh Physicians ("UPP"). Dr. Wang resides and works in this district. Prior to the events described herein, he directed a fellowship program in clinical cardiac electrophysiology. Wang is an American citizen who is ethnically Chinese by birth.

6. Defendant University of Pittsburgh ("Pitt") is an educational institution in, and supported by, the State of Pennsylvania. It is part of the Commonwealth System of Higher Education in Pennsylvania and is a state-related institution. UPSOM is a part of Pitt. Pitt receives federal funds that, among other things, assist it in providing a medical education for students at UPSOM.

7. Defendant University of Pittsburgh Medical Center ("UPMC") is a Pennsylvania corporation doing business in Pennsylvania. It operates hospitals and medical centers in Pennsylvania, including teaching hospitals, and is affiliated with Pitt. Indeed, linked together by numerous formal affiliation agreements, UPMC (through its teaching hospitals) and UPSOM function as a single integrated academic health center.

8. Defendant UPMC receives federal funds. It specifically receives federal funds for the primary purpose of employing residents and fellows in its residency and fellowship programs.

The fellowship and residency programs are part of a Graduate Medical Education ("GME") program.

9. Medical education for medical students at UPSOM includes learning from, and working with, UPSOM faculty in treating patients at hospitals, including hospitals operated by defendant UPMC. UPSOM supervises, and is responsible for, all of its medical students' medical education, including this practical part of their education.

10. As part of his job as a member of the faculty of UPSOM, Plaintiff taught and worked with medical students, usually in the context of treating patients at hospitals operated by defendant UPMC.

11. UPSOM and UPMC jointly promote and operate residency programs for medical school graduates and fellowship programs for physicians who have completed their residencies. The fellowship program for which Plaintiff was the director was one such fellowship program.

12. Defendant UPP is a group medical practice that employs faculty physicians and is affiliated with, and wholly-owned by, UPMC. It supplies physician services to UPMC facilities, and at least some of its employees also serve as faculty at UPSOM.

13. Defendant Samir Saba is the Chief of the Cardiology Division in the Department of Medicine at UPSOM. He is also the head of the Heart and Vascular Institute, a part of UPMC. The actions taken by Defendant Saba described below were taken either in his UPMC role, his UPSOM role, or both. Saba supervised Plaintiff in both his Pitt and UPMC roles, and Plaintiff reported to Saba in both capacities.

14. During the relevant time period, Saba was a member of the UPP Board of Directors.

15. Defendant Kathryn Berlacher is a Professor in the Cardiology Division in the Department of Medicine at UPSOM. She is also employed by UPMC. Berlacher has general supervisory responsibility over all cardiology fellowship programs, including those that have their own program director. In addition, she is responsible for residents. Berlacher reports to Saba in both her UPSOM and UPMC capacities. The actions taken by her described below were taken either in her UPMC role, her UPSOM role, or both.

16. Defendant American Heart Association, Inc. ("AHA") is a New York not-for-profit corporation whose headquarters is in Dallas, Texas. It publishes the Journal of the American Heart Association ("JAHA"), which is published online, including in this district.

**FACTUAL BACKGROUND**

17. Like almost all faculty at UPSOM, Plaintiff has two interrelated, overlapping employment agreements, one with Pitt and one with UPP. Plaintiff's employment contract with UPP requires him to provide both academic services to UPSOM and physician services to UPMC. In his UPP employment contract, UPP delegates supervision of all of Plaintiff's activities required by the contract "both his academic activities and the physician services" to a department head at UPSOM.

18. Similarly, UPMC delegates much of the supervision of the physicians who work in its facilities to UPP and, accordingly, with respect to Plaintiff, to the same individual identified in Plaintiff's employment contract with UPP.

19. Plaintiff's employment agreement required that his primary and secondary supervisors both have Pitt appointments who supervised him in Pitt's name. A true and correct copy of documentation corroborating these Pitt connections is attached as Exhibit A.

20. In their capacity as UPSOM faculty members, Saba and Berlacher also received W-2 forms for wages earned from Pitt as Pitt employees.

21. In 2019 and 2020, Plaintiff wrote an article on diversity and the cardiology workforce, tracing the history of the use of race and ethnicity as factors in determining admission into medical schools, residency programs, and fellowships. The article asserted that the medical profession had not been successful in reaching its goals of increasing the percentages of underrepresented races and ethnicities in the medical profession generally, and cardiology in particular. It also noted that programs to achieve those goals applied different standards to applications by members of underrepresented races and ethnicities and raised questions about the legality, effectiveness, and wisdom of doing so. Finally, the article opined that the cardiology field was violating the laws against discrimination in the way it used race as a factor in hiring, recruitment, promotion, and admissions.

22. Plaintiff submitted his article to JAHA for publication. It went through JAHA's normal review and vetting process, including a review of Plaintiff's quotes, cites, and sources for accuracy. JAHA's publishers offered to publish Plaintiff's article in JAHA in exchange for Plaintiff paying $1600. Plaintiff agreed to those terms and paid $1600 to the publishers to publish the article in JAHA. The article was placed online by JAHA on March 14, 2020, and was published in a print edition on April 7, 2020. A true and correct copy of the article – *Diversity, Inclusion, and Equity: Evolution of Race and Ethnicity Considerations for the Cardiology Workforce in the United States of America from 1969 to 2019* – is attached as Exhibit B.

23. Plaintiff's article concludes with the following passage:

> As Fitzgerald envisioned, "We will have succeeded when we no

> longer think we require black doctors for black patients, chicano doctors for chicano patients, or gay doctors for gay patients, but rather good doctors for all patients." Evolution to strategies that are neutral to race and ethnicity is essential. Ultimately, all who aspire to a profession in medicine and cardiology must be assessed as individuals on the basis of their personal merits, not their racial and ethnic identities.
>
> (Endnotes omitted.)

24. Defendants UPMC and Pitt understood that Plaintiff's criticisms of admissions and selection processes were applicable to UPSOM and UPMC. That is, the article's criticism of admissions policies to medical schools included the admissions policies at UPSOM. And the article's criticism of selection processes for residents, fellowships and similar post-graduate programs was a criticism of those policies at UPMC. Defendants understood that Plaintiff's criticisms of those policies included his argument that those policies, including the admissions policy at UPSOM and fellowship selection policies at UPMC, were likely illegal.

25. Some four months later, in late July 2020, certain faculty physicians and executives employed by Defendants Pitt, UPP, and UPMC, including Saba, Berlacher, and others, learned about the existence of Plaintiff's article, and objected to his conclusions – which were potentially problematic or embarrassing for UPSOM, UPP, and UPMC, since these institutions were publicly committed to a policy of race discrimination in favor of "underrepresented in medicine" candidates. Indeed, just a few weeks earlier, the Dean of UPSOM had proposed minority scholarships which, *inter alia*, would provide guaranteed support for two black students.

26. Defendants Pitt, UPP, UPMC, Saba, and Berlacher resolved to impose adverse consequences upon Plaintiff with respect to his employment at Pitt, UPP, and UPMC as a result

of the content and ideas in his article. The actions described below were taken pursuant to that resolution.

27. Defendants' concerns about Plaintiff's criticisms and their resolve to retaliate against him were both heightened because of the ongoing social context in July 2020. As the chair of UPSOM's Department of Medicine put it, although Plaintiff's article "was written before the George Floyd events, [the] timing of the print publication could not be worse." Put another way, the fact that a member of their institutions took a public stand against Defendants' illegal affirmative action policies caused "[p]anic[] [among] doctors and staff," *Wang*, 181 F.4th at 313, lest they be associated with views that were unpopular among certain segments of society. Given these realities, Defendants felt a need to even more forcefully retaliate against Plaintiff to make a public showing of their own commitment to "anti-racism."

28. On July 31, 2020, defendants Saba and Berlacher met with Plaintiff. During the course of the conversation, Plaintiff told Saba and Berlacher, in essence, that he wanted UPSOM and UPMC to follow the law. Saba and Berlacher understood that Plaintiff meant that the selection processes for medical students at UPSOM and for the GME programs at UPMC were violating antidiscrimination law because of the racial and ethnic preferences they employed.

29. Shortly after Plaintiff told Saba and Berlacher of the illegal nature of the selection processes at UPSOM and UPMC, Saba, with Berlacher's aid and agreement, removed Plaintiff from his role as the director of the fellowship program in clinical cardiac electrophysiology.

30. In addition, Saba, with Berlacher's aid and agreement, diminished Plaintiff's job responsibilities and negatively impacted Plaintiff's professional reputation by forbidding Plaintiff

from having contact with individuals in any GME program (fellows and residents) or medical students at UPSOM, duties which were previously part of Plaintiff's job responsibilities.

31. Saba was Plaintiff's supervisor in the medical school. Accordingly, he hadat least apparent authority to preclude Plaintiff from having contact with medical students.

32. Saba, with Berlacher's aid and agreement, imposed all of these adverse consequences on Plaintiff because of the views Plaintiff expressed in his article and during the meeting on July 31.

33. Saba's supervisor or supervisors at UPMC were kept apprised of Saba's adverse employment actions with respect to Plaintiff, and approved of them.

34. Saba has the authority to reinstate Plaintiff to his position as director of the fellowship program in clinical cardiac electrophysiology and to rescind the restriction on Plaintiff's contacts.

35. Anantha Shekhar was and is Pitt's Senior Vice Chancellor for the Health Sciences and the Dean of UPSOM. He was kept apprised of Saba's adverse employment actions with respect to Plaintiff, including the prohibition on his having contact with medical students, and approved them.

36. Shekhar is an officer of Pitt and reports to Pitt's Chancellor and to its Board of Trustees.

37. Shekhar is not employed by UPMC or UPP, although he is a member of the UPMC board of directors, as well as the boards of directors of several UPMC subsidiaries, including UPP.

38. On or around August 6, 2020, Shekhar emailed a statement about Dr. Wang's article from his PittMedDean@cm.pitt.edu account to a School of Medicine listserve. The

statement asserted that the views expressed in Dr. Wang's article "do not reflect the values of the University and its School of Medicine." His staff posted the statement to the University's Twitter account.

39. Mark Gladwin was the Chair of the Department of Medicine at UPSOM, with supervisorial authority over much of the UPSOM faculty including Plaintiff, Saba, and Berlacher. He was kept apprised of Saba's adverse employment actions with respect to Plaintiff, and approved them.

40. Shortly after Plaintiff's meeting with Saba and Berlacher, Gladwin wrote a "Dear Colleague" email to the UPSOM community. It was sent in his role as the Chair of the Department of Medicine at UPSOM. Among other things, it stated that many of those in the UPSOM community might have heard about a "perspective" published by "a faculty member" at UPSOM that "was antithetical to our values and deeply hurtful to many of our URM faculty." It further stated: "We have taken immediate action and removed the person from their [sic] leadership position . . ."

41. Although Gladwin did not mention Plaintiff by name in this email, he was referring to Plaintiff and the article that was published in JAHA. That he was referring to Plaintiff was well understood in the UPSOM community that received Gladwin's email.

42. As the Chair of the Department of Medicine, Gladwin had the authority to speak on behalf of UPSOM and to state UPSOM's position on Wang's article and position.

**UPMC and Pitt Defendants' Defamatory and Retaliatory Statements**

43. In a series of further retaliatory acts, Saba, Berlacher, and other employees of Pitt and UPMC undertook a "multi-front reputation-bashing that impugned Wang's integrity as an academic." *Wang*, 181 F.4th at 318. Among other things, the campaign included defamatory and

derogatory public statements, improper efforts to cause Plaintiff's article to be retracted by its publisher, and specific efforts to harass Plaintiff into quitting his employment. These actions were all undertaken within the scope of each individual's employment and on behalf of his or her employer(s). Among other things, it was "within the scope of their employment to accuse Wang of professional incompetence, and academic dishonesty." *Id.* at 316 (alterations, quotation marks omitted).

44. Saba, Berlacher, Shekhar, and Gladwin all participated directly in the reputation-bashing and/or further failed to intervene to prevent others from harassing and attacking Plaintiff despite having knowledge of the harassment and being in positions of authority. Several examples of statements in furtherance of the campaign to discredit Plaintiff follow.

45. First, in an email he circulated to several others on July 30, 2020, Shekhar asserted that Wang's article was "pseudo-scholarly" and used "handpicked data."

46. In a July 31, 2020 email, Berlacher complained to a colleague that Plaintiff's views against affirmative action made her "[n]auseous." In another email the same day to officials at other medical schools, Berlacher asserted that Wang had "skew[ed] data" in his paper, which she characterized as "quite frankly and without question, racist."

47. On August 1, 2020, Berlacher wrote to a broad distribution of colleagues that she believed Plaintiff's views were "counter to being a physician" and that he should be entirely removed from his employment for holding those views.

48. On August 2, 2020, Saba wrote to the same distribution with advice that a campaign to "ostracize[]" Plaintiff would be more effective if it did not come from the "top-down," but was rather positioned as a "grassroot [sic] movement." Saba predicted that "the

social environment here will become untenable for [Plaintiff] and this will lead to him leaving UPMC or to his reallocation to a peripheral site."

49. On August 2, 2020, Berlacher turbocharged the "grassroot[s]" campaign by posting the following on Twitter in reference to Plaintiff's article:

> **katie berlacher**@KBerlacherAug 2, 2020
>
> @PittCardiology I'm looking at you. What do we stand for? What do you think of this OPINION piece that misinterprets data and misquotes people? @JAHA_AHA this is scientifically invalid and racist.

Berlacher then responded to her own post using the official Pitt Cardiology account as follows:

> **Pitt Cardiology**
> @PittCardiology
>
> @PittCardiology stands for diversity equity and inclusion across the board. This article uses misquotes, false interpretations and racist thinking to defend a single person's conclusion. We are outraged that @JAHA_AHA published this shameful and infuriating piece.

50. The same day, a UPMC physician tweeted in response that Plaintiff's article was but "the latest in decades of pseudo-social science pieces used to try to justify and preserve systemic racism."

51. These posts, and others, which tagged JAHA were among several early efforts to cause the retraction of Plaintiff's article. The posts contained numerous falsehoods. There was nothing "scientifically invalid" about Plaintiff's article. It did not misinterpret data. It did not include misquotes. It was not intended to justify and preserve racism. The individuals making these claims knew them to be false because they had reviewed Plaintiff's article.

52. In any event, the following day, Berlacher tweeted that "we stand united . . . [a]nd denounce [Plaintiff's] racist beliefs. No PD or faculty member w these beliefs shd work w or lead trainees."

53. Defendants' social media postings and other communications were made with the intent of creating a viral incident targeting Plaintiff, both to drive him to resign from his employment and to enhance their own standing as committed "anti-racists." Gladwin later acknowledged that the postings "created a firestorm on twitter, facebook and in all national cardiology circles." He complained that the airing of Plaintiff's views "threaten[ed] my leadership agenda."

54. On August 4, 2020, Gladwin wrote an email to a wide distribution of professors and doctors calling Plaintiff's article "racist and deeply hurtful to our URM faculty."

55. In a circulated statement sent to Barry London of the University of Iowa and the editor in Chief of JAHA, as well as others, Shekhar, Saba, and other employees and executives of Pitt, UPP, and UPMC stated that the article had "blatant" and "egregious scientific falsehoods," and "several misquotes."

56. The statements set forth above were false. There were no "scientific falsehoods," much less blatant and egregious ones in the article. There were no misquotes in the article, much less "several" misquotes. The statements made were supported by the sources cited.

57. Shekhar, Saba, and the other employees of Pitt and UPMC who made these statements knew they were false because they had reviewed Plaintiff's article and checked the quotations and citations before making their statements.

58. Nevertheless, as detailed below, the campaign against Plaintiff soon bore fruit. Plaintiff's article was not only retracted, which in itself was highly damaging to Plaintiff's

academic career, but the retraction was accompanied by several additional defamatory statements by AHA.

**AHA Retracts the Article and Defames Plaintiff**

59. Within a single day of Berlacher's first Twitter post cited above, AHA began to back away from Plaintiff's article, despite the fact that the AHA had vetted it pursuant to the usual procedures for review of all articles and had checked and confirmed the accuracy of the article's quotations, citations, and sources.

60. On August 3, 2020, Don Lloyd-Jones, the President Elect of AHA, tweeted that Plaintiff's views "do not represent AHA's core values at all," and that the article contained "unscientific[] and untrue statements [along with] deeply concerning and hurtful opinions." These claims that the article contained unscientific and untrue statements were false and made with full knowledge of their falsity.

61. The same day JAHA tweeted that it was "re-evaluat[ing]" the article, and JAHA's Editor, Barry London posted a note stating that while Plaintiff's article "claimed 'to provide an overview of policies that have been created to impact the racial and ethnic composition of the cardiology workforce, to consider the evolution of racial and ethnic preferences in legal and medical spheres, to critically assess current paradigms and to consider potential solutions to anticipated challenges,' [i]n fact, its central purpose was to argue against affirmative action, noting that Black and Hispanic trainees in medicine are less qualified than White and Asian trainees."

62. On August 5, 2020, Shekhar, Saba, and others filed a formal request for AHA to retract the article, claiming that it contained "blatant scientific falsehoods" and "many . . .

misquotes." Shekhar subsequently told Plaintiff that he had nothing to do with seeking a retraction.

63. AHA retracted the article the very same day without first providing Plaintiff with any evidence of wrongdoing or errors in the article and without providing Plaintiff any opportunity to rebut any charges of wrongdoing or errors.

64. The decision to retract Plaintiff's article immediately and without affording him even an opportunity to respond was unusual, contrary to both AHA's normal practices, and contrary to the accepted practices of academic publishers. *Wang*, 181 F.4th at 315 (failure to notify Wang of errors or give him a chance to rebut them before retraction was "questionable in the academy."). It was unprecedented in both the speed with which the decision to retract was made and the complete failure to communicate with Plaintiff about the reasons for the retraction or to ask him for a response to the particular accusations of wrongdoing.

65. In conjunction with the retraction, AHA proceeded to issue a series of defamatorystatements. In its statement announcing the retraction on August 5, 2020, AHA claimed that it was retracting Plaintiff's article because it had been provided information from UPMC:

> The author's institution, the University of Pittsburgh Medical Center (UPMC), has notified the Editor-in-Chief that the article contains many misconceptions and misquotes and that together those inaccuracies, misstatements, and selective misreading of source materials strip the paper of its scientific validity.

66. Shortly thereafter, AHA updated its retraction statement by setting forth two "samples" of the "many misconceptions and misquotes" that it purportedly found in the article. In fact, neither of those "samples" misquoted anyone. *Wang*, 181 F4th at 312-14. Indeed, in the first "sample" of a misquote, Wang's statement in the article was, in fact, "fair, accurate, and

supported his conclusion that medical-education programs were giving explicit racial preferences that arguably violated civil-rights law." *Id.* at 312. The second sample "was not a quotation" at all. *Id.*

67. Further, the claim that the two were "samples" of the "many" misconceptions and misquotes was intended to induce the readers of the updated retraction statement (and likely did induce them) to believe that there were many more such misconceptions and misquotes, which was also false. *Id.* ("There were not 'many' other misquotations—just one modest error.").

68. On August 5, 2020, AHA published a further statement on the "newsroom" section of its website, which it updated the next day. In the updated release, it claimed that the views expressed in Plaintiff's article "are a misrepresentation of the facts and are contrary to our organization's core values and historic commitment to promoting diversity and inclusion in medicine and science." AHA "denounce[d]" Plaintiff's views and expressed regret for having enabled them. It specifically claimed that Plaintiff's article was factually inaccurate, affirming it "take[s] [its] responsibility to ensure factual accuracy seriously [in the publication of JAHA]." AHA assured the public and the medical community that "[t]he Journal can and will do better[,"] in the future, to prevent the publication of other articles like Plaintiff's article, which "contain[ed] deliberate misinformation"and "misrepresentation[.]"

69. On August 8, 2020, Lloyd-Jones issued a social media post endorsing and incorporating a prior tweet by Dr. Quinn Capers. The Capers tweet, in turn, explicitly accused Plaintiff of "deliberate[ly]" "falsif[ying] data/findings" in his paper. Lloyd-Jones' and Capers' statements were false and defamatory. Plaintiff did not falsify any data or findings, much less deliberately. Lloyd-Jones and Capers made these false and defamatory statements knowing that

they were false and defamatory because they had read Plaintiff's article. Moreover, with respect to the claim that Plaintiff acted "deliberately," Lloyd-Jones and Capers acted with at least deliberate indifference to the truth or falsity of their claim. Neither made any effort to discuss these issues with Plaintiff and could not have known his state of mind.

70. A short time thereafter, AHA published an article in JAHA entitled "A Path Forward," in which it stated that Plaintiff's institution had requested the article be retracted "based on specific scientific errors as well as misleading and incomplete quotations."

71. AHA also published an article by the editors of JAHA entitled "Equity, Diversity, and Inclusiveness in Cardiovascular Healthcare and Medicine." The article asserted that Plaintiff's article "misrepresented facts in its efforts to argue against affirmative action in the field of cardiology." It further stated: "We also wish to reiterate that while we welcome independent viewpoints, it is with the goal of creating an open dialogue and not a misrepresentation of evidence."

72. The underlying statements (both the ones AHA stated itself and those it attributed to others) set forth above were false. There were no "scientific falsehoods" or "specific scientific errors," much less blatant and egregious ones in the article. There were no misquotes in the article, much less "many" misquotes. There was no "deliberate misinformation." There was no "deliberate . . . misrepresentation[]." The statements in Plaintiff's article were supported by the sources cited.

73. Plaintiff subsequently asked the editors of JAHA for a point-by-point list of the misconceptions and misquotes that led to the retraction. He received no response.

74. AHA knew that its statements – both its own and those it republished that it attributed to others – were false because it had reviewed the article prior to publication and

checked its sources, citations, and quotations and because it checked those sources, citations, and quotations after the request for retraction had been made. Moreover, even with respect to any minor error in the article, its assertion that "misinformation" and "misrepresentation" in the article was "deliberate" was recklessly indifferent to whether it was true since AHA did not know, and made no effort to learn by speaking to him, Wang's state of mind.

**Further Retaliation**

75. Plaintiff was not provided the procedural protections traditionally accorded to a Pitt faculty member. See, e.g., https://www.policy.pitt.edu/ri-07-research-misconduct-policy. Accordingly, he was unable to defend himself against the accusations and ostracization.

76. Nonetheless, there was a "backlash to the backlash." *Wang*, 181 F.4th at 309. The Tenure and Academic Freedom Committee at Pitt and the Association of American University Professors both protested Plaintiff's treatment. The United States Department of Education began an investigation of whether Pitt's treatment of Plaintiff violated Title VI because it had improperly targeted him "with a campaign of denunciation and cancellation."

77. Months later, on October 27, 2020, Shekhar withdrew the restriction on Plaintiff's contact with medical students at the university, but left the other restrictions in place.

**Ongoing Harm to Plaintiff**

78. As a consequence of each of Defendants' actions described above, Plaintiff has suffered economic damages, reputational damages, and emotional distress damages.

79. First, Plaintiff suffered immediate financial losses as a result of being demoted. Plaintiff was paid sums in addition to his base salary to be the director of the fellowship in clinical cardiac electrophysiology. Because he was removed from that position, he is no longer paid those additional sums.

80. Plaintiff was also paid sums in addition to his base salary as a "Value Performance Incentive" based on the number of wRVUs (work relative value units) he earned in excess of an annual target, with the number of wRVUs calculated based on the number of patient consultations and clinical procedures performed. Because the groups with which he consults frequently included medical students, residents, or fellows, and because he is (or was in the case of students) prohibited from contact with those individuals, Plaintiff is no longer able to consult as frequently as he did previously and has lost income as a consequence. Indeed, after the contact restrictions were imposed, it was no longer possible for Plaintiff to consult on any patients at UPMC's flagship hospital, UPMC Presbyterian.

81. Plaintiff has lost paid outside speaking opportunities because of the loss of his position as director of the fellowship program in clinical cardiac electrophysiology.

82. Plaintiff's removal from the position of director of the fellowship program in clinical cardiac electrophysiology, and severe limitations on his ability to consult, remains in effect. In the absence of injunctive relief from this Court, these adverse actions against him will continue and Plaintiff will continue to suffer both economic harm and reputational damage.

83. Plaintiff has also suffered a severe degradation in his capacity for future earnings and advancement in his chosen career.

84. For an academic, having a paper retracted is a black mark that, in and of itself, has serious negative consequences on future earnings and advancement.

85. In addition, Plaintiff's former position as a fellowship program director carried significant career-enhancing benefits, including being a high-profile leader in the field, with an expanded professional network, and enhanced credibility and recognition. By terminating

Plaintiff from that role, Defendants not only undercut those benefits, but created negative signals that will invariably work against Plaintiff throughout his career.

86. In addition, the negative statements issued against Plaintiff were widely viewed. Gladwin admitted that there was a "firestorm" on social media and the false and defamatory statements against Plaintiff issued above were viewed on the internet tens if not hundreds of thousands of times. Many of the false and defamatory statements remain accessible on the internet to this day and continue to be viewed.

87. As a direct result of Defendants' defamatory and derogatory statements, many individuals who were exposed to those statements believe falsehoods about Plaintiff, including that he misquoted sources, that he engaged in academic dishonesty, that he is a racist, and that he sought to support racism in the medical profession.

**FIRST CLAIM FOR RELIEF**
**(for retaliation in violation of state and federal civil rights statutes)**

88. Plaintiff incorporates all prior allegations.

89. Plaintiff timely filed an administrative complaint against Pitt, UPP, and UPMC with the Pennsylvania Human Relations Commission and the Equal Employment Opportunity Commission. A true and correct copy is attached as Exhibit C. He received a notice of his right to sue from the U.S. Department of Justice on March 17, 2023. A true and correct copy is attached as Exhibit D. He timely brought suit under Title VII and the PHRA.

90. UPMC retains residents and fellows by contract.

91. Pitt has a contractual relationship with students at UPSOM. It provides a medical education in exchange for tuition.

92. UPMC receives federal funds for the primary purpose of employing residents and fellows.

93. Pitt also receives federal funds.

94. Pitt, UPMC, and UPP retaliated against Plaintiff both for the contentions in the article, and during the meeting on July 31, 2020, that medical schools (including Pitt) illegally discriminated on the basis of race and national origin in their admissions policies and that graduate medical education programs (including UPMC's) illegally discriminated on the basis of race and national origin in selecting residents and fellows.

95. UPMC and UPP retaliated against Plaintiff by (1) removing him as director of the fellowship program in clinical cardiac electrophysiology, (2) precluding him from having contact with fellows, residents, and medical students, (3) defaming him, (4) ostracizing and isolating him, (5) seeking retraction of his article, and (6) campaigning to denigrate him for the views he expressed.

96. Pitt retaliated against Plaintiff by (1) precluding him from having contact with medical students, (2) defaming him, (3) ostracizing and isolating him, (4) seeking retraction of his article, and (5) campaigning to denigrate him for the views he expressed.

97. Plaintiff had a reasonable belief that UPSOM and UPMC and other similar institutions (specifically, medical schools and academic health centers) illegally discriminated against applicants to medical schools, residency programs, and fellowships on the basis of race and ethnicity and violated federal and state law.

98. UPMC's discrimination against Plaintiff violated 42 U.S.C. §§ 1981, 2000d, *et seq.*, 2000e-3(a), and the Pennsylvania Human Relations Act, 43 Pa. Stat. § 955(d).

99. Pitt's discrimination against Plaintiff violated 42 U.S.C. §§ 1981, 2000d, *et seq.*,

2000e-3(a), and the Pennsylvania Human Relations Act, 43 Pa. Stat. § 955(d).

100. Plaintiff has lost pay and will continue to lose pay as a consequence of the adverse actions taken by Defendants Pitt, UPMC, and UPP. Plaintiff has suffered damages and will continue to suffer damages as a consequence of the adverse actions taken by these defendants. Accordingly, he is entitled to both damages for past harm and injunctive and/or declaratory relief to prevent ongoing and future harm.

**SECOND CLAIM FOR RELIEF**
**(for defamation)**

101. Plaintiff incorporates all prior allegations.

102. The statements made by Defendants Saba, Berlacher, UPMC, Pitt, and AHA described earlier in this complaint were false and made with actual malice.

103. These defendants defamed Plaintiff by accusing him of professional incompetence and academic dishonesty.

104. Pitt, UPMC, Saba, Berlacher, and AHA engaged in defamation *per se*.

105. Plaintiff has suffered damages and will continue to suffer damages as a consequence of this defamation.

**DEMAND FOR JUDGMENT**

WHEREFORE Plaintiff demands judgment in his favor as well as:

A. Injunctive relief requiring Plaintiff's reinstatement as director of the fellowship program in clinical cardiac electrophysiology and precluding defendants from enforcing their prohibition restricting Plaintiff's contacts;

B. Injunctive relief requiring Defendants to issue public corrections to their prior defamatory and retaliatory statements and to remove any defamatory materials that are currently accessible on the internet or otherwise, where practicable;

C. Injunctive relief requiring Defendants to reverse the retraction of Plaintiff's paper and to issue corrective statements regarding the former improper retraction;

D. Backpay, frontpay, and compensatory and punitive damages in an amount to be determined;

E. Attorney's fees and costs pursuant to 28 U.S.C. § 1920 and 42 U.S.C. §§ 1988, 2000e-5(k), 43 Pa. Stat. § 962 or any other applicable authority; and

F. Any other relief that is appropriate.

**JURY DEMAND**

Plaintiff hereby demands a jury for all claims triable by right by a jury.

Dated: September 18, 2026

/s/ Michael E. Rosman
Michael E. Rosman (admitted pro hac vice)
rosman@cir-usa.org
James Kerwin (pro hac vice motion pending)
kerwin@cir-usa.org
Michelle A. Scott (admitted pro hac vice)
scott@cir-usa.org
CENTER FOR INDIVIDUAL RIGHTS
1100 Connecticut Ave, NW, Ste. 625
Washington, D.C. 20036
(202) 833-8400

Shawn Rodgers (PA 307598)
srodgers@goldsteinlp.com
GOLDSTEIN LAW PARTNERS, LLC
200 School Alley, Suite 5
Green Lane, PA 18054
(610) 949-0444